**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE SYNCHRONOSS TECHNOLOGIES, INC. SECURITIES LITIGATION | Civil Action No. 17-2978 (FLW) (LHG) <br><br> **CLASS ACTION** |
| This Document Relates To: <br><br> ALL ACTIONS | |

**CONSOLIDATED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................... 2

    A.   OVERALL SUMMARY OF THE ALLEGATIONS ................................ 2

    B.   BACKGROUND ON THE COMPANY .............................................. 6

    C.   DEFENDANTS' FRAUDULENT ACCOUNTING PRACTICES AND ADMISSIONS IN THE ANNOUNCEMENT OF THE NEED FOR A RESTATEMENT .................................. 8

II.   NATURE OF THE ACTION .................................................................. 13

III.  JURISDICTION AND VENUE ............................................................. 13

IV.   PARTIES .............................................................................................. 14

    A.   LEAD PLAINTIFF ....................................................................... 14

    B.   THE CORPORATE DEFENDANT .................................................. 14

    C.   THE INDIVIDUAL DEFENDANTS ................................................ 14

V.   FACTUAL BACKGROUND ................................................................. 16

    A.   SYNCHRONOSS'S BUSINESS ..................................................... 16

        1.   Company Background ..................................................... 16

        2.   The Company's Classification Of Revenues ................... 16

        3.   The Company's Revenue Growth Drivers......................... 18

    B.   SYNCHRONOSS SHIFTS TOWARD "CLOUD" SERVICES ............... 19

        1.   Synchronoss Rebrands Itself As A Leading Cloud Services Provider.................................................... 19

        2.   The Company Transforms Its Executive Compensation Policies To Emphasize Cloud Services Revenues ........................ 21

        3.   Cloud Services Growth Spikes In Late 2014 ............... 22

        4.   Cloud Services Growth Tapers Beginning In Mid-2015 And The Company Enters Joint Ventures To Bolster Financial Results, While Organic Cloud Services Growth Diminishes ................................... 23

        5.   As 2016 Cloud Services Growth Stalls, The Company Reports A $25 Million Licensing Deal ........................ 24

    C.   SYNCHRONOSS DIVESTS ITS ACTIVATION SERVICES BUSINESS, ACQUIRES INTRALINKS, AND COMPANY EXECUTIVES RESIGN ............................... 26

        1.   In Early December 2016, Synchronoss Agrees To Sell Its Activation Business To Sequential ........................ 26

        2.   On The Same Day Synchronoss Announces The Sequential Transaction, It Announces The Acquisition Of IntraLinks And

That The IntraLinks CEO Will Replace Defendant Waldis As
Synchronoss's CEO .................................................................. 27

3.   In Late December 2016, Synchronoss Recognizes $9.2 Million In
Revenue From A Licensing Agreement With Sequential But Fails
To Disclose That Fact For Several Months ............................... 27

4.   In Early February 2017, Analysts Press For Details On The
Sequential Transaction, But Defendants Rosenberger And Waldis
Continue To Conceal The $9.2 Million Sequential Licensing Fee .......... 28

5.   Synchronoss's Stock Price Drops 5% After An Investigative
Journalist Report and Synchronoss's Subsequent Disclosure That
The $9.2 Million Sequential Licensing Fee Was Included In Fourth
Quarter 2016 Revenues .............................................................. 30

6.   Defendant Rosenberger Resigns In Early 2017 And A New CFO
Takes Over ................................................................................ 31

7.   The New Synchronoss CEO and CFO Resign Within Two Months ........ 31

8.   The Company Announces, But Never Holds, A Highly Anticipated
May 2017 Earnings Conference Call ........................................ 32

9.   The Company Sells IntraLinks Less Than Nine Months After
Acquiring It And CEO Waldis Resigns Once Again ................ 33

VI.   DEFENDANTS' FRAUDULENT SCHEME TO INFLATE THE COMPANY'S
STOCK PRICE BY MANIPULATING ITS ACCOUNTING ........................ 34

A.   DEFENDANTS IMPLEMENTED A REVENUE ACCOUNTING POLICY OF "BOOK
NOW, JUSTIFY LATER" ................................................................ 34

1.   Synchronoss's Senior Management Overrode The Company's
Revenue Recognition And Billing Manager .............................. 34

2.   Premature Revenue Recognition With Respect To Verizon And
AT&T Contracts ........................................................................ 36

a.   The First Quarter 2016 Verizon Contract ...................... 36

b.   Synchronoss Declines To Attach Verizon Contracts To Its
Financial Statements As Requested In An SEC Comment
Letter In 2016 ................................................................. 37

c.   The Late 2015 AT&T Contracts .................................... 38

3.   Premature Revenue Recognition Enabled Synchronoss To Falsely
Meet Revenue Targets ............................................................... 39

B.   DEFENDANTS CONCEALED A $9.2 MILLION ONE-TIME LICENSE
AGREEMENT WITH SEQUENTIAL THAT WAS INCLUDED IN FOURTH
QUARTER 2016 REVENUES ......................................................... 40

C.   THE $25 MILLION VERIZON LICENSING FEE ............................. 43

D.   VENDOR-SPECIFIC OBJECTIVE EVIDENCE ............................... 44

|     | E. | The Company's Material Weakness In Internal Control Over Financial Reporting | 45 |
|     | F. | The Probable Effect Of The Company's Announcement Of The Need To Restate Its 2015 and 2016 Financial Reports | 46 |
| VII. |   | THE EXCHANGE ACT CLAIMS | 47 |
|     | A. | Defendants' False Or Misleading Statements | 47 |
|     |   | 1. Fourth Quarter 2015 and Full Year 2015 | 48 |
|     |   | 2. First Quarter 2016 | 50 |
|     |   | Second Quarter 2016 | 52 |
|     |   | Third Quarter 2016 | 53 |
|     |   | 3. Fourth Quarter 2016 and Full Year 2016 | 55 |
|     | B. | Additional Allegations of Scienter | 58 |
|     |   | 1. Defendants' Knowledge of and Participation in the Fraudulent Accounting Scheme Creates a Strong Inference of Scienter | 58 |
|     |   | 2. Motive and Opportunity | 59 |
|     | C. | Loss Causation | 63 |
|     | D. | Inapplicability of the Statutory Safe Harbor | 68 |
|     | E. | Presumption Of Reliance | 69 |
|     | F. | Class Action Allegations | 70 |
| VIII. |   | CLAIMS FOR RELIEF | 72 |
| IX. |   | PRAYER FOR RELIEF | 76 |
| X. |   | JURY TRIAL DEMANDED | 77 |

1.     Court-appointed Lead Plaintiff Employees' Retirement System of the State of Hawaii ("Hawaii ERS" or "Lead Plaintiff") brings this action individually, and on behalf of all persons and entities similarly situated, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, *et seq.*, for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) promulgated thereunder against Synchronoss Technologies, Inc. ("Synchronoss" or the "Company") and certain current or former Synchronoss officers, and for violations of Section 20(a) of the Exchange Act against those same officers who controlled Synchronoss.

2.     Lead Plaintiff alleges the following based on personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based on, *inter alia*, the independent investigation of Court-appointed Lead Counsel, Grant & Eisenhofer P.A., and Liaison Counsel, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., and/or third parties they have retained to assist in their investigation.  This investigation included, but was not limited to:

(a) review and analysis of (i) public filings with the U.S. Securities and Exchange Commission ("SEC") by defendant Synchronoss and others, (ii) research reports by securities and financial analysts, (iii) transcripts of investor conference calls, (iv) publicly available presentations by Synchronoss, (v) press releases and media reports, (vi) economic analyses of securities transaction and pricing data, (vii) publicly available filings by regulators, (viii) the initial class action complaints filed in this action, alleging, *inter alia*, violations of Section 10(b) of the Exchange Act, (ix) accounting standards and literature, including publications by Ernst & Young LLP, and (x) other publicly available material and data identified herein;

(b) consultation with relevant experts; and

(c) interviews of confidential witnesses who are former employees of the Company (individually, a "CW," and collectively "CWs").

3.     Lead Counsel's investigation into the factual allegations contained herein is

continuing, and many of the relevant facts are known only to the Defendants named herein, or are exclusively within their custody or control.  In particular, as discussed further below, in June 2017, Synchronoss admitted in filings with the SEC that its financial statements for fiscal years 2015 and 2016 are materially misstated, failed to comply with generally accepted accounting principles ("GAAP"), and will be restated, but has thus far, as of the date of this filing, refused to identify the particular agreements, customers, and/or transactions that are the subject of the forthcoming restatement.  Those as-yet-unidentified agreements and transactions, among other things, are the subject of the fraud committed by Defendants, as alleged further below.  Lead Counsel believe that additional evidentiary support will exist for the allegations set forth herein after the restatement is filed and after a reasonable opportunity for discovery.

## I.  INTRODUCTION

### A.  OVERALL SUMMARY OF THE ALLEGATIONS

4.      Synchronoss is a mobile technology services company traded on NASDAQ.  The Company's two senior executives — CEO Stephen Waldis and former CFO Karen Rosenberger — implemented a fraudulent scheme to conceal the Company's deteriorating financial condition.  Among other improper and unlawful tactics (described in detail below), from at least February 3, 2016 to early 2017, Synchronoss:

(a) prematurely recognized contractual revenues, thereby overstating Company revenues in fiscal years 2015 and 2016 by as much as 10%;

(b) inflated revenues by orchestrating a deal with Sequential Technology International, LLC ("Sequential") that, unbeknownst to investors, added a $9.2 million licensing fee to Synchronoss's bottom line, which the Company improperly booked as revenue in the fourth quarter of 2016, thereby helping it to falsely meet earnings targets; and

(c) issued earnings guidance that, due to, *inter alia*, accounting manipulations related to the Company's historic revenues, were falsely inflated.

5.      In an effort to obscure their fraud, in December 2016, Synchronoss announced a complete corporate transformation.  Synchronoss surprised Wall Street by borrowing $900 million to acquire another company — Intralinks Holdings, Inc. ("Intralinks") — and making Intralinks' CEO the new CEO of Synchronoss in early 2017.  In addition, CFO Rosenberger resigned (for, at the time, seemingly innocuous reasons unrelated to fraud) and a new CFO was put in place.  The Company simultaneously divested a significant portion of its traditional business segment (so-called "activation" services, as described in detail below) in the Sequential transaction.  But, shortly thereafter, the fraud could no longer be sustained as the truth began to emerge via a report by investigative journalists.

6.      In the afternoon of Friday, February 24, 2017, a news article by the Southern Investigative Reporting Foundation ("SIRF") was released that accused Synchronoss of engaging in improper transactions with Sequential, a company with which CEO Waldis had undisclosed "friends and family" connections.  On the immediately following Monday, Synchronoss disclosed, for the first time, the existence of the $9.2 million licensing fee (referenced above) that was added to Synchronoss's bottom line and booked as revenue in the fourth quarter of 2016 in connection with the Sequential transaction.  On this news, the Company's stock price sank more than 5% from a close of $30.49 on February 24, 2017 to $28.69 on February 27, 2017.

7.      As the stock reaction demonstrates, the existence of the $9.2 million licensing fee and its inclusion in 2016 revenues was important news.  Indeed, just two weeks before, during the Company's February 8, 2017 earnings conference call, analysts had been pressing Defendants Rosenberger and Waldis for full details about the Sequential transaction.  For example, one analyst asked for "details on the Sequential sale" including "a sense of the size of the revenues that you will be generating" from a particular aspect of the deal while another

3

analyst inquired about the effect of the deal on Synchronoss's revenue guidance.  In responding, Rosenberger and Waldis misleadingly concealed both the existence of the $9.2 million licensing fee and the fact that it had been included in fourth quarter 2016 revenues; in addition, they also left unchanged and reiterated the 2017 revenue guidance figures they had previously announced during a December 6, 2016 earnings conference call when the Sequential transaction was first announced.

8.     The Sequential fraud was merely the tip of the iceberg, however.  Less than two months after the former Intralinks CEO and new CFO took charge at Synchronoss, they abruptly resigned at the end of April 2017 and the Company simultaneously announced a considerably large miss of earnings guidance issued by former management (*i.e.*, Defendants Waldis and Rosenberger) just a short time earlier.  This announcement caused the Company's stock price to **plummet 46% in one day** to close at $13.29 on gargantuan trading volume, and shortly thereafter, prompted a leading Wall Street analyst to write in an analyst report:

> Ultimately, the question we (and everyone) need to ask is '**What exactly did the former executives see that caused them to abruptly leave***?*'

9.     The answer came shortly after the resignations.  Despite the Company's innocuous explanations for the executive departures, Synchronoss ultimately admitted, beginning in June 2017, that its quarterly and annual financial statements *for the previous two years* (fiscal years 2015 and 2016) were false and would need to be restated, and further acknowledged that Synchronoss's revenue in 2015 and 2016 had been overstated by *as much as 10%* due to violations of fundamental accounting rules.  In other words, Synchronoss's 2015 and 2016 revenues were overstated by **more than $105 million**.  The revelation of this accounting fraud ultimately caused the stock price to plummet from more than $30 per share in late February 2017 (when, as referenced above, investigative journalists first cracked the Sequential story) to $11.26

per share in June 2017 (when the Company first announced the need for a restatement). This plunge of more than 60% of the stock's value wiped out over $870 million in shareholder value in less than four months.

10.     Not all Synchronoss shareholders suffered, however. Company insiders pocketed large gains before the plunge. In fact, while ordinary investors sustained tremendous losses as they remained unaware of Defendants' fraud, Company management collectively unloaded at least $14 million worth of Synchronoss stock in insider trading sales during the Class Period.[1] Defendant Waldis sold 221,486 shares during the Class Period for proceeds exceeding $6.6 million (net of the aggregate exercise price of options) while Defendant Rosenberger sold 29,583 shares for proceeds exceeding $800,000 (net of the aggregate exercise price of options).

11.     Rosenberger's insider trading suspiciously ramped up just prior to her resignation. At the same time the Company was, unbeknownst to investors, fraudulently recognizing $9.2 million in licensing fee revenue from the Sequential transaction, Rosenberger sold 14,000 shares on December 27 and 28, 2016 at prices above $39.50 per share for proceeds of $230,694.01 (net of the aggregate exercise price of options). This late December jettison of 14,000 shares dwarfed Rosenberger's prior sales in December, as she had sold 0 shares in December 2015, 0 shares in December 2013, 50 shares in December 2012 and 2,749 shares in December 2014. Rosenberger's suspiciously timed share dump continued into early 2017 as she unloaded another 12,453 shares in the first two months of 2017 (from January 1 through February 21) at prices ranging from $38.84 to $32.64 for $429,040, which was 200% to 300% more than the volume of shares she had sold during that same time frame in 2014, 2015, and 2016, and substantially more than she had sold during that same time frame in 2013.

