**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE SYNCHRONOSS TECHNOLOGIES, INC. DERIVATIVE LITIGATION _____ THIS DOCUMENT RELATES TO: ALL ACTIONS | Civil Action No. 17-2978 (FLW) (LHG) **OPINION** |

**WOLFSON, Chief United States District Judge:**

Presently before the Court is a motion by Defendants Synchronoss Technologies, Inc. ("Synchronoss" or the "Company"), Stephen G. Waldis ("Waldis"), and Karen L. Rosenberger ("Rosenberger") (collectively, "Defendants"), to dismiss Lead Plaintiff Employees Retirement System of the State of Hawaii's ("Plaintiff") Amended Class Action Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). In this putative class action securities litigation, Plaintiff alleges that it, and other similarly situated investors, purchased Synchronoss's stock between October 28, 2014 and June 13, 2017 (the "Class Period"), and that Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5; in addition, Plaintiff avers that Defendants Waldis and Rosenberger (collectively, "Individual Defendants") have violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Specifically, Plaintiff asserts that Defendants fraudulently inflated Synchronoss's stock by knowingly falsifying the Company's publicly reported revenues, and that Plaintiff and other investors relied on these material misrepresentations and omissions to their detriment. Defendants move to dismiss the

Amended Complaint on the basis that Plaintiff has failed to plead with particularity that Defendants acted with scienter, an element of a Section 10(b) claim, and because any forward-looking misstatements are protected by the Private Security Litigation Reform Act's ("PSLRA") Safe Harbor provision, 15 U.S.C. § 78u–5(c). For the reasons stated herein, Defendants' motion is granted, and Plaintiff's claims are dismissed without prejudice; however, Plaintiff is given leave to amend its Amended Complaint consistent with this Opinion within 30 days from the date of the Order accompanying this Opinion.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.  Defendants

The following allegations are taken from the Amended Complaint ("AC") and are assumed true for the purposes of review under Rule 12(b)(6). Synchronoss, a publicly traded mobile technology services company,[1] principally located in Bridgewater, New Jersey, specializes in providing "Activation" and "Cloud" services to commercial mobile carriers, including AT&T and Verizon. AC at ¶¶ 6, 31, 38, 40. Waldis founded Synchronoss and has served as its Executive Chairman since 2000. *Id.* at ¶ 33. In addition, Waldis was the Company's CEO from its inception in 2000 until January 18, 2017, when he resigned as CEO. *Id.* Waldis was reappointed as CEO on April 27, 2017, when his successor resigned as CEO. *Id.* He resigned as CEO for a second time on November 13, 2017. *Id.* Rosenberger is the former Chief Financial Officer and Executive Vice President of Synchronoss. *Id.* at ¶ 34. Rosenberger was the Company's CFO from April 2014 until April 1, 2017. *Id*. Prior to her appointment as CFO,

---

[1] On May 14, 2018, a NASDAQ hearing panel suspended trading of shares of Synchronoss common stock on NASDAQ due to Synchronoss's failure to timely file its periodic financial reports. AC at ¶ 31.

Rosenberger was the Company's Chief Accounting Officer and Senior Vice President from January 2012 until April 2014. *Id.*

## B. Synchronoss's Business

Synchronoss was founded in 2000 by Waldis, a former AT&T executive. *Id.* at ¶ 37. Waldis established an ongoing relationship between the company and AT&T to provide activation services to consumers who bought new mobile devices with AT&T as service provider. *Id.* at ¶¶ 38-40. Synchronoss provided software licenses to AT&T that enabled the consumer to simply open the box, automatically activate the cell phone and troubleshoot issues using a Synchronoss customer service call center. *Id.* at ¶ 38. Synchronoss enjoyed considerable success from this "Activation" business through 2012 and into 2013-2014. *Id.* at ¶¶ 38-39.

Beginning in 2013, the Activation business began to deteriorate, and the Company looked for other areas of growth, especially because one customer, AT&T, accounted for an exceedingly large amount of its revenues (80% at one point). *Id.* at ¶¶ 39-40. To offset slowing growth, the Company created a "Cloud" business. *Id.* at ¶ 40. The "Cloud" is a network of Internet servers used to store and process data after a device is activated and in use, and provides "back-up" for cell phone and personal computer data. *Id.* at ¶¶ 40-43, 60-64. Similar to "Activation," revenue for the "Cloud" business was generated primarily via software licensing agreements between the Company and service providers such as Verizon. *Id.* at ¶¶ 44-52. Along with AT&T, Verizon became, by far, one of Synchronoss's two largest customers, which were responsible for more than 60% of the Company's revenues. *Id.* at ¶¶ 55-56. By 2015, the Cloud business generated greater revenues than the Activation business. *Id.* at ¶ 54. However, by 3Q2015, Cloud revenue growth slowed. *Id.* at ¶ 77. Faced with slowing growth, a slumping stock price, and more

pressure to produce revenues, Plaintiffs allege that Defendants fraudulently booked revenues in order to artificially inflate the stock price.

### C. Allegedly Fraudulent Transactions

Plaintiff relies on the allegations of three Confidential Witnesses ("CW") regarding several allegedly fraudulent transactions into which Synchronoss entered. First, according to CW2, a Synchronoss employee from 2008-16 at the Vice-President level, who was responsible for overseeing contracts with the Company's largest customers, *id.* at ¶ 10, Synchronoss booked revenues of approximately $7 million in connection with two purported AT&T purchase transactions in late 2015 that did not occur. *Id.* at ¶¶ 174-75. CW2 stated that he was then "expressly tasked by Company management in 2016 with finding a way to retroactively justify the revenue numbers that had already been reported in 2015." *Id.* at ¶ 10. "[A]ccording to CW2, the practice [of booking revenues early and seeking to justify them later] also repeatedly caused Synchronoss to scramble to make [its] financial reports seem legitimate to auditors." *Id.* at ¶ 11. The Amended Complaint alleges that the recognition of this $7 million in AT&T revenue enabled Synchronoss to falsely meet its guidance in 4Q2015. *Id.* at ¶¶ 180-81.

Second, CW1 was a former Synchronoss financial analyst, CPA, and certified fraud examiner, who worked at the company from December 2015 to May 2016 with responsibility for revenue forecasting. *Id.* at ¶¶ 9, 163. CW1 claimed that he had personal knowledge that Synchronoss improperly and prematurely recognized $5 million in revenue from a purported contract with Verizon in 1Q2016 (ending Mar. 31, 2016), *id.* at ¶ 163, even though "this Verizon deal was only in initial discussion phases in March 2016, and was still unsigned in April 2016, after the quarter closed." *Id.* at ¶ 165. CW1 attended an April 2016 meeting in Bridgewater— which occurred after the close of Synchronoss's 2016 first quarter—where he saw Rosenberger

ask Synchronoss's Executive VP and General Manager Joel Silverman whether the Verizon contract had been signed. *Id.* The allegedly improper recognition of this $5 million in revenue from an unsigned contract with Synchronoss's largest customer apparently enabled the Company to meet its guidance when it reported its 1Q2016 results. *Id.* at ¶ 164. A short time later, the SEC requested, twice, that Synchronos attach its written contracts with Verizon to its SEC filings, but Synchronoss allegedly refused both times. *Id.* at ¶¶ 167-73.

Third, CW3, a former Synchronoss accountant who worked at the company from 2011 to April 2017, and had certain expense accounting functions, *id.* at ¶ 93, recalled that he witnessed a Senior Accountant at Synchronoss vehemently protest a directive from management to book $25 million in revenue from a transaction with Verizon in 3Q2016— "kicking and screaming," according to CW3—because the Company lacked substantiation for the deal. *Id.* at ¶ 94. According to CW3, the Senior Accountant protested that the decision to book the revenue went "against procedures" that stated Synchronoss had to have "x, y, and z, signed and sealed and delivered before" revenue could be recognized. *Id.* CW3 reported that executive management, including Rosenberger, instructed the Senior Accountant to book the revenue despite these objections. *Id.*

In addition to these three allegedly fraudulent transactions, Plaintiff alleges, based on the testimony of CW3, that Rosenberger personally directed manipulation of financial results every quarter during her tenure as CFO (Apr. 2014 to Apr. 2017). *Id.* at ¶¶ 13, 149, 231-39. This alleged scheme involved the misclassification of expenses and other financial metrics in order to avoid having to report a decrease in profit margins. *Id.* at ¶¶ 231-36. According to CW3, Andrew Latyszonek, a Synchronoss financial analyst, prepared a "flash file" on a weekly basis for the purpose of listing which expenses to bury or remove "down below the line" so as to show

attractive, but false, margins in Synchronoss's financial reports. *Id.* at ¶ 233. Latyszonek would then send this "flash file" to Rosenberger via email, who would approve the reclassified expenses in emails. *Id.* The allegedly manipulated entries ranged from a few hundred thousand dollars to $1 million each and, according to CW3, were "enough to move the needle and be material from an audit standpoint." *Id.* at ¶ 234. CW3 allegedly had access to the relevant information in the Company's Oracle financial system, and used that system to compare the "actual" figures against the "adjusted" figures that were publicly reported after Latyszonek, allegedly with Rosenberger's approval, "massaged, reclassified, and otherwise manipulated them." *Id.* at ¶ 233.