---

[1] The Class Period extends from February 3, 2016 to June 13, 2017, as discussed further below.

12. Thus, in total, $659,734 of Rosenberger's $800,000 in sales proceeds during the approximately 16-month Class Period — more than 80% — occurred within a less-than-two-month period (*i.e.*, from December 27, 2016 to February 21, 2017) immediately prior to her resignation and the bottom falling out when the stock took a 46% single-day nose dive to $13.29 per share in April 2017. Tellingly, while prior Synchronoss-insider sales were made in *all* months *throughout* the calendar year (as discussed further below), no Company insider has sold a single share since then.

## B.   BACKGROUND ON THE COMPANY

13. Synchronoss was founded in 2000 by Defendant Waldis, a former AT&T executive. He also became a former Synchronoss (chief) executive when the Intralinks CEO took over, but reassumed his position when the new CEO abruptly resigned after becoming privy to internal records that ultimately necessitated a restatement of two years' worth of false financial results reported during Waldis's and Rosenberger's tenures as CEO and CFO, respectively. While Rosenberger is now out of the industry completely,[2] Waldis was back in control as CEO of the Company that he founded for a short time, but he resigned as CEO once again on November 16, 2017.

14. In 2000, to take advantage of the rapidly growing market for services involving mobile devices (*e.g.*, cell phones), Waldis positioned Synchronoss to provide mobile device activation and customer relations services to commercial carriers, and in particular to AT&T. Broadly speaking, when a consumer purchased a new cell phone with AT&T as its service provider, Synchronoss would provide "soup to nuts" service to AT&T, including software technology licenses, which enabled the consumer to simply open the box, automatically activate

---

[2] The Company stated that Rosenberger resigned to "pursue other opportunities"; her Facebook and LinkedIn pages currently indicate that she "started new job at Hand and Stone Facial Spa."

the cell phone and troubleshoot any issues using a customer service call center provided by or through Synchronoss. Depending substantially on its core relationship with AT&T, from which it derived the bulk of its revenues, Synchronoss focused on such activation services from 2000 to its initial public offering in 2006, and then for about six years thereafter into 2012.

15.     In or about 2013, to offset slowing growth in its activation services business—particularly in light of the expiration of AT&T's five-year agreement with Apple, under which AT&T alone would distribute and service iPhones from 2007 to 2012—Synchronoss started to rebrand itself as a consumer and enterprise "cloud" services provider in 2013.  The "cloud" is a network of remote servers hosted on the Internet and used to store, manage, and process data in place of local servers or personal computers.  Similar to "activation" services revenues, "cloud" revenues were generated through, *inter alia*, software subscription and licensing revenue and revenue from the provision of related services.

16.     Through acquisitions, the Company had initially established a small presence in the "cloud" market in the early 2010s.  Its cloud services segment enjoyed explosive growth in 2013 and 2014, quickly outpacing activation services to become the Company's key driver of growth.  By 2015, for the first time, cloud services reportedly generated a greater portion of the Company's total annual revenues than activation services.  Not surprisingly, Wall Street analysts in 2015 and 2016 began to look closely at cloud revenues as a key indicator of the Company's growth and profitability.  Indeed, the Company was so keenly aware of Wall Street's focus on the cloud business that it acknowledged in its April 2016 proxy statement that "[f]rom time to time, our stock has declined due to investors' concerns around our customer concentration and the ability of our telecommunication's cloud strategy to succeed…."  Thus, success in its cloud business was vital to maintaining the Company's stock price, and the Company and Company

management were well aware of that reality.

17.     In addition, success in the cloud services market also became integral to executive compensation.  In 2014, Synchronoss changed its compensation policy to make success in the Company's cloud segment a substantial component of management compensation.  Indeed, the Company's 2014 Proxy Statement noted that even though revenues rose 28% in 2013 versus 2012, the Company's executive officers received a mere 25% of their incentive compensation targets because the targets were not focused on the proper mix of business.  So the Company performed a "clean slate" review of its compensation policies and revised them by, *inter alia*, adding cloud revenue as a performance metric for long-term incentive compensation awards. Thus, as discussed in detail below, in addition to insider trading profits, Waldis and Rosenberger and the rest of the Synchronoss management team were positioned to benefit substantially from artificially inflating revenues, particularly revenues related to the "cloud" segment.

18.     With "cloud" now firmly embedded in the Company's executive compensation philosophy, the Company's transformation from primarily an activation business to a cloud services enterprise culminated in the December 2016 divestiture of the bulk of Synchronoss's activation business to Sequential.  But as briefly discussed earlier and explained further below, the Sequential transaction included a $9.2 million licensing agreement that was concealed from investors to falsely meet fourth quarter and full-year 2016 earnings targets.  When SIRF blew the whistle about the Sequential transaction in February 2017, a cascade of events ensued, revealing a much wider fraud, and ultimately the announcement that two years' worth of the Company's financial reporting was false and will need to be restated.

### C.     DEFENDANTS' FRAUDULENT ACCOUNTING PRACTICES AND ADMISSIONS IN THE ANNOUNCEMENT OF THE NEED FOR A RESTATEMENT

19.     Defendants' accounting fraud was committed in part because the Company's

cloud services segment could not maintain the staggering growth rates reported in 2013, 2014, and 2015.  Between 2014 and 2016, the Company needed to secure new service contracts with its existing cloud services customers, including Verizon and AT&T, to generate growth.  But the Company manipulated accounting rules and processes to make it appear that it was meeting financial targets when, in reality, it had missed them badly.  Rather than truthfully disclose that the Company would not meet its financial targets, Defendants' statements throughout the Class Period concealed their fraudulent accounting practices.  As discussed below, far from disclosing how the Company was actually reporting its revenues, the Company repeatedly stated that, *inter alia*, it complied with GAAP and had effective internal controls over financial revenue reporting processes.  These statements, among others, were false or misleading (as the Company has now acknowledged in announcing a restatement), and artificially inflated Synchronoss's stock price. As Synchronoss's stock reached artificially inflated values in the $30's and $40's during the Class Period, enabling insiders to cash out substantial amounts of shares and otherwise enriching executives with incentive compensation to which they were not legitimately entitled, the Company was secretly resorting to fraudulent practices, such as the Sequential licensing transaction and other significant GAAP violations described below.

20.     Synchronoss has now admitted to two years' worth of GAAP violations. Specifically, in announcing the need for a restatement in June 2017, the Company admitted in an SEC filing that its 2015 and 2016 financial statements should not be relied upon and that revenue was overstated by as much as 10% because, as the Company described it in its SEC filing, there were misstatements:

> concerning revenue recognition in connection with certain licensing transactions. The Company has determined that revenues from each of the applicable [but unspecified] transactions should be recognized ratably over the term of the license

contract or netted as part of the consideration transferred in connection with purchase accounting.

21.     Synchronoss further admitted in this same SEC filing that, contrary to its representations throughout the Class Period, there was a "material weakness in internal control over financial reporting relating to its revenue recognition process at December 31, 2016" and that "the Company may identify additional material weaknesses."  In management presentations to analysts held shortly after this SEC filing, the Company withdrew its previous 2017 annual guidance and reiterated that the restatement will address "certain license transactions which were originally recognized as a perpetual license to either netting the license as part of purchase accounting or spreading the license ratably over an extended period," though Synchronoss continued its refusal to identify the specific transactions, customers, and agreements at issue.

22.     Although the Company has consistently refused to identify the transactions that are the subject of the need for the restatement, it is highly likely that Synchronoss's accounting for the $9.2 million licensing fee in the Sequential transaction is a subject of the forthcoming restatement.  As discussed earlier, the Company initially concealed the very existence of the licensing fee from shareholders, and then only belatedly — after the whistleblower report questioning the Sequential transaction — disclosed its existence and the fact that it had been surreptitiously included in fourth quarter 2016 revenues.  By failing to disclose that its fourth quarter 2016 and full-year 2016 financial results benefited from a material, $9.2 million one-time entry, the Company not only misrepresented its financial condition but also violated GAAP.

23.     More specifically, the $9.2 million licensing fee should not have been recognized as revenue because it was a component of the transaction to sell the activation business to Sequential.  In fact, the restatement is likely to demonstrate that the Company essentially (and improperly) financed its own revenue.  Specifically, as discussed further below, the Company

provided to Sequential a "Seller's Note" of $83 million to finance the sale of the business to Sequential.[3]  Having paid reduced purchase consideration due to the Seller's Note, Sequential's capital was "freed up" to enter into the license transaction.

24.     Accounting Standards Codification ("ASC"), the source of U.S. Generally Accepted Accounting Principles, 985-605-55-4 provides:

> [A] group of contracts or agreements may be so closely related that they are, in effect, parts of a single arrangement and should be viewed as one multiple-element arrangement when determining the appropriate amount of revenue to be recognized….

Thus, the $9.2 million fee should have been considered additional purchase consideration from Sequential, rather than revenue.  Recognizing the $9.2 million licensing fee as revenue in the fourth quarter of 2016 violated GAAP.

25.     Aside from the Sequential transaction, it is highly likely that the need for the restatement involves Synchronoss's accounting for transactions with Verizon, one of its largest customers.[4]  For example, Synchronoss resolved to book millions of dollars in revenue in the first quarter of 2016 purportedly flowing from a contract with Verizon that, according to CW1, a former Synchronoss employee who was interviewed by Lead Counsel's investigators, apparently had not been signed at the time the revenue was booked.  Recognition of such revenue in a financial quarter prior to a contract even being signed is a blatant violation of GAAP.  ASC 985-605-25-17 states that:  "revenue shall not be recognized on any element of the arrangement unless persuasive evidence of an arrangement exists."  ASC 985-605-25-16 states:  "If the

---

[3] A "Sellers Note" is a form of debt financing in which the seller (here Synchronoss) agrees to receive a portion of the purchase price as a series of installment payments from the buyer (here Sequential).

[4] A June 13, 2017 JP Morgan analyst report expresses frustration that the Company failed to specify the transactions at issue and states that a licensing deal with Verizon is likely involved.

vendor has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties."

26.     Such an improper accounting practice could not happen by accident.  As revealed by CW2, also a former Synchronoss employee who was interviewed by Lead Counsel's investigators, the Company had a revenue recognition accounting system in place, including a dedicated Revenue Recognition and Billing Manager with responsibility for substantiating and validating revenue streams.   The revenue substantiation process required submission of documentation proving that, *inter alia*, the transactions generating the revenue in fact exist and meet all applicable accounting standards warranting recognition.   This process could be circumvented or overcome only by, or with the approval of, senior Company executives.  Indeed, in the instance detailed by CW1 (referenced above), Defendant Rosenberger inquired at an April 2016 internal meeting held at the Company's Bridgewater, New Jersey headquarters about *whether* a certain $5 million Verizon contract had been signed yet, when the Company had **already recognized that revenue** in the quarter ending on March 31, 2016.  CW1 also believes that there may be internal Company emails discussing whether this Verizon contract was signed prior to the close of first quarter of 2016, corroborating this account.

27.     Synchronoss's fraudulent revenue booking practices were not limited to Verizon contracts.  Such practices also occurred relating to AT&T, the other of Synchronoss's two largest customers.   According to CW2, Synchronoss booked revenues of approximately $7 million in connection with two AT&T purchase transactions in late 2015 that did not occur.  CW2 was expressly tasked by Company management *in 2016* with finding a way to justify the revenue numbers that had already been reported in 2015.

## II.  NATURE OF THE ACTION

28.     The claims asserted herein are based on the foregoing facts, among others set forth below, and arise under the Exchange Act.

29.     The Exchange Act claims are brought by Lead Plaintiff individually and on behalf of all persons and entities who, between February 3, 2016 (the date the Company announced its false or misleading fourth quarter and full year 2015 financial results) and June 13, 2017 (the date of the last corrective disclosure), inclusive (the "Class Period"), purchased or otherwise acquired the securities of Synchronoss, and were damaged thereby (collectively, the "Class").

## III. JURISDICTION AND VENUE

30.     The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

31.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Defendant Synchronoss maintains an office in this District. Many of the acts and transactions that constitute violations of law complained of herein took place in this District.

33.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV. PARTIES

### A.   LEAD PLAINTIFF

34.   Lead Plaintiff Hawaii ERS is a public pension fund providing retirement, disability, survivor, and other benefits to more than 119,000 members, including retirees, beneficiaries, inactive vested members, and active public employees working for the State and counties of Hawaii, including police officers, firefighters, teachers, professors, emergency medical technicians, and other State and county employees.   Hawaii ERS is responsible for managing over $14 billion in assets.   Hawaii ERS purchased shares of Synchronoss stock at artificially inflated prices as set forth in Appendix A during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein.   On September 5, 2017, this Court appointed Hawaii ERS as Lead Plaintiff for this litigation.

### B.   THE CORPORATE DEFENDANT

35.   Defendant Synchronoss is a Delaware corporation with its principal executive offices located at 200 Crossing Boulevard, 8th Floor, Bridgewater, New Jersey 08807.   The Company's primary business is mobile technology services.   Synchronoss securities are traded on NASDAQ under the symbol "SNCR."

36.   According to the Company's 2016 Form 10-K filed with the SEC on February 27, 2017, as of February 16, 2017 there were 45,998,579 shares of common stock outstanding.

### C.   THE INDIVIDUAL DEFENDANTS

37.   Defendant Stephen G. Waldis is the founder, Chief Executive Officer, and Executive Chairman of Sychronoss.   Waldis was the Company's CEO from its inception in 2000 until January 19, 2017, when he resigned as CEO.   Waldis was reappointed as CEO on April 27, 2017, when his successor, Ronald Hovsepian (the former CEO of IntraLinks), resigned as CEO.

14

38.     Defendant Karen L. Rosenberger is the former Chief Financial Officer and Executive Vice President of Synchronoss.   Rosenberger was the Company's CFO from April 2014 until February 27, 2017.  Prior to her appointment as CFO, Rosenberger was the Company's Chief Accounting Officer and Senior Vice President from January 2012 until April 2014.

39.     Defendants Waldis and Rosenberger are collectively referred to herein as the "Individual Defendants."

40.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's public statements. In addition, the Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Synchronoss's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.   The Individual Defendants were provided with copies of the Company's reports, press releases, and other public statements alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false or misleading statements pleaded herein, as those statements were each "group-published" information, the result of their collective actions.

15

## V.  FACTUAL BACKGROUND

### A.   SYNCHRONOSS'S BUSINESS

#### 1.   Company Background

41.   Synchronoss is a mobile technology services company co-founded in 2000 by Defendant Waldis.  Defendant Waldis began his career with AT&T, holding a variety of technical, product management, and sales and marketing positions with that company prior to founding Synchronoss.