As one example, in connection with Synchronoss's March 2016 acquisition of Openwave Messaging ("Openwave"), a messaging, security, and identity management firm servicing telecommunications carriers, *id.* at ¶ 58, CW3 testified that Synchronoss reclassified salaries of sales employees as "research and development" ("R&D") costs, when in truth they should have been classified as "sales" costs. *Id.* at ¶¶ 235-36. According to Plaintiff, this reclassification was significant because R&D expenses are tax-deductible whereas sales costs are not and, in addition, R&D expenses are viewed more favorably by investors because they signal investment in future growth, whereas sales costs erode current margins without future benefit. *Id.* at ¶ 235. CW3 claimed to be personally tasked with "pushing" salaries of Openwave sales employees from sales to R&D expense in 2Q2016. *Id.* CW3 testified that he or she confirmed with an Openwave Senior Vice President that the employees whose expenses were being reclassified were not part of Openwave's R&D team, and then objected to the reclassification of these expenses. *Id.* Although CW3 does not claim to have had personal contact with Rosenberger, he claims to know that Rosenberger approved this misclassification of expenses, including

purporting to know of an email that Rosenberger wrote to Latyszonek approving the classification. *Id.* at ¶ 236.

Finally, with Synchronoss's activation business struggling, in December, 2016, the company announced that it was borrowing $900 million to acquire Intralinks Holdings, Inc. ("Intralinks"), a cloud services provider, and made the head of Intralinks, Ronald Hovsepian, the CEO of Synchnronoss, replacing Waldis. *Id.* at ¶¶ 104-107. Synchronoss simultaneously announced that it would divest 70% of its Activation business in a deal with a small, privately-held company known as Sequential Technology International, LLC ("Sequential"). *Id.* at ¶¶ 14-16, 97-103. Synchronoss disclosed that it would retain 30% ownership of the Activation business, and Sequential would pay $146 million to Synchronoss as a purchase price. *Id.* at ¶ 101. Sequential funded the bulk of its acquisition of Synchronoss's Activation business with a Seller's Note from Synchronoss of $83 million and an undisclosed guarantee to Goldman Sachs of $30 million of a $40 million term loan Goldman Sachs had made to Sequential. *Id.* at ¶ 102. Stated differently, according to Plaintiff, Synchronoss fronted Sequential nearly 60% of the purchase price. *Id.* Also in connection with the Sequential transaction, Synchronoss and Sequential had entered into a software license agreement under which Sequential obtained a perpetual license for certain analytics software products owned by Synchronoss, which Synchronoss had valued at $9.2 million. *Id.* at ¶ 108. Synchronoss booked the $9.2 million licensing fee as revenue in the fourth quarter of 2016, but did not disclose that fact until months later. *Id.* at ¶ 110.

### D. Discovery of Alleged Fraud/Restatement of Financials

On February 24, 2017, the Southern Investigative Research Foundation published an exposé, accusing Synchronoss of engaging in improper transactions with Sequential, with which

Waldis has "friends and family" connections through an "obscure entity" known as Rumson Hitters, LLC. *Id.* at ¶ 99-100. The report stated that "Synchronoss's public statements about the Activation unit's buyer [*i.e.*, Sequential] are incomplete, at best." *Id.* at ¶ 122. The article reported, *inter alia*, that Sequential is "a corporate shell, formed in early November, 2016….by…a former neighbor of Stephen Waldis and an early-stage Synchronoss investor," while "'Rumson Hitters' is an inside joke among the families of several of Synchronoss'…founders like Waldis and his fellow Seton University [sic] Alum" who lives in Rumson, and was formed to support Synchronoss business since its inception. *Id.* at ¶¶ 100, 123. After the report was published, the company disclosed, for the first time, that fourth quarter 2016 revenues were artificially boosted by the $9.2 million licensing fee, and the Company's stock price sank more than 5% from a close of $30.49 on February 24, 2017 to $28.69 on February 27, 2017. *Id.* at ¶¶ 122-24, 367-69.

On April 1, 2017, Rosenberger resigned as CFO of Synchronoss—though she had announced her intention to resign on that date well before the investigative report was published—and was replaced by the former Intralinks CFO John Fredericks. *Id.* at ¶¶ 125, 127. Less than a month later, on April 27, 2017, the Company announced that newly appointed CEO and CFO, Hovsepian and Frederick, respectively, would resign to "pursue other interests" and simultaneously announced a large miss of earnings guidance. *Id.* at ¶ 130. Waldis was re-appointed CEO on April 27, 2017, a position he held until he stepped down a second time in November 2017. *Id.* at ¶ 132-33.

In July 2018, Synchronoss filed restated financials for 2014-2016. *Id.* at ¶ 3. According to the Amended Complaint, the Company admitted in the Restatement, *inter alia*, that: (a) it "book[ed] revenues relating to a transaction in a period prior to there being sufficient

documentation of an agreement with the customer about the transaction.," *id.* at ¶ 144; (b) "licensing fees were improperly accounted for on a gross basis as revenue," *id.*; (c) its quarterly and annual financial reports for 2014-2016 and its communications from 2014-2017 were false and/or materially misstated and should no longer be relied upon, *id.* at ¶¶ 241-43; (d) it had "pervasive material weaknesses" in internal controls from 2014-2017, *id.* at ¶ 242; and (e) it fired three employees "for cause," *id.* at ¶ 243. As a result of the Restatement, revenue for 2014-2016 was restated down from $1,212,168,000 to $1,032,271,000, a reduction of nearly $180 million (or more than 14.8%), *id.* at ¶ 247, and net income of $93.5 million for 2014 through 2016 was restated to a cumulative loss of $40 million (a difference of $134 million, representing a 143% decrease in net income). *Id.* at ¶ 249.

### E. Alleged Insider Sales

Plaintiff also makes a series of allegations that Rosenberger and Waldis cashed out substantial insider trading profits before the Synchronoss stock collapsed. According to the Amended Complaint, Rosenberger's trading suspiciously ramped up just prior to her resignation. For instance, Rosenberger sold 14,000 shares on December 27 and 28, 2016 at prices above $39.50 per share for proceeds of $230,694.01, which, allegedly dwarfed Rosenberger's prior sales in December (as she had sold 0 shares in Dec. 2015, 0 shares in Dec. 2013, 50 shares in Dec. 2012 and 2,749 shares in Dec. 2014). *See id.* at ¶ 350. Rosenberger then allegedly sold another 12,453 shares from January 1 through February 21 at prices ranging from $38.84 to $32.64 for $429,040 (during the same time period, she sold 9,499 shares in 2013, 4,200 shares in 2014, 5,518 shares in 2015, and 4,006 shares in 2016). *See id.* at ¶ 349. Waldis also sold substantial stock during the Class Period, selling 569,800 shares for proceeds exceeding $18

million *Id.* at ¶¶ 19, 351. Collectively, Waldis, Rosenberger and other Synchronoss insiders sold $21 million in stock during the Class Period. *Id.* at ¶ 348.

Plaintiff admits that, according to the SEC Insider Forms 4 disclosing these sales, each of these sales was made pursuant to a Rule 10(b)(5)-1 plan.[2] *Id.* at ¶ 352. However, Plaintiff surmises that given the changes in Waldis's and Rosenberger's patterns of stock sales in Synchronoss, the Rule 10(b)(5)-1 plan applicable to Waldis's and Rosenberger's transactions must have been amended once or more during the Class Period. *Id.* Defendants, for their part, point to publicly filed SEC trading forms that reveal that Waldis and Rosenberger still held a substantial amount of stock in the Company at the end of the class period—510,929 shares for Waldis and 15,070 for Rosenberger (the most she held at any previous years end)—a period over which Synchronoss's shares declined in value from $53.67 at the Class Period high to $12.13. *See* Frank Decl., Ex. K., ECF No. 66-13.