42.   When Synchronoss completed its initial public offering in June 2006, it branded itself as an e-commerce software provider serving the communications industry.  At that time, its principal product was the "ActivationNow" software platform, a technology designed to automate the process of activating mobile devices and to facilitate delivery of communications services.  In 2005, the year prior to its IPO, it derived approximately 80% of annual revenues from its "long-standing relationship" with AT&T/Cingular Wireless.

#### 2.   The Company's Classification Of Revenues

43.   During the Class Period, the Company had two primary lines of business: Activation Services and Cloud Services.  Activation Services include mobile and other device activations and related services.  Cloud Services include device and content management and backup services for both personal and commercial customers.  The Company announces revenues associated with each line of business separately.

44.   The Company classifies its revenues into four categories: (a) transaction fees, (b) subscription fees, (c) professional services, and (d) licensing.  In reporting revenues for these categories, it aggregates transaction revenues with subscription revenues, and professional services revenues with licensing revenues.  All four categories can include revenues generated in both the Activation Services and Cloud Services lines of business.

45.     Synchronoss's transaction and subscription revenues derive from contracts that extend up to 60 months from execution.  Transaction and subscription revenues account for a greater portion of total revenues than professional services and licensing revenues.  For example, transaction and subscription revenues accounted for 77% of revenues for 2014 and 71% of revenues for 2015.

46.     Transaction revenues are principally based on a contractual price per transaction and include a variety of transactions, such as processing orders, setting up and activating accounts, porting telephone numbers, running credit checks, and performing inventory management.

47.     Subscription revenues are based on term contracts and include enterprise portal management services on a subscription basis, maintenance agreements on software licenses, active user fees and software-as-a-service fees, hosting and storage fees, and related maintenance support for those services.

48.     Synchronoss represents in its 2015 and 2016 Form 10-K filings that it recognizes transaction revenues "based on the total number of transactions processed at the applicable price established in the relevant contract."

49.     Synchronoss represents in its 2015 and 2016 Form 10-K filings that it recognizes subscription revenues "on a straight-line basis over the life of the contract or on a fixed monthly fee based on a set contracted amount."

50.     Professional services include process and workflow consulting services and development services.  Synchronoss represents in its 2015 and 2016 Form 10-K filings that it accounts separately for professional services revenues derived from transaction or subscription agreements "when the professional services have value to the customer on a standalone basis and

there is objective and reliable evidence of fair value of the professional services."  When accounted for separately, Synchronoss represents that such revenues are recognized "as services are performed and all other elements of revenue recognition have been satisfied."

51.     Licensing includes arrangements with other companies for use of Synchronoss software products or platforms.  Synchronoss represents in its 2015 and 2016 Form 10-K filings that it recognizes such revenues "when the license is delivered to our customers and all of the software revenue recognition criteria are met."

### 3.     The Company's Revenue Growth Drivers

52.     Historically, AT&T was Synchronoss's most important Activation Services customer.  For example, while AT&T had an exclusivity agreement with Apple, under which AT&T alone would distribute and service iPhones from 2007 to 2012, Synchronoss handled iPhone activations for AT&T, among other things.

53.     While the Company's Activation Services business has declined over time, its Cloud Services business has expanded.  The Cloud Services business has grown rapidly, showing enormous year-over-year growth—even exceeding 100% growth in certain quarters. By 2015, the Company's cloud business generated greater annual revenues than its activation business for the first time.

54.     Activation Services accounted for 54% of revenues in 2014, 46% of revenues in 2015, and 33% of revenues in 2016.  Cloud Services accounted for 46% of revenues in 2014, 54% of revenues in 2015, and 67% of revenues in 2016.

55.     Throughout the Class Period, Synchronoss's largest customers were Verizon and AT&T.  Contracts with Verizon and AT&T accounted for 73% of total revenues in 2014, 75% of total revenues in 2015, and 62% of total revenues in 2016.

56.     During the Class Period, Synchronoss's growth strategy focused on providing

18

new services to its existing customers rather than marketing to new customers, primarily because its existing customers were captive—they have already incurred substantial expenses in adopting Synchronoss's infrastructure, making termination and replacement of Synchronoss an extremely expensive proposition—while new customers would be required to incur significant expenses to transition to Synchronoss.

57.     Synchronoss's growth strategy also included aggressively pursuing acquisitions. For example, during the Class Period, Synchronoss acquired F-Secure Corporation's ("F-Secure") personal cloud storage business for $60 million in February 2015; SnapOne, Inc., a consumer cloud services company, in mid-2015; OpenWave Messaging ("OpenWave"), a messaging, security, and identity management firm servicing telecommunications carriers, for $125 million in March 2016; and, as discussed earlier, IntraLinks, a developer of virtual data room and document sharing software, for $821 million in January 2017.

58.     Synchronoss also acquired Voxmobili, S.A. ("Voxmobili"), an address book software developer primarily servicing European telecommunications carriers, for $26 million in July 2014.

### B.     SYNCHRONOSS SHIFTS TOWARD "CLOUD" SERVICES

#### 1.     Synchronoss Rebrands Itself As A Leading Cloud Services Provider

59.     Until 2012, Synchronoss described itself as "a mobile innovation company that provides activation and mobile content management solutions."   In 2013, it began describing itself as "the mobile innovation leader that provides personal cloud solutions and software-based activation for connected devices across the globe."

60.     The Company's rebranding as a leading cloud services provider was substantially complete by the third quarter of 2013, when the Company reported enormous growth in the cloud segment.

61.     As a Deutsche Bank analyst noted in early 2014, "After years of perception as an AT&T-focused story, SNCR has successfully refocused investors on new products and growth in the Personal Cloud segment, where Verizon Wireless is the biggest customer . . . ."

62.     As Defendants knew, the Company's Cloud Services segment was the main driver of the value of its stock price throughout the whole Class Period.  The Company's public statements, including financial reports and earnings guidance, reflect its focus on Cloud Services, and Company executives repeatedly acknowledged that Cloud Services offered greater growth opportunities than Activation Services.

63.     For instance, Company press releases and earnings calls accompanying quarterly or annual filings routinely included statements from Defendants Waldis and Rosenberger to that effect:

   a. In the press release issued February 5, 2015, Defendant Waldis stated, "We believe that our expanding cloud services customer base, coupled with greater opportunities for subscriber adoption and utilization, provide a long runway for growth in this dynamic market."

   b. Similarly, Defendant Waldis stated in an April 29, 2015 Company press release, "During the quarter, both sides of our business contributed to the strong performance, particularly our Cloud Services, which grew by 63% year-over-year.  Mobile Operators around the world are capitalizing on the success of how personal cloud can drive important benefits to their valuable subscribers.  We are pleased with our successful formula for helping our customers gain adoption and success with our personal cloud platform."

   c. Defendant Waldis stated in a July 29, 2015 Company press release that, "Each of our businesses performed well in the quarter and we were pleased to see some of our new wins begin to scale and drive volumes, particularly on the cloud side.  We are gaining strong traction among international mobile operators who are increasingly realizing the significant value Synchronoss's white-label cloud solution can deliver to their subscribers."

   d. On the April 29, 2015 earnings call, Defendant Rosenberger stated:  "Our cloud business is the principal driver to the increased total revenue forecast [for full year 2015]."

e. On the October 28, 2015 earnings call, Defendant Waldis stated: "[O]ur cloud business, launched in 2011, was a majority of our revenue in the third quarter, exceeded an annualized run rate of $300 million and grew over 30% for the quarter. The success of our cloud initiative has expanded our customer base, added a highly profitable revenue stream and demonstrated our ability to get into new markets and scale them fast."

64.     Indeed, the Company was so keenly aware of Wall Street's focus on the cloud business that it acknowledged in its April 2016 proxy statement that "[f]rom time to time, our stock has declined due to investors' concerns around our customer concentration and the ability of our telecommunication's cloud strategy to succeed…."

### 2.     The Company Transforms Its Executive Compensation Policies To Emphasize Cloud Services Revenues

65.     In 2014, Synchronoss introduced policies to make success in the Cloud Services business a substantial component of executive and management compensation.

66.     The Company's 2014 Proxy Statement, dated April 21, 2014, noted that although total revenues increased by 28% in 2013 versus 2012, with an operating income margin of 23%, the Company's executive officers received "only 25%" of their incentive compensation targets because the targets were not focused on the proper mix of business—that is, the targets were not focused on growth in Cloud Services, which the Company had by then recognized as the primary revenue driver of the Company as a whole.

67.     Accordingly, the Company performed a "clean slate" review of its compensation policies and revised them by, *inter alia*, adding Cloud Services revenues as a "Strategic Performance Metric" for long-term incentive compensation awards.  The Company's stated purpose in doing so was to tie executive compensation to targets likely to "improve stockholder value," acknowledging that Cloud Services had become the *de facto* revenue and growth driver of the whole Company.

68.     With this transformation in executive compensation policy, the Company strongly incentivized executives, including Defendants Waldis and Rosenberger, to ensure that the Cloud Services business continued to meet, or appear to meet, revenue targets.

### 3.     Cloud Services Growth Spikes In Late 2014

69.     Cloud Services revenues were up 75% in the fourth quarter of 2013 and up 48% for full-year 2013, growing at over twice the rate of Activation Services.

70.     The segment continued its explosive growth in 2014, growing 83% year-over-year in the first quarter and 74% year-over-year in the second quarter.  The Company increased its full-year 2014 guidance based primarily on the strong growth in Cloud Services in the first two quarters of 2014.  Indeed, in those quarters, Activation Services growth was flat or down compared to growth in the first half of 2013.

71.     In the very next quarter following the Company's introduction of a new executive compensation policy taking Cloud Services performance into account as a key metric, Synchronoss announced record-breaking growth in that segment.

72.     Driven by Cloud Services revenues, Synchronoss's third quarter 2014 results, announced on October 28, 2014, far exceeded its own projections.  In that quarter, Cloud Services grew a staggering 115% year-over-year, prompting the Company to again raise its guidance in its October 28, 2014 announcement.

73.     On that date, the price of the Company's shares jumped from a close of $46.59 on October 27, 2014, to $51.95 on October 28, 2014, on substantial volume exceeding 2 million shares.

74.     Cloud Services continued the trend in the fourth quarter of 2014, growing 61% year-over-year, yielding a hefty total year-over-year 2014 growth rate of 82%.

75. At the start of 2015, the Company continued to aggressively grow its Cloud Services business. In the first quarter, the segment grew 63% compared to first quarter 2014, prompting the Company to yet again increase its guidance on the strength of the Cloud Services performance.

### 4. Cloud Services Growth Tapers Beginning In Mid-2015 And The Company Enters Joint Ventures To Bolster Financial Results, While Organic Cloud Services Growth Diminishes

76. Cloud Services grew 54% year-over-year during the second quarter of 2015, and 31% in the third quarter. With its slowing—though still impressive—Cloud Services growth rates, Synchronoss indicated in October 28, 2015 statements that cloud projects with major customers, including AT&T, T-Mobile, and BT, were just getting started and should be expected to reignite the segment's historical growth rates. In response to a question about growth of the Company's cloud business as a result of deals with AT&T and T-Mobile, Defendant Waldis stated: "[I]t's a great question, to feel comfortable that we can maintain what we believe to be good growth rates. If these [deals] end up materializing quicker, because of the adoption rate shoot up, which we believe has the capability, but not guarantee in any of the accounts, then we have an opportunity to do better than that."

77. In late 2015, Synchronoss formed two joint ventures to expand its role in cloud technology markets. It formed SNCR, LLC, a joint venture with Goldman Sachs, in November 2015, and Zentry, LLC, a joint venture with Verizon, in December 2015.

78. SNCR, LLC was formed to develop "advanced mobile solutions leveraging proprietary secure enterprise mobility technology" contributed by Goldman Sachs as well as Synchronoss's WorkSpace platform.

79. Synchronoss obtained a 67% interest in SNCR, LLC in exchange for a perpetual license for the use of the WorkSpace platform.

80.     Goldman Sachs obtained a put option to sell its share of SNCR, LLC to Synchronoss, and Synchronoss obtained a call option to require Goldman Sachs to sell its share of SNCR, LLC to Synchronoss.  Goldman Sachs has a "redeemable non-controlling interest" in SNCR, LLC.  SNCR, LLC is a variable interest entity ("VIE"), of which Synchronoss is the primary beneficiary.

81.     The second JV, Zentry, LLC, was formed to develop and manage a secure mobile user identification and authentication platform.

82.     Synchronoss contributed $48 million to obtain a 67% interest in Zentry, LLC.

83.     Synchronoss's co-venturer, Verizon, obtained a put option to sell its share of Zentry, LLC to Synchronoss after December 31, 2018, and Synchronoss obtained a call option to require Verizon to sell its share of Zentry, LLC to Synchronoss after December 31, 2018. Verizon has a "redeemable non-controlling interest" in Zentry, LLC.  Zentry, LLC is not a VIE.

84.     On December 31, 2015, Zentry, LLC entered into a $23 million perpetual license agreement with a Verizon subsidiary for the use of certain Verizon user authentication software.

85.     Synchronoss's Cloud Services growth was reported to be up again in the fourth quarter of 2015, showing a year-over-year growth rate of 43%.

86.     However, the Company subsequently disclosed in its 2015 Form 10-K that $20.3 million of fourth quarter revenues were attributable to its joint ventures with Goldman Sachs and Verizon.  Taking this attribution into account, organic growth in the Cloud Services segment actually continued to slow, with only a 11% year-over-year growth rate for the quarter.

**5.      As 2016 Cloud Services Growth Stalls, The Company Reports A $25 Million Licensing Deal**

87.     In 2016, the Company struggled to keep pace with the rapid growth in Cloud Services revenue reported in 2013, 2014, and the first half of 2015.  The first quarter of 2016

showed modest growth of 18% year-over-year in the Cloud Services business, and the Company reported 33% growth in the second quarter, 34% growth in the third quarter, and 36% growth in the fourth quarter.

88.     During the third quarter 2016 earnings call held on November 7, 2016, Defendant Waldis announced that the Company "signed a $25 million license deal with Verizon during the quarter." Defendant Rosenberger confirmed during the same call that:

> our cloud business has hit an inflection point, as our previously stated strategic initiatives at Verizon on the Personal Cloud front enabled us to further expand our addressable market at this key customer with a $25 million license deal signed and recognized in the quarter.

89.     The $25 million Verizon license deal helped the Company to report substantial growth in the third quarter of 2016.  Synchronoss reported $101.9 million in Cloud Services revenue and $176.4 million in total revenue in that quarter.  In the absence of the $25 million Verizon license deal, Cloud Services revenue would have been $76.9 million and total revenue would have been $151.4 million.  Year-over-year, such results show that neither Cloud Services nor total operations had, in fact, grown much at all, because third quarter 2015 Cloud Services revenue was $76.1 million and third quarter 2015 total revenue was $150.9 million.  Given analysts' and the market's focus on the Company's cloud services revenue growth, improperly booking revenue from the Verizon contract to maintain artificially inflated cloud services and total revenue growth helped to keep Synchronoss's stock price artificially high.