## F. Allegedly False or Misleading Statements

Plaintiff premises its securities fraud claims on several allegedly false or misleading statements made by the Company. These statements include: (a) statements describing revenues for the current quarter, preceding quarter, year-to-date, or prior year-to-date, (b) guidance statements projecting revenues for the impending quarter or year, (c) the statement that the Company's financial statements have been prepared in accordance with GAAP, (d) statements describing the Company's accounting practices respecting revenue recognition, and (e) Sarbanes-Oxley certifications attesting to the truth and accuracy of the Company's financial reports, and the existence and effectiveness of the Company's internal controls over financial

---

[2] A Rule 10b5–1 plan is a written plan that allows corporate insiders to make prearranged stock transactions. *See* 17 C.F.R. § 240.10b5–1(c).

reporting and disclosures. AC at ¶ 255. Of these statements, most are historical statements concerning the state of the Company's finances and its accounting practices that, according to Plaintiff, were revealed to be false or misleading by the Restatement. Only (b)—the guidance statements projecting revenues—are so-called forward-looking statements potentially subject to the PSLRA's safe harbor provision.

As an example of the type of historical misstatements alleged, Plaintiff alleges that Waldis and Rosenberger made misleading public statements in a November 2016 earnings call discussing the $25 million Verizon deal. During the call, Waldis announced that Synchronoss "signed a $25 million license deal with Verizon during the quarter," *id.* at ¶ 89, and Rosenberger explained to analysts that this deal with a "key customer" was documented in a "25 million license deal signed and recognized in the [third] quarter." *Id.* Analysts specifically asked Rosenberger whether this $25 million Verizon deal was "baked into [Synchronoss's] initial guidance," *id.* at ¶ 90, and Rosenberger replied: "Yes, so clearly that deal has been in the works for little [sic] while and was clearly contemplated while we were giving guidance on our last earnings call." *Id.*

## G. Procedural History

On Monday, May 1, 2017, two business days after the Company announced lower than expected financials, Plaintiffs filed this action, alleging that the Company's miss of its Q12017 projections was the result of an alleged fraud perpetrated by the Company and its senior executives. ECF. No. 1. Following the consolidation of numerous similar complaints, but before any consolidated complaint was filed, Synchronoss announced that it would be restating certain prior financial results reported for the years 2014 through 2016. AC at ¶¶ 3, 5. Plaintiffs then filed a Consolidated Complaint on November 20, 2017. ECF. No. 37. Defendants moved to

dismiss the Consolidated Complaint in February 2018, ECF. No. 45, which was pending when Synchronoss filed the Restatement on July 9, 2018. Lead Plaintiff filed its Amended Complaint on August 24, 2018, adding allegations related to the Restatement and testimony from CW3. The Amended Complaint brings claims under section 10(b) of the Exchange Act and under Section 20(a) of the Exchange Act, alleging that Defendants made material false or misleading statements concerning its financial health and the status of certain contracts. Subsequently, Defendants filed the present motion, arguing that Plaintiff's claims must be dismissed for failure to adequately allege scienter, and/or due to the application of the PSLRA safe harbor for forward-looking statements.

## II.   <u>LEGAL STANDARD</u>

Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

"Independent of the standard applicable to Rule 12(b)(6) motions," Fed. R. Civ. P. 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223-24 (3d Cir. 2004)). Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico*, 507 F.3d at 200 (citing *Lum*, 361 F.3d at 224). Indeed, the Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 216).

In addition to Rule 9(b)'s heightened pleading requirements, Congress enacted the PSLRA, 15 U.S.C § 78u, *et seq.*, to require an even higher pleading standard for plaintiffs bringing private securities fraud actions. *In re Suprema, 438 F.3d at 276*. This heightened pleading standard is targeted at preventing abusive securities litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (identifying "ways in which the class-action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by class

action lawyers of the clients whom they purportedly represent . . .") (quotes and citations omitted).

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Both provisions of the PSLRA require facts to be pled with "particularity." *Avaya*, 564 F.3d at 253. This particularity language "echoes precisely Fed. R. Civ. P. 9(b)." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999); *see* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). Indeed, although the PSLRA replaces Rule 9(b) as the pleading standard governing private securities class actions, the rule's particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u-4(b)(1) of] the PSLRA." *Avaya*, 564 F.3d at 253 (citations omitted). This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *In re Advanta*, 180 F.3d at 534 (quotations marks omitted).

## III.   <u>DISCUSSION</u>

Defendants divide their dismissal motion into two parts. They argue that Plaintiff's Restatement-related claims stemming from Defendants' historical statements fail because

Plaintiff has not adequately pled that Defendants acted with scienter, and they also argue that Defendants' forward-looking revenue projections are protected by the PSLRA's safe harbor provision.[3] I will first describe the elements of a § 10(b) claim before turning to these arguments.

## A. Claims under Section 10(b) of the Exchange Act

The private right of action under Section 10(b) and Rule 10b-5 "creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). In relevant part, Rule 10b-5 makes it unlawful for an individual "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5, the plaintiff must allege: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." *Gold v. Ford Motor Co.*, 577 F. App'x 120, 122 (3d Cir. 2014) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

Defendants contest only one element of Plaintiff's 10b-5 claim: scienter. "Scienter" stands for the "mental state [of] intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). Under this PSLRA's pleading requirement, a plaintiff must "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Avaya*, 564 F.3d at 267 (quoting 15 U.S.C. § 78u-

---

[3] As explained, *infra*, Plaintiff's § 20(a) claim is derivative of its §10(b) claim, and thus, it will rise and fall with the § 10(b) claim.

4(b)(2)). The scienter standard requires a plaintiff to allege facts giving rise to a strong inference "of either reckless or conscious behavior." *Advanta*, 180 F.3d at 534-35. Courts must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs,* 551 U.S. at 324.  A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314; *see id.* at 324 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences" (internal quotation marks omitted)).

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences . . . . A plaintiff alleging fraud in a § 10(b) action . . . must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs,* 551 U.S. at 323, 28-29 (emphasis in original). "While [courts] [] aggregate the allegations in the complaint to determine whether [they] create[] a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases." *Winer Family Trust*, 503 F.3d at 337 (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006) *rev'd on other grounds*, 551 U.S. 308 (2007)).

In conducting the scienter analysis, "[t]he inquiry…is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original). However, the Third Circuit has "explicitly approved of scienter analyses that assess individual categories of scienter allegations individually when it is clear, as it is here, that a district court ultimately considered the allegations as a whole." *In re Hertz Glob. Holdings Inc*,

905 F.3d 106, 115 (3d Cir. 2018) (citing *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 493 (3d Cir. 2016) (concluding that just because a court is "thorough in explaining why it found scienter lacking as to each asserted misrepresentation does not suggest that it did not consider the allegations as a whole")); *see also Avaya*, 564 F.3d at 280 ("Although we have discussed each of the alleged facts bearing on defendants' scienter one at a time, we have heeded *Tellabs*'s command to evaluate [the plaintiffs'] allegations collectively rather than individually."). I will, therefore, follow this approach and consider the alleged facts bearing on scienter individually, while at the same time considering whether, holistically, they give rise to a strong inference of scienter.

**B. Restatement Related Claims – Whether Plaintiff Has Adequately Pled Scienter**

1. Confidential Witnesses

Plaintiff first attempts to establish scienter through the testimony of three confidential witnesses. While a plaintiff in a securities fraud action can support a complaint through confidential sources, statements from such sources can only be used:

> (1) if the complaint sets forth other factual allegations, such as documentary evidence, which are sufficient alone to support a fraud allegation, or (2) when the confidential sources are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged.

*In re Intelligroup Sec. Litig.*, 527 F.Supp.2d 262, 290 (D.N.J. 2007) (internal citations omitted). As there is no documentary evidence that alone supports Plaintiff's fraud allegations, it is assumed that Plaintiff seeks to utilize the testimony of its confidential sources through the second method. [4] In order to satisfy the burden under this method, "the complaint must disclose: (1) the

---

[4] While Plaintiff alleges that "CW1 identified further documents that support fraud—specifically internal emails discussing how the $5 million Verizon contract was still unsigned in April 2016," ECF No. 68 at 46, CW1 has identified no such documents, but rather only speculated that "there

time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information." *Id.* (citing *See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,* 394 F.3d 126, 146 (3d Cir. 2004) ("*Chubb* ")). Additionally, "allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe supporting events in detail." *Id.* (*citing Chubb,* 394 F.3d at 146). Where these requirements are not met, courts must ignore the insufficiently described witness' statements for purposes of evaluating the plaintiff's allegations. *Id.; Avaya,* 564 F.3d at 263 ("If [confidential] source allegations are found wanting with respect to these criteria, then [courts] must discount them steeply.").

Plaintiff has, in some respects, adequately described the confidential witnesses with particularity, including by alleging "the duration of each CW's employment [and] the time period during which the CWs acquired the relevant information," *Avaya,* 564 F.3d, at 263; *see Chubb,* 394 F.3d at 150. Nonetheless, the confidential witness statements on which Plaintiff relies suffer from a more fundamental problem: they do not contain specific details regarding the basis for the source's personal knowledge and/or do not describe supporting events in detail.