90.     At a subsequent earnings call for the fourth quarter of 2016, held February 8, 2017, an attendee, Samad Samana of Stephens, Inc., asked Defendant Waldis for more details about the $25 million Verizon license deal:

> The Verizon, the $25 million payment that was announced last quarter.  We have been told that, that is a new product or a new initiative.  Is that separate from what

you're talking about at Mobile World Congress on the analytics side, or is that the same announcement?  Maybe help us understand that?

Defendant Waldis responded:  "Two different things.  The Verizon opportunity is a relationship that you will hear more about in Q1 [of 2017] that is not publicly announced."

C. **SYNCHRONOSS DIVESTS ITS ACTIVATION SERVICES BUSINESS, ACQUIRES INTRALINKS, AND COMPANY EXECUTIVES RESIGN**

1. **In Early December 2016, Synchronoss Agrees To Sell Its Activation Business To Sequential**

91.     Throughout 2016, Activation Services revenues were negative year-over-year (*i.e.*, declining in growth) or flat (*i.e.*, roughly equivalent in growth).

92.     On November 7, 2016, the Company announced on its quarterly earnings call that it was reviewing strategic alternatives concerning its Activation Services segment.

93.     Less than a month later, it had formed an agreement to sell 70% of the Activation Services segment to a new company, Sequential, that according to the February 24, 2017 SIRF article, is owned primarily by "friends and family" members of Synchronoss executives, including Defendant Waldis.

94.     Sequential was formerly known as Omniglobe, which was owned in part by Defendant Waldis.  At the time of the transaction, Sequential was owned and controlled by, among others, friends and family of Defendant Waldis, including former co-owners of Omniglobe.

95.     Under the terms of the deal, as announced on December 6, 2016, Synchronoss would retain a 30% stake in the Activation Services business and receive $146 million from Sequential.

96.     Sequential also funded the bulk of its acquisition of Synchronoss's Activation Services business with a Seller's Note from Synchronoss in the amount of $83 million.  Stated

differently, Synchronoss fronted Sequential nearly 60% of the purchase price.  As the Company disclosed in the 2016 Form 10-K, Sequential paid only $18.1 million in cash to consummate the transaction.

97.     The Company also disclosed its intent to divest the remaining 30% ownership stake in the Activation Services segment during the 2017 fiscal year.

> **2.      On The Same Day Synchronoss Announces The Sequential Transaction, It Announces The Acquisition Of IntraLinks And That The IntraLinks CEO Will Replace Defendant Waldis As Synchronoss's CEO**

98.     The Company's divestiture of its Activation Services business occurred simultaneously with its acquisition of IntraLinks, a cloud services provider.

99.     On the very same day the Company announced that it would divest its Activation Services business in the Sequential transaction, it announced that it had agreed to acquire IntraLinks in an all-cash tender offer of $13 per share, or $821 million.

100.    Synchronoss funded the IntraLinks deal with proceeds from the Sequential transaction and $900 million in new debt.

101.    In connection with the IntraLinks acquisition and Sequential divestiture, Synchronoss announced that Defendant Waldis would soon step down from his position as CEO and that Ronald Hovsepian, head of IntraLinks, would assume that position.

> **3.      In Late December 2016, Synchronoss Recognizes $9.2 Million In Revenue From A Licensing Agreement With Sequential But Fails To Disclose That Fact For Several Months**

102.    Unbeknownst to investors, in connection with the Sequential transaction, Synchronoss and Sequential had entered into a software license agreement under which Sequential obtained a perpetual license for certain analytics software products owned by Synchronoss, which Synchronoss had valued at $9.2 million.

103.    Synchronoss booked this $9.2 million licensing revenue in the fourth quarter of 2016, but did not disclose that fact until after the aforementioned SIRF investigative report surfaced in late February 2017.  After the SIRF article, the Company included mention of the $9.2 million agreement in its 2016 Form 10-K filed with the SEC on February 27, 2017.

104.    Between December 6, 2016 and February 26, 2017, Defendants had several opportunities to disclose the Sequential license agreement and the associated $9.2 million valuation, which was added directly to fourth quarter 2016 Cloud Services revenue, but failed to do so.

105.    For example, on December 6, 2016, Synchronoss filed a Form 8-K including a 16-page slide deck entitled "Welcome to Synchronoss 3.0: IntraLinks Acquisition Overview and Activation Divestiture," which outlined the terms of the Sequential transaction.  The 8-K and the slide deck failed to disclose the license agreement.

106.    On January 5, 2017, Synchronoss filed a Form 8-K containing preliminary financing materials relating to the IntraLinks acquisition and Sequential transaction.  This 8-K also failed to disclose the licensing agreement.

### 4.    In Early February 2017, Analysts Press For Details On The Sequential Transaction, But Defendants Rosenberger And Waldis Continue To Conceal The $9.2 Million Sequential Licensing Fee

107.    The Company announced its fourth quarter 2016 financial results on February 8, 2017, issuing a Form 8-K and press release and hosting an investor conference call.  The Company addressed the Sequential transaction in the Form 8-K and press release, and Defendants Waldis and Rosenberger each addressed the Sequential transaction during the conference call—including in their responses to questions about the transaction from attendees.  Once again, no mention of the licensing arrangement was made, as detailed below.

108.   On the February 8 conference call, Tavis McCourt, an analyst with Raymond James & Associates, Inc., specifically asked Defendant Rosenberger the following:

> Then just some details on the Sequential sale.  Can you give us a sense of the size of the revenues that you will be generating from Sequential for providing them services during the transition period, and maybe the margins on those revenues and the timing of when you would expect them to go away?

Defendant Rosenberger answered:

> I can give you some information on that, Tavis.  I think as we went through the transaction we had talked about the fact that we were going to provide ongoing services for a three-year term to Sequential Technologies.  Obviously contractual, around $30 million in revenue per year over the next three years associated with those services.  As far as margins, et cetera, we don't give those details, but it's clearly consistent with our mix of business.

109.   In response to a follow-up question concerning "the terms on the $83 million receivable in terms of is there a due date on that," Defendant Rosenberger stated:

> One thing I would really note on any of the Sequential Technologies information that made it to our balance sheet is obviously it's a partnership with Sequential, but we are anticipating that they will likely refinance that over the next couple of quarters. . . .

110.   Defendant Waldis supplemented Defendant Rosenberger's response, stating:

> "That's right.  There's a couple of things.  One is that when we did the original financing and we ran a process with various different folks, one of the things we did we kept to a small group because we didn't want any, obviously, on the financing side.  We expect them to refinance.  They're in the process of that already.  In fact, we had mentioned about our 30% ownership in the entity being cashed out or sold out is the expectation during 2017. . . .

111.   A different analyst, Samad Samana from Stephens, Inc., asked Defendants for more detail about the Sequential deal and the $32 million transition services agreement payment:

> I actually wanted to follow up on the $32 million payment.  I am curious, when you gave the original $520 million of cloud revenue guidance for calendar 2017, did that assume the $32 million services agreement?  Or how much of this analytics revenue that is now being put into cloud was previously in activations? I guess I'm trying to bridge the map [sic] of guidance didn't change but there this

[sic] $32 million payment now that you're getting.  Help me understand where that was classified before, or where you thought that would be classified into.

112.   Defendant Rosenberger responded to Mr. Samana's question as follows: "No, this is new analytics revenue, as we talked about.  Clearly the $32 million is part of a TSA [transition services agreement] arrangement, but it is all around the analytics."

113.   In each of the foregoing exchanges, Defendants Waldis and Rosenberger had ample opportunity to disclose the Sequential licensing agreement and its $9.2 million contribution to fourth quarter and full-year 2016 revenues, but instead concealed it.[5] Defendants' scheme to conceal the one-time $9.2 million Sequential licensing fee, and the fact that it had been included in fourth quarter 2016 revenues, began to unravel with publication of the SIRF article.

> **5.  Synchronoss's Stock Price Drops 5% After An Investigative Journalist Report and Synchronoss's Subsequent Disclosure That The $9.2 Million Sequential Licensing Fee Was Included In Fourth Quarter 2016 Revenues**

114.   According to its website, SIRF is an investigative journalism concern that was launched in 2012 with the goal of providing in-depth financial investigative reporting for the common good.  SIRF conducted an investigation related to the Sequential transaction.  On February 24, 2017, SIRF published an article entitled "*Synchronoss Technologies: The Friends and Family Plan*" in which it raised substantial questions about the Sequential transaction and concluded that "Synchronoss's public statements about the Activation unit's buyer [*i.e.*, Sequential] are incomplete, at best."

115.   After the SIRF article was published, prompting the Company to disclose in its 10-K, for the first time, that fourth quarter 2016 revenues were artificially boosted by the $9.2

---

[5] During the call, Synchronoss also announced that Rosenberger would be stepping down as CFO, but would remain in that position going forward until a replacement could be found.

million licensing fee, the Company's stock price sank more than 5% from a close of $30.49 on February 24, 2017 to $28.69 on February 27, 2017.

### 6. Defendant Rosenberger Resigns In Early 2017 And A New CFO Takes Over

116. On February 14, 2017, the Company announced that Defendant Rosenberger's previously announced intention to resign as CFO was now official and she would resign effective April 1, 2017. The press release stated that Rosenberger resigned to "pursue other opportunities."

117. Defendant Rosenberger's Facebook and LinkedIn pages state that she presently works for and/or owns a spa in Virginia. She is no longer a public company CFO.

118. In a press release dated February 27, 2017, the Company announced that IntraLinks' CFO, John Fredericks, had been appointed CFO of Synchronoss, effective immediately. In a subsequent Form 8-K, filed on March 2, 2017, Synchronoss disclosed that Mr. Frederick's compensation package includes an annual base salary of $425,000, annual performance bonus of up to 80% of his salary, $450,000 in restricted stock, and a target value of $1.9 million in long-term incentives.

119. The March 2, 2017 Form 8-K also stated that Defendant Rosenberger was awarded a severance package including a payment of $1,203,681, a transition payment of $200,000, and a three-month consulting arrangement for which she would be paid $580,000.

### 7. The New Synchronoss CEO And CFO Resign Within Two Months

120. On March 30, 2017, the Company announced details surrounding recently appointed CEO Hovsepian's compensation package, including his salary of $609,000 with a 110% performance bonus, 156,515 stock options, 54,780 restricted shares, and 54,780 performance shares for 2017.

121.    Less than a month later, on April 27, 2017, the Company announced that Messrs. Hovsepian and Frederick, the CEO and CFO of Synchronoss, respectively, would resign to "pursue other interests" and simultaneously announced a large miss of earnings guidance issued by former management (*i.e.*, Defendants Waldis and Rosenberger) just a short time earlier, which as noted above, caused the Company's stock price to plummet 46% in one day.

122.    In connection with their resignations, Messrs. Hovsepian and Frederick received lump-sum payments of $3.2 million and $1.2 million, respectively.  Mr. Hovsepian was also awarded a two-year consulting agreement under which he would receive $750,000 per year.

123.    According to his LinkedIn page, Mr. Frederick presently holds a position as a trustee for a preparatory school in Maryland.  He is no longer a public company CFO.  Mr. Hovsepian's present employment status is not known.

124.    Defendant Waldis was re-appointed CEO on April 27, 2017.  Lawrence Irving, the Company's former CFO from 2001 to July 2014, was re-appointed CFO on the same day.

### 8.    The Company Announces, But Never Holds, A Highly Anticipated May 2017 Earnings Conference Call

125.    The April 27, 2017 announcement also stated that the Company would hold a conference call on May 9, 2017 to discuss financial issues and presumably the host of problems that had been disclosed.

126.    An April 27, 2017 analyst report by Stephens Inc. summarized the situation as follows:

> **May 9th conference call could provide more clarity**.  Over the last five months, SNCR has divested its primary legacy business (Activation Services), bet the farm on another large business (IntraLinks), re-classified revenue without making it clear to investors and then providing some details well after the fact, flip flopped CEOs, lost/fired two CFOs, and underperformed against implied expectations and consensus estimates.  All of these actions have resulted in significantly more questions than answers about the future of the business.  We hope to get more

clarity when the leadership team reports final 1Q results on May 9th around the strategic direction of the company….

127.    That conference call was never held.  Instead, as discussed earlier herein and in more detail further below, the Company canceled the call, and subsequently announced the need to restate two years' worth of its financial statements due to widespread GAAP violations that have resulted in its financial statements for 2015 and 2016 overstating revenues by up to 10%, or more than *$105 million*.

### 9.    The Company Sells IntraLinks Less Than Nine Months After Acquiring It, And CEO Waldis Resigns Once Again

128.    On November 16, 2017, the Company announced that, after buying IntraLinks only nine months earlier, it had sold IntraLinks to a private equity firm and CEO Waldis would, once again, be stepping down as CEO.

129.    According to a November 16, 2017 *Dow Jones Institutional News* article, the holders of a majority of Synchronoss's $226 million in convertible bonds maintain that the sale of IntraLinks constituted a sale of "substantially all of Synchronoss's assets" and breached the borrowing covenants in the governing indenture.

130.    As of the filing date of this complaint, the Company's restatement still has not been filed with the SEC.  The Company has also not filed Forms 10-Q for the quarters ended March 31, June 30, and September 30, 2017 with the SEC.  On November 20, 2017, the Company filed a Form 8-K with the SEC disclosing that it remains subject to delisting by NASDAQ due to "its delayed filing of the Company's Forms 10-Q for the quarters ended March 31, June 30, and September 30, 2017 with the SEC."  The Company further disclosed that it will seek a hearing to stay delisting from NASDAQ and that "[a]t the hearing, the Company will present its plan to regain compliance with the Rule and will request the continued listing of its

common stock on Nasdaq while it works to become current in its periodic public filings with the SEC."

## VI. DEFENDANTS' FRAUDULENT SCHEME TO INFLATE THE COMPANY'S STOCK PRICE BY MANIPULATING ITS ACCOUNTING

131.    In part because the Company could not sustain the break-neck pace of growth that the Cloud Services segment initially showed, Defendants resorted to accounting manipulation in order to meet or exceed their financial projections and earnings guidance statements.   In this way, as detailed herein, Defendants managed to artificially prop up the Company's stock price.

132.    The financial results and guidance statements issued by the Company during the Class Period were materially false or misleading because they were tainted by Defendants' practice of improperly and prematurely recognizing revenues.  The Company improperly booked revenues that purportedly derived from contracts or agreements that had not been signed at the time the revenue was booked, and prematurely booked revenues from contracts or agreements that should have been recognized ratably over several quarters or years.  As explained below, these practices included, *inter alia*, contracts with Verizon and AT&T — Synchronoss's two largest customers — in addition to the Sequential licensing transaction.