Plaintiff alleges that CW1, a financial analyst, CPA, and certified fraud examiner who worked at the company for around a year in 2015 and 2016, had personal knowledge of Rosenberger's involvement in the allegedly improper recognition of the $5 million Verizon

---

may be internal Company emails" discussing the Verizon contract. AC at ¶ 165. Furthermore, the reference in the Amended Complaint to an email from an undisclosed AT&T employee to an undisclosed Synchronoss recipient indicating that AT&T would proceed with a transaction, *id.* at ¶ 175, provides no help to Plaintiff's argument that Individual Defendants acted with scienter, as it does not suggest any wrongdoing by Synchronoss, and, moreover, neither Waldis nor Rosenberger is alleged to have received the email.

contract. AC at ¶ 165. Specifically, Plaintiff contends that a conversation that CW1 allegedly overheard establishes that Rosenberger knew that the Verizon contract was unsigned, but approved recognition of the contract's revenue nevertheless. In that connection, CW1's sole claim is that, while at a meeting in Bridgewater in April 2016, he saw Rosenberger ask Synchronoss's Executive VP and General Manager Joel Silverman *whether* the Verizon contract had yet been signed, even though the company had already recognized the $5 million for accounting purposes. *Id.* However, simply inquiring about the status of the contract does not demonstrate, as Plaintiff contends, that Rosenberger knew that it was unsigned at the time she asked the question, a flaw that alone undermines Plaintiff's reliance on CW1's testimony. But, just as importantly, even assuming that Rosenberger was aware that the contract had not been signed at that point, Rosenberger's question provides little assistance in determining whether she was acting with a fraudulent state of mind. Indeed, this was precisely the case in *National Junior Baseball League*, where the plaintiff attempted to use the statements of a confidential witness to establish that the defendant knew the failure to book an impairment charge was improper and violated GAAP. *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 547 (D.N.J. 2010). There, the plaintiff's allegations were insufficient because they contained no "facts, such as actual knowledge on the part of the Defendants of PharmaNet's misconduct, that would give rise to a duty to make an impairment charge." *Id.* Here too, as explained *infra*, the relevant GAAP rules are not as clear as Plaintiff avers, and nothing in CW1's recollection of the Bridgewater meeting would raise an inference that Rosenberger *knew* that recognizing revenue prior to contractual signing was potentially improper. *See OFI Asset Mgmt.*, 834 F.3d at 496 (disregarding statements of confidential witness that, "even if true," were

"not sufficiently on point"). The testimony of CW1 is, therefore, discounted in establishing scienter.

The testimony of CW2 fares no better. Plaintiff alleges that CW2 was involved in Synchronoss's allegedly booking revenues of approximately $7 million in connection with two AT&T purchase transactions in late 2015 that did not occur. AC at ¶¶ 174-75. CW2, a long-time Synchronoss employee at the Vice President level, stated that he was "expressly tasked by Company management in 2016 with finding a way to retroactively justify the revenue numbers [from the AT&T transactions] that had already been reported in 201." *Id.* at ¶ 10. He also relayed that "the practice [of booking revenues early and seeking to justify them later] also repeatedly caused Synchronoss to scramble to make [its] financial reports seem legitimate to auditors." *Id.* at ¶11. CW2's testimony is too imprecise and disconnected from Individual Defendants in this case to provide much help in establishing scienter. Indeed, CW2's barebone statements do not relate the circumstances surrounding the alleged management directive or explain how CW2 learned of the alleged Company practice, thus falling well short of the requirement that CW testimony must "describe supporting events in detail." *Intelligroup*, 527 F.Supp.2d at 290. More importantly, however, the Amended Complaint contains no facts concerning *who* in management tasked CW2 with retroactively justifying the revenue numbers, including whether Waldis or Rosenberger had any involvement. Thus, Plaintiff has failed to demonstrate that CW2's statements support a finding of scienter against any of the Individual Defendants. *See id.* at 364 (citing *In re Watchguard Sec. Litig.*, No. 05-678, 2006 WL 2927663, at *6 (W.D. Wash. Oct. 12, 2006) (discounting testimony of confidential source whose "allegations are silent as to the knowledge or conduct of any [d]efendant.")).

The testimony of CW3, a former Synchronoss accountant who worked at the company from 2011 to April 2017 and "indirectly" reported to Rosenberger, likewise fails to support an inference of scienter. CW3 provided details about the $25 million Verizon transaction that the company allegedly prematurely booked in the third quarter of 2016. CW3 did not personally witness either Rosenberger or Waldis's involvement in the deal, but rather recalled that a Senior Accountant at Synchronoss reacted by "kicking and screaming" to a management directive to book the $25 million as revenue because the Company lacked substantiation for the deal, and that Rosenberger allegedly overruled the accountant's objections. AC at ¶ 94. According to CW3, this deal was "infamous" within the Company. *Id.* However, nowhere in the Amended Complaint is CW3 ever alleged to have had any direct contact with Rosenberger, which is unsurprising given that CW3 reported only "indirectly" to her. Nor does the Amended Complaint give any basis for the supposed "infamy" of the deal. More importantly, Plaintiff does not allege that CW3 was personally involved in the transaction or that CW3 had first-hand knowledge. Thus, CW3 testimony amounts to nothing more than second-hand retelling and generalized rumor, neither of which provides value in trying to infer scienter. *See Intelligroup,* 527 F.Supp.2d at 360-61 (discounting information provided by confidential witnesses who were "not providing firsthand information," but rather were repeating statements the witnesses heard and holding that statements that are "nothing but rumor . . . cannot amount to either direct or supplemental evidence and, therefore, [are] of no value for the purposes of the Court's inquiry"); *see also Nat'l Junior Baseball League*, 720 F. Supp. 2d at 540.

CW3 also makes generalized complaints about the company's accounting practices, reporting that Rosenberger utilized the "flash file" that Latyszonek prepared on a weekly basis to determine which expenses to bury or remove "down below the line" so as to show attractive, but

false, margins in the Company's financial reports. Yet, these allegations are broad and general, and do not "provide any particulars regarding…how much revenue was improperly recognized. Plaintiff['s] allegations do not suffice." *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 539. The "flash file" refers to a wide array of Company financial information, and Plaintiff does not appear to allege that any specific "flash file" contained specific facts contradicting any specific public statement. To the extent that Plaintiff alleges that certain accounting decisions—such as the alleged reclassification of the salaries of Openwave sales employees as R&D costs—were included in these flash files, which is not clear from the Amended Complaint, Plaintiff has not adequately alleged that either Individual Defendant was involved in this decision. As the Third Circuit recently held, "vague[]" allegations about "widely distributed" reports do not state with particularity facts giving rise to a strong inference of scienter where there are no allegations that any defendant knew a particular statement was false when made. *Martin v. GNC Holdings, Inc.*, 757 F. Appx. 151, 154 (3d Cir. 2018).

Thus, the testimony of the CWs does not support an inference of scienter.

2.  GAAP Violations

Plaintiff next argues that Individual Defendants' involvement in GAAP violations that led to the restatement of Synchronoss's financials is grounds for inferring scienter. Allegations of GAAP violations "present nothing but a sub-group of the inaccurate public statement category of securities cases." *Intelligroup*, 527 F.Supp.2d at 286. In that regard, courts have uniformly held that allegations of scienter based on GAAP violations do not create the requisite strong inference of scienter unless the plaintiff's complaint alleges "more." *See Christian v. BT Grp. PLC*, No. 17-497, 2018 WL 3647213, at *8 (D.N.J. Aug. 1, 2018) (*"GAAP violations do not themselves create a strong inference of scienter. Courts have found that GAAP violations can support an

inference of scienter, but do not independently create such an inference."); *Nat'l Junior Baseball League*, 720 F. Supp. 2d at 557; *see also Wyser–Pratte Mgmt. Co. v. Telxon Corp.,* 413 F.3d 553, 563 (6th Cir. 2005); *Ferris, Baker Watts, Inc. v. Ernst & Young, L.L.P.,* 395 F.3d 851, 855 (8th Cir. 2005); *Saxton, Inc. Sec. Litig.,* 156 Fed.Appx. 917, 920 (9th Cir. 2005); *Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1192 (10th Cir. 2003); *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 432 (5th Cir. 2002); *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1208 (11th Cir. 2001); *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 84–85 (2d Cir. 1999); *Malone v. Microdyne Corp.,* 26 F.3d 471, 479 (4th Cir. 1994). The decisions in this Circuit are no exception. *Westinghouse Sec. Litig.,* 90 F.3d 696 (3d Cir. 1996).