### A.   DEFENDANTS IMPLEMENTED A REVENUE ACCOUNTING POLICY OF "BOOK NOW, JUSTIFY LATER"

#### 1.    Synchronoss's Senior Management Overrode The Company's Revenue Recognition And Billing Manager

133.    Throughout the Class Period, the Company had a revenue recognition accounting process in place designed to validate and substantiate projected revenues from customer agreements, software licenses, and other contracts.  As stated earlier, the Company employed a dedicated Revenue Recognition and Billing Manager, who was responsible for confirming the

accuracy of recorded revenue streams and the propriety of recognizing revenues.  The Revenue Recognition and Billing Manager was formerly a senior auditor for a major accounting firm.

134.    According to CW2—a long-time Synchronoss employee at the Vice President level, with over eight years' experience at the Company, who was responsible for overseeing contracts with the Company's largest customers through 2016, including the AT&T relationship, and who reported directly to the Company's Executive Vice President/General Manager tier— only senior Company officers were capable of overriding the Revenue Recognition and Billing Manager, or bypassing the revenue recognition accounting process entirely.

135.    According to CW2, the Revenue Recognition and Billing Manager routinely demanded from the employees responsible for overseeing the relevant client relationships all documentation substantiating revenues from new contracts, licenses, or other agreements, as well as any other information necessary to establish the appropriate timing of the recognition of such revenues.

136.    This system of "checks-and-balances" was overridden by senior management during the Class Period.  As detailed below, when the Company's actual quarterly revenues fell short of its projections or market expectations, senior management selectively disabled this validation system to conceal the shortfall and artificially inflate revenues.

137.    Defendants' selective "book now, justify later" philosophy enabled the Company to prematurely book revenues and meet or exceed its financial projections and earnings guidance statements, as well as the expectations of investors and market analysts, but, according to CW2, the practice also repeatedly caused Synchronoss to scramble to make the Company's financial reports seem legitimate to auditors.  Indeed, as alleged below, in 2016, CW2 was expressly tasked with making revenue figures from 2015 appear legitimate.

138.   Ultimately, this unlawful approach to booking revenues culminated in the Company's need to restate its quarterly and annual financial reports for 2015 and 2016.

### 2.   Premature Revenue Recognition With Respect To Verizon And AT&T Contracts

139.   According to CWs, Synchronoss booked revenues from contracts or agreements that were not yet signed as of the closing of the reporting period in which the revenue was recognized, or from contracts or agreements that were never signed.

140.   Among other things, the practice of recognizing revenues from contracts or agreements that have not yet been signed violates ASC 985-605-25-3, which establishes basic revenue recognition criteria for software licenses.  Subpart 3a provides that revenue may only be recognized when "[p]ersuasive evidence of an arrangement exists."  Similarly, ASC 985-605-25-17 provides that "revenue shall not be recognized on any element of the arrangement unless persuasive evidence of an arrangement exists."

141.   Software revenue recognition guidelines published by the Company's own auditors, Ernst & Young LLP (revised September 2016), state further that:

> If a vendor's customary practice is to obtain signed contracts to evidence an arrangement, revenue recognition is precluded if a contract signed by both parties is not in hand at the end of an accounting period, even if the contract is executed soon thereafter and management believes that execution of the contract is merely perfunctory.  Letters of intent, memoranda of understanding and similar documents are not acceptable evidence of the arrangement.

142.   As discussed below, Defendants flouted these common-sense rules that revenues must not be recognized unless and until the underlying contract or agreement is executed.

### a.   The First Quarter 2016 Verizon Contract

143.   According to CW1, a CPA and certified fraud examiner previously employed by Synchronoss as a financial analyst with responsibility for revenue forecasting, and who has direct knowledge of the Company's revenue recognition accounting practices, Synchronoss improperly

and prematurely recognized $5 million in cloud software licensing revenue purportedly derived from an agreement with Verizon in the first quarter of 2016.  However, no such agreement was signed in that quarter.

144.    Synchronoss's recognition of this revenue enabled it to report Cloud Services revenues exceeding its first quarter 2016 guidance and to bolster the purported growth of the segment driving the Company's stock price.

145.    According to CW1, this Verizon deal was only in initial discussion phases in March 2016, and was still unsigned in April 2016, after the quarter closed.  Moreover, there were discussions, of which CW1 is aware, between Rosenberger and Synchronoss's Executive VP and General Manager regarding *whether* the Verizon contract had yet been signed that occurred during April 2016, which was *after* the close of Synchronoss's 2016 first quarter.  CW1 also believes that there may be internal Company emails discussing whether this Verizon contract was signed prior to the close of first quarter of 2016.

> **b.    Synchronoss Declines To Attach Verizon Contracts To Its Financial Statements As Requested In An SEC Comment Letter In 2016**

146.    In commenting on Synchronoss's disclosures during the Class Period, the SEC specifically asked that Synchronoss disclose to shareholders significant Verizon contracts, but the Company flatly refused.

147.    More specifically, in a comment letter dated September 2, 2016, the SEC questioned Synchronoss's revenues from AT&T and Verizon, its largest customers, and requested that Synchronoss publicly disclose its contracts with Verizon as exhibits to future filings.

148.    Synchronoss refused to attach the contracts in response to the SEC's request.  In its response dated September 16, 2016, the Company stated that "it does not believe that any

individual contract between it and Verizon is one upon which the Company's business is substantially dependent."

149.    The SEC responded by letter dated September 22, 2016, requesting further information about the Company's contracts with Verizon.

150.    In the Company's response, dated October 6, 2016, the Company once again declined to attach any contracts with Verizon to its financial reports.

151.    The Company's refusals are telling.   Had particular Verizon contracts been released publicly, the dates that the contracts were entered into – or more particularly, the dates that they were *not* entered into – may have become public, thereby potentially making Defendants' fraud detectable by the public.   In part because the Company declined to produce the contracts, investors were kept in the dark.

### c.    The Late 2015 AT&T Contracts

152.    According to CW2, the former Vice President responsible for overseeing contracts with the Company's largest customers through 2016, Synchronoss booked revenues of approximately $7 million in connection with two AT&T purchase transactions in late 2015 that did not occur.   CW2 was expressly tasked by Company management with finding a way to justify the numbers in 2016.

153.    The only basis for these revenues, which were recognized in 2015, is an email from an AT&T employee indicating that AT&T would proceed with the underlying purchase transactions.   However, the deal never materialized, and no contract was signed.   Nevertheless, the Company booked the revenue.

### 3. Premature Revenue Recognition Enabled Synchronoss To Falsely Meet Revenue Targets

154. On each of these occasions, the improperly recognized revenues enabled the Company to meet its revenue targets and/or projections.

155. As alleged above, in the fourth quarter of 2015, organic revenue growth in the Cloud Services segment was only 11%, or less than $7 million.[6]  Accordingly, the Company's selective recognition of $7 million of revenues from AT&T deals that did not go through—at least in that quarter, if ever—alone enabled the Company to show Cloud Services growth in that quarter.

156. Similarly, the Company's improper recognition in the first quarter of 2016 of $5 million of revenues from a Verizon deal that was not consummated in that quarter, if ever, facilitated its achievement of its target for that quarter, but concealed that fact from investors.

157. Specifically, after the market closed on May 5, 2016, the Company provided guidance of $142-$147 million in non-GAAP revenue for the first quarter of 2016, and reported $145.6 million in non-GAAP revenue for the quarter.  After this news, Synchronoss's stock price surged from a close of $28.90 on May 5, 2016, to a close of $34.90 on May 6, 2016, on substantial volume exceeding 1.7 million shares.  If the $5 million in improperly recognized revenue had not been included in first quarter 2016 revenue, the Company would have missed its earnings guidance for the quarter.

---

[6] Fourth quarter 2014 Cloud Services revenue was approximately $63.4 million.  Fourth quarter 2015 Cloud Services revenue grew 11% year-over-year after adjusting for the Company's joint ventures with Goldman Sachs and Verizon, as alleged above.

**B.**     **DEFENDANTS CONCEALED THAT A $9.2 MILLION ONE-TIME LICENSE AGREEMENT WITH SEQUENTIAL WAS INCLUDED IN FOURTH QUARTER 2016 REVENUES**

158.     A further example of the Company's inappropriate accounting and financial reporting practices is its failure to disclose the perpetual license agreement with Sequential purportedly formed on December 22, 2016, under which it booked revenues of $9.2 million in the fourth quarter of 2016, but concealed that fact from investors.

159.     Unbeknownst to shareholders, these revenues enabled the Company to meet its guidance for the quarter and the 2016 year.   However, by withholding that the revenues represented a one-time item rather than organic growth, the Company inaccurately led the market to believe that its Cloud Services segment grew significantly more than it had in fact during that quarter and year.

160.     In reality, once the $9.2 million in revenues associated with the Sequential license agreement is backed out of the fourth quarter and full-year 2016 financial results, the Cloud Services segment showed significantly slowing growth.

161.     Moreover, under ASC 985-605-55-4, which was discussed earlier herein, the Company was required to account for all components of the December 2016 Sequential transaction in the aggregate.

162.     Under that standard, the $9.2 million license agreement constitutes a part of a single multiple-element arrangement rather than a separate, standalone transaction.   Where a group of contracts or agreements are formed between the same software vendor and customer— as in Synchronoss's agreement to divest 70% of its Activation Services business to Sequential in December 2016—the standard requires the vendor to account for the component agreements as part of a multiple-element arrangement rather than separate transactions.

40

163.    The factors to be considered under ASC 985-605-55-4 in determining whether a contract or agreement is a part of a multiple-element arrangement or a separate transaction are:

    a.  The contracts or agreements are negotiated or executed within a short timeframe of each other;

    b.  The different elements are closely interrelated or interdependent in terms of design, technology, or function;

    c.  The fee for one or more contracts or agreements is subject to refund, forfeiture, or other concession if another contract is not completed satisfactorily;

    d.  One or more elements in one contract or agreement are essential to the functionality of an element in another contract or agreement;

    e.  Payment terms under one contract or agreement coincide with performance criteria of another contract or agreement;

    f.  The negotiations are conducted jointly with two or more parties (for example, from different divisions of the same entity) to do what in essence is a single project.

164.    In forming the December 2016 divestiture arrangement, Synchronoss and Sequential negotiated and executed a number of component agreements at or around the same time, including (a) the $146 million purchase price, (b) the proportion of the Activation Services business that would be divested in the transaction, (c) the $83 million Seller's Note issued by Synchronoss, (d) the three-year, $32 million-per-year transition fee payable by Sequential, and (e) the $9.2 million perpetual license agreement.

165.    These different elements are "closely interrelated in terms of design [or] function" in that all are oriented toward the completion of the divestiture of the Company's Activation Services business to Sequential.  For the same reason, these component agreements all seek to carry out "what in essence is a single project."

166.    Had Defendants complied with ASC 985-605-55-4, rather than recognizing the $9.2 million from the licensing agreement as additional revenue, the $9.2 million would have

been considered additional consideration for the price of Sequential's purchase of an interest in Synchronoss's Activation business.

167.    However, even if the $9.2 million license agreement qualifies under ASC 985-605-55-4 as a standalone transaction warranting separate recognition of this revenue, which it does not, the value assigned by Defendants—$9.2 million—has no objective basis.

168.    According to the Company's 2016 Form 10-K, this value was determined using "a cost approach, which calculates the time and effort required to recreate the technology today. Inputs used to value the license are considered Level 3 inputs."

169.    Level 3 inputs are subjective estimates made by management, and are widely recognized as the most uncertain class of valuation inputs.

170.    To fairly value a software license—such as the transaction in which Synchronoss furnished a license to Sequential for use of certain analytics software—in accordance with GAAP (ASC 845), vendor-specific objective evidence ("VSOE") of fair value of the software must exist.

171.    According to the E&Y revenue recognition guidelines, "In practice, it would be rare for a vendor to demonstrate VSOE of fair value of software products (as such products are rarely sold individually and not along with other elements, such as PCs)."

172.    Defendants tacitly acknowledged that no VSOE of fair value of the licensed analytics software exists because the license was valued using only Level 3 (subjective) inputs. Accordingly, the $9.2 million license revenue recognized in the fourth quarter of 2016 lacks any objective basis and was not computed in accordance with GAAP, even if the underlying license agreement qualifies under ASC 985-605-55-4 as a standalone agreement—which it does not.

173. On June 13, 2017, the Company disclosed that its forthcoming restatement would correct previously recognized revenue to "net" that revenue "as part of the consideration transferred in connection with purchase accounting." Later, in a presentation to investors on June 22, 2017, the Company shed slightly more light on the impacted transactions. Specifically, the Company disclosed "[t]he restatement primarily corrects certain license transactions which were originally recognized as a perpetual license to either netting the license as part of purchase accounting…" While Synchronoss withheld details regarding the actual transaction(s) at issue, together, these disclosures strongly point to the Sequential transaction as one of the accounting errors requiring correction. That is, the Company's 2016 Form 10-K identifies only one transaction recognized as revenue on a perpetual basis, the Sequential licensing transaction. Further, the Sequential transaction was entered into concurrent with a transaction requiring purchase accounting—the divestiture of 70% of the Activation business—providing further evidence that the Sequential licensing transaction will be a basis for the forthcoming restatement.

### C. THE $25 MILLION VERIZON LICENSING FEE

174. In the wake of the Company's announcement that it would restate its financial statements—and the Company's decision to withhold the identity of the specific contracts, licenses, and other agreements that prompted the restatement—securities analysts who follow the Company have offered informed estimates of the agreements likely to require accounting reevaluation.

175. In a June 13, 2017 report, Sterling Auty of JP Morgan Securities, LLC stated that, "While no specific contract or companies were listed [in the Company's restatement announcement,] the only transaction in this timeframe that would appear to make sense to net out would be the licensing deal that came around the same time frame as the company's acquisition of the authentication business from Verizon."

176.     On information and belief, the $25 million Verizon license deal announced by Defendants Waldis and Rosenberger during the third quarter 2016 earnings call, held November 7, 2016, is one of the revenue sources that will be reevaluated in the forthcoming restatement. The basis for this allegation includes (a) the Company's failure to identify the contracts, licenses, or other agreements that will be reevaluated in the forthcoming restatement, (b) Mr. Auty's informed estimate that this license may require reevaluation, and (c) that the basis for the Company's restatement appears to center around the Company's improper early recognition of substantial portions of revenue from licenses, of which the $25 million Verizon license is the largest publicly disclosed example.