The court in *Intelligroup* summarized the pleading requirements in this context:

> it appears that the "more" envisioned by the courts consists of the panoply of such facts which could sufficiently indicate that defendants had clear reasons to doubt the validity of the issuer's financials but, nonetheless, kept turning a blind eye to all such factual "red flags." *See Rothman* [*v. Gregor*]*,* 220 F.3d 81 [(2d. Cir. 2000)] (plaintiffs did not adequately plead scienter where the complaint alleged that defendants' policy of expensing prepaid royalties was contrary to GAAP, resulting in nearly $74 million in royalties continuing to be reported as assets long after they should have been expensed); [*In re*] *Comshare* [*Sec. Litig.*]*,* 183 F.3d [542,] 553 [(6th Cir. 1999)] (plaintiffs failed to plead scienter properly—although plaintiffs' allegations combined both GAAP violations and claims of failure to adequately monitor relevant information—since plaintiffs did not allege specific facts to show that defendants knew or could have known about the accounting errors, "or that their regular procedures should have alerted them to the errors sooner than they did") ... *In re Health Mgmt. Inc. Sec. Litig.,* 970 F.Supp. 192 (E.D.N.Y. 1997) (a strong inference of recklessness is sufficiently pled where the complaint alleges that defendant was actually advised of but ignored "red flags").

*Intelligroup,* 527 F.Supp.2d at 287.

In attempting to allege something "more" than mere GAAP violations, Plaintiff relies heavily on the supposed simplicity of the rules allegedly violated, an argument that it supports

with out-of-circuit case law.[5] *See In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 638

(E.D. Va. 2000) ("[I]f the GAAP rules and MicroStrategy accounting policies Defendants are

alleged to have violated are relatively simple, it is more likely that the Defendants were aware of

the violations and consciously or intentionally implemented or supported them, or were reckless

in this regard."). However, courts in this district interpreting *MicroStrategy*, have been hesitant

to follow its lead in placing heavy emphasis on the simplicity of the at-issue GAAP rules. *See,*

*e.g.*, *In re Bio-Tech. Gen. Corp.*, No. 02-6048, 2006 WL 3068553, at *10 (D.N.J. Oct. 26,

2006), *aff'd sub nom.*, 283 F. App'x 887 (3d Cir. 2008) ("Even a perfunctory analysis of *In re*

*Microstrategy,* the case to which this Court cited on the "simple nature" point, reveals that

simplicity of accounting guidelines is merely *one of several* factors to be examined in

determining whether scienter is sufficiently pled."). The *Intelligroup* court reasoned, moreover,

that,

> in cases examining alleged wrongs by an issuer rather than an accountant, GAAP
> violations might be given additional significance only where the provisions of
> GAAP so coincide with conclusions obvious to any business person and present
> recitals of knowledge so common to the business—rather than accounting—
> community, that a violation of this type of GAAP provision equates to a self-
> evident business nonsensicality which cannot be made by a defendant with a
> non-culpable state of mind.

*Intelligroup,* 527 F. Supp. 2d at 352. In that regard, Plaintiff contends that Defendant violated

three GAAP rules, all of which are so simple that the violations alone must be grounds for

inferring scienter.

---

[5] As already discussed, the statements of the CWs do not support a finding of scienter, and,
likewise, do not add to Plaintiff's attempt to plead scienter based on GAAP violations. *See*
*Chubb*, 394 F.3d at 153–54 (rejecting plaintiff's attempt to rely on statements of confidential
witnesses to infer scienter in connection with accounting violations when Plaintiff had failed to
describe the confidential witnesses with particularity).

Plaintiff first argues that recognizing revenue prior to contractual signing in connection with the two Verizon transactions and one AT&T transaction violated two accounting standards set forth as ASC 985-605-25-16 and -17. These provide that revenue from software agreements "shall not be recognized on any element of the arrangement unless persuasive evidence of an arrangement exists," and where a vendor "has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties." AC at ¶¶ 155-56 (citing ASC 985-605-25-16, -17). Put plainly, Plaintiff argues that these accounting standards stand for the proposition that "[w]here a company has…a practice of using written contracts, revenue can be recognized only if a contract has been signed by both parties and is 'in hand' prior to recognizing the revenue." ECF No. 68 (citing AC at ¶¶ 7, 155).[6] Implicit in these rules, then, is that a written contract is required in order to recognize revenue only when the parties customarily use written contracts. Thus, in order to allege that either of the Individual Defendants violated these accounting standards, Plaintiff must allege that Synchronoss has a "customary business practice of using written contracts," but that the Company, nonetheless, recognized revenue before a signed, written contract was in hand.

Plaintiff, however, has failed to allege the existence of such a customary business practice, such that the supposed accounting violations are not the "self-evident business nonsensicalit[ies] which cannot be made by a defendant with a non-culpable state of mind."

---

[6] Plaintiff also argues that Defendants violated the general Ernst & Young ("E&Y") guidelines on revenue recognition, which state: "[R]evenue recognition is precluded if a contract signed by both parties is not in hand at the end of the accounting period, even if the contract is executed soon thereafter and management believes that execution of the contract is perfunctory." AC at ¶ 7. These guidelines are not specific to Synchronoss, however, and, moreover, Plaintiff has not referenced any case law finding scienter based on the mere violation of an accounting firm guideline.

*Intelligroup,* 527 F. Supp. 2d at 352. For example, Plaintiff, in support of its argument that the

Company had a practice of recognizing revenue only upon contractual signing, emphasizes the

following unremarkable statements that make no mention of recognizing revenue: Waldis

mentioning on a Q42014 earnings call "signing a substantial expansion of our contract with

Verizon Wireless"; statements in the 2016 form 10k that the company "generate[s] a substantial

portion of our revenues … from contracts that extend up to 60 months from execution" and that

"in periods of economic slowdown…the average time between our initial contact with a

prospective customer and the signing of a sales contract increases"; and a signed master services

agreement with AT&T stating that "This Agreement and any Orders placed hereunder may be

amended or modified only by a written document signed by the authorized representative of the

Party against whom enforcement is sought." AC at ¶ 154. These statements, which perhaps

suggest that Synchronoss had a practice of executing written contracts with AT&T and Verizon,

do not elucidate anything about the company's revenue recognition practices with respect to

these contracts. The only statement that Plaintiff cites in which any Defendant mentions revenue

recognition—Rosenberger explaining to analysts that a Verizon transaction was documented in a

"25 million license deal signed and recognized in the [third] quarter," *id.* at ¶ 177—merely

indicates that Rosenberger believed that the Verizon contract had been signed and recognized as

revenue. It does not reveal, however, the Company's customary business practice.[7]

---

[7] Also unavailing is Plaintiff's argument that scienter is reinforced because Waldis and
Rosenberger allegedly did not disclose the details of the Sequential transaction in a call with an
analyst. AC at ¶¶ 115-20. Plaintiff cites *comScore* for the proposition that where defendant
"sp[eaks] extensively" on investor calls about an issue and knows it is "a subject about which
investors and analysts often inquire[]," scienter is "reinforce[d]." *Fresno Cty. Employees' Ret.
Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017). However, there, it was
"undisputed that [defendants] were aware of and made statements about comScore's revenue
recognition practices[.]" That is not the case here.

Underscoring the deficiencies in Plaintiff's allegations is that the only statement referenced by either party that concerns the Company's revenue recognition practices is a 2017 SEC disclosure issued in conjunction with the Restatement explaining that Synchronoss had a practice, in certain cases, of recognizing revenue *prior* to contractual signing. According to the disclosure, the Company, in some instances, determined that "persuasive evidence of an arrangement" existed for revenue recognition purposes, not upon contractual signing, but upon the Company's "receipt from [the] customer of written confirmation of the order and commitment to pay the agreed price, such as a quote approval sent by the customer in response to a quote issued by the Company[.]"[8] Frank Decl., Ex. C (2017 10-K/A) at 3, 55, 63, ECF No. 66-5. While this disclosure does not definitively demonstrate the Company's revenue recognition practices for its AT&T or Verizon contracts, it is telling that Plaintiff has presented nothing comparable suggesting that the Company recognized revenue from those contracts only upon contractual signing. At this stage, then, Plaintiff, has failed to meet the PLSRA's heightened pleading standard to demonstrate that the Plaintiff actually violated the GAAP rule, let alone shown that the rule violated was "simple."