### D.     VENDOR-SPECIFIC OBJECTIVE EVIDENCE

177.     In connection with the fraud, from 2015 to 2016, Defendants flouted software licensing revenue recognition rules under GAAP by prematurely recognizing licensing revenues in the quarter in which the license agreement was formed, rather than ratably over the life of the agreement.  Specifically, U.S. GAAP requires that in order to recognize revenue upfront from an arrangement comprising an up-front delivery of software, followed by provision of services over time, the company must have vendor-specific objective evidence ('VSOE") that supports allocating a portion of the price received to the delivery of the software and a portion of the price to the ongoing services.  In the absence of such VSOE, pursuant to ASC 985-605-25-10, "the entire fee shall be recognized over the period during which the services are expected to be performed."  The Company's disclosures to date strongly indicate that the Company did not have such VSOE, and accordingly, it will be required to restate its financials to reflect recognition of substantial portions of revenue that it previously recognized upfront, ratably over the life of the contract.

178.     Revenue recognition was the first Critical Accounting Policy listed amongst the Company's such policies.  The Company's description of this critical policy assured investors GAAP was applied as follows, "When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered elements." Thus, the Company was aware that evidence of VSOE, or standalone value, was critical to its ability to report revenue on an upfront basis.

179.     Indeed, on September 25, 2014, the Chief Accountant of the SEC's Enforcement Division stated "VSOE is a critically important component in determining the timing in which software companies recognize revenue, and JDA's internal accounting controls surrounding VSOE were inadequate in various ways."   In addition, in an April 2008 publication, Synchronoss's own auditor, Ernst & Young wrote: "The SEC staff continues to challenge registrants in the technology industry to demonstrate whether they have sufficient support for their assertions that such evidence of fair value exists."   Thus, it was well known within the industry in which Synchronoss operates that having sufficient VSOE is critical for purposes of recognizing revenue.

### E.     THE COMPANY'S MATERIAL WEAKNESS IN INTERNAL CONTROL OVER FINANCIAL REPORTING

179.     In combination, these repeated errors raised questions regarding the integrity of Synchronoss' internal control over financial reporting ("ICFR"). Indeed, the Company has also admitted that its previous claims to have effective ICFR also require correction.  Specifically, the Company's ICFR was exposed to a material weakness.

180.     The Company has thus far withheld detail regarding the basis for its determination that revenue on the Sequential transaction and other revenue associated with purchase and

licensing transactions was in error.  Nevertheless, on its face, the recognition of revenue on these transactions would appear to have only been possible if the Company's ICFR was ineffective. That is, a properly functioning ICFR would have prevented, or detected and corrected, these violations of GAAP.

181.    This situation was exactly in-line with the Company's circumstances.  That is, the Sequential license agreement was finalized on December 22, 2016.  This was the exact same date that the sale of the activation business occurred.

182.    The above-referenced provision in GAAP exists to address form-over-substance issues where two parties engineer an outcome to obtain advantageous financial reporting.  In this instance, the Company stood to benefit by reporting additional revenue as opposed to an element of the purchase accounting for its activation business.

183.    Accordingly, it was imperative for the Company to demonstrate the license agreement had standalone value to support the amount of revenue recognized.  The Company's auditor's guidance indicates that it would be "rare" for a company to able to demonstrate such standalone value.  The Company, however, claimed to have performed such an analysis relying on Level 3 inputs, a term in GAAP used to describe unobservable inputs. (ASC 820-10-20)  The restatement will likely reveal that analysis as a sham.

### F.    THE PROBABLE EFFECT OF THE COMPANY'S ANNOUNCEMENT OF THE NEED TO RESTATE ITS 2015 AND 2016 FINANCIAL REPORTS

184.    As a direct result of the improper accounting practices described in Sections VI.A-D, the Company admitted that its quarterly and annual financial reports for 2015 and 2016 were materially misstated and should no longer be relied upon.

185.    As discussed above, on June 13, 2017, the Company disclosed that it had "identified a material weakness in internal control over financial reporting related to its revenue

recognition process at December 31, 2016," and that its quarterly and annual financial reports for 2015 and 2016 overstated revenues by up to 10% per year.

186.    Synchronoss's reported revenues were approximately $578,831,000 in 2015, and $476,750,000 in 2016.[7]

187.    Accordingly, the Company admitted that its 2015 revenues were inflated by up to approximately $57,883,100; and that its 2016 revenues were inflated by up to approximately $47,675,000.

188.    In total, therefore, Synchronoss overstated its revenues for the 2015-2016 period by up to $105,558,100.

## VII.  THE EXCHANGE ACT CLAIMS

### A.    DEFENDANTS' FALSE OR MISLEADING STATEMENTS

189.    During the Class Period, Defendants issued materially false or misleading statements, including (a) statements describing revenues for the current quarter, preceding quarter, year-to-date, or prior year-to-date, (b) guidance statements projecting revenues for the impending quarter or year, (c) the statement that the Company's financial statements have been prepared in accordance with GAAP, (d) statements describing the Company's accounting practices respecting revenue recognition, and (e) Sarbanes-Oxley certifications attesting to the truth and accuracy of the Company's financial reports, and the existence and effectiveness of the Company's internal controls over financial reporting and disclosures.  These statements, and others, as detailed below, were false or misleading.

---

[7] Synchronoss adjusted its 2015 revenues in its 2016 Form 10-K to "exclude discontinued operations for the divestiture of the Company's [carrier activation] business in the fourth quarter of 2016."  It reported adjusted 2015 revenues of approximately $428,117,000.

### 1.     Fourth Quarter 2015 and Full Year 2015

190.     The Company announced its fourth quarter 2015 financial results on February 3, 2016.  The Company's press release reported revenues "[o]n a GAAP basis" of "$157.2 million, representing an increase of 21% compared to the fourth quarter of 2014."   The press release further reported gross profits of $90.2 million, income from operations of $15.4 million, net income of $5.3 million, and diluted earnings per share of $0.12 for the fourth quarter of 2015 compared to $0.30 for the fourth quarter of 2014, all on a GAAP basis.  The press release also stated:   "Cloud Services revenue accounted for $90.9 million of non-GAAP revenue, representing approximately 58% of total non-GAAP revenue and growing 43% on a year-over-year basis."

191.     On the Company's February 3, 2016 earnings call, Defendant Rosenberger stated: "[L]et me turn to the guidance starting with the full year 2016. Non-GAAP revenues are expected to be in the range of $655 million to $680 million."   Defendant Rosenberger further stated:

> (a) "Turning to the first quarter. We are currently targeting non-GAAP revenues in the range of $142 million to $147 million."; (b) "Our non-GAAP Cloud Services revenue in the fourth quarter was $90.9 million, which represented 58% of our total revenue and year-over-year growth of 43%."; and (c) "we currently anticipate our Cloud Services revenue will be in the range of $378 million to $391 million or growth of 24% at the midpoint of our range."

192.     In its Form 10-K for the year ended December 31, 2015, which was signed by Defendants Waldis and Rosenberger on February 26, 2016, and filed with the SEC on February 26, 2016, Synchronoss reported net revenue of $578.831 million and income from operations of $79.590 million.  The Form 10-K also stated:  "our consolidated financial statements . . . have been prepared in accordance with U.S. GAAP."

48

193.     The following statement appeared in the Forms 10-K issued by the Company for 2015 (and 2016), which were signed by Defendants Waldis and Rosenberger and filed with the SEC on February 26, 2016, and February 27, 2017, respectively:

> Revenue from software license arrangements is recognized when the license is delivered to our customers and all of the software revenue recognition criteria are met. When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered elements. We determine VSOE for each element based on historical stand-alone sales to third-parties.

194.     In certifications attached as exhibits to the 2015 Form 10-K and signed by Defendants Waldis and Rosenberger on February 26, 2016, Defendants Waldis and Rosenberger made certifications that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The certifications further stated:

> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have:  (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; (b) Designed such internal control over financial reporting, or caused such control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

195.     The foregoing statements in ¶¶ 190 through 194 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked as revenue substantial portions of the value of contracts in the current quarter (and for full-year 2015), which should have been recognized ratably over time; (ii) Defendants provided false or misleading guidance because they lacked a reasonable basis for the guidance that they provided and Defendants were aware that the guidance was unreasonable at the time it was made; (iii) Defendants' accounting practices did not comply with GAAP; (iv) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (v) the Company has admitted that: (a)  the financial statements it issued in this quarter and year "should be restated and should no longer be relied upon"; (b) that "revenues from [unidentified] transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting"; and (c) that the revenue impact of this restatement may be up to 10%; (vi) according to CW2, the Company recorded $7 million in revenue from two contracts with AT&T, for which the Company did not have adequate documentation, as required by GAAP, and which never came to fruition, or did so only after the close of the fourth quarter and fiscal year 2015; and (vii) the Company lacked effective internal controls over financial reporting.

## 2.     First Quarter 2016

196.     The Company announced its first quarter 2016 financial results on May 5, 2016. The Company's press release reported GAAP revenue of "$142.7 million compared to $132.9 in the first quarter of 2015."   The press release further reported gross profits of $74.4 million, income from operations of negative $4.7 million, net income of negative $7.3 million, and diluted earnings per share of negative $0.21 for the first quarter of 2016 compared to positive

$0.23 for the first quarter of 2015, all on a GAAP basis.  The press release also stated:  "Cloud Services revenue accounted for $84.3 million of non-GAAP revenue, representing approximately 58% of total non-GAAP revenue and growing 18% on a year-over-year basis."

197.   On the Company's May 5, 2016 earnings call, Defendant Rosenberger stated:

(a) "Now, let me move to guidance for the second quarter and an update for our 2016 outlook. Non-GAAP revenues are expected to be in the range of $155 million to $160 million."; (b) "For 2016, we now expect total revenues of between $665 million and $685 million."; (c) "Our cloud services revenue in the first quarter was $84.3 million, which represented 58% of our total revenue and grew 18% year-over-year, exceeding both Street and internal expectations."; and (d) "Breaking our revenue guidance down further, we currently anticipate our cloud services revenue [for second quarter 2016] will be in the range of $92 million to $95 million, or a growth of 30% at the midpoint of our range, as we have a visibl[y] stronger pipeline heading into the second quarter and the second half of the year on the heels of a number of cloud deployments with new and existing customers."

198.   In its Form 10-Q for the quarter ended March 31, 2016, which was signed by Defendants Waldis and Rosenberger on May 10, 2016, and filed with the SEC on May 10, 2016, Synchronoss reported net revenue of $142.686 million and loss from operations of $4.665 million.  The Form 10-Q also stated:  "our consolidated financial statements . . . have been prepared in accordance with GAAP."

199.   The first quarter 2016 Form 10-Q also incorporated by reference the statements made in paragraph 193 above.

200.   In certifications attached as exhibits to the Q1 2016 Form 10-Q and signed by defendants Waldis and Rosenberger on May 10, 2016, Defendants Waldis and Rosenberger made certifications that were identical to the certifications alleged in paragraph 194, above.

201.   The foregoing statements in ¶¶196  through 200 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked as revenue substantial portions of the value of contracts in the current quarter, which should have

been recognized ratably over time or not at all; (ii) Defendants provided false or misleading guidance because they lacked a reasonable basis for the guidance that they provided and Defendants were aware that the guidance was unreasonable at the time it was made; (iii) Defendants' accounting practices did not comply with GAAP; (iv) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (v) the Company has admitted that: (a) the financial statements it issued in this quarter "should be restated and should no longer be relied upon"; (b) that "revenues from [unidentified] transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting"; and (c) that the revenue impact of this restatement may be up to 10%; (vi) according to CW1, the Company failed to disclose that revenue from the $5 million Verizon contract alleged above was included in this quarter's reported financial results of the Company even though the contract had not been executed prior to the end of the quarter on March 31, 2016, if at all; and (vii) the Company lacked effective internal controls over financial reporting.

### 3.     Second Quarter 2016

202.     The Company announced its second quarter 2016 financial results on August 3, 2016.

203.     In its Form 10-Q and associated Form 8-K for the quarter ended June 30, 2016, which was signed by Defendants Waldis and Rosenberger on August 4, 2016, and filed with the SEC on August 4, 2016, Synchronoss reported revenues for the "Six Months Ended June 30, 2016" as $300,237,000, incorporating false revenue figures from the first quarter of 2016. The Form 10-Q also stated: "our consolidated financial statements . . . have been prepared in accordance with GAAP."

204.    The foregoing statements in ¶¶ 202 through 203 were false or misleading for the same reasons the statements set forth in Section VII.A.2 (concerning first quarter 2016) are false or misleading.

### 4.    Third Quarter 2016

205.    The Company announced its third quarter 2016 financial results on November 7, 2016.  The Company's press release reported revenue of "$176.4 million GAAP compared to $150.9 in the third quarter of 2015."  The press release further reported gross profits of $99.2 million, operating income of $13.2 million, net income of $7.7 million, and diluted earnings per share of $0.16 for the third quarter of 2016 compared to $0.21 for the third quarter of 2015, all on a GAAP basis.  The press release also stated:  "Cloud Solution revenue:  $101.9 million of GAAP revenue, representing approximately 58% of total GAAP revenues and growing 34% on a year-over-year basis.  $106.4 million of non-GAAP revenue, representing approximately 59% of total non-GAAP revenue and growing 40% on a year-over-year basis."

206.    On the Company's November 7, 2016 earnings call, Defendant Rosenberger stated:

(a) "Starting with the top line, non-GAAP revenues were $181 million, which was above the high end of our guidance and up 20% on a year-over-year basis, driven by stronger than expected cloud revenues and in-line activation performance."; (b) "Now, let me move to guidance for the fourth quarter. Non-GAAP revenues are expected to be in the range of $194 million to $201 million."; (c) "Our cloud solution revenue in the third quarter was $106.4 million, which represented 59% of our total revenue and grew 40% year-over-year. This was above the high end of our guidance range of between $102 million to $105 million."; and (d)  "Breaking our revenue guidance down further, we currently anticipate our cloud solution revenue [for fourth quarter 2016] will be in the range of $122 million to $125 million or a growth of 36% at the midpoint of our range as we have a visible, stronger pipeline heading into the fourth quarter in 2017 on the heels of a number of cloud deployments with new and existing customers."

207.    On the Company's November 7, 2016 earnings call, Defendant Waldis stated that, "we signed a $25 million license deal with Verizon during the quarter," but failed to disclose that

the Company improperly recognized this revenue upfront rather than ratably, as required by GAAP.  Similarly, Defendant Rosenberger stated that the "$25 million license deal" was "signed and recognized in the quarter," but failed to disclose that the Company improperly recognized this revenue upfront rather than ratably, as required by GAAP.