Thus, this case is distinguishable from the cases on which Plaintiff relies, in which courts inferred scienter based on straightforward violations of GAAP revenue recognition rules *and* clear company policy regarding revenue recognition. *See MicroStrategy*, 115 F. Supp. 2d at 637 (Plaintiff alleged that the revenue recognition policy was so obvious, not only because of GAAP, but because of the company's "own publicly acknowledged policy of not recognizing revenues from an arrangement until 'evidence of the arrangement is provided ... by a contract signed by

---

[8] The Court may take judicial notice of this public SEC filing. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (holding that district court may rely on "documents filed with the SEC, but not relied upon in the Complaint").

both parties'"); *In re Medicis Pharm. Corp. Sec. Litig.*, No. 08-1821, 2010 WL 3154863, at *6

(D. Ariz. Aug. 9, 2010) (noting that defendant specifically identified the Company's reserve

accounting methodology as one of the company's most "'critical accounting policies'"); *In re*

*Ravisent Techs., Inc. Sec. Litig.*, 2004 WL 1563024, *9 (E.D. Pa. July 13, 2004) (alleged

violation of defendant's "crystalline policy" that "revenue was to be recognized when

[defendant] was notified it was delivered").

Moreover, the remaining GAAP rules that Plaintiff alleges that Defendants violated

plainly involve the type of complex accounting judgments that are insufficient to support an

inference of scienter. Specifically, Plaintiff contends that a number of licensing contracts that

Synchronoss entered into violated a GAAP rule related to the accounting treatment of a group of

related contracts. This standard states that

> Software vendors may execute more than one contract or agreement with a
> single customer. However, a group of contract or agreements may be so closely
> related that they are, in effect, parts of a single arrangement and should be
> viewed as one multiple-element arrangement when determining the appropriate
> amount of revenue to be recognized in accordance with this Subtopic.

ASC 985-605-55-4. Plaintiff alleges that the Company's accounting treatment of various

transactions violated this rule, including, 1) recognizing as revenue the $9.2 million licensing fee

paid as part the sale of the Activation business to Sequential, and 2) recognizing as revenue a $10

million patent-dispute settlement payment by Openwave as standalone license revenue when it

should have treated this $10 million not as revenue but rather as a reduction of the purchase price

Synchronoss paid to acquire Openwave.[9]

---

[9] Plaintiff also alleges that the historical accounting for the Openwave settlement violated ASC
605-25-25-3, which states that "separate contracts with the same entity or related parties that are
entered into at or near the same time are presumed to have been negotiated as a package and
shall, therefore, be evaluated as a single arrangement in considering whether there are one or
more units of accounting." However, according to the SEC guidance that Plaintiff cites in the

The parties dispute whether this rule is even applicable to the at-issue transactions. Plaintiff characterizes the standard as requiring "the vendor to account for the component agreements as part of a multiple-element arrangement rather than as separate transactions" where "a group of contracts or agreements is formed between the same software vendor and customer." AC at ¶ 188. Defendants, in contrast, dispute the applicability of the rule to the licensing contracts at issue, arguing that "[t]he standard is more narrow than that and addresses the recognition of revenue when a software vendor has multiple software contracts with a single customer that amount to a single arrangement." ECF No. 66 at 48.  Regardless of whose interpretation of the rule is correct, Plaintiff's allegations do not demonstrate that deciding whether several contracts are so closely related so that they must be treated as a single agreement is a decision that is "obvious to a business—rather than an accounting— mind." *See Intelligroup*, 527 F. Supp. 2d at 352 ("While Plaintiffs' submissions offer a long list of GAAP violations in Intelligroup's Statements, Plaintiffs' pleadings are void of any allegations that the violations involved errors so obvious to a business—rather than accounting—mind that Defendants must have been aware of the wrongs."). Any error in the application of this complex rule, standing alone, does not support a strong inference of scienter.

Based on the alleged GAAP violations, Plaintiff has failed to show that Individual Defendants had clear reasons to doubt the validity of the Synchronoss's financials but,

Amended Complaint, application of this rule is a "challenge" that "requires judgment" and that the SEC is "willing to consider reasonable judgments" in the application of the standard. AC at ¶ 212 (citing Eric C. West, *Speech by SEC Staff: Remarks before the 2007 AICPA National Conference on Current SEC and PCAOB Developments*, December 10, 2007, https://www.sec.gov/news/speech/2007/spch121007ecw.htm at 2.). Plaintiff fails to demonstrate how an alleged violation of an accounting principle that requires the application of reasonable judgments could possibly give rise to a strong inference of scienter.

nonetheless, kept turning a blind eye to all such factual "red flags." Accordingly, the GAAP violations alleged here do not support an inference of scienter.

    3.  <u>Magnitude of Restatement</u>

Plaintiff also argues that the magnitude of the Synchronoss's 2018 Restatement, which revealed that the Company's revenues and income had been substantially overstated, raises an inference of scienter. "Although a restatement of financial results is probative of scienter, more is needed to support a strong inference of scienter." *In re Bio–Tech. Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 588 (D.N.J. 2005). This is true even when the relative size of the restatement is large. *See id.* at 581 (dismissing securities fraud claims despite company's restatement resulting in a 90% reduction in revenue, noting that such allegations do not, without more, "establish motive sufficient for creating a strong inference of scienter"); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 13-08846, 2014 WL 7176187, at *7 (S.D.N.Y. Dec. 16, 2014) ("The fact of an error, even a large error, does not suggest knowledge or intent to misstate when the financial results were originally published.").

Here, Defendants do not dispute that the magnitude of the Restatement was substantial: revenues were overstated by $180 million or 14.8%, and the previously reported net income of $93.5 million was restated to a cumulative loss of $40 million. However, the mere fact of this large Restatement does not create a strong inference of scienter. *In re Hertz* is instructive on this point. There, the defendant had to restate its financials over three fiscal years and resulted in a pre-tax income reduction of $90 million for 2012 and $72 million for 2013. No. 13-7050, 2017 WL 1536223, at *16 (D.N.J Apr. 27, 2017). The court found that these overstatements were the result of a "pernicious… combination of discrete accounting errors that occurred over fifteen areas… and a minimum of twenty adjustments that were necessary across those areas." *Id.*

Nonetheless, as in *Hertz*, the size and scope of the restatement can only get Plaintiff so far. As the court there found,

> the Restatement merely describes mismanagement, Plaintiffs were required to supplement it with additional allegations of wrongdoing. They were required to allege that Defendants were "aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement." *Hayes*, 982 F.2d at 106 (citing *Shapiro* [*v. UJB Fin. Corp.*], 964 F.2d[ 272,] 281–83 [(3d. Cir. 1992)]). They did not do so.

*Id.* at *17. On appeal, the Third Circuit affirmed this finding. *In re Hertz*, 905 F.3d at 116 (citing *Dobina v. Weatherford Int'l Ltd.*, 909 F.Supp.2d 228, 251 (S.D.N.Y. 2012) (explaining that the magnitude of a restatement does not give rise to a strong inference of scienter if there are no allegations "that the ... defendants had any contemporaneous basis to believe that the information they related was incorrect")). Here too, Plaintiff's argument rests heavily on the mere fact that the Company significantly restated its financials, which revealed serious deficiencies in the Company's accounting practices. But Plaintiff has failed to buttress this fact with "particularized allegations of fraudulent intent" on the part of the Individual Defendants. Accordingly, the size and scope of the Restatement of Synchronoss's financials "provide at most some inference of scienter but not a strong inference." *Id.* at 117.

4. Size of Contracts/Key Customers Involved

Plaintiff also attempts to plead scienter based on the size of the contracts at issue and their relative importance to Synchronoss's business. "[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F.Supp.3d 635, 653-654 (E.D. Pa. 2015); *Nat'l Junior Baseball*

*League*, 720 F. Supp. 2d at 556 ("[A] person's status as a corporate officer, when considered alongside other allegations, can help support an inference that this person is familiar with the company's most important operations.) (citations omitted). In other words, "it is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question." *In re Heartland Payment Sys., Inc. Sec. Litig.*, No. 09-1043, 2009 WL 4798148, at *7 (D.N.J. Dec. 7, 2009); *City of Roseville Employees' Retirement Sys. v. Horizon Lines, Inc.*, 686 F.Supp.2d 404, 423 (D. Del. 2009) ("While it is true that false or misleading statements by key executives regarding a company's lead product or core business practices will weigh in favor of finding a strong inference of scienter, [courts] will not make such an inference 'absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements.'"); *Nat'l Junior Baseball League*, 720 F.Supp.2d at 556 ("Plaintiff cannot rely on th[e core purpose] doctrine when it has failed to allege other individualized allegations that [the individual defendants] had knowledge of the facts at issue.").[10]

    Here, Plaintiff alleges that the Company's contracts with AT&T and Verizon represented an overwhelming segment of the company's business, accounting for as much as 75% of

---

[10] In the cases cited by Plaintiff in support of its "core business" argument, the courts treated defendants' "core business" allegations as one small piece of a larger picture establishing that the defendants acted with scienter, or did not discuss the relevance of the "core business" allegations at all. *See In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *18 (D.N.J. Dec. 6, 2018); *Roofers Pension Fund v. Papa*, 2018 WL 3601229, at *24 (D.N.J. July 27, 2018); *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 113 (D. Mass. 2014) (no discussion of "core business" allegation beyond quoting plaintiff's allegation); *Mill Bridge V, Inc. v. Benton*, 2009 WL 4639641 at *30 (E.D. Pa. Dec. 3, 2009) (defendants pointed to "no other clear motivating factor" for executive committee member's trades in company securities at suspicious time); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) (no discussion of "core operations").

revenues during the relevant time period. AC at ¶ 6. However, in that regard, Plaintiff fails to adequately support its theory with specific allegations that Defendants acted with the requisite fraudulent intent with respect to the Verizon and AT&T contracts. Absent any particularized allegations, Plaintiff's "core business" argument amounts to an attempt to impute knowledge to Individual Defendants of the alleged fraud only because they held leadership positions at the Company and, hence, "must have known" of every detail of the Company's business with key customers. Such an argument, without more, cannot support an inference of scienter.