208.    In its Form 10-Q for the quarter ended September 30, 2016, which was signed by Defendants Waldis and Rosenberger on November 8, 2016, and filed with the SEC on November 8, 2016, Synchronoss reported net revenue of $176.421 million and income from operations of $13.209 million.  The Form 10-Q and associated Form 8-K also report revenues for the "Nine Months Ended September 30, 2016" as $476,658,000, incorporating false revenue figures from the first quarter of 2016.  The Form 10-Q also states:  "our consolidated financial statements . . . have been prepared in accordance with GAAP."

209.    The third quarter 2016 Form 10-Q also incorporated by reference the statements made in paragraph 193 above.

210.    In certifications attached as exhibits to the Q3 2016 Form 10-Q and signed by Defendants Waldis and Rosenberger on November 8, 2016, Defendants Waldis and Rosenberger made certifications that were identical to the certifications alleged in paragraph 194, above.

211.    The foregoing statements in ¶¶ 205 through 210 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked as revenue substantial portions of the value of contracts in the current quarter, which should have been recognized ratably over time or not at all, including but not limited to the $25 million Verizon license agreement fully recognized as revenue in the quarter; (ii) Defendants provided false or misleading guidance because they lacked a reasonable basis for the guidance that they provided and Defendants were aware that the guidance was unreasonable at the time it was

made; (iii) Defendants' accounting practices did not comply with GAAP; (iv) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (v) the Company has admitted that: (a)  the financial statements it issued in this quarter "should be restated and should no longer be relied upon"; (b) that "revenues from [unidentified] transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting"; and (c) that the revenue impact of this restatement may be up to 10%; and (vi) the Company lacked effective internal controls over financial reporting.

### 5.     Fourth Quarter 2016 and Full Year 2016

212.     The Company announced its fourth quarter and full-year 2016 financial results on February 8, 2017.  The Company's press release reported fourth quarter 2016 revenue from continuing operations of "$121.7 million GAAP compared to $121.2 in the fourth quarter of 2015."  The press release further reported for the fourth quarter of 2016 gross profits from continuing operations of $71.5 million, operating income from continuing operations of negative $30.4 million, net income of negative $22.6 million, and diluted earnings per share of negative $0.51 for the fourth quarter of 2016 compared to negative $0.07 for the fourth quarter of 2015, all on a GAAP basis.  The press release also stated:  "GAAP Cloud Services revenue from continuing operations accounted for $121.7 million in the fourth quarter."  The press release reported for the full year 2016 revenues from continuing operations of $476.7 million, gross profits from continuing operations of $282.5 million, operating income from continuing operations of negative $71.9 million, net income of negative $55.7 million, and diluted earnings per share of negative $1.28, all on a GAAP basis.

213.     On the Company's February 8, 2017 earnings call, Defendant Rosenberger stated:

(a) "Starting with the top line, non-GAAP revenues from continued operations [for fourth quarter 2016] were $123.9 million."; "For the first quarter, we expect total revenues of between $173 million and $178 million."; (b) "For 2017, non-GAAP revenues are expected to be in the range of $810 million to $820 million, unchanged from our initial guidance given on December 6 for the combined company."; and (c) "Cloud revenue from continued operations were $123.9 million and was at the high end of our original guidance from $122 million to $125 million."

214.    In addition, on the February 8, 2017 earnings call, Defendants failed to disclose (i) that the Company had entered into a $9.2 million licensing agreement in connection with the divestiture of a portion of its activation business to Sequential; (ii) that it had included that $9.2 million in its revenue for the fourth quarter of 2016 and full-year 2016; and (iii) that Synchronoss had improperly recognized that revenue in that it failed to instead include this transaction as an offset to the purchase accounting in the same period.  Defendants concealed this information, despite the fact that, as explained earlier herein, several analysts pressed Defendants for additional information about the Sequential transaction on the earnings calls.

215.    Also, on the February 8, 2017 earnings call, Defendant Waldis failed to disclose the improper accounting treatment of the $25 million licensing fee with Verizon, despite responding to a question from an analyst about the Verizon licensing fee.  Specifically, analyst Samad Samana asked:  "The Verizon, the $25 million payment that was announced last quarter. We have been told that, that is a new product or a new initiative.  Is that separate from what you're talking about at Mobile World Congress on the analytics side, or is that the same announcement?  Maybe help us understand that?"  Waldis responded:  "Two different things. The Verizon opportunity is a relationship that you will hear more about in Q1 that is not publicly announced.  The latter that we are referring to is separate.  It's two different."

216.    In its Form 10-K for the year ended December 31, 2016, which was signed by Defendants Waldis and Rosenberger on February 27, 2017, and filed with the SEC on

February 27, 2017, Synchronoss reported net revenue of $476.750 million and income from continuing operations of negative $71.809 million. The Form 10-K also states: "our consolidated financial statements . . . have been prepared in accordance with U.S. GAAP."

217.    The 2016 Form 10-K also included the statements made in paragraph 193 above.

218.    In certifications attached as exhibits to the 2016 Form 10-K and signed by Defendants Waldis and Rosenberger on February 27, 2016, Defendants Waldis and Rosenberger made certifications that were identical to the certifications alleged in paragraph 194, above.

219.    The foregoing statements in ¶¶ 212 through 218 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked as revenue substantial portions of the value of contracts in the current quarter, which should have been recognized ratably over time or not at all; (ii) Defendants provided false or misleading guidance because they lacked a reasonable basis for the guidance that they provided and Defendants were aware that the guidance was unreasonable at the time it was made; (iii) Defendants' accounting practices did not comply with GAAP; (iv) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (v) the Company has admitted that: (a)  the financial statements it issued in this quarter "should be restated and should no longer be relied upon"; (b) that "revenues from [unidentified] transactions should be recognized ratably over the term of the license contract or netted as part of the consideration transferred in connection with purchase accounting"; and (c) that the revenue impact of this restatement may be up to 10%; (vi) the Company failed to treat the $9.2 million licensing "revenue" as an offset to the purchase accounting associated with the Sequential transaction as required by GAAP; (vii) the Company failed to timely disclose the $9.2 million licensing

agreement that the Company entered into in connection with the Sequential transaction; and (viii) the Company lacked effective internal controls over financial reporting.

### B. ADDITIONAL ALLEGATIONS OF SCIENTER

#### 1. Defendants' Knowledge of and Participation in the Fraudulent Accounting Scheme Creates a Strong Inference of Scienter

220.   Given, among other things, the importance of Cloud revenues to the Company's financial reporting and given that Defendants knew such revenues were particularly significant to analysts and the investing public and, therefore, to the Company's stock price, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.

221.   In addition, Defendants' knowledge included awareness of the existence of accounting improprieties and material weaknesses which enabled the Company to manipulate its reported financial results. The existence of these serious financial matters created a corporate environment ripe for manipulation, particularly with respect to the Company's financial reports to investors.

222.   Moreover, according to CW1, in April 2016, Defendant Rosenberger inquired about the status of a contract with Verizon that had not yet been signed but was nevertheless included in the Company's revenue numbers for that quarter, reflecting her direct knowledge of the fraud.

223.   Further, according to CW2, Synchronoss employed a dedicated manager with responsibility for overseeing recognition of revenue from contracts with clients, who demanded

documentation sufficient to justify recognizing revenue from such contracts.  However, when necessary to inflate revenues to meet previously issued guidance or market expectations, senior Company management overrode the process that was in place to recognize revenue only in an appropriate manner.

### 2.    Motive and Opportunity

224.    An inference that Defendants acted with scienter is bolstered by sales of stock that Defendants made throughout the Class Period, while the Company's share price was artificially inflated due to Defendants' materially false or misleading statements and omissions.

225.    As stated earlier, according to forms filed with the SEC, Company insiders collectively unloaded at least $14 million (net of the aggregate exercise price of options) in Synchronoss stock in insider trading sales during the Class Period.[8]

226.    During the Class Period, according to forms filed with the SEC, Defendant Rosenberger sold 29,583 shares of Synchronoss stock for proceeds of $818,099.28 (net of the aggregate exercise price of options).  Notably, Defendant Rosenberger unloaded 12,453 shares in the first two months of 2017 for proceeds totaling $429,040.66 (net of the aggregate exercise price of options), shortly before Defendants' fraudulent scheme was revealed.  In the process, Defendant Rosenberger reduced the number of shares of Synchronoss common stock that she held by more than 18%, from 40,219 shares at the end of December 2016 to 32,846 shares as of February 21, 2017.  The 12,453 shares of Synchronoss stock that she sold from January 1

---

[8] This amount includes Class Period sales by Defendants Waldis and Rosenberger, as well as Section 16 officers Robert Garcia (President and COO), Ronald Prague (General Counsel), David Schuette (Executive Vice President), and Chris Halbard (Executive Vice President, International), and directors William Cadogan, James McCormick, Charles Hoffman, Donnie Moore, and Thomas Hopkins.

through February 21, 2017, is substantially greater than in the comparable time period during prior years:

| Time Period | Shares sold |
|---|---|
| 1/1/2016 – 2/21/2016 | 4,006 |
| 1/1/2015 – 2/21/2015 | 5,518 |
| 1/1/2014 – 2/21/2014 | 4,200 |
| 1/1/2013 – 2/21/2013 | 9,499 |

On an annualized basis, the 12,453 shares this Defendant Rosenberger sold between January 1, 2017 and February 21, 2017, amounts to more than 87,000, more than quadruple the number of shares that she sold in any year since 2013.

227.     Moreover, in December 2016, following the announcement of the Sequential transaction (but before the fraud involving Sequential was disclosed by the Company), Defendant Rosenberger sold 14,000 shares of stock.  This dwarfs the number of shares that she sold in the month of December in each of the prior four years:

| Time Period | Shares sold |
|---|---|
| December 2015 | 0 |
| December 2014 | 2,749 |
| December 2013 | 0 |
| December 2012 | 50 |

228.     Defendant Waldis sold 221,486 during the Class Period for proceeds of $6,690,699.11 (net of the aggregate exercise price of options).

229.     Further bolstering an inference of scienter, none of the Company's reporting persons has sold any shares of Synchronoss stock in the more than six months since the 46% one-day drop in April 2017.

230.     In addition, on February 4, 2016, the Company announced a $100 million share repurchase plan to be executed over the ensuing twelve to eighteen months.  As stated in Synchronoss's 2016 Form 10-K:  "As of December 31, 2016, a total of 1.3 million shares ha[d] been purchased under the program for an aggregate purchase price of $40 million."  Thus, the

Company spent more than $40 million in cash repurchasing stock during the Class Period while, at the same time, it was borrowing huge amounts to, for example, engage in the IntraLinks transaction, and accepting an $83 million "friends and family" IOU to complete the Sequential transaction.  These repurchases, many of which were at lofty prices in the $30's and $40's, contributed to the ability of Defendants to unload shares at high prices before the bottom dropped out on April 27th.

231.    Defendants' motive to engage in the fraudulent scheme is further bolstered by the Synchronoss's incentive compensation system. Throughout the Class Period, a substantial portion of Defendants' total compensation comprised bonuses that were tied to the Company's performance, providing Defendants a motive to falsely inflate the Company's financial metrics. In its 2014 Proxy, the Company stated that it performed a "clean slate: review of its compensation programs and policies."  Among the changes that the Board made to its executive compensation program, it "added Cloud Revenue as a performance metric for [Synchronoss's] long-term equity incentive compensation plan."  Moreover, as discussed below, revenue and operating income were also performance metrics with respect to various components of Waldis's and Rosenberger's incentive compensation, providing Defendants with a motive for artificially inflating revenue, operating income, and cloud revenue throughout the Class Period.

232.    Since 2014, when the Company altered its incentive compensation plan, a substantial portion of Waldis's and Rosenberger's total compensation comprised incentive compensation tied to the performance of the Company.  For 2014, 2015, and 2016, Waldis and Rosenberger's base salaries were as follows:

| Defendant | 2014 | 2015 | 2016 |
|---|---|---|---|
| Waldis | $573,947 | $591,165 | $608,900 |
| Rosenberger | $236,900 | $330,000 | $360,000 |

233.    For each of 2014, 2015, and 2016, Defendants Waldis and Rosenberger were awarded a cash bonus calculated based on an objective corporate component and a discretionary individual component.  For each of these years, the corporate component was based on the Company's achievement of predetermined non-GAAP revenue and non-GAAP operating incoming targets.  In part due to Defendants' fraudulent scheme, the Company achieved the targets for non-GAAP revenue and non-GAAP operating income.  Defendants, respectively, were awarded the following cash bonuses with respect to 2014, 2015, and 2016:

| Defendant | 2014 | 2015 | 2016 |
|---|---|---|---|
| Waldis | $961,361 | $821,216 | $748,155 |
| Rosenberger | $258,750 | $242,409 | $241,272 |

234.    In addition, with respect to 2014, 2015, and 2016, Defendants Waldis and Rosenberger were awarded performance based restricted shares.  The number of shares that each was awarded was based on achievement of certain targets for non-GAAP revenue, non-GAAP operating income (for 2014 and 2015; for 2016, this financial metric was replaced by non-GAAP EBITDA growth), and cloud revenue.  Synchronoss's non-GAAP revenue exceeded the target in each of 2014, 2015, and 2016.  Non-GAAP operating income and cloud revenue exceeded the respective targets in 2014 and 2015.  Non-GAAP EBITDA growth in 2016 fell slightly below target (34% compared to a target of 35%), as did cloud revenue ($403.3 million compared to a target of $412.2 million).  Defendants Waldis and Rosenberger received, respectively, the following number of performance based restricted shares with respect to 2014, 2015, and 2016:

| Defendant | 2014 | 2015 | 2016 |
|---|---|---|---|
| Waldis | 87,413 | 51,802 | 17,509 |
| Rosenberger | 5,360 | 6,137 | 4,148 |

235.    Defendants Waldis and Rosenberger also were awarded, as a result of the Company's artificially inflated performance, restricted shares that vest over three years and

shares subject to options that would vest over the following four years.  In 2014, 2015, and 2016, Defendants Waldis and Rosenberger were awarded the following numbers of shares of restricted stock and shares subject to options:

| **Defendant** | **2014 Restricted shares Shares subject to option** | **2015 Restricted shares Shares subject to option** | **2016 Restricted shares Shares subject to option** |
|---|---|---|---|
| Waldis | 40,493 | 25,901 | 52,951 |
|  | 87,413 | 70,546 | 133,043 |
| Rosenberger | 2,464 | 6,137 | 12,915 |
|  | 5,360 | 16,716 | 32,449 |

236.    The Defendants had the opportunity to commit fraud because each of them prepared, reviewed and/or approved the SEC filings, press releases, investor presentations, conference call statements and other documents containing the false or misleading statements and omissions as alleged herein, and thus had the ability to influence and control the content of those statements.

### C.    LOSS CAUSATION

237.    Lead Plaintiff and the Class suffered substantial damages as a direct and proximate result of Defendants' fraudulent conduct as alleged herein.