     5. <u>Insider Sales</u>

Plaintiff contends that Rosenberger and Waldis's selling of company stock in the year leading up to the discovery of the alleged fraud presented them with a motive and opportunity to commit fraud, thereby supporting an inference that they acted with scienter. While the Third Circuit recognizes that in the wake of the Supreme Court's decision in *Tellabs* "'motive and opportunity' may no longer serve as an independent route to scienter," particularized allegations regarding motive and opportunity may, in combination with other allegations, support a strong inference of scienter. *Avaya,* 564 F.3d at 277; *see also Tellabs,* 551 U.S. at 323–25. In that connection, Plaintiff alleges that Rosenberg's and Waldis's sale of company stock during the class period is indicative of scienter. Courts "will not infer fraudulent intent from the mere fact that some officers sold stock." *Burlington Coat Factory*, 114 F.3d at 1424. But if the stock sales are unusual in scope or timing, they may support an inference of scienter. *See id.* Whether a sale is "unusual in scope" depends on factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *In re Suprema*, 438 F.3d at 277 (citing *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 635 (D.N.J. 2002)). Other factors relevant to scope and timing are whether the sales were "normal and routine," and

whether the profits were substantial relative to the seller's ordinary compensation. *Id.* (citing *Burlington Coat Factory*, 114 F.3d at 1423).

Here, Plaintiff alleges that Waldis sold 569,800 shares during the Class Period for proceeds exceeding $18 million while Rosenberger sold 51,593 shares for proceeds exceeding $1.4 million. AC at ¶ 19. Plaintiff alleges that Rosenberger's insider sales suspiciously ramped up just prior to her resignation to levels more than 200% to 300% in prior periods. *Id.* at ¶ 349. Plaintiff also alleges that Waldis, meanwhile, cashed out $18 million in insider trading profits at lofty prices before revelations about the fraud. *Id.* at ¶ 351.

As Plaintiff concedes, every single stock sale effected by Individual Defendants cited in the Amended Complaint was effected pursuant to SEC Rule 10b5-1 plans.[11] *See id.* at ¶ 352. Pursuant to SEC Rule 10b5-1, a person's trading is not "on the basis of" material non-public information, such as the allegedly fraudulent practices here, if the person adopted, and sold their securities pursuant to a written trading plan consistent with the terms of Rule 10b5-1. Courts have consistently held that "[t]rades made under automatic trading plans are of minimal value in establishing an inference of scienter." *Lovallo v. Pacira Pharm., Inc.*, No. 14-06172, 2015 WL 7300492, at *13 (D.N.J. Nov. 18, 2015) (citing *Avaya*, 564 F.3d at 279); *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 410, 410 n.56 (D.N.J. 2010) (evidence of trading under 10b5-1 trading plans "largely irrelevant" to demonstration of scienter); *In re Audible Inc. Sec. Litig.*, 2007 WL 1062986, at *12 (D.N.J. April 3, 2007) (noting that "evidence that ... stock sales

---

[11] A Rule 10b5–1 plan is a written plan that allows corporate insiders to make prearranged stock transactions. *See* 17 C.F.R. § 240.10b5–1(c). The Court may consider such documents on a motion to dismiss because they are publicly-filed SEC documents. *In re Hertz*, 2017 WL 1536223, at *22 n. 10; *see also In re NutrSystem, Inc., Derivative Litig.*, 666 F.Supp. 2d 501, 518 n.11 (E.D. Pa. 2009) ("The Court finds that it can take judicial notice of the public filings showing that the challenged sales by [defendants] were made pursuant to 10b5–1 plans") (citing *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000)).

were made via Rule 10(b)5-1 plans ... would prevent those shares from being considered in the motive and opportunity analysis")). *See also In re NutriSystem,* 666 F. Supp. 2d at 518 (such sales "counter any inference that the trades were made on the basis of insider knowledge."); *City of Roseville*, 686 F. Supp. 2d at 425 (defendants stock sales "specified by their Rule 10b5–1 plans…do not marginally increase the likelihood that defendants make knowingly false or misleading statements out of a desire for personal financial gain") (citing *Avaya,* 564 F.3d at 279). While conceding that the trades were effected pursuant to the 10(b)(5)-1 plans, Plaintiff speculates that the Plans "must have been amended once or more during the Class period," given the changes in Waldis's and Rosenberger's patterns of stock sales in Synchronoss. AC at ¶ 352.[12]

Although it is true that a 10b5–1 plan that is amended during the class period might weaken Individual Defendants' argument that they did not approve the specific trades at issue, it is also Plaintiff's burden to demonstrate when the Plan was adopted or amended. *See In re NutriSystem*, 666 F. Supp. 2d at 518 n. 11 ("Although the Court has no information before it as to when these plans were adopted…the plaintiff has failed to plead facts showing that [the defendants] possessed material non-public information prior to their challenged sales of NutriSystem stock. The plaintiff has therefore failed to plead any facts suggesting that the 10b5–

---

[12] Although not addressed in their opposition brief, Plaintiff alleges that the Individual Defendants' "motive to engage in the fraudulent scheme is further bolstered by [] Synchronoss's incentive compensation system." AC at ¶ 356. Specifically, Plaintiff alleges motive because the Company's compensation system was tied to the Company's performance, including revenue and operating income, and that in 2014—prior to the Class Period—the Company added revenue attributed to its cloud business as a performance metric. *Id.* at ¶ 356-60. These allegations assert nothing more than "generalized motives that would be possessed by most corporate directors or officers [that] do not establish scienter." *In re Bio-Tech.*, 380 F. Supp. 2d at 581. For this reason, courts in the Third Circuit frequently reject such allegations as a basis to infer scienter. *See id.*; *see also In re Dig. Island Sec. Litig.*, 357 F.3d 322, 331 (3d Cir. 2004) (An allegation that defendants were motivated by a desire to increase executive compensation was insufficient because such a desire can be imputed to all corporate officers) (citation and quotation omitted).

1 plans were adopted at a time when [the defendants] possessed such information."). As in

*NutriSystem*, Plaintiff here can only speculate that the plans were amended, offering the Court

snippets of Individual Defendants' prior trading activity, but providing no information as to

when or how the Plans were amended.  And indeed, just because an individual's trading activity

appeared to vary from year-to-year or month-to-month, does not necessarily mean that the

10(b)(5)-1 plan was amended: for example, pursuant to such plans, sales might not be triggered

on specific dates, but rather at "times at which each Defendant's restricted stock vested, and that

the sales [might be] made to pay the tax liability incurred as a result of the vesting." *In re Egalet

Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 512 (E.D. Pa. 2018) (finding that the fact that sales were

made pursuant to a Rule 10(b)(5)-1 plan "weighs heavily against an inference of scienter"). In

fact, according to several Forms 4 included as exhibits to this motion, a number of Individual

Defendants' sales were triggered for exactly this reason. *See, e.g.*, Frank Decl., Ex. K at 149

("All sales reported on this Form were effected pursuant to an approved Rule 10b5-1 trading

plan. Represents sale to cover vesting of shares of Restricted Stock."). Thus, Plaintiff's

speculation that Waldis and Rosenberger's 10(b)(5)-1 trading plans must have been amended

does not satisfy the PSLRA's heightened pleading standards, and trades made pursuant to these

plans are of little probative value in establishing scienter.