238.    Throughout the Class Period, the price of Synchronoss's stock was artificially inflated as a direct result of Defendants' materially false or misleading statements and omissions about, inter alia, the Company's revenues and guidance, its revenue recognition accounting practices, its compliance with GAAP, and the efficacy of its internal controls over financial reporting.  These materially false or misleading statements and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of Synchronoss and its financial well-being, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false or misleading statements during the Class Period resulted in Lead Plaintiff and the Class purchasing the Company's stock at artificially

inflated prices. Had the truth been disclosed to the market prior to and/or during the Class Period, Lead Plaintiff and the Class would not have purchased Synchronoss common stock or would not have purchased Synchronoss common stock at the artificially inflated prices they paid.

239. Starting with the Company's announcement of financial results for the fourth quarter of 2015 on February 3, 2016, Defendants misled investors to believe that the Company was generating more revenue than it really was.

240. Throughout the Class Period, Defendants continued to misrepresent the Company's quarterly and annual revenues, misstating the Company's balance sheets in its financial disclosures, misrepresenting the Company's results from operations, failing to prepare its financial results in accordance with GAAP, and failing to disclose its improper revenue recognition accounting practices in both reporting its financial results and offering guidance to investors. These misrepresentations—detailed in Section VII.A—caused artificial inflation in Synchronoss's stock and/or caused Synchronoss's stock to remain artificially inflated throughout the Class Period.

241. As alleged above, the Company, *inter alia*, falsely met its quarterly and annual revenue targets (and market expectations) throughout the Class Period by improperly and prematurely recognizing revenue from contracts with its biggest customers, Verizon and AT&T.

242. Similarly, as alleged above, the Company concealed the fact that it would receive $9.2 million under a licensing agreement with Sequential in December 2016 and further that the Company used that undisclosed $9.2 million licensing fee to falsely meet its fourth quarter 2016 revenue targets, and also issued guidance for 2017 in December 2016, which the Company reiterated in early February 2017, that the Company subsequently withdrew.

243.    As the truth about the Company and its financial condition began to emerge, the artificial inflation caused by the false or misleading statements and omissions alleged herein was gradually eliminated from the price of the Company's securities, causing significant losses to Lead Plaintiff and the Class.

244.    Sometime in the afternoon on Friday, February 24, 2017, SIRF released a report claiming that Synchronoss had concealed aspects of the complex set of transactions through which it divested 70% of its Activation Services business to Sequential and acquired IntraLinks. Synchronoss's stock price dropped from a close of $30.89 on February 23, 2017 to close at $30.49 by the end of trading on February 24, 2017 on substantial volume of 2,963,287 shares. Then, on the immediately following Monday, February 27, 2017, the Company provided further detail regarding the Sequential transaction that had been referenced in the SIRF's investigative report.  In particular, Synchronoss filed its Form 10-K with the SEC, which revealed for the first time that the Company had entered into a licensing agreement with Sequential in December 2016, under which the Company would receive $9.2 million, and which it immediately recorded as revenue.  Specifically, the Form 10-K stated (emphasis added):

> On December 22, 2016, the Company entered into a non-exclusive perpetual license agreement with STIH, in the amount of $9.2 million, ***which is included in net revenues in the statement of income***, for the use of the Company's Analytics software.

Thus, for the first time, the market became aware that the Company had used the one-time $9.2 million licensing fee to meet its fourth quarter 2016 revenue targets.  As a result of these partial corrective disclosures and/or materializations of concealed risk, the Company's stock, which, as stated above, had dropped to close at $30.49 on February 24, 2017 after the SIRF article was released, dropped again on the news to close at $28.69 on February 27, on substantial trading volume of 1.3 million shares.

245.    On April 27, 2017, the Company announced that the former Intralinks CEO, Ron Hovespian, who had become Synchronoss's CEO less than two months earlier, and Synchronoss's new CFO, John Frederick, who replaced Defendant Rosenberger less than two months earlier, were abruptly resigning, and further that Synchronoss's total revenue for the first quarter of 2017 would be $13 million to $14 million less than the Company's previously announced guidance of $176 million (an 8% miss), and that operating margins would be only 8-10%, much lower than the Company's prior guidance of 18-19%.  As a result of this further partial corrective disclosure and/or materialization of concealed risk, the stock price was slashed by 46%, dropping $11.33 from a close of $24.62 on April 26, 2017 to a close of $13.29 on April 27, 2017, on enormous trading volume of over 27 million shares.

246.    The Company issued related disclosures on consecutive trading days May 12 and May 15, 2017—a Friday and a Monday, respectively—concerning its inability to timely file its upcoming quarterly statement.  As a result of this further partial corrective disclosures and/or materializations of concealed risk, these disclosures caused the stock to drop from $15.98 on May 11, 2017 to $14.49 on May 15, 2017, on significant trading volume.

247.    More specifically, on May 12, 2017, the Company filed with the SEC a Notice of Late Filing indicating that it could not timely file its first quarter 2017 Form 10-Q because management required additional time to comply with the Company's internal controls and procedures and to review certain aspects of the Company's financial statements.  On that date, the stock closed at $15.62 per share, dropping from the closing price of $15.98 on May 11, 2017 on volume of 1,288,085 shares.

248.    The Company then filed a Form 8-K and issued a press release on May 15, 2017, disclosing that the Company would delay its first quarter 2017 earnings release and conference

call as well as its Form 10-Q for that quarter.  The press release stated that Defendant Waldis and the Company's new CFO, Lawrence Irving, "together with the audit committee of the Company's board of directors and with the assistance of accounting and legal advisors, conducted a thorough review of accounting of certain transactions conducted in prior financial periods," that the results of the review were provided to Synchronoss's external auditor, Ernst & Young, who suggested additional reviews.  As a result of these further partial corrective disclosures and/or materializations of concealed risk, the Company's stock dropped from $15.62 per share to $14.49 per share on high trading volume of nearly 4 million shares.

249.    On May 22, 2017, the Company announced its receipt from NASDAQ of a notice of noncompliance with NASDAQ Listing Rule 5250(c)(1) because of its failure to timely file its first quarter 2017 Form 10-Q.  As a result of this further partial corrective disclosure and/or materialization of concealed risk, the Company's stock dropped from a close of $13.54 on May 19, 2017 to a close of $12.82 on May 22, 2017, on high trading volume of over 4 million shares.

250.    After the end of trading on June 13, 2017, the Company announced that its quarterly and annual financial reports and statements for 2015 and 2016 should not be relied upon because the Company "has identified a material weakness in internal controls over financial reporting related to its revenue recognition process at December 31, 2016."  As a result of this further partial corrective disclosure and/or materialization of concealed risk, the Company's stock fell from the closing price of $12.28 on June 12, 2017 to close at $11.26 on June 14, 2017, on high trading volume of nearly 3.5 million shares.

251.    The precipitous declines in Synchronoss's stock price following the series of revelations from February 27, 2017 to June 13, 2017, and the resulting losses suffered by

members of the Class, are directly attributable to the market's reaction to the disclosure of information and/or risks that had previously been misrepresented and/or concealed by the Defendants, and to the market's adjustment of the Company's stock price to reflect the newly-emerging truth about its actual financial condition, revenues, revenue recognition practices, and compliance with GAAP.

252.     Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiff and other members of the Class.

**D.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

253.     The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this complaint.

254.     First, the statements complained of were not forward-looking statements nor were they identified as forward-looking statements when made.  Rather, the false or misleading statements complained of concerned historical and/or current facts and conditions existing at the time the statements were made.

255.     To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Defendants are liable for those false or misleading forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Synchronoss who knew that the statement was materially false or misleading when made.

E.    PRESUMPTION OF RELIANCE

256.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)   the Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the securities of Synchronoss traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the securities of Synchronoss; and

(e)   Lead Plaintiff and other members of the Class purchased the securities of Synchronoss between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

257.    At all relevant times, the market for the securities of Synchronoss was efficient for the following reasons, among others:

(a)   as a regulated issuer, Synchronoss filed periodic public reports with the SEC;

(b)   Synchronoss regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services, and through the investor relations page on the Company's Internet web site;

(c)   Synchronoss was followed by numerous securities analysts employed by major brokerage firm(s), including Sterling Auty of JP Morgan, Michael Nemeroff of Credit Suisse, Nandan Amjadi of Deutsche Bank, Tavis McCourt of Raymond James & Associates, Gary Powell of Wells Fargo Securities, Tome Roderick of Stiffel Nicolaus, Greg Burns of Sidoti & Company and Samad Samana of Stephens, Inc., who participated in conference calls with Synchronoss management and/or wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d) the stock of Synchronoss was actively traded on NASDAQ, an efficient market, where the Company's common stock trades under the ticker symbol SNCR.

258. As a result of the foregoing, the market for the securities of Synchronoss promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities of Synchronoss. Under these circumstances, all purchasers of the securities of Synchronoss during the Class Period suffered similar injuries through their purchase of the securities at artificially inflated prices and the presumption of reliance applies.

259. Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, the Class is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## F. CLASS ACTION ALLEGATIONS

260. Lead Plaintiff brings the Exchange Act claims on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class, which, as alleged previously, consists of all persons or entities who purchased or otherwise acquired the securities of Synchronoss during the Class Period (between February 3, 2016 and June 13, 2017, inclusive), and were damaged thereby. Excluded from the Class are Defendants (as set forth above), and present or former executive officers of the corporate defendant and their immediate family members (as defined in 17 C.F.R. § 229.404 (Instructions (1)(a)(iii) and (1)(b)(ii)).

261. The members of the Class are so numerous that joinder of all members is impracticable. For example, Synchronoss's stock traded actively on NASDAQ and, as of February 16, 2017, there were 45,998,579 Synchronoss shares outstanding. While the exact number of the Class members is unknown to Lead Plaintiff at this time and can only be

ascertained through appropriate discovery, Lead Plaintiff believes that the Class members number in the thousands.

262.     Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and the other members of the Class purchased or otherwise acquired Synchronoss common stock during the Class Period and sustained damages as a result of the Defendants' conduct complained of herein.

263.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to the Class.

264.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a) whether the Exchange Act was violated by the Defendants' acts as alleged herein;
>
> (b) whether statements made by the Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and prospects of Synchronoss; and
>
> (c) the extent of damages sustained by the Class, and the proper measure of damages.

265.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them as alleged herein.  There will be no difficulty in the management of this action as a class action.

266.     The names and addresses of those persons and entities that purchased or otherwise acquired and/or sold Synchronoss's common stock during the Class Period are available from the

Company's transfer agent(s) or other sources.  Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

### VIII. CLAIMS FOR RELIEF

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act**
**(Against All Defendants)**

267.    Lead Plaintiff and the Class repeat and reallege each of the allegations set forth above as if fully set forth herein.

268.    This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Lead Plaintiff and the Class, against Defendants Synchronoss, Waldis and Rosenberger.

269.    As alleged herein, throughout the Class Period, the Defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.  The Defendants' false and/or misleading statements and omissions were intended to and did, as alleged herein:  (a) deceive the investing public and Lead Plaintiff and other members of the Class; (b) artificially create, inflate and/or maintain the market for and market price of the Company's securities; and (c) cause Lead Plaintiff and other members of the Class to purchase the Company's securities at inflated prices.

270.    The Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or

disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

271.    As described above, the Defendants made the false or misleading statements and/or omissions knowingly and intentionally, or with such recklessness as to constitute willful deceit and fraud upon Lead Plaintiff and the other Class members who purchased Synchronoss stock during the Class Period.

272.    The Defendants' false and/or misleading statements and/or omissions were made in connection with the purchase or sale of the Company's securities.

273.    In ignorance of the false or misleading nature of the Defendants' statements and/or omissions, and relying directly or indirectly on those statements and/or upon the integrity of the market price for Synchronoss securities, Lead Plaintiff and members of the Class purchased Synchronoss stock at artificially inflated prices during the Class Period.  But for the fraud, they would not have purchased the stock at artificially inflated prices.

274.    The market price of Synchronoss stock declined materially upon the public disclosure of the facts that had been previously misrepresented or omitted by the Defendants, as described above.

275.    Lead Plaintiff and members of the Class were substantially damaged as a direct and proximate result of their purchases of Synchronoss stock at artificially inflated prices and the subsequent decline in the price of Synchronoss stock when the truth was disclosed.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### (Against Defendants Waldis and Rosenberger)

276.    Lead Plaintiff and the Class repeat and reallege each of the allegations set forth above as if fully set forth herein.

277.     This claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Waldis and Rosenberger (collectively, the "Section 20(a) Defendants") on behalf of Lead Plaintiff and the Class.

278.     As alleged herein, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making false or misleading statements and/or omissions in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct.  This fraudulent conduct was undertaken with scienter because Synchronoss is charged with the knowledge and scienter of Defendants' Waldis and/or Rosenberger and/or others who knew of or engaged in recklessness in disregarding the falsity or misleading nature of the Company's statements and of the fraudulent nature of the scheme.

279.     Lead Plaintiff and other members of the Class who purchased Synchronoss stock suffered damages in connection with their purchases of those securities, as a direct and proximate result of the violations of Section 10(b) and Rule 10b-5(b) by the Defendants.

280.     Defendants Waldis and Rosenberger were controlling persons of Synchronoss because of their senior executive positions with Synchronoss, their direct involvement in the day-to-day business and operations of Synchronoss, including participation in drafting and signing and approving Synchronoss's SEC filings, and participation in and speaking roles at investor and earnings conference calls and/or presentations.

281.     By virtue of the foregoing, the Section 20(a) Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Synchronoss, including the content and dissemination of press releases and other materials alleged to be false or misleading herein.

282.     The Section 20(a) Defendants are culpable for participation in the matters alleged herein because they did not act in good faith in connection with the conduct at issue, acted with knowledge that Synchronoss's public statements were materially false or misleading, or omitted material information, and/or or they acted with reckless disregard for the truth.

283.     By virtue of their positions as controlling persons of Synchronoss, and their culpable participation in the Defendants' violation of Section 10(b) and Rule 10b-5(b) as alleged herein, the Section 20(a) Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class;

(b) Awarding all damages and other remedies set forth in the Exchange Act against Defendants in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and costs of suit; and

(d) Such other and further relief as the Court may deem just and proper.

## X.  JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:  November 20, 2017

_/s/ James E. Cecchi_
James E. Cecchi
CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO,
P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

_Liaison Counsel for the Class_

Daniel L. Berger (_pro hac vice_)
Charles T. Caliendo (_pro hac vice_)
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, New York 10017
Tel:  (646) 722-8500
Fax:  (646) 722-8501

Kyle J. McGee
Michael T. Manuel (_pro hac vice_)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
Tel:  (302) 622-7000
Fax:  (302) 622-7100

_Counsel for Lead Plaintiff and the Proposed Class_