What is more, even if Individual Defendants' transactions were not made pursuant to

Rule 10b5-1 plans, Plaintiff's allegations regarding the timing and amount of these sales are not

particularly suggestive of scienter. Indeed, even with their sales, Waldis and Rosenberger,

respectively, held 510,929 shares and 15,070 shares at the end of the Class Period, a period over

which Synchronoss's shares declined in value from $53.67 at the Class Period high to $12.13 at

the end of the Class Period. *See Advanta*, 180 F.3d at 541 ("Far from supporting a 'strong

inference' that defendants had a motive to capitalize on artificially inflated stock prices, these facts [*i.e.*, defendants' retained holdings] suggest they had every incentive to keep Advanta profitable."). Also weighing against a finding of scienter is the fact that Plaintiff provides none of Waldis's trading history prior to the Class Period, giving the Court no comparable trades to determine whether his sales were out of line with his prior trading activity. In fact, according to public filings cited by Defendants, in 2013, the year before the alleged fraud here supposedly began, Waldis sold securities yielding proceeds in excess of $15 million, an amount greater than his proceeds for any subsequent year. *See* Frank Decl., Ex. K; *see also Ronconi v. Larkin*, 253 F.3d 423, 435-37 (9th Cir. 2001) (sale by insider of 98% of holdings during class period was insufficient evidence of scienter where plaintiff failed to provide sufficient trading history to suggest trading was "dramatically out of line with prior trading practices").

As for Rosenberger, Plaintiff points to public SEC filings supposedly demonstrating that Rosenberger's sales in the months before her departure far exceeded her sales over the same periods in prior years. For example, Rosenberger sold 12,453 shares in between January 1, 2017 and February 21, 2017, whereas she sold, at most, 9,499 shares over the same period in past years. Defendants do not contest that Rosenberger may have sold more shares in these specific periods than in prior years, but they note that publicly filed trading records show that Rosenberger's sales of shares were actually consistent year-to-year, and there was nothing unusual about her trading during the Class Period. *See* ECF No. 66-1 at 22. Indeed, Rosenberger held more shares at the end of the Class Period than at the end of any other year. *Id.* Moreover, any uptick in sales prior to Rosenberger's resignation is not particularly surprising, as such a practice is relatively common. *See In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 896 (8th Cir. 2002) (finding that sales by resigning officer "should not materially impact the scienter analysis"

because it is "not unusual for individuals leaving a company . . . to sell shares") (quoting *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999)).

Thus, Plaintiff's motive-and-opportunity allegations in connection with Waldis and Rosenberger stock sales do not support an inference of scienter.

6. Resignations

Finally, Plaintiff argues, in a footnote, that Rosenberger's and Waldis's resignations from the Company support an inference of scienter. The Third Circuit and other courts have found resignations of key officers to be insufficient to show that they acted with the requisite scienter to commit the alleged fraud. *In re Interpool, Inc. Sec. Litig.*, No. 04–321, 2005 WL 2000237, at *17 (D.N.J. Aug. 17, 2005) (citing *In re The Great Atl. & Pac. Tea Co., Inc. Sec. Litig.*, 103 Fed.Appx. 465 (3d Cir. 2004)) (declining to find that the allegation that nine employees were fired as a result of accounting irregularities supported a strong inference of scienter); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (finding that resignations, without additional evidence that accounting irregularities were the reason for the resignations, do not have "any scienter implications")).

Here, Plaintiff has not provided any additional evidence to infer that the resignations are suggestive of fraud, arguing only that the timing of the resignations was "uncharacteristic" of the Company's typical hiring and firing practices. After the Sequential and Intralinks transactions, Waldis resigned and was replaced by the Intralinks CEO (though Waldis did become CEO again after the Class Period), and Rosenberger resigned weeks before the Restatement announcement (though her impending resignation had already been announced). However, Plaintiff does not allege any specific connection between these resignations and the alleged fraud, but rather, only alleges that their resignations coincided with the Company's acquisition of IntraLinks, when

management transitions during such corporate restructurings are typical. Plaintiff fails to allege any evidence of an "'extraordinary corporate punishment measure' applied to any of the Individual Defendants as is required by other case law in this circuit." *Par Pharma*, 2008 WL 2559362, at *12 (citing *Intelligroup* 527 F. Supp. 2d at 348). Thus, the resignations of Waldis and Rosenberger do not support an inference of scienter.

      7.  <u>Opposing Inferences</u>

      Taken together, Plaintiff's allegations are simply not "as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314. Indeed, aside from the discounted testimony of the CWs, Plaintiff relies exclusively on circumstantial evidence resulting from alleged GAAP violations, the fact that the Company restated its financials, that Individual Defendants had a motive and opportunity to commit fraud based on their alleged insider sales, and that the Individual Defendants resigned their positions at a suspicious time. What can be inferred from these allegations is that some degree of corporate mismanagement and lax accounting practices resulted in the Company restating its financials. Conspicuously missing from Plaintiff's allegations, though, is any indication that the Individual Defendants here, Waldis and Rosenberger, were aware of the fraudulent practices, let alone knowingly or recklessly participated in such practices. Taken together, then, these allegations fail to support an inference that is at least as compelling as the opposing inference: "that corporate mismanagement resulted in accounting irregularities and, at most, negligent misstatements." *In re Hertz*, 905 F.3d at 121.

      Indeed, in *Hertz*, the plaintiff relied on circumstantial allegations to support scienter similar to those that Plaintiff relies on here; for example, that "Individual Defendants resigned as Hertz discovered [accounting] problems, and that [they] sold portions of their Hertz stock holdings while those problems were ongoing." *Id.* The court concluded that although the "FAC

and Restatement make clear that the problems plaguing Hertz and its accounting department were significant…and that those problems resulted in material misstatements regarding the Company's financial condition," the allegations did "not necessarily suggest that Hertz or its senior management were engaged in a systemic fraud. More plausible is the suggestion that the Individual Defendants were just bad leaders." *Id.* Based on the allegations, that may be the case here. Indeed, according to the Company's Restatement, there is no doubt that Synchronoss's accounting department performed its job poorly, perhaps even fraudulently, and that Rosenberger and Waldis possessed positions of power within the Company while this occurred. But the inference that Rosenberger and Waldis acted with fraudulent intent is not more plausible than the inference that they simply did a poor job overseeing the accounting department. Such an inference cannot support a securities fraud claim.

### C. Forward-Looking Statements

In addition to arguing that that Plaintiff's Restatement-related claims must be dismissed because they have not adequately pled scienter, Defendants also argue that Plaintiff's claims related to Defendant's allegedly misleading or fraudulent forward-looking revenue projections are protected by the PSLRA safe harbor for forward-looking statements. The PSLRA's Safe Harbor provision, 15 U.S.C. § 78u–5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254.

The Court has already found that Plaintiff failed to allege that Defendants had actual knowledge of their statements' falsehood. In its briefing, Plaintiff relies on the exact same allegations as to why Defendants had actual knowledge that its revenue projections were false

(*i.e.* the Company's "established practice of falsely recognizing revenue from contracts that had not been signed with its biggest customers (AT&T and Verizon) since at least 4Q2015" and "fail[ing] to disclose that their forecasts were part and parcel of an ongoing revenue recognition scheme"). *See* ECF No. 68 at 57-58. As already explained, the sole bases for Plaintiff's "actual knowledge" allegation are the statements of the CWs, which are not reliable. Therefore, because Plaintiff has failed to adequately plead that Defendants were actually aware of the falsity of the revenue projections, Plaintiff's claims based on forward-looking statements fail, and the Court need not address the adequacy of Defendants' cautionary language. *See In re Bio-Tech.*, 380 F. Supp. 2d at 597 ("Because this Court has concluded that Plaintiff has failed to create a strong inference of scienter with respect to BTG's statements concerning Oxandrin, the Court need not address the applicability of the [first prong of the] PSLRA's safe harbor provision for forward-looking statements.").

### D. Section 20(a)

Plaintiff also alleges that Individual Defendants are liable under Section 20(a) of the Exchange Act. This statute reads, in pertinent part:

> § 78t. Liability of controlling persons and persons who aid and abet violations
>
> (a) Joint and several liability
>
> ...
>
> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable ...

15 U.S.C. § 78t(a); *see also Suprema*, 438 F.3d at 285 (discussing the statute). However, "liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person." *Avaya*, 564 F.3d at 252 (citing *In re Alpharma Sec. Litig.*, 372 F.3d 137, 153

(3d Cir. 2004)). Because Plaintiff fails to sufficiently plead a claim under Section 10(b), it is "impossible to hold the [Individual Defendants] liable under § 20(a)." *Shapiro*, 964 F.2d at 279. The Section 20(a) claims against Individual Defendants Waldis and Rosenberger are therefore also dismissed.

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion is granted and Plaintiff's claims are dismissed without prejudice; however, Plaintiff shall have 30 days from the date of the Order accompanying this Opinion to amend its Amended Complaint consistent with this Opinion.


Dated:  June 28, 2019                                         /s/ Freda L. Wolfson
                                                              Hon. Freda L. Wolfson
                                                              Chief United States District Judge