**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE SYNCHRONOSS TECHNOLOGIES, INC. SECURITIES LITIGATION | Civil Action No. 17-2978 (FLW) (LHG) |
| | **CLASS ACTION** |
| This Document Relates To: ALL ACTIONS | |

**SECOND AMENDED CLASS ACTION COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 2

II.  NATURE OF THE ACTION ............................................................................. 9

III.  JURISDICTION AND VENUE ....................................................................... 9

IV.  PARTIES ........................................................................................................ 10

    A.  LEAD PLAINTIFF ..................................................................................... 10

    B.  THE CORPORATE DEFENDANT ............................................................. 10

    C.  THE INDIVIDUAL DEFENDANTS ........................................................... 11

V.  FACTUAL BACKGROUND ........................................................................... 12

    A.  SYNCHRONOSS'S BUSINESS ................................................................... 12

        1.  Company Background ................................................................. 12

        2.  The Company's Classification Of Revenues .............................. 15

        3.  The Company's Revenue Growth Drivers .................................. 17

    B.  SYNCHRONOSS SHIFTS TOWARD "CLOUD" SERVICES ............................ 19

        1.  Synchronoss Rebrands Itself As A Leading Cloud Services
            Provider ...................................................................................... 19

        2.  The Company Transforms Its Executive Compensation Policies To
            Emphasize Cloud Services Revenues ........................................ 20

        3.  Cloud Services Growth Spikes In Late 2014 ............................ 21

        4.  Cloud Services Growth Tapers Beginning In Mid-2015 And The
            Company Enters Joint Ventures To Bolster Financial Results,
            While Organic Cloud Services Growth Diminishes ................. 22

        5.  As 2016 Cloud Services Growth Stalls, The Company Reports A
            $25 Million Licensing Deal ...................................................... 24

    C.  SYNCHRONOSS DIVESTS ITS ACTIVATION SERVICES BUSINESS, ACQUIRES
        INTRALINKS, AND COMPANY EXECUTIVES RESIGN ................................. 28

        1.  In Early December 2016, Synchronoss Agrees To Sell Its
            Activation Business To Sequential ............................................ 28

        2.  On The Same Day Synchronoss Announces The Sequential
            Transaction, It Announces The Acquisition Of IntraLinks And
            That The IntraLinks CEO Will Replace Defendant Waldis As
            Synchronoss's CEO ................................................................... 29

3.      In Late December 2016, Synchronoss Recognizes $9.2 Million In Revenue From A Licensing Agreement With Sequential But Fails To Disclose That Fact For Several Months And Synchronoss Also Fails To Disclose That It Had Secretly Provided A Guarantee To Goldman Sachs As Part of the Sequential Transaction ........................... 30

4.      In Early February 2017, Analysts Press For Details On The Sequential Transaction, But Defendants Rosenberger And Waldis Continue To Conceal The $9.2 Million Sequential Licensing Fee And Other Material Terms of the Sequential Deal .................................. 31

5.      Synchronoss's Stock Price Drops 5% After An Investigative Journalist Report and Synchronoss's Subsequent Disclosure That The $9.2 Million Sequential Licensing Fee Was Included In Fourth Quarter 2016 Revenues ............................................................................ 33

6.      Defendant Rosenberger Resigns In Early 2017 And A New CFO Takes Over .................................................................................................. 34

D.    THE NEW SYNCHRONOSS CEO AND CFO RESIGN WITHIN TWO MONTHS............ 35

1.      The Company Announces, But Never Holds, A Highly Anticipated May 2017 Earnings Conference Call.................................................... 35

2.      The Company Sells IntraLinks Less Than Nine Months After Acquiring It, And CEO Waldis Resigns Once Again.............................. 36

VI.   DEFENDANTS' FRAUDULENT SCHEME TO INFLATE THE COMPANY'S STOCK PRICE BY MANIPULATING ITS ACCOUNTING ........................................ 37

A.    DEFENDANTS IMPLEMENTED A REVENUE ACCOUNTING POLICY OF "BOOK NOW, JUSTIFY LATER".................................................................................... 38

1.      Synchronoss's Senior Management Overrode The Company's Revenue Recognition And Billing Manager............................................... 38

2.      Premature Revenue Recognition With Respect To Verizon And AT&T Contracts ............................................................................... 41

a.    2014 Transactions ......................................................... 44

b.    The First Quarter 2016 Verizon Contract ..................................... 45

c.    Synchronoss Declines To Attach Verizon Contracts To Its Financial Statements As Requested In An SEC Comment Letter In 2016................................................................ 46

d.    The Late 2015 AT&T Contracts .................................................... 47

e.    The Third Quarter 2016 Verizon Contract.................................... 48

3.      Premature Revenue Recognition Enabled Synchronoss To Falsely Meet Revenue Targets .............................................................................. 49

B.     DEFENDANTS CONCEALED THAT A $9.2 MILLION ONE-TIME LICENSE AGREEMENT WITH SEQUENTIAL WAS INCLUDED IN FOURTH QUARTER 2016 REVENUES ................................................ 49

C.     ON SEVERAL OTHER OCCASIONS, DEFENDANTS IMPROPERLY TREATED FEES FROM  LICENSING AGREEMENTS ENTERED INTO IN CONNECTION WITH ACQUISITIONS OR PATENT SETTLEMENTS AS REVENUE, IN BLATANT VIOLATION OF GAAP ................................................ 54

D.     VENDOR-SPECIFIC OBJECTIVE EVIDENCE AND THE $25 MILLION VERIZON LICENSING AGREEMENT ................................................ 57

E.     THE COMPANY'S MATERIAL WEAKNESS IN INTERNAL CONTROL OVER FINANCIAL REPORTING ................................................ 59

F.     THE EFFECT OF THE COMPANY'S ANNOUNCEMENT OF THE NEED TO RESTATE ITS 2014, 2015, AND 2016 FINANCIAL REPORTS ................................................ 66

        1.     Material Weaknesses In Internal Controls That Are So Pervasive They Still Have Not Been Rectified ................................................ 66

        2.     Three Employees Were Fired Due To Wrongdoing in Connection with Revenue Recognition, and Synchronoss Admits Violations of Basic GAAP Accounting Rules and The Falsity of All Earnings Communications from 2014 to Early 2017 ................................................ 66

        3.     The Financial Effects Of The Restatement Are Enormous ................................................ 67

                a.     Effect on Revenues ................................................ 67

                b.     Effect On Net Income (Loss) From Operations ................................................ 68

                c.     Effect on Total Assets and Shareholders' Equity ................................................ 68

                d.     Effect on Earnings Per Share ................................................ 69

                e.     Effect On Reported Financial Metrics On a Quarterly Basis ................................................ 69

VII.   THE EXCHANGE ACT CLAIMS ................................................ 72

A.     DEFENDANTS' FALSE OR MISLEADING STATEMENTS ................................................ 72

        1.     Historical False or Misleading Statements ................................................ 73

                a.     Third Quarter 2014 ................................................ 73

                b.     Fourth Quarter 2014 and Full Year 2014 ................................................ 75

                c.     First Quarter 2015 ................................................ 77

                d.     Second Quarter 2015 ................................................ 78

                e.     Third Quarter 2015 ................................................ 80

                f.     Fourth Quarter 2015 and Full Year 2015 ................................................ 81

                g.     First Quarter 2016 ................................................ 84

                h.     Second Quarter 2016 ................................................ 86

|  |  | i. | Third Quarter 2016 ....................................................... 86 |
|  |  | j. | Fourth Quarter 2016 and Full Year 2016..................................... 88 |
|  | 2. | False and Misleading Guidance Statements ............................. 91 |  |
|  |  | a. | Third Quarter 2016 ....................................................... 91 |
|  |  | b. | Full Year 2017 ........................................................... 93 |

B.   ADDITIONAL ALLEGATIONS OF SCIENTER............................................. 94

    1.   The Magnitude of the Restatement Creates a Strong Inference of Scienter ................................................................................ 94

    2.   The Nature of the GAAP and Accounting Policy Violations Creates a Strong Inference of Scienter......................................... 95

    3.   Defendants' Abuses of Internal Controls Creates a Strong Inference of Scienter .................................................................. 96

    4.   Defendants' Knowledge of and Participation in the Fraudulent Accounting Scheme Creates a Strong Inference of Scienter ................... 99

    5.   Motive and Opportunity.......................................................... 100

C.   ADDITIONAL FACTS REGARDING DEFENDANTS' FRAUD...................................... 105

    1.   Lead Plaintiff's Confidential Witnesses ....................................... 106

|  |  | a. | Lead Plaintiff's Original Confidential Witnesses ....................... 106 |
|  |  | b. | Lead Plaintiff's New Confidential Witnesses............................. 108 |

    2.   The Company Had a Customary Business Practice of Using Written Contracts ................................................................ 111

    3.   The Company's Improper Revenue Accounting Practices.................... 120

    4.   The Company Improperly Booked $25 Million of Revenue in the Third Quarter of 2016 on a Verizon Licensing Deal ............................ 124

    5.   The Company's Improper Booking of a $5 Million Verizon Deal......... 125

    6.   The "Flash File" and the Company's Improper Reclassification of Expenses ........................................................................... 126

    7.   Rosenberger's Knowledge of the Company's Improper Accounting for the Openwave and Sequential Transactions..................................... 129

    8.   Additional Information Regarding The Individual Defendants' Unloading of Company Stock During the Class Period ........................ 131

D.   LOSS CAUSATION.................................................................... 132

E.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ......................................... 137

F.   PRESUMPTION OF RELIANCE............................................................ 138

G.   CLASS ACTION ALLEGATIONS .......................................................... 139

VIII.   CLAIMS FOR RELIEF .................................................................................. 141

FIRST CLAIM  Violation of Section 10(b) of The Exchange Act
(Against All Defendants) ...................................................................... 141

SECOND CLAIM  Violation of Section 20(a) of The Exchange Act
(Against Defendants Waldis and Rosenberger) .................................... 143

IX.   PRAYER FOR RELIEF ............................................................................... 144

X.   JURY TRIAL DEMANDED ........................................................................ 145

1.      Court-appointed Lead Plaintiff Employees' Retirement System of the State of Hawaii ("Hawaii ERS" or "Lead Plaintiff") brings this action individually, and on behalf of all persons and entities similarly situated, pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, *et seq.*, for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) promulgated thereunder against Synchronoss Technologies, Inc. ("Synchronoss" or the "Company") and certain Synchronoss officers, and for violations of Section 20(a) of the Exchange Act against those same officers who controlled Synchronoss.

2.      Lead Plaintiff alleges the following based on personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Lead Plaintiff's information and belief is based on, *inter alia*, the independent investigation of Court-appointed Lead Counsel, Grant & Eisenhofer P.A., and Liaison Counsel, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C., and/or third parties they have retained to assist in their investigation.  Following the dismissal without prejudice of Lead Plaintiff's Consolidated Amended Complaint (ECF No. 61), Lead Plaintiff continued its investigation and obtained significant additional evidence of Defendants' Exchange Act violations.  This Complaint retains all allegations in the Consolidated Amended Complaint and contains numerous additional facts uncovered by Lead Plaintiff, which are set forth in Section VII.C.  Lead Plaintiff's investigation included, but was not limited to:

(a)     review and analysis of (i) public filings with the U.S. Securities and Exchange Commission ("SEC") by defendant Synchronoss and others, (ii) research reports by securities and financial analysts, (iii) transcripts of investor conference calls, (iv) publicly available presentations by Synchronoss, (v) press releases and media reports, (vi) economic analyses of securities transaction and pricing data, (vii) publicly available filings by regulators, (viii) the initial class action complaints filed in this action, alleging, *inter alia*, violations of Section 10(b) of the Exchange Act, (ix) accounting standards and literature, including publications by Ernst &

Young LLP, and (x) other publicly available material and data identified herein;

(b)     consultation with relevant experts; and

(c)     interviews of confidential witnesses who are former employees of the Company (individually, a "CW," and collectively "CWs").

3.     In June 2017, Synchronoss first announced that its financial statements for 2015 and 2016 should not be relied upon and would need to be restated, and shortly thereafter it announced that its 2014 financial statements also should not be relied upon and would need to be restated.  Over one year later, on July 2, 2018, Synchronoss filed a series of disclosures with the SEC that included restated financial information for fiscal years 2014 through 2016 and a description of the circumstances that led to the restatement, and amended those disclosures on July 9, 2018 (collectively, the "Restatement").

4.     Although the Restatement has provided additional information about Defendants' fraud, in some circumstances Synchronoss has not identified certain agreements, customers, and/or transactions that are the subject of the Restatement.  Those as-yet-unidentified agreements and transactions, among other things, are subjects of the fraud committed by Defendants, as alleged further below.

## I.     INTRODUCTION

5.     This is a securities fraud case about a company that knowingly falsified its publicly reported revenues and the senior officers who caused it to do so.  Synchronoss is a mobile technology services company whose stock traded on NASDAQ prior to a suspension of trading in May 2018.  In 2017, Synchronoss withdrew its 2014, 2015, and 2016 financial reports and announced it would be restating those reports because they overstate revenues by as much as 10% per year.  Over a year later, in July 2018, the Company finally restated its 2014-2016

financial reports.  The restated financials reduce cumulative revenues for that period by $180 million (nearly 15%).

6.     Among other things, Synchronoss licenses software to cell phone service providers like AT&T and Verizon.  The software enables the providers' customers to, *inter alia*, activate mobile devices and provides the customers with data storage and back-up capabilities. Waldis and Rosenberger were the Company's CEO and CFO, respectively, during the relevant time (from 2014 to 2017), and AT&T and Verizon were, by far, Synchronoss's largest clients, accounting for as much as 75% of revenues.

7.     For companies having a practice of using written contracts to sell or license software (as Synchronoss did), the most basic rule is that revenue can be recognized *only* if a contract has been signed by both parties.  This is a bright-line rule under Generally Accepted Accounting Principles ("GAAP"), and, indeed, Synchronoss's own accountant, Ernst & Young ("E&Y"), made that plain in its revenue recognition guidelines, which state (emphasis added):

> [R]evenue recognition **is precluded** if a contract signed by both parties is not **in hand** at the end of the accounting period, **even if** the contract is executed soon thereafter and management believes that execution of the contract is perfunctory.  Letters of intent, memoranda of understanding and similar documents are **_not_** acceptable evidence of the arrangement.

8.     Defendants consciously, or at a bare minimum, recklessly, violated this simple rule, as attested to by confidential witnesses who are former Company employees, in order to fraudulently meet its guidance quarter after quarter over several years.

9.     For example, CW1, a former Synchronoss financial analyst with responsibility for revenue forecasting, as well as a certified public accountant and certified fraud examiner, has personal knowledge that Synchronoss improperly and prematurely recognized $5 million in revenue from a purported contract with Verizon in the first quarter of 2016 (ending March 31, 2016), even though this Verizon deal was only in initial discussion phases in March 2016, and

was still unsigned in April 2016, after the quarter closed.  CW1 participated in a meeting in April 2016 at the Company's Bridgewater headquarters at which Rosenberger and Synchronoss Executive Vice President and General Manager Joel Silverman discussed *whether* this Verizon contract had yet been signed—*after* the close of Synchronoss's 2016 first quarter.  The improper recognition of this $5 million in revenue from an unsigned contract with the Company's largest customer was highly material and enabled the Company to falsely meet its guidance when it reported 1Q2016 results after the market closed on May 5, 2016, which caused the stock to surge from $28.90 to $34.90 on May 6, 2016.

10.    CW2, a long-time Synchronoss employee at the Vice President level with over eight years' experience at the Company, provided details about other transactions in connection with which the same fraudulent practices were implemented.  CW2 had responsibility for overseeing contracts with the Company's largest customers, including AT&T, and reported directly to the Executive Vice President/General Manager tier.  According to CW2, the Company had a system of "checks-and-balances" (*i.e.*, internal controls relating to revenue recognition) which included a dedicated Revenue Recognition and Billing Manager who would typically demand documentation from new contracts to establish the appropriate timing of the recognition of revenues.  According to CW2, further, Synchronoss booked revenues of approximately $7 million in connection with two AT&T purchase transactions in late 2015 *that did not occur*.  As if this were not bad enough, CW2 was then expressly tasked by Company management *in 2016* with finding a way to retroactively justify the revenue numbers that had already been reported in 2015.

11.    According to CW2, the practice of booking revenues early and seeking to justify them later also repeatedly caused Synchronoss to scramble to make its financial reports seem

4

legitimate to auditors.  Like the $5 million in false Verizon revenue, the improper recognition of this $7 million in AT&T revenue (via, *inter alia*, conscious subversion of revenue recognition controls) enabled Synchronoss to falsely meet its guidance in 4Q2015.

12.     CW3, a former Synchronoss accountant, detailed still more troubling misconduct in Bridgewater.  According to CW3, Waldis, Rosenberger, Silverman, and President and Chief Operating Officer Robert (Bob) Garcia instructed the accounting staff to manipulate the Company's financial results for reporting purposes, including by bypassing the Company's revenue recognition procedures and other internal controls for the express purpose of (falsely) meeting earnings guidance.  CW3 specifically referenced an "infamous" $25 million transaction with Verizon that was booked as revenue without proper substantiation, over the "kicking and screaming" objections of a Synchronoss revenue recognition accountant (and other members of the accounting team) — objections that CW3 recalls Rosenberger overruled.

13.     CW3 confirmed that the financial results for *every quarter* during which Rosenberger was CFO (April 2014 to April 2017) were manipulated to avoid ever showing a decrease in profit margins.  Indeed, CW3 detailed the use of a "flash file" prepared by Synchronoss financial analyst Andrew Latyszonek for the purpose of manipulating expenses and other financial metrics to meet certain targets, which was shared with Rosenberger on a weekly basis, and which Rosenberger reviewed and approved.  From time to time, Latyszonek required CW3's cooperation to implement Rosenberger's instructions, but CW3 normally refused to participate; at that point, Latyszonek would seek and obtain Rosenberger's express authorization in writing (email) to make the desired adjustments.  Latyszonek was rewarded for his cooperation in 2016 with a substantial special bonus (which CW3 believes was $50,000).  Although accounting and revenue recognition staff protested against the fraudulent practices

implemented by Waldis, Rosenberger, and other senior officers, they were powerless to stop these abuses.

14.     In addition, Defendants knowingly hid from investors that Synchronoss had included a $9.2 million one-time license fee in its fourth quarter and 2016 yearly revenues to meet its targets.  This fee was derived from a highly unusual deal between Synchronoss and a newly-formed company called Sequential Technology International, LLC ("Sequential") with which Waldis had undisclosed "friends and family" connections through an obscure entity known as Rumson Hitters, LLC.  The licensing fee was agreed to in a contract Synchronoss executed on December 22, 2016, and was part of the consideration exchanged in Synchronoss's sale of one business segment—"Activation Services," as described below—to Sequential.  But Defendants concealed the fee and the contract, failing to disclose that the Company had met its guidance for 4Q2016 and FY2016 only by padding its revenues with a one-time fee.

15.     When, in early 2017, analysts pressed Waldis and Rosenberger for "a sense of the size of the revenues" from this Sequential transaction, the two specifically concealed the existence of the fee, the contract documenting it, and that the fee had been secretly included in 2016 revenues, and issued false revenue guidance for 2017.  Like revenue based on unsigned contracts, inclusion of this license fee in 2016 revenues was itself a violation of elementary GAAP rules because, as explained below, the Company in effect financed its own "revenues." The license fee should have been accounted for as a part of the Sequential transaction, not as stand-alone revenue.

16.     When, in February 2017, journalists began to reveal the truth about the Sequential deal in an exposé and Synchronoss was forced to admit the existence of the $9.2 million fee and

6

its inclusion in 4Q2016 revenues, Synchronoss's stock, then trading above $30 per share, immediately sank by 5%.  A cascade of corrective disclosures continued the downward spiral.

17.     Waldis and Rosenberger each resigned in early 2017.  Waldis was replaced by the former CEO of a company Synchronoss had recently acquired (Intralinks Holdings, Inc. ("Intralinks")) while Rosenberger was replaced by a former Avid Technologies CFO.  But within **two months** of taking their positions, both the replacement CEO and CFO abruptly resigned without explanation in April 2017.  The Company simultaneously announced a large miss of earnings guidance issued by Waldis and Rosenberger just a short time earlier.  This announcement caused the Company's stock price to **plummet 46% in one day** to close at $13.29 on gargantuan trading volume, and shortly thereafter, prompted a leading Wall Street analyst to ask in an analyst report:

> Ultimately, the question we (and everyone) need to ask is '**What exactly did the former executives see that caused them to abruptly leave***?*'

18.     Shortly thereafter, in June 2017, the Company withdrew its 2015 and 2016 financial statements, advising that they should no longer be relied upon and would need to be restated because they overstated revenues by as much as 10% each year as a result of "material weakness[es] in internal control over financial reporting relating to [the Company's] revenue recognition process," and announcing that NASDAQ may de-list it.  In other words, Synchronoss reported that its 2015 and 2016 revenues had been overstated by more than $105 million.  In October 2017, the Company withdrew its 2014 financial statements for similar reasons.

19.     These disclosures about the fraud resulted in the stock price sinking to single digits, but not before Waldis and Rosenberger used their insider knowledge to cash out millions of dollars in stock.  Waldis sold 569,800 shares during the Class Period for proceeds exceeding

$18 million (net of the aggregate exercise price of options) while Rosenberger sold 51,593 shares for proceeds exceeding $1.4 million (net of the aggregate exercise price of options).

20.     The revelation of this accounting fraud caused the stock price to plummet from more than $30 per share in late February 2017 (when journalists first cracked the Sequential story) to $11.26 per share in June 2017 (when the Company first announced the need for a restatement).  This plunge of more than 60% of the stock's value wiped out ***over $870 million*** in shareholder value in less than four months.

21.     The extent of the GAAP violations and internal control deficiencies here are so pervasive that it took Synchronoss over one year to complete its restatement.  The Company's restated financial reports were issued on July 2, 2018, and amended on July 9, 2018.  As the full Restatement now reveals, revenues for fiscal years 2014 through 2016 were overstated by $180 million, well in excess of the 10% Synchronoss first announced in June 2017.

22.     Synchronoss has admitted in the Restatement that throughout the relevant time it had "pervasive material weaknesses" in internal controls.  Indeed, those internal control deficiencies run so deep that Synchronoss has yet to publicly state that they have been remedied and NASDAQ has yet to lift the suspension on trading it imposed in May 2018.  As recently as August 9, 2018, the Company stated that it "do[es] not have a time line on" when, and if, NASDAQ will do so.  Now that the market is aware of the true state of Synchronoss's finances during the Class Period, the stock price is valued in the $6 range in over-the-counter "pink sheets" trading.

23.     If Waldis and Rosenberger had told the truth about Synchronoss's actual finances while they were unloading shares on the market prior to the stock's collapse, and their insider sales were at this $6 post-Restatement valuation, instead of at the lofty prices the stock reached

in the $30's and $40's while the fraud was ongoing, Waldis's insider sales of 569,800 shares during the Class Period would have netted him approximately $14,667,940.09 *less* than what he received from sales that took place during the fraud.  Similarly, Rosenberger's sale of 51,593 shares during the Class Period would have netted her $1,148,992.93 *less* than what she received during the fraud.

## II.  NATURE OF THE ACTION

24.    The claims asserted herein are based on the facts alleged herein, and arise under the Exchange Act.

25.    The Exchange Act claims are brought by Lead Plaintiff individually and on behalf of all persons and entities who, between October 28, 2014 (the date the Company announced its false or misleading third quarter 2014 financial results) and June 13, 2017 (the date of the last corrective disclosure), inclusive (the "Class Period"), purchased or otherwise acquired the securities of Synchronoss, and were damaged thereby (collectively, the "Class").

## III.  JURISDICTION AND VENUE

26.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

27.    This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

28.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Defendant Synchronoss maintains an office in this District. Many of the acts and transactions that constitute violations of law complained of herein took place in this District.

29.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.    PARTIES

### A.    LEAD PLAINTIFF

30.     Lead Plaintiff Hawaii ERS is a public pension fund providing retirement, disability, survivor, and other benefits to more than 135,000 members.  Its members include retirees, beneficiaries, inactive vested members, and active public employees working for the State and counties of Hawaii, including police officers, firefighters, teachers, professors, emergency medical technicians, and other State and county employees.  Hawaii ERS is responsible for managing over $17 billion in assets.  Hawaii ERS purchased shares of Synchronoss stock at artificially inflated prices during the Class Period as set forth in Appendix A, and suffered damages as a result of the violations of the federal securities laws alleged herein. On September 5, 2017, this Court appointed Hawaii ERS as Lead Plaintiff for this litigation.

### B.    THE CORPORATE DEFENDANT

31.     Defendant Synchronoss is a Delaware corporation with its principal executive offices located at 200 Crossing Boulevard, 8th Floor, Bridgewater, New Jersey 08807.  The Company's primary business is mobile technology services.  Until May 14, 2018, Synchronoss common stock traded on NASDAQ under the symbol "SNCR."  On May 14, 2018, a NASDAQ hearing panel suspended trading of shares of Synchronoss common stock on NASDAQ due to Synchronoss's failure to timely file its periodic financial reports.  As recently as August 9, 2018, the Company stated that it does not have a time line as to when, or if, the suspension of trading will be lifted.

10

32.     According to the Company's 2016 Form 10-K filed with the SEC on February 27, 2017, as of February 16, 2017 there were 45,998,579 shares of common stock outstanding.

C.     THE INDIVIDUAL DEFENDANTS

33.     Defendant Stephen G. Waldis founded Synchronoss and has served as its Executive Chairman since 2000.  In addition, Waldis was the Company's CEO from its inception in 2000 until January 18, 2017, when he resigned as CEO.  Waldis was reappointed as CEO on April 27, 2017, when his successor, Ronald Hovsepian (the former CEO of IntraLinks), resigned as CEO.  He resigned as CEO for a second time on November 13, 2017, when he was replaced by former AT&T executive Glenn Lurie.

34.     Defendant Karen L. Rosenberger is the former Chief Financial Officer and Executive Vice President of Synchronoss.  Rosenberger was the Company's CFO from April 2014 until April 1, 2017.  Prior to her appointment as CFO, Rosenberger was the Company's Chief Accounting Officer and Senior Vice President from January 2012 until April 2014.

35.     Defendants Waldis and Rosenberger are collectively referred to herein as the "Individual Defendants."

36.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's public statements. In addition, the Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Synchronoss's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports, press releases, and other public statements alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material

non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false or misleading statements pleaded herein, as those statements were each "group-published" information, the result of their collective actions.

## V.    FACTUAL BACKGROUND

### A.    SYNCHRONOSS'S BUSINESS

#### 1.    Company Background

37.    Synchronoss was founded in 2000 by Defendant Waldis, a former AT&T executive. Defendant Waldis began his career with AT&T, holding a variety of technical, product management, and sales and marketing positions with that company prior to founding Synchronoss. Waldis served as Synchronoss's CEO until January 18, 2017, when the Intralinks CEO took over. Waldis reassumed his position when the new CEO abruptly resigned just two months later, after becoming privy to internal records that ultimately necessitated a restatement of three years' worth of false financial results reported during Waldis's and Rosenberger's tenures as CEO and CFO, respectively. Rosenberger is now out of the industry completely. The Company stated that Rosenberger resigned to "pursue other opportunities"; her Facebook and LinkedIn pages indicated that she "started new job at Hand and Stone Facial Spa." Waldis was back in control as CEO of the Company that he founded for a short time, but he resigned as CEO once again on November 13, 2017.

38.    In 2000, to take advantage of the rapidly growing market for services involving mobile devices (e.g., cell phones), Waldis positioned Synchronoss to provide mobile device activation and customer relations services to commercial carriers, and in particular to AT&T.

When a consumer purchased a new cell phone with AT&T as its service provider, Synchronoss would provide "soup to nuts" service to AT&T, including software technology licenses, which enabled the consumer to simply open the box, automatically activate the cell phone and troubleshoot any issues using a customer service call center provided by or through Synchronoss. Depending substantially on its core relationship with AT&T, from which it derived the bulk of its revenues, Synchronoss focused on such activation services from 2000 to its initial public offering in 2006, and then for about six years thereafter into 2012.

39.     When Synchronoss completed its initial public offering in June 2006, it branded itself as an e-commerce software provider serving the communications industry.  At that time, its principal product was the "ActivationNow" software platform, a technology designed to automate the process of activating mobile devices and to facilitate delivery of communications services.  In 2005, the year prior to its IPO, it derived approximately 80% of annual revenues from its "long-standing relationship" with AT&T/Cingular Wireless.

40.     In or about 2013, to offset slowing growth in its activation services business—particularly in light of the expiration of AT&T's five-year agreement with Apple, under which AT&T alone would distribute and service iPhones from 2007 to 2012—Synchronoss started to rebrand itself as a consumer and enterprise "cloud" services provider.  The "cloud" is a network of remote servers hosted on the Internet and used to store, manage, and process data in place of local servers or personal computers.  Similar to "activation" services revenues, "cloud" revenues were generated through, inter alia, software subscription and licensing revenue and revenue from the provision of related services.

41.     Through acquisitions, the Company had initially established a small presence in the "cloud" market in the early 2010s.  Its cloud services segment enjoyed explosive growth in

2013 and 2014, quickly outpacing activation services to become the Company's key driver of growth.  By 2015, for the first time, cloud services reportedly generated a greater portion of the Company's total annual revenues than activation services.  Not surprisingly, Wall Street analysts in 2015 and 2016 began to look closely at cloud revenues as a key indicator of the Company's growth and profitability.  Indeed, the Company was so keenly aware of Wall Street's focus on the cloud business that it acknowledged in its April 2016 proxy statement that "[f]rom time to time, our stock has declined due to investors' concerns around our customer concentration and the ability of our telecommunication's cloud strategy to succeed…."  Thus, success in its cloud business was vital to maintaining the Company's stock price, and the Company and Company management were well aware of that reality.

42.     In addition, success in the cloud services market also became integral to executive compensation.  In 2014, Synchronoss changed its compensation policy to make success in the Company's cloud segment a substantial component of management compensation.  Indeed, the Company's 2014 Proxy Statement noted that even though revenues rose 28% in 2013 versus 2012, the Company's executive officers received a mere 25% of their incentive compensation targets because the targets were not focused on the proper mix of business.  So the Company performed a "clean slate" review of its compensation policies and revised them by, *inter alia*, adding cloud revenue as a performance metric for long-term incentive compensation awards. Thus, as discussed in detail below, in addition to insider trading profits, Waldis and Rosenberger and the rest of the Synchronoss management team were positioned to benefit substantially from artificially inflating revenues, particularly revenues related to the "cloud" segment.

43.     With "cloud" now firmly embedded in the Company's executive compensation philosophy, the Company's transformation from primarily an activation business to a cloud

services enterprise culminated in the December 2016 divestiture of the bulk of Synchronoss's activation business to Sequential. But as explained further below, the Sequential transaction included a $9.2 million licensing agreement that was concealed from investors to allow Synchronoss to falsely meet fourth quarter and full-year 2016 earnings targets. When SIRF blew the whistle about the Sequential transaction in February 2017, a cascade of events ensued, revealing a much wider fraud, which led to the announcement that three years' worth of the Company's financial reporting was false and to the Restatement.

### 2. The Company's Classification Of Revenues

44. During the Class Period, the Company had two primary lines of business: Activation Services and Cloud Services. Activation Services include mobile and other device activations and related services. Cloud Services include device and content management and backup services for both personal and commercial customers. The Company reports revenues associated with each line of business separately.

45. The Company classifies its revenues into four categories: (a) transaction fees, (b) subscription fees, (c) professional services, and (d) licensing. In reporting revenues for these categories, it aggregates transaction revenues with subscription revenues, and professional services revenues with licensing revenues. All four categories can include revenues generated in both the Activation Services and Cloud Services lines of business.

46. Synchronoss's transaction and subscription revenues derive from contracts that extend up to 60 months from execution. Transaction and subscription revenues account for a greater portion of total revenues than professional services and licensing revenues. For example, transaction and subscription revenues accounted for 77% of revenues for 2014 and 71% of revenues for 2015.

47.     Transaction revenues are principally based on a contractual price per transaction and include a variety of transactions, such as processing orders, setting up and activating accounts, porting telephone numbers, running credit checks, and performing inventory management.

48.     Subscription revenues are based on term contracts and include enterprise portal management services on a subscription basis, maintenance agreements on software licenses, active user fees and software-as-a-service fees, hosting and storage fees, and related maintenance support for those services.

49.     Synchronoss represented in its 2014, 2015, and 2016 Form 10-K filings that it recognizes transaction revenues "based on the total number of transactions processed at the applicable price established in the relevant contract." (2014 Form 10-K at 33; 2015 Form 10-K at 35; 2016 Form 10-K at 44)

50.     Synchronoss represented in its 2015 and 2016 Form 10-K filings that it recognizes subscription revenues "on a straight-line basis over the life of the contract or on a fixed monthly fee based on a set contracted amount." (2015 Form 10-K at 35; 2016 Form 10-K at 44) Synchronoss represented in its 2014 Form 10-K filing that it recognizes subscription revenues "on a straight-line basis over the life of the contract."  (2014 Form 10-K at 33)

51.     Professional services include process and workflow consulting services and development services.  Synchronoss represented in its 2014, 2015, and 2016 Form 10-K filings that it accounts separately for professional services revenues derived from transaction or subscription agreements "when the professional services have value to the customer on a standalone basis and there is objective and reliable evidence of fair value of the professional services."  When accounted for separately, Synchronoss represents that such revenues are

recognized "as services are performed and all other elements of revenue recognition have been satisfied."  (2014 Form 10-K at 34; 2015 Form 10-K at 35; 2016 Form 10-K at 44)

52.     Licensing includes arrangements with other companies for use of Synchronoss software products or platforms.  Synchronoss represented in its 2014, 2015, and 2016 Form 10-K filings that it recognizes such revenues "when the license is delivered to our customers and all of the software revenue recognition criteria are met" and that "we follow specific and detailed rules and guidelines related to revenue recognition." (2014 Form 10-K at 34; 2015 Form 10-K at; 2016 Form 10-K at 45)

### 3.     The Company's Revenue Growth Drivers

53.     Historically, AT&T was Synchronoss's most important Activation Services customer.  For example, while AT&T had an exclusivity agreement with Apple, under which AT&T alone would distribute and service iPhones from 2007 to 2012, Synchronoss handled iPhone activations for AT&T, among other things.

54.     While the Company's Activation Services business has declined over time, its Cloud Services business has expanded.  The Cloud Services business has grown rapidly, showing enormous year-over-year growth—even exceeding 100% growth in certain quarters.  By 2015, the Company's cloud business generated greater annual revenues than its activation business for the first time.

55.     Activation Services accounted for 54% of revenues in 2014, 46% of revenues in 2015, and 33% of revenues in 2016.  Cloud Services accounted for 46% of revenues in 2014, 54% of revenues in 2015, and 67% of revenues in 2016.

56.     Throughout the Class Period, Synchronoss's largest customers were Verizon and AT&T.  Contracts with Verizon and AT&T accounted for 73% of total revenues in 2014, 75% of total revenues in 2015, and 62% of total revenues in 2016.  In fact, Synchronoss repeatedly

referred to Verizon and AT&T as its core business during the Class Period.  For example, during a February 3, 2016 earnings conference call, defendant Waldis announced a new strategic venture with Verizon and referred to it as a "strategic relationship[] with [one of] our core communication service providers."  Rosenberger referred to Verizon as "our core customer" during the same call.  Similarly, during a March 16, 2016 Raymond James Institutional Investors Conference, Daniel Ives, Synchronoss's Senior Vice President, Finance and Corporate Development stated:  "obviously, AT&T and Verizon are our core customers, 75% of revenue."

57.     During the Class Period, Synchronoss's growth strategy focused on providing new services to its existing customers rather than marketing to new customers, primarily because its existing customers were captive—they have already incurred substantial expenses in adopting Synchronoss's infrastructure, making termination and replacement of Synchronoss an extremely expensive proposition—while new customers would be required to incur significant expenses to transition to Synchronoss.

58.     Synchronoss's growth strategy also included aggressively pursuing acquisitions.  For example, during the Class Period, Synchronoss acquired F-Secure Corporation's ("F-Secure") personal cloud storage business for $60 million in February 2015; SnapOne, Inc., a consumer cloud services company, in mid-2015; OpenWave Messaging ("OpenWave"), a messaging, security, and identity management firm servicing telecommunications carriers, for $125 million in March 2016; and, as discussed earlier, IntraLinks, a developer of virtual data room and document sharing software, for $821 million in January 2017.

59.     Synchronoss also acquired Voxmobili, S.A. ("Voxmobili"), an address book software developer primarily servicing European telecommunications carriers, for $26 million in July 2014.

**B.    SYNCHRONOSS SHIFTS TOWARD "CLOUD" SERVICES**

**1.    Synchronoss Rebrands Itself As A Leading Cloud Services Provider**

60.    Until 2012, Synchronoss described itself as "a mobile innovation company that provides activation and mobile content management solutions."   In 2013, it began describing itself as "the mobile innovation leader that provides personal cloud solutions and software-based activation for connected devices across the globe."

61.    The Company's rebranding as a leading cloud services provider was substantially complete by the third quarter of 2013, when the Company reported enormous growth in the cloud segment.

62.    As a Deutsche Bank analyst noted in early 2014, "After years of perception as an AT&T-focused story, SNCR has successfully refocused investors on new products and growth in the Personal Cloud segment, where Verizon Wireless is the biggest customer . . . ."

63.    As Defendants knew, the Company's Cloud Services segment was the main driver of the value of its stock price throughout the whole Class Period.   The Company's public statements, including financial reports and earnings guidance, reflect its focus on Cloud Services, and Company executives repeatedly acknowledged that Cloud Services offered greater growth opportunities than Activation Services.

64.    For instance, Company press releases and earnings calls accompanying quarterly or annual filings routinely included statements from Defendants Waldis and Rosenberger to that effect:

(a)    In the press release issued February 5, 2015, Defendant Waldis stated, "We believe that our expanding cloud services customer base, coupled with greater opportunities for subscriber adoption and utilization, provide a long runway for growth in this dynamic market."

(b)    Similarly, Defendant Waldis stated in an April 29, 2015 Company press release, "During the quarter, both sides of our business contributed to the

19

strong performance, particularly our Cloud Services, which grew by 63% year-over-year.  Mobile Operators around the world are capitalizing on the success of how personal cloud can drive important benefits to their valuable subscribers.   We are pleased with our successful formula for helping our customers gain adoption and success with our personal cloud platform."

(c)    Defendant Waldis stated in a July 29, 2015 Company press release that, "Each of our businesses performed well in the quarter and we were pleased to see some of our new wins begin to scale and drive volumes, particularly on the cloud side.   We are gaining strong traction among international mobile operators who are increasingly realizing the significant value Synchronoss's white-label cloud solution can deliver to their subscribers."

(d)    On the April 29, 2015 earnings call, Defendant Rosenberger stated:  "Our cloud business is the principal driver to the increased total revenue forecast [for full year 2015]."

(e)    On the October 28, 2015 earnings call, Defendant Waldis stated:  "[O]ur cloud business, launched in 2011, was a majority of our revenue in the third quarter, exceeded an annualized run rate of $300 million and grew over 30% for the quarter. The success of our cloud initiative has expanded our customer base, added a highly profitable revenue stream and demonstrated our ability to get into new markets and scale them fast."

65.    Indeed, the Company was so keenly aware of Wall Street's focus on the cloud business that it acknowledged in its April 2016 proxy statement (p. 33) that "[f]rom time to time, our stock has declined due to investors' concerns around our customer concentration and the ability of our telecommunication's cloud strategy to succeed…."

### 2.    The Company Transforms Its Executive Compensation Policies To Emphasize Cloud Services Revenues

66.    In 2014, Synchronoss introduced policies to make success in the Cloud Services business a substantial component of executive and management compensation.

67.    The Company's 2014 Proxy Statement, dated April 21, 2014, noted that although total revenues increased by 28% in 2013 versus 2012, with an operating income margin of 23%, the Company's executive officers received "only 25%" of their potential target compensation

because the incentive compensation criteria were not focused on the proper mix of business—that is, the criteria were not focused on growth in Cloud Services, which the Company had by then recognized as the primary revenue driver of the Company as a whole.

68.     Accordingly, the Company performed a "clean slate" review of its compensation policies and revised them by, *inter alia*, adding Cloud Services revenues as a "Strategic Performance Metric" for long-term incentive compensation awards.  The Company's stated purpose in doing so was to tie executive compensation to targets likely to "improve stockholder value," acknowledging that Cloud Services had become the *de facto* revenue and growth driver of the whole Company.

69.     With this transformation in executive compensation policy, the Company strongly incentivized executives, including Defendants Waldis and Rosenberger, to ensure that the Cloud Services business continued to meet, or appear to meet, revenue targets.

### 3.     Cloud Services Growth Spikes In Late 2014

70.     Cloud Services revenues were up 75% in the fourth quarter of 2013 and up 48% for full-year 2013, growing at over twice the rate of Activation Services.

71.     The segment continued its explosive growth in 2014, growing 83% year-over-year in the first quarter and 74% year-over-year in the second quarter.  The Company increased its full-year 2014 guidance based primarily on the strong growth in Cloud Services in the first two quarters of 2014.  Indeed, in those quarters, Activation Services growth was flat or down compared to growth in the first half of 2013.

72.     In the very next quarter following the Company's introduction of a new executive compensation policy taking Cloud Services performance into account as a key metric, Synchronoss announced record-breaking growth in that segment.

73.     Driven by Cloud Services revenues, Synchronoss's third quarter 2014 results, announced on October 28, 2014, far exceeded its own projections.  In that quarter, Cloud Services grew a staggering 115% year-over-year, prompting the Company to again raise its guidance in its October 28, 2014 announcement.

74.     On that date, the price of the Company's shares jumped from a close of $46.59 on October 27, 2014, to $51.95 on October 28, 2014, on substantial volume exceeding 2 million shares.

75.     Cloud Services continued the trend in the fourth quarter of 2014, growing 61% year-over-year, yielding a hefty total year-over-year 2014 growth rate of 82%.

76.     At the start of 2015, the Company continued to aggressively grow its Cloud Services business.  In the first quarter, the segment grew 63% compared to first quarter 2014, prompting the Company to yet again increase its guidance on the strength of the Cloud Services performance.

### 4.     Cloud Services Growth Tapers Beginning In Mid-2015 And The Company Enters Joint Ventures To Bolster Financial Results, While Organic Cloud Services Growth Diminishes

77.     Cloud Services grew 54% year-over-year during the second quarter of 2015, and 31% in the third quarter.  With its slowing—though still impressive—Cloud Services growth rates, Synchronoss indicated in October 28, 2015 statements that cloud projects with major customers, including AT&T, T-Mobile, and BT, were just getting started and should be expected to reignite the segment's historical growth rates.  In response to a question about growth of the Company's cloud business as a result of deals with AT&T and T-Mobile, Defendant Waldis stated:  "[I]t's a great question, to feel comfortable that we can maintain what we believe to be good growth rates.  If these [deals] end up materializing quicker, because of the adoption rate

shoot up, which we believe has the capability, but not guarantee in any of the accounts, then we have an opportunity to do better than that."

78.     In late 2015, Synchronoss formed two joint ventures ("JVs") to expand its role in cloud technology markets.  It formed SNCR, LLC, a joint venture with Goldman Sachs, in November 2015, and Zentry, LLC, a joint venture with Verizon, in December 2015.

79.     SNCR, LLC was formed to develop "advanced mobile solutions leveraging proprietary secure enterprise mobility technology" contributed by Goldman Sachs as well as Synchronoss's WorkSpace platform.

80.     Synchronoss obtained a 67% interest in SNCR, LLC in exchange for a perpetual license for the use of the WorkSpace platform.

81.     Goldman Sachs obtained a put option to sell its share of SNCR, LLC to Synchronoss, and Synchronoss obtained a call option to require Goldman Sachs to sell its share of SNCR, LLC to Synchronoss.  Goldman Sachs has a "redeemable non-controlling interest" in SNCR, LLC.  SNCR, LLC is a variable interest entity ("VIE"), of which Synchronoss is the primary beneficiary.

82.     The second JV, Zentry, LLC, was formed to develop and manage a secure mobile user identification and authentication platform.

83.     Synchronoss contributed $48 million to obtain a 67% interest in Zentry, LLC.

84.     Synchronoss's co-venturer, Verizon, obtained a put option to sell its share of Zentry, LLC to Synchronoss after December 31, 2018, and Synchronoss obtained a call option to require Verizon to sell its share of Zentry, LLC to Synchronoss after December 31, 2018. Verizon has a "redeemable non-controlling interest" in Zentry, LLC.  Zentry, LLC is not a VIE.

85.     On December 31, 2015, Zentry, LLC entered into a $23 million perpetual license agreement with a Verizon subsidiary for the use of certain Verizon user authentication software.

86.     Synchronoss's Cloud Services growth was reported to be up again in the fourth quarter of 2015, showing a year-over-year growth rate of 43%.

87.     However, the Company subsequently disclosed in its 2015 Form 10-K that $20.3 million of fourth quarter revenues were attributable to its joint ventures with Goldman Sachs and Verizon.  Taking this attribution into account, organic growth in the Cloud Services segment actually continued to slow, with only 11% year-over-year growth for the quarter.

### 5.     As 2016 Cloud Services Growth Stalls, The Company Reports A $25 Million Licensing Deal

88.     In 2016, the Company struggled to keep pace with the rapid growth in Cloud Services revenue reported in 2013, 2014, and the first half of 2015.  The first quarter of 2016 showed modest growth of 18% year-over-year in the Cloud Services business, and the Company reported 33% growth in the second quarter, 34% growth in the third quarter, and 36% growth in the fourth quarter.

89.     During the third quarter 2016 earnings call held on November 7, 2016, Defendant Waldis announced that the Company "signed a $25 million license deal with Verizon during the quarter."  Waldis explained that "[a] key contributor to our cloud performance in the quarter was continued success of the Verizon relationship, as we have significantly expanded our partnership during the course of 2016…."  Defendant Rosenberger confirmed during the same call that (emphasis added):

> our cloud business has hit an inflection point, as our previously stated strategic initiatives at Verizon on the Personal Cloud front enabled us to further expand our addressable market at this key customer with **a $25 million license deal signed and recognized in the quarter**. We expect this new strategic cloud initiative will help us realize more recurring revenues in the upcoming quarters…

90.     An analyst, Samad Samana of Stephens, Inc. followed up with a question for

Rosenberger (emphasis added):

> Karen, I have one question for you.  **On the $25 million Verizon deal in 3Q, was**
> **that baked into your initial guidance**, or was that a deal you were working on?  I
> guess I'm just trying to parse out how much of the upside contributed – came
> from that?  Then as you think about 4Q guidance, are there any lumpy type of
> deals from Verizon or any other cloud customers that we should be aware of?

Rosenberger replied (emphasis added):

> Yes, so clearly that deal has been in the works for little [sic] while and **was**
> **clearly contemplated while we were giving guidance on our last earnings call**.
> The only thing that I would say is by way of our overall business model, it
> remains unchanged from the 65% to 75% of our revenue streams coming from
> recurring sources of revenue with the balance coming from nonrecurring sources
> and that can vary from quarter to quarter.

91.     Waldis and Rosenberger thus admitted that Synchronoss had benefitted by

recognizing $25 million of license revenue from the Verizon contract solely in the third quarter

of 2016 and that they had included this $25 million of license revenue in the Company's 2016

earnings guidance figures.  Indeed, in a November 7, 2016 analyst report issued after the call,

Wells Fargo analyst Gary Powell reiterated his "Outperform" rating on Synchronoss, stating

(emphasis added):  "SNCR's Q3 **revenue benefitted from a $25MM license fee with Verizon**

**that was contemplated in prior guidance**.  These large license fees have historically been a

leading indicator of recurring revenue growth, and the Company indicated as much on the

earnings call.  On an organic basis (including the fee), we estimate that SNCR's revenue growth

improved 18% in Q3 vs 9% in 1H [*i.e.*, first half] [20]16."  Similarly, JP Morgan analyst Sterling

Auty increased his price target on Synchronoss from $56 to $65 based in part on the ostensible

fact that "the cloud business continues to outperform with a further expansion of the Verizon

relationship and a $25 million deal in the quarter."

92.     In the Restatement, however, Synchronoss disclosed that only $17.1 million of license revenue had been recognized for *the entirety of 2016*.  Consequently, the amount of revenue recognized from the $25 million Verizon contract in the third quarter of 2016 results was clearly adjusted substantially downward as part of the Restatement.

93.     CW3, who indirectly reported to Rosenberger (by way of the Company's controller), provided details about the $25 million Verizon transaction booked in the third quarter of 2016.  CW3 is a former Synchronoss accountant employed by the Company in its Bridgewater headquarters from 2011 to April 2017.  CW3 had responsibility for accounts payable functions (processing invoices and payments) and other expense accounting functions.  CW3 implemented the Company's internal Oracle financial system and undertook duties relating to financial reporting operations.

94.     According to CW3, this transaction was "infamous" among the Company's accounting and revenue recognition teams as an example of the Company's serious accounting abuses.  CW3 stated that the Company did not have substantiation justifying the recognition of this revenue.  CW3 recalled that, at the time, the Company's Revenue Recognition and Billing Manager was on maternity leave, and a Synchronoss accountant and member of the revenue recognition team, who according to her LinkedIn profile has been employed by Synchronoss as a Senior Accountant since January 2015, was filling in for her.   This Senior Accountant vehemently protested the directive from management to book this $25 million revenue— "kicking and screaming," according to CW3—because the Company lacked substantiation for the deal.  According to CW3, the Senior Accountant protested that the decision to book the revenue went "against procedures" that stated Synchronoss had to have "x, y, and z, signed and sealed and delivered before" revenue could be recognized.   CW3 reports that executive

management instructed the Senior Accountant to book the revenue despite these objections. CW3 recalls that this was done at the direction of Rosenberger.

95.     The $25 million Verizon license deal enabled the Company to report substantial growth in the third quarter of 2016.  Synchronoss reported $101.9 million in Cloud Services revenue and $176.4 million in total revenue in that quarter.  In the absence of the supposed $25 million Verizon license deal, Cloud Services revenue would have been $76.9 million and total revenue would have been $151.4 million, which would not have shown any growth over cloud services revenue for the 3Q of the prior year.  Thus, cloud services revenue for 3Q 2016 was $76.9 M compared to $76.1 M for 3Q 2015; and total revenue was $151.4 M vs. $150.9 M for the prior year.  Given analysts' and the market's focus on the Company's cloud services revenue growth, improperly booking revenue from the Verizon contract to maintain artificially inflated cloud services and total revenue growth helped to keep Synchronoss's stock price artificially high.

96.     At a subsequent earnings call for the fourth quarter of 2016, held February 8, 2017, an attendee, Samad Samana of Stephens, Inc., asked Defendant Waldis for more details about the $25 million Verizon license deal:

> The Verizon, the $25 million payment that was announced last quarter.  We have been told that, that is a new product or a new initiative.  Is that separate from what you're talking about at Mobile World Congress on the analytics side, or is that the same announcement?  Maybe help us understand that?

Defendant Waldis responded:  "Two different things.  The Verizon opportunity is a relationship that you will hear more about in Q1 [of 2017] that is not publicly announced."  The Company never provided more details about the "Verizon opportunity" because it was a phantom contract for which the Company lacked substantiation.

**C.** **SYNCHRONOSS DIVESTS ITS ACTIVATION SERVICES BUSINESS, ACQUIRES INTRALINKS, AND COMPANY EXECUTIVES RESIGN**

**1.** **In Early December 2016, Synchronoss Agrees To Sell Its Activation Business To Sequential**

97.    Throughout 2016, Activation Services revenues were negative year-over-year (i.e., declining in growth) or flat (i.e., roughly equivalent in growth).

98.    On November 7, 2016, the Company announced on its quarterly earnings call that it was reviewing strategic alternatives concerning its Activation Services segment.

99.    Less than a month later, it had formed an agreement to sell 70% of the Activation Services segment to a new company, Sequential, that according to a February 24, 2017 Southern Investigative Research Foundation ("SIRF") article, is owned primarily by "friends and family" members of Synchronoss executives, including Defendant Waldis.

100.    Sequential was formerly known as Omniglobe, which was owned in part by Defendant Waldis.  At the time of the transaction, Sequential was owned and controlled by, among others, friends and family of Defendant Waldis, including former co-owners of Omniglobe.  In fact, according to the February 24, 2017 SIRF article, Synchronoss engaged in a series of improper transactions with Sequential, with which Waldis has friends and family connections through an obscure entity known as Rumson Hitters, LLC.  The same article reported that Sequential is "a corporate shell, formed in early November, 2016….by…a former neighbor of Stephen Waldis and an early-stage Synchronoss investor," while "'Rumson Hitters' is an inside joke among the families of several of Synchronoss'…founders like Waldis and his fellow Seton University [sic] Alum" who lives in Rumson, New Jersey, and was formed to support Synchronoss's business since its inception.

101.    Under the terms of the deal, as announced on December 6, 2016, Synchronoss would retain a 30% stake in the Activation Services business and receive $146 million from Sequential.

102.    Sequential funded the bulk of its acquisition of Synchronoss's Activation Services business with a Seller's Note from Synchronoss in the amount of $83 million and an undisclosed guarantee to Goldman Sachs of $30 million of the $40 million term loan Goldman Sachs had made to Sequential.   Stated differently, Synchronoss fronted Sequential nearly 60% of the purchase price.  As the Company disclosed in the 2016 Form 10-K, Sequential paid only $18.1 million in cash to consummate the transaction.

103.    The Company also disclosed its intent to divest the remaining 30% ownership stake in the Activation Services segment during the 2017 fiscal year.

> **2.     On The Same Day Synchronoss Announces The Sequential Transaction, It Announces The Acquisition Of IntraLinks And That The IntraLinks CEO Will Replace Defendant Waldis As Synchronoss's CEO**

104.    The Company's divestiture of its Activation Services business occurred simultaneously with its acquisition of IntraLinks, a cloud services provider.

105.    On the very same day the Company announced that it would divest its Activation Services business in the Sequential transaction, it announced that it had agreed to acquire IntraLinks in an all-cash tender offer of $13 per share, or $821 million.

106.    Synchronoss funded the IntraLinks deal with proceeds from the Sequential transaction and $900 million in new debt.

107.    In connection with the IntraLinks acquisition and Sequential divestiture, Synchronoss announced that Defendant Waldis would soon step down from his position as CEO and that Ronald Hovsepian, head of IntraLinks, would assume that position.

3.     **In Late December 2016, Synchronoss Recognizes $9.2 Million In Revenue From A Licensing Agreement With Sequential But Fails To Disclose That Fact For Several Months And Synchronoss Also Fails To Disclose That It Had Secretly Provided A Guarantee To Goldman Sachs As Part of the Sequential Transaction**

108.    Unbeknownst to investors, in connection with the Sequential transaction, Synchronoss and Sequential had entered into a software license agreement under which Sequential obtained a perpetual license for certain analytics software products owned by Synchronoss, which Synchronoss had valued at $9.2 million.

109.    In addition, as Synchronoss has now recognized in the Restatement, Synchronoss failed to disclose that as part of the divestiture of Sequential, Synchronoss provided a guarantee to Goldman Sachs for $30.0 million of the $40.0 million in senior debt extended by Goldman Sachs to Sequential.

110.    Synchronoss booked the $9.2 million licensing fee as revenue in the fourth quarter of 2016, but did not disclose that fact until months later, after the aforementioned SIRF investigative report surfaced in late February 2017.  After the SIRF article, the Company included mention of the $9.2 million agreement in its 2016 Form 10-K filed with the SEC on February 27, 2017.

111.    Between December 6, 2016 and February 26, 2017, Defendants had several opportunities to disclose the Sequential license agreement and the associated $9.2 million valuation, which was added directly to fourth quarter 2016 revenue, but failed to do so. Defendants also concealed the fact that the Company had provided a $30 million guarantee to Goldman Sachs in connection with the Sequential divestiture.

112.    For example, on December 6, 2016, Synchronoss filed a Form 8-K including a 16-page slide deck entitled "Welcome to Synchronoss 3.0: IntraLinks Acquisition Overview and

Activation Divestiture," which outlined the terms of the Sequential transaction.  The 8-K and the slide deck failed to disclose the license agreement and the Goldman Sachs guarantee.

113.   On January 5, 2017, Synchronoss filed a Form 8-K containing preliminary financing materials relating to the IntraLinks acquisition and Sequential transaction.  This 8-K also failed to disclose the licensing agreement and the Goldman Sachs guarantee.

        **4.**       **In Early February 2017, Analysts Press For Details On The Sequential Transaction, But Defendants Rosenberger And Waldis Continue To Conceal The $9.2 Million Sequential Licensing Fee And Other Material Terms of the Sequential Deal**

114.   The Company announced its fourth quarter 2016 financial results on February 8, 2017, issuing a Form 8-K and press release and hosting an investor conference call.  The Company addressed the Sequential transaction in the Form 8-K and press release, and Defendants Waldis and Rosenberger each addressed the Sequential transaction during the conference call—including in their responses to questions about the transaction from attendees.  Once again, no mention of the licensing arrangement or the Goldman Sachs guarantee was made, as detailed below.

115.   On the February 8 conference call, Tavis McCourt, an analyst with Raymond James & Associates, Inc., specifically asked Defendant Rosenberger the following:

> Then just some details on the Sequential sale.  Can you give us a sense of the size of the revenues that you will be generating from Sequential for providing them services during the transition period, and maybe the margins on those revenues and the timing of when you would expect them to go away?

Defendant Rosenberger answered:

> I can give you some information on that, Tavis.  I think as we went through the transaction we had talked about the fact that we were going to provide ongoing services for a three-year term to Sequential Technologies.  Obviously contractual, around $30 million in revenue per year over the next three years associated with those services.  As far as margins, et cetera, we don't give those details, but it's clearly consistent with our mix of business.

116.    In response to a follow-up question concerning "the terms on the $83 million receivable in terms of is there a due date on that," Defendant Rosenberger stated:

> One thing I would really note on any of the Sequential Technologies information that made it to our balance sheet is obviously it's a partnership with Sequential, but we are anticipating that they will likely refinance that over the next couple of quarters. . . .

117.    Defendant Waldis supplemented Defendant Rosenberger's response, stating:

> "That's right. There's a couple of things. One is that when we did the original financing and we ran a process with various different folks, one of the things we did we kept to a small group because we didn't want any, obviously, on the financing side. We expect them to refinance. They're in the process of that already. In fact, we had mentioned about our 30% ownership in the entity being cashed out or sold out is the expectation during 2017. . . .

118.    A different analyst, Samad Samana from Stephens, Inc., asked Defendants for more detail about the Sequential deal and the $32 million transition services agreement payment:

> I actually wanted to follow up on the $32 million payment. I am curious, when you gave the original $520 million of cloud revenue guidance for calendar 2017, did that assume the $32 million services agreement? Or how much of this analytics revenue that is now being put into cloud was previously in activations? I guess I'm trying to bridge the map [sic] of guidance didn't change but there this [sic] $32 million payment now that you're getting. Help me understand where that was classified before, or where you thought that would be classified into.

119.    Defendant Rosenberger responded to Mr. Samana's question as follows: "No, this is new analytics revenue, as we talked about. Clearly the $32 million is part of a TSA [transition services agreement] arrangement, but it is all around the analytics."

120.    In each of the foregoing exchanges, Defendants Waldis and Rosenberger had ample opportunity to disclose the Sequential licensing agreement and its $9.2 million contribution to fourth quarter and full-year 2016 revenues, but instead concealed it. Defendants also concealed the $30 million guarantee to Goldman Sachs. Defendants' scheme to conceal the

one-time $9.2 million Sequential licensing fee, and the fact that it had been included in fourth quarter 2016 revenues, began to unravel with publication of the SIRF article.

121.    During this call, Synchronoss also announced that Rosenberger would be stepping down as CFO, but would remain in that position going forward until a replacement could be found.

> **5.      Synchronoss's Stock Price Drops 5% After An Investigative Journalist Report and Synchronoss's Subsequent Disclosure That The $9.2 Million Sequential Licensing Fee Was Included In Fourth Quarter 2016 Revenues**

122.    According to its website, SIRF is an investigative journalism concern that was launched in 2012 with the goal of providing in-depth financial investigative reporting for the common good.   SIRF conducted an investigation related to the Sequential transaction.   On February 24, 2017, SIRF published an article entitled "*Synchronoss Technologies:  The Friends and Family Plan*" in which it raised substantial questions about the Sequential transaction and concluded that "Synchronoss's public statements about the Activation unit's buyer [*i.e.*, Sequential] are incomplete, at best."

123.    The SIRF article explained that Sequential was the current iteration of a company formerly known as Omniglobe, which was owned by Waldis and certain other investors, including investors with close connections to Waldis.  At the time of the transaction, Sequential was owned and controlled by, among others, friends and family of Waldis, including former co-owners of Omniglobe now holding a stake in the special purpose vehicle named Rumson Hitters, LLC, as described above.  SIRF reported that Sequential is "a corporate shell, formed in early November, 2016….by…a former neighbor of Stephen Waldis and an early-stage Synchronoss investor," calling Waldis' credibility, the Company's statements about the Sequential divestiture, and the legitimacy and completeness of the figures disclosed by the Company into question.

124.    After the SIRF article was published, prompting the Company to disclose in its 10-K, for the first time, that fourth quarter 2016 revenues were artificially boosted by the $9.2 million licensing fee, the Company's stock price sank more than 5% from a close of $30.49 on February 24, 2017 to $28.69 on February 27, 2017.

### 6.    Defendant Rosenberger Resigns In Early 2017 And A New CFO Takes Over

125.    On February 14, 2017, the Company announced that Defendant Rosenberger's previously announced intention to resign as CFO was now official and she would resign effective April 1, 2017.    The press release stated that Rosenberger resigned to "pursue other opportunities."   At the time of her abrupt departure, Rosenberger had a year remaining on her employment contract with Synchronoss.

126.    Defendant Rosenberger's Facebook and LinkedIn pages state that she presently works for and/or owns a spa in Virginia.  She is no longer a public company CFO.

127.    In a press release dated February 27, 2017, the Company announced that IntraLinks' CFO, John Fredericks, had been appointed CFO of Synchronoss, effective immediately.  In a subsequent Form 8-K, filed on March 2, 2017, Synchronoss disclosed that Mr. Frederick's compensation package includes an annual base salary of $425,000, annual performance bonus of up to 80% of his salary, $450,000 in restricted stock, and a target value of $1.9 million in long-term incentives.

128.    The March 2, 2017 Form 8-K also stated that Defendant Rosenberger was awarded a severance package including a payment of $1,203,681, a transition payment of $200,000, and a three-month consulting arrangement for which she would be paid $580,000.

### D.     THE NEW SYNCHRONOSS CEO AND CFO RESIGN WITHIN TWO MONTHS

129.    On March 30, 2017, the Company announced details surrounding recently appointed CEO Hovsepian's compensation package, including his salary of $609,000 with a 110% performance bonus, 156,515 stock options, 54,780 restricted shares, and 54,780 performance shares for 2017.

130.    Less than a month later, on April 27, 2017, the Company announced that Messrs. Hovsepian and Frederick, the CEO and CFO of Synchronoss, respectively, would resign to "pursue other interests" and simultaneously announced a large miss of earnings guidance issued by former management (i.e., Defendants Waldis and Rosenberger) just a short time earlier, which as noted above, caused the Company's stock price to plummet 46% in one day.

131.    In connection with their resignations, Messrs. Hovsepian and Frederick received lump-sum payments of $3.2 million and $1.2 million, respectively.  Mr. Hovsepian was also awarded a two-year consulting agreement under which he would receive $750,000 per year.

132.    Defendant Waldis was re-appointed CEO on April 27, 2017.  Lawrence Irving, the Company's former CFO from 2001 to July 2014, was re-appointed CFO on the same day.

133.    Defendant Waldis stepped down as CEO – for a second time – on November 13, 2017.

### 1.     The Company Announces, But Never Holds, A Highly Anticipated May 2017 Earnings Conference Call

134.    The April 27, 2017 announcement also stated that the Company would hold a conference call on May 9, 2017 to discuss financial issues and presumably the host of problems that had been disclosed.

135.    An April 27, 2017 analyst report by Stephens Inc. summarized the situation as follows:

**May 9th conference call could provide more clarity**.  Over the last five months, SNCR has divested its primary legacy business (Activation Services), bet the farm on another large business (IntraLinks), re-classified revenue without making it clear to investors and then providing some details well after the fact, flip flopped CEOs, lost/fired two CFOs, and underperformed against implied expectations and consensus estimates.  All of these actions have resulted in significantly more questions than answers about the future of the business.  We hope to get more clarity when the leadership team reports final 1Q results on May 9th around the strategic direction of the company….

136.    That conference call was never held.  Instead, as discussed earlier herein and in more detail further below, the Company canceled the call, and subsequently announced the need to restate three years' worth of its financial statements due to widespread accounting issues and GAAP violations that have resulted in its financial statements for 2014, 2015, and 2016 being restated, with revenues for the three years being adjusted downward by nearly ***$180 million***.

## 2.    The Company Sells IntraLinks Less Than Nine Months After Acquiring It, And CEO Waldis Resigns Once Again

137.    On November 16, 2017, the Company announced that, after buying IntraLinks only nine months earlier, it had sold IntraLinks to a private equity firm and CEO Waldis had, once again, stepped down as CEO.

138.    According to a November 16, 2017 Dow Jones Institutional News article, the holders of a majority of Synchronoss's $226 million in convertible bonds maintain that the sale of IntraLinks constituted a sale of "substantially all of Synchronoss's assets" and breached the borrowing covenants in the governing indenture.

139.    On November 20, 2017, the Company filed a Form 8-K with the SEC disclosing that it remains subject to delisting by NASDAQ due to "its delayed filing of the Company's Forms 10-Q for the quarters ended March 31, June 30, and September 30, 2017 with the SEC." The Company further disclosed that it will seek a hearing to stay delisting from NASDAQ and that "[a]t the hearing, the Company will present its plan to regain compliance with the Rule and

will request the continued listing of its common stock on Nasdaq while it works to become current in its periodic public filings with the SEC."

140.     After a protracted effort to delay the inevitable, Synchronoss was suspended from NASDAQ on May 14, 2018.  As recently as August 9, 2018, when the Company filed a Form 10-Q and held an investor conference call, the Company stated that it "do[es] not have a time line" as to when the suspension of trading will be lifted.

141.     The admitted internal control deficiencies giving rise to the Restatement are so pervasive that, as of the date of this filing, Synchronoss has yet to announce that it has remediated those deficiencies.

## VI.     DEFENDANTS' FRAUDULENT SCHEME TO INFLATE THE COMPANY'S STOCK PRICE BY MANIPULATING ITS ACCOUNTING

142.     In part because the Company could not sustain the break-neck pace of growth that the Cloud Services segment initially showed, Defendants resorted to accounting manipulation in order to meet or exceed their financial projections and earnings guidance statements.  In this way, as detailed herein, Defendants managed to artificially prop up the Company's stock price throughout the Class Period.

143.     The financial results and guidance statements issued by the Company during the Class Period were materially false or misleading because they were tainted by Defendants' practice of improperly and prematurely recognizing revenues.  The Company improperly booked revenues that purportedly derived from contracts or agreements that had not, in fact, been signed at the time the revenue was booked, and prematurely booked revenues from contracts or agreements that should have been recognized ratably over several quarters or years.  As explained below, these practices included, *inter alia*, improperly recognizing revenue from

contracts with Verizon and AT&T — Synchronoss's two largest customers — in addition to the Sequential licensing transaction and certain other transactions detailed herein.

144.    The Restatement confirmed the nature of the accounting improprieties that Synchronoss had carried out for years in order to falsely bolster its revenue and falsely minimize its expenses.   The three primary categories of adjustments of revenue identified in the Restatement are:

- a. **Revenue Recognition Adjustments Relating to Hosting Services**:  These revenue adjustments relate to contracts with subscription services customers and certain software license customers whereby Synchronoss booked certain components of revenue on an upfront basis that should have been recognized ratably over time.

- b. **Revenue Recognition Adjustments Related to Establishing Persuasive Evidence of an Arrangement**:  These revenue adjustments relate to Synchronoss's booking of revenues relating to a transaction in a period prior to there being sufficient documentation of an agreement with the customer about the transaction.

- c. **Adjustments Related to Accounting for Acquisitions and Divestitures**: These revenue adjustments relate to the Company's improper treatment of fees for licenses that were entered into in connection with certain acquisitions and divestitures.  Initially, these licensing fees were improperly accounted for on a gross basis as revenue.  As part of the Restatement, Synchronoss reversed this revenue in recognition of the fact that the fees had actually been negotiated as part of the accounting for acquisition or divestiture.

**A.    DEFENDANTS IMPLEMENTED A REVENUE ACCOUNTING POLICY OF "BOOK NOW, JUSTIFY LATER"**

**1.    Synchronoss's Senior Management Overrode The Company's Revenue Recognition And Billing Manager**

145.    Throughout the Class Period, the Company had a revenue recognition accounting process in place designed to validate and substantiate projected revenues from customer agreements, software licenses, and other contracts.  As stated earlier, the Company employed a dedicated Revenue Recognition and Billing Manager, who was responsible for confirming the

accuracy of recorded revenue streams and the propriety of recognizing revenues.  The Revenue Recognition and Billing Manager was formerly a senior auditor for a major accounting firm.

146.    According to CW2—a long-time Synchronoss employee at the Vice President level, with over eight years' experience at the Company (2008-2016), who was responsible for overseeing contracts with the Company's largest customers through 2016, including the AT&T relationship, and who reported directly to the Company's Executive Vice President/General Manager tier—only senior Company officers were capable of overriding the Revenue Recognition and Billing Manager, or bypassing the revenue recognition accounting process entirely.  CW3 confirmed that only Waldis, Rosenberger, Garcia (who reported to Waldis), and Silverman (who reported to Waldis via Garcia) were capable of overcoming the revenue recognition procedures in place at the Company.

147.    According to CW2, the Revenue Recognition and Billing Manager routinely demanded from the employees responsible for overseeing the relevant client relationships all documentation substantiating revenues from new contracts, licenses, or other agreements, as well as any other information necessary to establish the appropriate timing of the recognition of such revenues.  As CW3 put it, the procedure in place was described to CW3 by revenue recognition personnel as a requirement that an agreement be "signed and sealed and delivered before" revenue could be recognized.

148.    This system of "checks-and-balances" was overridden by senior management, including Waldis and Rosenberger, during the Class Period.  As detailed below, when the Company's actual quarterly revenues fell short of its projections or market expectations, senior management selectively disabled this validation system to conceal the shortfall and artificially inflate revenues.

149.    Indeed, CW3 reports that during *every quarter* in which Rosenberger was CFO (April 2014 to April 2017), the Company's financial metrics were materially manipulated at her direction for the express purpose of never showing a decline in the Company's profit margin.

150.    Defendants' selective "book now, justify later" philosophy enabled the Company to prematurely book revenues and meet or exceed its financial projections and earnings guidance statements, as well as the expectations of investors and market analysts, but, according to CW2, the practice also repeatedly caused Synchronoss to scramble to make the Company's financial reports seem legitimate to auditors.  Indeed, as alleged below, from February 2016 to December 2016, CW2 was expressly tasked with making revenue figures from 2015 appear legitimate.  The Restatement admits that there were "instances where there were additional arrangements entered into that **were not properly disclosed**" (emphasis added) to the Company's external auditors, and, as a result, Synchronoss "terminated for cause three employees who participated in, or condoned, such conduct."

151.    As alleged above, Synchronoss's revenue recognition practices also generated substantial internal dissent at Synchronoss.  According to CW3, the accounting and revenue recognition staff were well aware of the falsity of the reported financial figures, and the fact that Waldis and Rosenberger ran roughshod over the Company's internal accounting and revenue recognition policies, but were powerless to stop it.  According to CW3, the most egregious example of this was vehement opposition ("kicking and screaming" opposition, according to CW3) by a Synchronoss Senior Accountant (along with other members of the accounting team, including the Company's former Corporate Controller) to the booking of $25 million in revenues in third quarter 2016 purportedly relating to a Verizon deal that did not have substantiation. Rosenberger instructed this Senior Accountant, who was a member of the revenue recognition

team, to book the revenue despite this glaring deficiency.  According to CW3, this deal became "infamous" among the accounting and revenue recognition teams for that reason.

152.   Ultimately, this unlawful approach to booking revenues culminated in the Company's need to restate its quarterly and annual financial reports for 2014 through 2016.

### 2.   Premature Revenue Recognition With Respect To Verizon And AT&T Contracts

153.   According to CWs, Synchronoss booked revenues from contracts or agreements that were not yet signed as of the closing of the reporting period in which the revenue was recognized, or from contracts or agreements that were never signed.

154.   Synchronoss and its customers had a practice of using written contracts when entering into business arrangements.  This is confirmed by the language that Synchronoss uses in its annual filings to describe contracts that it has entered into.  For example, Synchronoss's 2016 Form 10-K contained the following statements that reflect the Company's practice of using written contracts:

- "We generate a substantial portion of our revenues on a per transaction or subscription basis, which is derived from contracts that extend up to 60 months *from execution*.";

- "In periods of economic slowdown our typical sales cycle lengthens, which means that the average time between our initial contact with a prospective customer and *the signing of a sales contract* increases.";

- "Because we recognize revenue for certain of our products and services ratably over the term of our customer agreements, downturns or upturns in the value of *signed contracts* will not be fully and immediately reflected in our operating results."

In addition, Synchronoss has publicly filed written contracts with customers as part of its SEC reporting obligations.  For example, the September 1, 2005, Master Services Agreement, which governs the relationship between Synchronoss and one of its largest customers, AT&T, provides:

"This Agreement and any Orders placed hereunder may be amended or modified only by a written document *signed* by the authorized representative of the Party against whom enforcement is sought."   The Master Services Agreement was ***personally signed*** by defendant Waldis. Defendant Rosenberger specifically discussed the Master Service Agreement with analysts on, at the very least, a November 16, 2016 Credit Suisse Technology, Media and Telecom Conference. Furthermore, at a December 1, 2015 Credit Suisse Technology, Media & Telcom Conference, in response to a question from Credit Suisse analyst Michael Nemeroff asking Rosenberger to "[t]ell us about your relationship with Verizon, whether that's good, bad, better, or worse than when you *signed* the contract," Rosenberger confirmed that "the Verizon contract goes through 2018."   Similarly, during the Company's Q4 2014 earnings conference call in which Rosenberger participated, Waldis stated "in the fourth quarter and the first few weeks of 2015, we've executed on a number of exciting opportunities, including *signing* a substantial expansion of our contract with Verizon Wireless."

155.   Among other things, the practice of recognizing revenues from contracts or agreements that have not yet been signed violates both common sense and Accounting Standards Codification ("ASC") 985-605-25-3, which establishes basic revenue recognition criteria for software licenses.  Subpart 3a provides that revenue may only be recognized when "[p]ersuasive evidence of an arrangement exists."  Similarly, ASC 985-605-25-17 provides that "revenue shall not be recognized on any element of the arrangement unless persuasive evidence of an arrangement exists."

156.   ASC 985-605-25-16 states:  "If the vendor has a customary business practice of using written contracts [as Synchronoss did here], evidence of the arrangement is provided **only** by a contract signed by both parties."   Waldis and Rosenberger were clearly aware of this

requirement, especially since Waldis signed a "master" contract with AT&T which expressly stated that all subsequent orders must be confirmed in a signed, written contract.

157.  Software revenue recognition guidelines published by the Company's own auditors, Ernst & Young LLP (revised September 2016), state further that (emphasis added):

> If a vendor's customary practice is to obtain signed contracts to evidence an arrangement, revenue recognition is ***precluded*** if a contract **signed by both parties** is not **in hand** at the end of an accounting period, even if the contract is executed soon thereafter and management believes that execution of the contract is merely perfunctory.   Letters of intent, memoranda of understanding and similar documents are **_not_** acceptable evidence of the arrangement.

158.  As discussed below, Defendants flouted these common-sense rules that revenues must not be recognized unless and until the underlying contract or agreement is executed and is in the hands of management prior to the end of an accounting period, and misrepresented the truth in SEC filings during the Class Period when they stated "we follow specific and detailed rules and guidelines related to revenue recognition" and comply with GAAP.

159.  Indeed, the Restatement acknowledges improper accounting respecting customers (such as AT&T) with which Synchronoss had "master services agreements."  The Restatement states:

> Historically, the company had, and continues to have, contractual arrangement with certain customers whereby there is an established master services agreement that includes general terms and conditions.   Such master services agreements contemplate the customer delivering purchasing documentation for purposes of completing orders, indicating the nature, price and quantity of the products and services ordered.   In certain cases, the company had historically formed a view that persuasive evidence of an arrangement existed relating to such orders based upon its receipt from the customer of written confirmation of the order and commitment to pay the agreed price, such as a quote approval sent by the customer in response to a quote issued by the company, but ***prior to the customer's subsequent delivery to the company of an executed statement of work or, in some instances, a purchase order pursuant to a master services agreement***.

Synchronoss's historical practice as described in the Restatement is ***exactly*** what Ernst & Young's guidelines cited above unequivocally state is prohibited. Thus, the Restatement states that Synchronoss "has determined, in certain situations, to revise the timing of revenue recognition to when it received final formal contract documentation, which occurred in a future [accounting] period." This admission corroborates the CWs' reports that show Waldis and Rosenberger intentionally caused the Company to recognize revenues without "formal contract documentation" in place.

### a.    2014 Transactions

160.   In the Restatement, Synchronoss adjusted its 2014 revenue downward by a staggering $53.322 million in the category of adjustments that it labeled "Evidence of Arrangement and Other Revenue." This corresponds to more than one-sixth of total revenue for the year.

161.   Synchronoss has not expressly disclosed which contracts or customers were involved in this adjustment to 2014 revenue. Moreover, unlike for fiscal years 2015 and 2016, Synchronoss has not disclosed quarterly adjustments to its financials for fiscal year 2014. However, according to Synchronoss's 2014 10-K, AT&T and Verizon in the aggregate accounted for 73% of Synchronoss's net revenue in 2014. Accordingly, given the magnitude of this adjustment to revenue, some or all of the revenues affected by this adjustment were based on contracts between Synchronoss and either Verizon or AT&T.

162.   In its Restatement, Synchronoss has admitted that this $53.322 million downward revision to 2014 revenues was necessary because the revenues were improperly recognized in the absence of persuasive evidence of an arrangement, as GAAP requires.

### b.      The First Quarter 2016 Verizon Contract

163.    According to CW1, a CPA and certified fraud examiner previously employed by Synchronoss from December 2015 to May 2016 as a financial analyst with responsibility for revenue forecasting, and who has direct knowledge of the Company's revenue recognition accounting practices, Synchronoss improperly and prematurely recognized $5 million in cloud software licensing revenue purportedly derived from an agreement with Verizon in the first quarter of 2016.  However, no such agreement was signed in that quarter.

164.    Synchronoss's recognition of this revenue enabled it to report Cloud Services revenues exceeding its first quarter 2016 guidance and to bolster the purported growth of the segment driving the Company's stock price.

165.    According to CW1, this Verizon deal was only in initial discussion phases in March 2016, and was still unsigned in April 2016, after the quarter closed.  Moreover, CW1 attended several meetings regarding the Company's first quarter 2016 financial results held in the executive conference room of the Company's Bridgewater headquarters, and at one such meeting in April 2016, CW1 witnessed Rosenberger ask Synchronoss's Executive VP and General Manager Joel Silverman *whether* the Verizon contract had yet been signed, despite that this meeting occurred *after* the close of Synchronoss's 2016 first quarter.  CW1 saw the revenue results for the quarter and knows the $5 million purportedly deriving from this transaction with Verizon was included therein.  CW1 also believes that there may be internal Company emails discussing whether this Verizon contract was signed prior to the close of first quarter of 2016.

166.    Further supporting the fact that revenue from this Verizon contract was improperly recognized in the first quarter of 2016, as part of the Restatement, Synchronoss disclosed that it had made an approximately $18 million adjustment downward of first quarter 2016 revenue in the "Evidence of Arrangement" category.

45

c. **Synchronoss Declines To Attach Verizon Contracts To Its Financial Statements As Requested In An SEC Comment Letter In 2016**

167.   In commenting on Synchronoss's disclosures during the Class Period, the SEC specifically asked that Synchronoss disclose to shareholders significant Verizon contracts, but the Company flatly refused.

168.   More specifically, in a comment letter dated September 2, 2016, the SEC questioned Synchronoss's revenues from AT&T and Verizon, its largest customers, and requested that Synchronoss publicly disclose its contracts with Verizon as exhibits to future filings.

169.   Synchronoss refused to attach the contracts in response to the SEC's request.  In its response dated September 16, 2016, the Company stated that "it does not believe that any individual contract between it and Verizon is one upon which the Company's business is substantially dependent."

170.   The SEC responded by letter dated September 22, 2016, requesting further information about the Company's contracts with Verizon.

171.   In the Company's response, dated October 6, 2016, the Company once again declined to attach any contracts with Verizon to its financial reports.

172.   The Company's refusals are telling.  Had particular Verizon contracts been released publicly, the dates that the contracts were entered into – or more particularly, the dates that they were *not* entered into – may have become public, thereby potentially making Defendants' fraud detectable by the public.  In part because the Company declined to produce the contracts, investors were kept in the dark.

173.   In connection with the Restatement, Synchronoss did an "about face" on its prior position that no individual contract with Verizon was material such that Synchronoss did not

46

need to attach it to SEC filings, as the SEC had instructed in 2016.  In its Form 10-Q for the first quarter of 2018, filed with the SEC on July 2, 2018, Synchronoss disclosed that it had amended the terms of Statement of Work No. 1 under the Application Service Provider Agreement between Synchronoss and Verizon dated April 1, 2013, and attached this contract with Verizon to the Form 10-Q.

### d.      The Late 2015 AT&T Contracts

174.    According to CW2, the former Vice President responsible for overseeing contracts with the Company's largest customers through 2016, Synchronoss booked revenues of approximately $7 million in connection with two AT&T purchase transactions in late 2015 that did not occur.  In February 2016, CW2 was expressly tasked by Company management with finding a way to justify the numbers that had already been booked.  This task occupied CW2 until December 2016.  CW2 learned of the late 2015 recognition of this revenue in February 2016, when CW2 was tasked with justifying it.

175.    The only basis for these revenues, which were recognized in 2015, is an email from an AT&T employee indicating that AT&T would proceed with the underlying purchase transactions.  As Defendants knew, such a communication, which falls far short of a signed contract, is not sufficient evidence of an arrangement to warrant booking revenue from the deal. In fact, the deal never materialized, and no contract was signed.  Nevertheless, the Company booked the revenue.

176.    The fact that Synchronoss improperly booked this revenue in the fourth quarter of 2015 is further supported by the fact that in the Restatement, Synchronoss made a downward adjustment of over $12 million to its revenue for the fourth quarter of 2015 in the "Evidence of Arrangement" category.

### e.      The Third Quarter 2016 Verizon Contract

177.     During the third quarter 2016 earnings call held on November 7, 2016, Defendant Waldis announced that the Company "signed a $25 million license deal with Verizon during the quarter."  Defendant Rosenberger confirmed during the same call that "our cloud business has hit an inflection point, as our previously stated strategic initiatives at Verizon on the Personal Cloud front enabled us to further expand our addressable market at this key customer with **a $25 million license deal signed and recognized in the quarter**."

178.     According to CW3, as alleged above, the Company lacked substantiation for this $25 million contract at the time the revenue was recognized.  As also alleged above, the Revenue Recognition and Billing Manager was on maternity leave at that time, and a Senior Accountant, who was a member of the revenue recognition team, was serving in her role.  The Senior Accountant vehemently objected to booking the $25 million revenues for this contract in light of the lack of substantiation.  CW3 described the Senior Accountant's protest as "kicking and screaming" because recognizing the revenues would be "against procedures," namely the revenue recognition procedures the Senior Accountant was tasked with enforcing.  These procedures required revenue substantiation in the form of executed license agreements or other contracts "signed, sealed, and delivered before" recognition could occur.  CW3 reports that the directive to book the revenue despite these objections came directly from Rosenberger.

179.     The fact that Synchronoss improperly booked this revenue in the third quarter of 2016 is further supported by the fact that in the Restatement, Synchronoss reported $17.1 million in license revenues (the category to which this $25 million in revenue belongs) for the entirety of 2016, meaning that at least a substantial portion of the $25 million was wiped out or redistributed across later quarters.

### 3.  Premature Revenue Recognition Enabled Synchronoss To Falsely Meet Revenue Targets

180.    On each of these occasions, the improperly recognized revenues enabled the Company to meet its revenue targets and/or projections.

181.    As alleged above, in the fourth quarter of 2015, organic revenue growth in the Cloud Services segment was only 11%, or less than $7 million. Fourth quarter 2014 Cloud Services revenue was approximately $63.4 million.  Accordingly, the Company's selective recognition of $7 million of revenues from AT&T deals that did not go through—at least in that quarter, if ever—alone enabled the Company to show Cloud Services growth in that quarter.

182.    Similarly, the Company's improper recognition in the first quarter of 2016 of $5 million of revenues from a Verizon deal that was not consummated in that quarter, if ever, facilitated its achievement of its target for that quarter, but concealed that fact from investors.

183.    Specifically, after the market closed on May 5, 2016, the Company reported $145.6 million in non-GAAP revenue for the first quarter of 2016, which fit neatly within the Company's guidance range of $142-$147 million for the quarter.  After this news, Synchronoss's stock price surged from a close of $28.90 on May 5, 2016, to a close of $34.90 on May 6, 2016, on substantial volume exceeding 1.7 million shares.  If the $5 million in improperly recognized revenue had not been included in first quarter 2016 revenue, the Company would have missed its earnings guidance for the quarter.

### B.  DEFENDANTS CONCEALED THAT A $9.2 MILLION ONE-TIME LICENSE AGREEMENT WITH SEQUENTIAL WAS INCLUDED IN FOURTH QUARTER 2016 REVENUES

184.    A further example of the Company's inappropriate accounting and financial reporting practices is its failure to disclose the perpetual license agreement with Sequential

purportedly formed on December 22, 2016, under which it booked revenues of $9.2 million in the fourth quarter of 2016, but concealed that fact from investors.

185.     Unbeknownst to shareholders, these revenues enabled the Company to meet its guidance for the quarter and the 2016 year.  However, by obscuring the fact that the revenues represented a one-time item rather than organic growth, the Company inaccurately led the market to believe that revenues grew significantly more than they had in fact grown during that quarter and year.

186.     In reality, once the $9.2 million in revenues associated with the Sequential license agreement is backed out of the fourth quarter and full-year 2016 financial results, revenue growth was actually less than represented.

187.     Moreover, under Accounting Standards Codification ("ASC") 985-605-55-4, "a group of contracts or agreements may be so closely related that they are, in effect, parts of a single arrangement and should be viewed as one multiple-element arrangement when determining the appropriate amount of revenue to be recognized[.]"  Pursuant to this standard, the Company was required to account for all components of the December 2016 Sequential transaction in the aggregate.

188.     Under that standard, the $9.2 million license agreement constitutes a part of a single multiple-element arrangement rather than a separate, standalone transaction.  Where a group of contracts or agreements is formed between the same software vendor and customer—as in Synchronoss's agreement to divest 70% of its Activation Services business to Sequential in December 2016—the standard requires the vendor to account for the component agreements as part of a multiple-element arrangement rather than as separate transactions.  This standard exists to ensure that companies account for events in accordance with their substance not their form.

189.    The factors to be considered under ASC 985-605-55-4 in determining whether a contract or agreement is a part of a multiple-element arrangement or a separate transaction are:

(a)    The contracts or agreements are negotiated or executed within a short timeframe of each other;

(b)    The different elements are closely interrelated or interdependent in terms of design, technology, or function;

(c)    The fee for one or more contracts or agreements is subject to refund, forfeiture, or other concession if another contract is not completed satisfactorily;

(d)    One or more elements in one contract or agreement are essential to the functionality of an element in another contract or agreement;

(e)    Payment terms under one contract or agreement coincide with performance criteria of another contract or agreement;

(f)    The negotiations are conducted jointly with two or more parties (for example, from different divisions of the same entity) to do what in essence is a single project.

190.    In forming the December 2016 divestiture arrangement, Synchronoss and Sequential negotiated and executed a number of component agreements at or around the same time, including (a) the $146 million purchase price, (b) the proportion of the Activation Services business that would be divested in the transaction, (c) the $83 million Seller's Note issued by Synchronoss, (d) the three-year, $32 million-per-year transition fee payable by Sequential, (e) the undisclosed guarantee by Synchronoss of $30 million of the $40 million term loan Goldman Sachs had made to Sequential, and (f) the $9.2 million perpetual license agreement.

191.    These different elements are "closely interrelated in terms of design [or] function" in that all are oriented toward the completion of the divestiture of the Company's Activation Services business to Sequential.  For the same reason, these component agreements all seek to carry out "what in essence is a single project," as stated in ASC 985-605-55-4(f), above.

192.    Had Defendants complied with ASC 985-605-55-4, rather than recognizing the $9.2 million from the licensing agreement as additional revenue, the $9.2 million would have been considered additional consideration for the price of Sequential's purchase of an interest in Synchronoss's Activation business.

193.    The Company has admitted that it improperly accounted for the Sequential license fee as standalone revenue.  In the Restatement, Synchronoss reclassified the revenue from the Sequential license fee as additional gain on the sale of the Activation Services business to Sequential.

194.    As alleged above, the Company initially concealed the very existence of the licensing fee from shareholders, and then only belatedly—after the whistleblower report questioning the Sequential transaction was published in late February 2017—disclosed its existence and the fact that it had been surreptitiously included in fourth quarter 2016 revenues. By failing to disclose that its fourth quarter 2016 and full-year 2016 financial results benefited from a material, $9.2 million one-time entry, the Company not only misrepresented its financial condition but also violated basic GAAP rules.

195.    As the Company's admission in the Restatement makes clear, the Company essentially (and improperly) financed its own revenue in the Sequential deal.  Specifically, the Company provided to Sequential a Seller's Note of $83 million to finance the sale of the activation business to Sequential.   In addition, unbeknownst to shareholders, Synchronoss provided a secret guarantee to Goldman for $30 million of the $40 million term loan Goldman extended to Sequential in connection with the sale of the activation business, which the Company has now admitted in the Restatement required it to pay approximately $6.2 million to Goldman as a result of Sequential's default on loan covenants in June 2017.   Having paid

reduced purchase consideration due to the Seller's Note and the undisclosed guarantee to Goldman provided by Synchronoss, Sequential's capital was freed up to enter into the $9.2 million license transaction, which Synchronoss then improperly treated as free-standing revenue to pad its fourth quarter and full-year 2016 results.  Moreover, the Company has admitted that it did not have adequate internal controls to ensure that transactions were appropriately accounted for from a substance over form perspective.

196.    However, even if the $9.2 million license agreement had qualified under ASC 985-605-55-4 as a standalone transaction warranting separate recognition of this revenue, which, as reflected by Synchronoss's reclassification of this fee from revenue to additional gain on sale as part of this line of business, it did not, the value assigned by Defendants—$9.2 million—had no objective basis.

197.    According to the Company's 2016 Form 10-K, this value was determined using "a cost approach, which calculates the time and effort required to recreate the technology today. Inputs used to value the license are considered Level 3 inputs."

198.    Level 3 inputs are subjective estimates made by management, and are widely recognized as the most uncertain class of valuation inputs.

199.    To fairly value a software license—such as the transaction in which Synchronoss furnished a license to Sequential for use of certain analytics software—in accordance with GAAP (ASC 845), vendor-specific objective evidence ("VSOE") of fair value of the software must exist.

200.    According to the E&Y revenue recognition guidelines, "In practice, it would be rare for a vendor to demonstrate VSOE of fair value of software products (as such products are rarely sold individually and not along with other elements, such as PCs)."

201.    Defendants tacitly acknowledged that no VSOE of fair value of the licensed analytics software exists because the license was valued using only Level 3 (subjective) inputs. Accordingly, the $9.2 million license revenue recognized in the fourth quarter of 2016 lacks any objective basis and was not computed in accordance with GAAP, even if the underlying license agreement qualified under ASC 985-605-55-4 as a standalone agreement—which it did not.

### C.    ON SEVERAL OTHER OCCASIONS, DEFENDANTS IMPROPERLY TREATED FEES FROM  LICENSING AGREEMENTS ENTERED INTO IN CONNECTION WITH ACQUISITIONS OR PATENT SETTLEMENTS AS REVENUE, IN BLATANT VIOLATION OF GAAP

202.    Synchronoss used the same form over substance technique applied in the Sequential transaction with a number of other material contracts during the Class Period. That is, Synchronoss created non-substantive revenue contracts to piggyback other significant business events to prop up its reported revenue. For example, as discussed above, in December 2015, Synchronoss entered into a joint venture (previously defined as "JV") with Verizon in an entity called Zentry.  At the same time that Zentry was formed, Synchronoss entered into a $23 million license agreement with Zentry.  In the Restatement, the Company acknowledged that it treated the licensing fee as revenue in the fourth quarter of 2015.  As with the Sequential transaction, recognition of the licensing fee as standalone revenue, rather than as part of the accounting as part of the formation of the JV, was a blatant violation of GAAP.

203.    In the Restatement, Synchronoss states that the license agreement was "entered into concurrently with the venture formation." As such, the Company "determined to net these license fees against the cash contributions paid as part of the joint venture formation, resulting in a reduction of the goodwill and intangible assets recorded in purchase accounting."  As a result, Synchronoss adjusted its revenue in fourth quarter of 2015 downward by $20,090,000 in the "Acquisitions & Divestiture" category.

204.    Similarly, Synchronoss reported that it acquired F-Secure's cloud storage business on February 23, 2015 for $59.5 million.   Just five days earlier, on February 18, 2015, Synchronoss had entered into a patent settlement and license agreement with F-Secure, which had been valued at fair value. Synchronoss did not, however, disclose the amount of this patent settlement and license agreement, the fair value of the agreement, or how it had accounted for the agreement, including whether the agreement was accounted for as part of the acquisition or as revenue.

205.    In fact, as part of the Restatement, Synchronoss revealed that it had recognized $10 million of revenue related to this transaction – 7.5% of its total revenue for the quarter – instead of treating the licensing fee as reducing the amount of consideration that Synchronoss paid to acquire F-Secure.   Just as with the improperly recognized Sequential license fee and the improperly recognized Zentry revenue, the license fee paid by F-Secure should have been treated as part of the purchase accounting, rather than as standalone revenue.

206.    Similarly, when Synchronoss first reported its acquisition of the messaging, security, and identity management firm Openwave, Synchronoss described a cash and stock purchase price totaling $124.5 million.

207.    In the Restatement, Synchronoss disclosed for the first time that simultaneous to the Openwave acquisition, it negotiated a settlement agreement with Openwave whereby Openwave paid $10.0 million to Synchronoss.   Synchronoss improperly recognized this $10.0 million as license revenue in the first quarter of 2016.

208.    Synchronoss also disclosed that the patent settlement had been negotiated as part of the total consideration to be paid to acquire Openwave. In other words, the consideration transferred by Synchronoss to acquire Openwave was only $114.5 million rather than $124.5

million offset by an undisclosed round-trip payment of $10 million recognized as revenue in a purportedly separate but concurrent transaction.

209.    The SEC Staff, in widely known guidance published in 2007 concerning accurate reporting on settlements and their accounting treatment, has emphasized the importance of disclosure regarding the reporting of such settlement transactions:

> In any case, disclosure of the settlement and its classification is important for users to understand the judgments you have made.

210.    As with the "revenue" that Synchronoss improperly recognized in connection with the F-Secure licensing fee, the $10 million of "revenue" that the Company recognized in connection with the Openwave license represented 9.6% of the Company's total revenue in the first quarter of 2016.

211.    Synchronoss's historical accounting for the Openwave and F-Secure settlements, as well as other undisclosed settlements in fiscal 2014, as revenue was a clear violation of GAAP. ASC 605-25 states:

> [S]eparate contracts with the same entity or related parties that are entered into at or near the same time are presumed to have been negotiated as a package and shall, therefore, be evaluated as a single arrangement in considering whether there are one or more units of accounting. (ASC 605-25-25-3)

212.    The SEC Staff has reiterated that ASC 605-25 (formerly EITF 00-21) applies in evaluating the accounting for litigation settlements:

> An additional challenge that may arise when accounting for a litigation settlement is determining the proper allocation of consideration among the recognizable elements. While EITF 00-21 was written for multiple element revenue arrangements, we believe that its allocation guidance is also useful to determine how to allocate consideration paid in a multiple element legal settlement.

213.    In the Restatement, Synchronoss admitted that among the flaws in its controls was a failure to "ensur[e] transactions are appropriately accounted for from a substance over form perspective." Specifically, the substance of these transactions was that Synchronoss was making

an acquisition and any simultaneous cashflow was merely engineered to achieve a desired revenue result.

214.    In fact, the Restatement acknowledged that the accounting applied to the F-Secure, Openwave, and other similar transactions was improper:

> We did not design and maintain adequate review and approval controls, including the use of appropriate technical accounting expertise, when recording complex or non-routine transactions such as those involving revenue recognition, acquisitions and divestitures, and asset impairment, ***including ensuring transactions are appropriately accounted for from a substance over form perspective***.

### D.    VENDOR-SPECIFIC OBJECTIVE EVIDENCE AND THE $25 MILLION VERIZON LICENSING AGREEMENT

215.    In connection with the fraud, from 2014 to 2016, Defendants flouted software licensing revenue recognition rules under GAAP by prematurely recognizing licensing revenues in the quarter in which the license agreement was formed, rather than ratably over the life of the agreement.  Specifically, U.S. GAAP requires that in order to recognize revenue upfront from an arrangement comprising an up-front delivery of software, followed by provision of services over time, the company must have vendor-specific objective evidence (previously defined as "VSOE") that supports allocating a portion of the price received to the delivery of the software and a portion of the price to the ongoing services.  In the absence of such VSOE, pursuant to ASC 985-605-25-10, "the entire fee shall be recognized over the period during which the services are expected to be performed."  The Company's disclosures leading up to, and including, the Restatement confirm that the Company did not have such VSOE, and accordingly, it had to restate its financials to reflect recognition of substantial portions of revenue that it previously recognized upfront, ratably over the life of the contract.

216.    Revenue recognition was the first Critical Accounting Policy listed amongst the Company's such policies.  The Company's description of this critical policy assured investors

GAAP was applied as follows: "When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered elements." Thus, the Company was aware that evidence of VSOE, or standalone value, was critical to its ability to report revenue on an upfront basis.

217.    Indeed, on September 25, 2014, the Chief Accountant of the SEC's Enforcement Division stated "VSOE is a critically important component in determining the timing in which software companies recognize revenue, and JDA's internal accounting controls surrounding VSOE were inadequate in various ways."   In addition, in an April 2008 publication, Synchronoss's own auditor, Ernst & Young wrote: "The SEC staff continues to challenge registrants in the technology industry to demonstrate whether they have sufficient support for their assertions that such evidence of fair value exists."   Thus, it was well known within the industry in which Synchronoss operates, and to its auditor, that having sufficient VSOE is critical for purposes of recognizing revenue.

218.    In the Restatement, the Company has restated substantial portions of revenue that had previously been recognized on an upfront basis to instead be recognized ratably in a category that it labeled "Revenue Recognition Adjustments Relating to Hosting Services."   In the Restatement, the Company stated:

> In accordance with the software revenue recognition rules, since the Company cannot establish vendor specific objective evidence of fair value of the hosting services, the software license element cannot be separated from the hosting services. The revised accounting treatment for the revenue recognition is reflected in the restated consolidated financial statements, whereby the bundled arrangement fees have been recognized ratably over the economic life of the hosting services.

219.    Although the Restatement does not positively identify the licensing agreements affected by this revised accounting treatment, the Company's $25 million Verizon licensing deal, recognized in the third quarter of 2016, is one such agreement.

220.    On the third quarter 2016 earnings call, Defendant Rosenberger stated that the Verizon contract was "a $25 million license deal signed and recognized this quarter."  Thus, the Verizon contract contributed $25 million to Synchronoss's 2016 license fees.

221.    Synchronoss's previous failure to properly account for purportedly separate hosting agreements meant that revenue from the Verizon contract and other license agreements recognized on a perpetual basis required a substantial downward adjustment. According to the Company's 10-K issued in connection with the Restatement, restated license revenue for fiscal year 2016 was 4% of revenue, or approximately $17.1 million for the entire year as compared to 16% or more than $76 million as originally reported.

222.    Given that restated license revenue for the entire year of 2016 was less than the $25 million Verizon contract, a substantial portion of the $25 million in revenue from the Verizon contract in the third quarter of 2016 (i.e., at least approximately $8 million, and that assumes, implausibly, that *no other license revenue in 2016 was restated*) was adjusted downward and instead recognized ratably over the life of the contract (or simply wiped out).

### E.    THE COMPANY'S MATERIAL WEAKNESS IN INTERNAL CONTROL OVER FINANCIAL REPORTING

223.    In combination, the Company's repeated revenue recognition violations establish the lack of integrity of Synchronoss's internal control over financial reporting ("ICFR"). Indeed, the Company has also admitted that its previous claims to have effective ICFR also require correction.  Specifically, despite management's previous contentions otherwise, the Company's ICFR was exposed to a material weakness.

224.    A material weakness is a deficiency, or a combination of deficiencies, in ICFR, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

225.    On its face, the improper recognition of revenue in a number of disparate categories, that have required the Company to adjust its revenue by nearly $180 million for 2014 through 2016, would appear to have only been possible if the Company's ICFR was utterly ineffective. That is, a properly functioning ICFR would have prevented, or detected and corrected, the improper and premature recognition of revenues and the other substantial violations of basic GAAP requirements.

226.    The treatment of the license fee in connection with the Sequential transaction exemplifies this. This situation was exactly in-line with the Company's circumstances. That is, the Sequential license agreement was finalized on December 22, 2016. This was the exact same date that the sale of the activation business occurred.

227.    The above-referenced provisions in GAAP exist to address form-over-substance issues where two parties engineer an outcome to obtain advantageous financial reporting. In this instance, the Company stood to benefit by reporting additional revenue as opposed to an element of the purchase accounting for its activation business.

228.    Accordingly, it was imperative for the Company to demonstrate the license agreement had standalone value to support the amount of revenue recognized. The Company's auditor's guidance indicates that it would be "rare" for a company to able to demonstrate such standalone value. The Company, however, claimed to have performed such an analysis relying on Level 3 inputs, a term in GAAP used to describe unobservable inputs. (ASC 820-10-20)

229.    In its most recent 10-K, the Company admitted:  "[M]anagement determined that control deficiencies existed with respect to certain aspects of our historical financial reporting and, accordingly, management has concluded that management's reports related to the effectiveness of internal and disclosure controls may not have been correct. We did not maintain effective internal control over financial reporting as of December 31, 2017."  In addition, the Company's outside auditors refused to offer a positive opinion on the Synchronoss's internal controls and instead issued an opinion in connection with the Restatement that the Company's internal controls over financial reporting were ineffective.

230.    With respect to its internal controls, the Company further admitted:

• We did not always ensure that the four basic elements of revenue recognition were achieved prior to revenue recognition and all elements within multiple element arrangements were identified and accounted for appropriately.

• We did not maintain adequate oversight that guided individuals in applying internal control over financial reporting in preventing or detecting material accounting errors, or omissions, due to inadequate information and, in certain instances, compliance with the Company's revenue recognition policies.

• We did not always ensure that relevant information was timely communicated within our organization, to our independent directors, the Audit Committee, and our independent auditors.

• We did not generate and provide quality information and communication based on the criteria established in the COSO framework [*i.e.*, Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission], and have identified control deficiencies in the principles associated with the information and communication component of the COSO framework that constitute material weaknesses, either individually or in the aggregate, relating to: (i) obtaining, generating, and using relevant quality information to support the function of internal control, and (ii) communicating accurate information internally and externally, including providing information pursuant to objectives, responsibilities and functions of internal control.

• We did not design and maintain adequate review and approval controls, including the use of appropriate technical accounting expertise, when recording complex or non-routine transactions such as those involving revenue recognition, acquisitions and divestitures, and asset impairment, including ensuring

transactions are appropriately accounted for from a substance over form perspective.

•We did not maintain sufficient personnel with an appropriate level of accounting knowledge, experience, and training in the application of US GAAP commensurate with the size of the entity and nature and complexity of financial reporting requirements.

•We did not design and maintain effective review and approval controls over the period-end reporting process, including maintaining sufficient formal, written policies and procedures governing the financial statement close process.

•We did not maintain adequate polices procedures and documentation to support an effective IT general control environment. Our management identified control deficiencies in the operating effectiveness of information technology general controls ("ITGC") related to information technology ("IT") application systems, databases and operating systems throughout the organization that are used for financial reporting purposes. Specifically, we did not establish effective program change and user access controls which restricted user access to IT applications consistent with their assigned authorities and responsibilities. Consequently, automated processes and controls over financial reporting which are dependent upon effective ITGCs, and manual controls which are dependent upon the completeness and accuracy of the information generated from the IT systems, were ineffective.

•We did not maintain an Internal audit group to provide oversight which limited our ability to effectively monitor internal controls.

•We did not consistently maintain a corporate culture that prevented the occurrence of certain deviations from Company policy.

231.    CW3 has provided further evidence of accounting abuses confirming that the

Company's internal controls over financial reporting were severely deficient.  In addition to

improperly recognizing revenue, and improperly accounting for multi-element arrangements

(such as the Sequential license agreement that was a part of the Activation Services divestiture,

the revenue associated with the JVs, and the patent settlements that were part of company

acquisitions), Defendants systematically minimized or concealed expenses by intentionally

misclassifying them.  CW3 knows about this misclassification in part because CW3 implemented

and had access to the Company's Oracle financial system, which CW3 used to compare actual and "adjusted" financial metrics.

232.    According to CW3, minimizing or concealing expenses—like inflating revenues—was part and parcel of executive management's scheme to ensure the Company never reported a decrease in profit margins.

233.    CW3 reports that Rosenberger utilized the "flash file" prepared on a weekly basis by Latyszonek to determine which expenses to bury or remove "down below the line" so as to show attractive, but false, margins in the Company's financial reports.  CW3 had access to the relevant information in the Company's Oracle financial system, and used that to compare against the "adjusted" figures that were publicly reported after Latyszonek, with Rosenberger's approval, massaged, reclassified, and otherwise manipulated them.  From this review, CW3 was able to confirm that Rosenberger and Latyszonek were directing improper reclassification of expenses and other accounting adjustments as a means of reporting numbers to investors that presented a more positive picture of Synchronoss's financial performance than was actually the case.

234.    CW3 relates that the specific improper accounting adjustments known personally to CW3 were not minor, small-dollar-value adjustments.  They ranged in value from a few hundred thousand dollars to $1 million each, amounting to a significant manipulation of expenses and other metrics each and every quarter during the Class Period.  According to CW3, the adjustments were "enough to move the needle and be material from an audit standpoint."

235.    For example, CW3 states that Rosenberger has caused the Company to reclassify salaries of sales employees as "research and development" costs, when in fact they should have been classified as "sales" costs.  CW3 was personally tasked with "pushing" the salaries of

customer-facing employees of Openwave, which Synchronoss had recently acquired, from sales to R&D and booking their salaries as an R&D expense in the second quarter of 2016. R&D expenses are tax-deductible operating expenses, whereas sales costs are not. Moreover, R&D expenses are viewed more favorably by investors and analysts than sales costs because R&D signals investment in future product development and intellectual property strength, whereas sales costs erode current margins without future benefit. In connection with objecting to the reclassification of these expenses, CW3 confirmed with a Senior Vice President of Engineering at Openwave that the employees whose expenses were being reclassified from sales to R&D expenses were not part of Openwave's R&D team.

236. CW3 knows that Rosenberger approved this misclassification of expenses because CW3 objected to Latyszonek's instruction that CW3 make the change. In this case, as in other cases, Latyszonek sought and obtained direct authorization for the change from Rosenberger, who wrote in an email that she "approved" the classification. CW3 saw or participated in similar reclassifications and misclassifications in every quarter during which Rosenberger was CFO.

237. Throughout 2015 and 2016, CW3 reports that the executive management of the Company held weekly "flash" meetings in the Bridgewater headquarters designed to give management insight on what the quarterly numbers looked like on a weekly basis. CW3 states that, to his knowledge, accounting manipulations were openly discussed at these meetings among the senior officers in attendance, including Waldis, Rosenberger, and Garcia. Latyszonek's weekly "flash file" showed the attendees of these meetings, including Waldis, Rosenberger, and Garcia, the necessary accounting manipulations that would be "adjusted" to show positive growth and improving margins. The flash file contained budget figures for each department and

various categories of financial information, such as expenses and revenues, with projections of final quarterly figures.  This format enabled the executives to see what changes to various inputs (expenses, revenues, etc.) would do to the final output, i.e., the quarterly figures.  CW3 contributed certain information to Latyszonek for inclusion in the weekly flash file, including expense information.

238.   In one glaring example of misconduct, according to CW3, Rosenberger instructed the entire accounting team to "find something" that each of them could cut after deciding that the flash file indicated Synchronoss was not going to "make" its quarterly numbers.  Rosenberger thereby enlisted the accounting department as a whole in her fraudulent scheme.  As a result of their efforts—directed by Rosenberger—the Company was able to meet its guidance for the quarter, although CW3 could not recall in exactly which quarter this occurred.

239.   CW3 stated that Latyszonek was rewarded for his cooperation in fall 2016 with a substantial special bonus (which CW3 believes was $50,000), which was not provided to other similarly situated employees and which was not provided on the Company's normal employee bonus schedule (March-April).

240.   In the Restatement, the Company confirmed that it "made certain adjustments to the opening balance[] of Openwave Messaging, Inc. … impacting deferred revenue…. Adjustments in deferred revenue … were reported post-acquisition as revenues and costs were realized" (at 1).  The Company further announced, *inter alia*, that its 2016 cost of revenues figure increased in the Restatement "primarily due to increased personnel costs … due [to] the acquisition of Openwave" (at 68), and that its sales costs increased in 2016, including "$15.5 million in personnel related costs," due to the "Openwave acquisition" (at 69).   These

adjustments corroborate CW3's statement that Rosenberger caused the Company to misclassify Openwave sales costs as R&D expenses.

### F. THE EFFECT OF THE COMPANY'S ANNOUNCEMENT OF THE NEED TO RESTATE ITS 2014, 2015, AND 2016 FINANCIAL REPORTS

241.  As a direct result of the improper accounting practices described in Sections VI.A-D, the Company admitted that its quarterly and annual financial reports for 2014, 2015, and 2016 were materially misstated and should no longer be relied upon.  The Company further announced in the Restatement that *all* of its communications from 2014 to early 2017 related to earnings are false and should no longer be relied upon.

### 1. Material Weaknesses In Internal Controls That Are So Pervasive They Still Have Not Been Rectified

242.  In the Restatement, which it took the Company more than one year to complete since the need to restate was first announced, Synchronoss admitted that it has had "**pervasive material weaknesses** in [its] internal control processes" related to financial reporting for at least 2014 through 2017.  In fact, the internal control weaknesses run so deep that well over a year after the need to restate was first announced, those weaknesses still have not been rectified. Indeed, the Company announced in the Restatement that "there is *ongoing* remediation of material weaknesses in our internal control over financial reporting" and Synchronoss's outside accountants refused to give a positive opinion, stating instead that in the auditor's opinion, Synchronoss still does not maintain effective internal control over financial reporting.

### 2. Three Employees Were Fired Due To Wrongdoing in Connection with Revenue Recognition, and Synchronoss Admits Violations of Basic GAAP Accounting Rules and The Falsity of All Earnings Communications from 2014 to Early 2017

243.  Synchronoss announced in the Restatement that it fired three employees "for cause" due to improper conduct related to revenue recognition.  Synchronoss further admitted

that it inappropriately booked revenues from 2014 to 2016, violated basic accounting rules, and issued financial statements that were false or misleading from 2014 to 2017.  In fact, the Restatement not only acknowledges the falsity of Synchronoss's annual and quarterly financial statements (as Synchronoss had already admitted in announcing the need for the Restatement), but further admits that ***all*** of its earnings related communications from 2014 to 2017 were false, stating (emphasis added):  "***all*** earnings press releases ***and similar communications*** issued by us, for such periods [i.e., 2014 through 2017], should not be relied upon and are superseded in their entirety by this Form 10-K [*i.e.*, the Restatement]."

### 3. The Financial Effects Of The Restatement Are Enormous

244.    The magnitude of the Restatement's effect on revenues, income (loss) from operations and assets and shareholder's equity is huge.

### a. Effect on Revenues

245.    In the Restatement, Synchronoss adjusted its previously reported 2015 revenue of $579 million down to $523 million (a difference of $56 million), and its previously reported 2016 revenue of $622 million down to $572 million (a difference of $50 million).   These changes represent decreases of ***9.6% and 8.1%***, respectively, of previously reported 2015 and 2016 revenues.

246.    Synchronoss adjusted its previously reported 2014 revenue of $457 million down to $383 million, a $74 million downward adjustment representing a 16% decrease in previously reported 2014 revenues.

247.    In total, Synchronoss's cumulative revenue for 2014 through 2016 was adjusted downward from $1,212,168,000 to $1,032,271,000, a cumulative reduction of nearly ***$180 million*** (or more than 14.8%).

### b.     Effect On Net Income (Loss) From Operations

248.     The restatement of Synchronoss's net income (loss) from operations was even more pronounced.   For 2016, Synchronoss's net income from operations of $8 million was restated to a net loss of $3 million (in other words, a 140% decrease in income).   For 2015, Synchronoss's previously reported net income from operations of $47 million decreased to just $2 million, a decrease of ***nearly 95%***.   For 2014, net income from operations of $39 million was restated to a loss of $40 million, an over 200% decrease.

249.     Thus, while Synchronoss reported net income from operations from 2014 through 2016 of $93.5 million, in reality it had a cumulative loss during that time of $40 million (a difference of $134 million, a ***143% decrease*** in net income). These dramatically restated income metrics demonstrate that Synchronoss has been in dire financial straits for years, a crucial fact obscured by Defendants' massive accounting fraud.

### c.     Effect on Total Assets and Shareholders' Equity

250.     In addition to the drastically inflated revenue and income figures Defendants reported to investors during the fraud, Defendants' fraud also artificially inflated Synchronoss's assets and shareholders' equity.   As revealed by the Restatement:   (a) for 2016, total assets were reduced from $1,164,729,000 to $1,054,351,000 (a reduction of $110,378,000, approximately 9.5%) and stockholder's equity reduced from $657,115,000 to $529,797,000 (a reduction of $127,318,000 or more than 19%); (b) for 2015, total assets were reduced from $1,010,228,000 to $931,562,000 (a reduction of $78,666,000 or more than 7%) and stockholder's equity reduced from $609,814,000 to $505,323,000 (a reduction of $104,491,000 or more than 17%); and (c) for 2014, total assets were reduced from $862,822,000 to $836,865,000 (a reduction of $25,957,000 or more than 3%) and stockholder's equity reduced from $529,107,000 to $463,464,000 (a reduction of $65,643,000 or more than 12%).

### d.        Effect on Earnings Per Share

251.    As revealed by the Restatement:  (a) for 2016, basic earnings per share fell from $0.45 per share to $0.27 per share (a decrease of 40%); (b) for 2015, basic earnings per share dropped more than 90% from $0.96 per share to $0.09 per share; and (c) for 2014, basic earnings per share with respect to continuing operations (for 2014, earnings per share related to Synchronoss's discontinued business is not reported in the Restatement) fell from a loss $0.05 per share to a loss of $1.99 per share (a reduction of *__more than 3,800%__*).

### e.        Effect On Reported Financial Metrics On a Quarterly Basis

252.    The table below shows the effect of the restatement on net revenue for fiscal year 2014 through 2016, and the effect for each quarter of 2015 and 2016.  (The Restatement did not break out adjustments by quarter with respect to 2014.)

**NET REVENUE (in thousands)**

|  | Previously reported (including discontinued operations) | Total Adjustment | As adjusted (including discontinued operations) | Adjustment Percentage (including discontinued operations) |
|---|---|---|---|---|
| 2014 | $457,301 | ($73,885) | $383,416 | -16.16% |
| 1Q2015 | $132,931 | $14,210 | $147,141 | 10.69% |
| 2Q2015 | $137,776 | ($14,466) | $123,310 | -10.50% |
| 3Q2015 | $150,997 | ($20,550) | $130,447 | -13.61% |
| 4Q2015 | $157,213 | ($34,750) | $122,463 | -22.10% |
| 2015 | $578,917 | ($55,556) | $523,361 | -9.60% |
| 1Q2016 | $142,719 | ($25,973) | $116,746 | -18.20% |
| 2Q2016 | $157,255 | $2,846 | $160,101 | 1.81% |
| 3Q2016 | $176,380 | ($12,544) | $163,836 | -7.11% |
| 4Q2016 | $145,996 | ($14,785) | $131,211 | -10.13% |
| 2016 | $622,350 | ($50,456) | $571,894 | -8.11% |
| TOTAL | $1,658,568 | ($179,897) | $1,478,671 | -10.85% |

253.    The table below shows the effect of the restatement on net income (loss) for fiscal

year 2014 through 2016, and the effect for each quarter of 2015 and 2016:

## NET INCOME (LOSS) (in thousands)

|  | Previously reported (including discontinued operations) | Total Adjustment | As adjusted (including discontinued operations) | Adjustment Percentage (including discontinued operations) |
|---|---|---|---|---|
| 2014 | $38,895 | ($78,534) | ($39,639) | -202.91% |
| 1Q2015 | $10,561 | $9,177 | $19,738 | 86.90% |
| 2Q2015 | $15,154 | ($7,745) | $7,409 | -51.11% |
| 3Q2015 | $9,645 | ($18,503) | ($8,858) | -191.84% |
| 4Q2015 | $11,322 | ($27,126) | ($15,804) | -239.59% |
| 2015 | $46,682 | ($44,197) | $2,485 | -94.68% |
| 1Q2016 | ($11,083) | ($21,253) | ($32,336) | -191.76% |
| 2Q2016 | ($7,303) | $11,995 | $4,692 | 164.25% |
| 3Q2016 | $4,833 | ($5,618) | ($785) | -116.24% |
| 4Q2016 | $21,545 | $3,575 | $25,120 | 16.59% |
| 2016 | $7,992 | ($11,301) | ($3,309) | -141.40% |
| TOTAL | $93,569 | ($134,032) | ($40,463) | -143.24% |

254.    The table below shows the effect of the restatement on basic earnings per share

for fiscal year 2014 through 2016, and the effect for each quarter of 2015 and 2016 (for fiscal

year 2014, the Restatement provides only the effect of the restatement on earnings per share with

respect to continuing operations, so that is what is provided in this chart; for fiscal years 2015

and 2016, the Restatement shows the effect of the restatement of earnings per share with respect

to both continuing and discontinued operations):

**BASIC EARNINGS PER SHARE**

|  | Previously reported | Total Adjustment | As adjusted | Adjustment Percentage |
|---|---|---|---|---|
| 2014 | $(0.05) | $(1.94) | $(1.99) | -3880.00% |
| 1Q2015 | $0.25 | $0.23 | $0.48 | 92.00% |
| 2Q2015 | $0.36 | $(0.19) | $0.17 | -52.78% |
| 3Q2015 | $0.23 | $(0.44) | $(0.21) | -191.30% |
| 4Q2015 | $0.12 | $(0.47) | $(0.35) | -391.67% |
| 2015 | $0.96 | $(0.87) | $0.09 | -90.63% |
| 1Q2016 | $(0.18) | $(0.50) | $(0.68) | -277.78% |
| 2Q2016 | $(0.10) | $0.28 | $0.18 | 280.00% |
| 3Q2016 | $0.18 | $(0.12) | $0.06 | -66.67% |
| 4Q2016 | $0.55 | $0.16 | $0.71 | 29.09% |
| 2016 | $0.45 | $(0.18) | $0.27 | -40.00% |
| TOTAL | $1.36 | $(2.99) | $(1.63) | -219.85% |

## VII.   THE EXCHANGE ACT CLAIMS

### A.   DEFENDANTS' FALSE OR MISLEADING STATEMENTS

255.   During the Class Period, Defendants issued materially false or misleading statements, including (a) statements describing revenues for the current quarter, preceding quarter, year-to-date, or prior year-to-date, (b) guidance statements projecting revenues for the impending quarter or year, (c) the statement that the Company's financial statements have been prepared in accordance with GAAP, (d) statements describing the Company's accounting practices respecting revenue recognition, and (e) Sarbanes-Oxley certifications attesting to the truth and accuracy of the Company's financial reports, and the existence and effectiveness of the Company's internal controls over financial reporting and disclosures.  These statements, and others, as detailed below, were false or misleading.

### 1.   Historical False or Misleading Statements

### a.   Third Quarter 2014

256.   The Company announced its third quarter 2014 financial results on October 28, 2014.   The Company's press release quoted Waldis as touting "115% year-over-year Cloud Services revenue growth," and reported revenues "[o]n a GAAP basis" of "$125.2 million, representing an increase of 40% compared to the third quarter of 2013."   The press release further reports gross profits of $74.7 million, income from operations of $15.6 million, net income applicable to common stock of $9.3 million, and diluted earnings per share of $0.22 compared to $0.09 for the third quarter of 2013, all on a GAAP basis.   The press release also states that "Cloud Services non-GAAP revenue was $57.9 million, representing approximately 46% of total revenue."

257.   In the October 28, 2014 press release, Defendant Rosenberger is quoted as saying, "[W]e continue to generate both meaningful growth and sustained profitability."

258.   On the third quarter 2014 earnings call, held on October 28, 2014, Defendant Rosenberger stated:   "Our non-GAAP Cloud Services revenue in the third quarter was $57.9 million representing 46% of our total revenue and year-over-year growth of 115%."   Defendant Waldis stated:   "Our strong third quarter results were highlighted by the significant outperformance in our cloud services business, which generated year-over-year revenue growth of 115%."

259.   In its Form 10-Q for the quarter ended September 30, 2014, which was signed by Defendants Waldis and Rosenberger on October 31, 2014, and filed with the SEC on October 31, 2014, Synchronoss reported net revenue of $125.175 million and income from operations of $15.618 million. Synchronoss reported net revenue of $457.314 million and income from

operations of $62.298 million for the year-to-date 2014 period.  The Form 10-Q also states: "[O]ur consolidated financial statements . . . have been prepared in accordance with GAAP."

260.    The following statement appeared in the Forms 10-K issued by the Company for 2013, 2014, 2015, and 2016, which were signed by Defendants Waldis and Rosenberger and filed with the SEC on February 26, 2014, February 25, 2015, February 26, 2016, and February 27, 2017, respectively:

> Revenue from software license arrangements is recognized when the license is delivered to our customers and all of the software revenue recognition criteria are met. When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered elements. We determine VSOE for each element based on historical stand-alone sales to third-parties.

These disclosure documents also stated:  "we follow specific and detailed rules and guidelines related to revenue recognition."

261.    These statements were incorporated by reference in the third quarter 2014 Form 10-Q.

262.    Under the heading "Changes in internal controls over financial reporting," the third quarter 2014 10-Q also stated:  "We have implemented new financial systems that will continue in phases over the reminder of the year.  In connection with this initiative and the resulting changes in our financial systems, the Company continues to enhance the design and documentations of our internal control processes to ensure that controls over our financial reporting remain effective."

263.    In certifications attached as exhibits to the third quarter 2014 Form 10-Q and signed by Defendants Waldis and Rosenberger, respectively, on October 31, 2014, Defendants Waldis and Rosenberger certified that they reviewed the third quarter 2014 Form 10-Q and that the report "does not contain any untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The certifications further stated:

> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have:  (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; (b) Designed such internal control over financial reporting, or caused such control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

264.    The foregoing statements in ¶¶256 through 263 were false or misleading because (i) Defendants' accounting practices did not comply with GAAP; (ii) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (iii) the Company has restated its financials for 2014, including adjusting revenue downward by more than 20%; and/or (iv) the Company lacked effective internal controls over financial reporting.

### b.      Fourth Quarter 2014 and Full Year 2014

265.    The Company announced its fourth quarter 2014 and full-year 2014 financial results on February 5, 2015.  The Company's press release highlighted "year-over-year Cloud Services revenue growth of 61%," and reported revenues "[o]n a GAAP basis" of "$130.2 million, representing an increase of 34% compared to the fourth quarter of 2013."  The press release further reported gross profits of $77.6 million, income from operations of $20.5 million,

net income of $13.6 million, and diluted earnings per share of $0.30 for the fourth quarter of 2014 compared to $0.39 for the fourth quarter of 2013, all on a GAAP basis.  The press release also states that Cloud Services non-GAAP revenue was $63.4 million, "representing approximately 48% of total non-GAAP revenue and growing 61% on a year-over-year basis."

266.    On the Company's February 5, 2015 earnings call, Defendant Rosenberger stated: "Our non-GAAP Cloud Services revenue in the fourth quarter was $63.4 million, which represented 48% of our total revenue and year-over-year growth of 61%."

267.    In its Form 10-K for the year ended December 31, 2014, which was signed by Defendants Waldis and Rosenberger on February 25, 2015, and filed with the SEC on February 26, 2015, Synchronoss reported net revenue of $457.314 million and income from operations of $62.298 million.

268.    The 2014 Form 10-K also included the statements made in paragraph 260 above.

269.    In certifications attached as exhibits to the 2014 Form 10-K and signed by defendants Waldis and Rosenberger, respectively, on February 25, 2015, Defendants Waldis and Rosenberger made certifications that were identical to the certifications alleged in paragraph 263, above.

270.    The foregoing statements in ¶¶265 through 269 were false or misleading because (i)  Defendants' accounting practices did not comply with GAAP; (ii) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (iii) in its Restatement, the Company has substantially restated its 2014 financials, including decreasing its revenue by nearly $70 million and its loss from operations by nearly $78 million for 2014; and/or (iv) the Company lacked effective internal controls over financial reporting.

### c.        First Quarter 2015

271.    The Company announced its first quarter 2015 financial results on April 29, 2015. The Company's press release touted "63% year-over-year" growth in Cloud Services," and reported revenues "[o]n a GAAP basis" of "$132.9 million, representing an increase of 35% compared to the first quarter of 2014."  The press release further reported gross profits of $79.3 million, income from operations of $18.3 million, net income of $10.6 million, and diluted earnings per share of $0.23 for the first quarter of 2015 compared to $0.19 for the first quarter of 2014, all on a GAAP basis.  The press release also stated:  "Cloud Services revenue of $71.3 million increases 63% year-over-year."   The press release also quoted Defendant Waldis as stating:  "During the quarter, both sides of our business contributed to the strong performance, particularly our Cloud Services, which grew by 63% year-over-year.  Mobile Operators around the world are capitalizing on the success of how personal cloud can drive important benefits to their valuable subscribers.   We are pleased with our successful formula for helping our customers gain adoption and success with our personal cloud platform."

272.    On the Company's April 29, 2015 earnings call, Defendant Rosenberger stated: "Our non-GAAP cloud revenue in the first quarter was $71.3 million, which represented 54% of our total revenue and year-over-year growth of 63%."

273.    In its Form 10-Q for the quarter ended March 31, 2015, which was signed by Defendants Waldis and Rosenberger on May 1, 2015, and filed with the SEC on May 1, 2015, Synchronoss reported net revenue of $132.926 million and income from operations of $18.289 million.   The Form 10-Q also states:  "our consolidated financial statements . . . have been prepared in accordance with GAAP."

274.    The first quarter 2015 Form 10-Q also incorporated by reference the statements made in paragraph 260 above.

275.   Under the heading "Changes in internal controls over financial reporting," the first quarter 2015 10-Q also stated:  "We have implemented new financial systems that will continue in phases over the reminder of the year.  In connection with this initiative and the resulting changes in our financial systems, the Company continues to enhance the design and documentations of our internal control processes to ensure that controls over our financial reporting remain effective."

276.   In certifications attached exhibits to the Q1 2015 Form 10-Q and signed by defendants Waldis and Rosenberger, respectively, on May 1, 2015, Defendants Waldis and Rosenberger made certifications that were identical to the certifications alleged in paragraph 263, above.

277.   The foregoing statements in ¶¶271 through 276 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked as revenue substantial portions of the value of contracts in the current quarter, which should have been recognized ratably over time; (ii) Defendants' accounting practices did not comply with GAAP; (iii) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (iv) the Company has restated its financials for this quarter, including adjusting revenue downward by more than $16 million relating to "Hosting" adjustment, and $10 million related to an "Acquisitions & Divestiture" adjustment; (v) the Company failed to treat the $10 million licensing "revenue" as part of the accounting of the patent settlement with F-Secure as required by GAAP; and (vi) the Company lacked effective internal controls over financial reporting.

### d.   Second Quarter 2015

278.   The Company announced its second quarter 2015 financial results on July 29, 2015.  The Company's press release reported revenues "[o]n a GAAP basis" of "$137.8 million,

representing an increase of 33% compared to the second quarter of 2014."  The press release further reported gross profits of $82.9 million, income from operations of $23.6 million, net income of $15.2 million, and diluted earnings per share of $0.33 for the second quarter of 2015 compared to $0.20 for the second quarter of 2014, all on a GAAP basis.  The press release also stated:  "Cloud Services revenue of $71.9 million increases 54% year-over-year."  The press release also quoted Defendant Waldis as stating:  "Each of our businesses performed well in the quarter and we were pleased to see some of our new wins begin to scale and drive volumes, particularly on the cloud side.  We are gaining strong traction among international mobile operators who are increasingly realizing the significant value Synchronoss's white-label cloud solution can deliver to their subscribers."

279.    On the Company's July 29, 2015 earnings call, Defendant Rosenberger stated: "Our non-GAAP cloud services revenue in the second quarter was $71.9 million which represented 52% of our total revenue and year-over-year growth of 54%."

280.    In its Form 10-Q for the quarter ended June 30, 2015, which was signed by Defendants Waldis and Rosenberger on July 31, 2015, and filed with the SEC on July 31, 2015, Synchronoss reported net revenue of $137.820 million and income from operations of $23.638 million.  The Form 10-Q also states:  "our consolidated financial statements . . . have been prepared in accordance with GAAP."

281.    The second quarter 2015 Form 10-Q also incorporated by reference the statements made in paragraph 260 above.

282.    In certifications attached as exhibits to the Q2 2015 Form 10-Q and signed by defendants Waldis and Rosenberger on July 31, 2015, Defendants Waldis and Rosenberger made certifications that were identical to the certifications alleged in paragraph 263, above.

283.    The foregoing statements in ¶¶278 through 282 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked as revenue substantial portions of the value of contracts in the current quarter, which should have been recognized ratably over time; (ii) Defendants' accounting practices did not comply with GAAP; (iii) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (iv) the Company has restated its financials for this quarter, including adjusting revenue downward by more than $5.5 million relating to "Hosting" adjustment, and $8.88 million related to an "Evidence of Arrangement and Other Revenue" adjustment; and (v) the Company lacked effective internal controls over financial reporting.

### e.    Third Quarter 2015

284.    The Company announced its third quarter 2015 financial results on October 28, 2015.  The Company's press release reported revenues "[o]n a GAAP basis" of "$150.9 million, representing an increase of 21% compared to the third quarter of 2014."   The press release further reported gross profits of $87.4 million, income from operations of $22.3 million, net income of $9.6 million, and diluted earnings per share of $0.21 for the third quarter of 2015 compared to $0.22 for the third quarter of 2014, all on a GAAP basis.  The press release also stated:  "Cloud Services revenue of $76.1 million increases 31% year-over-year."

285.    On the Company's October 28, 2015 earnings call, Defendant Rosenberger stated: "Our non-GAAP cloud services revenue was $76.1 million, which represented just over 50% of our total revenue and year-over-year growth of 31%."

286.    On the earnings call, Defendant Waldis stated: "[O]ur cloud business, launched in 2011, was a majority of our revenue in the third quarter, exceed[ed] an annualized run rate of $300 million and grew over 30% for the quarter. The success of our cloud initiative has

expanded our customer base, added a highly profitable revenue stream and demonstrated our ability to get into new markets and scale them fast."

287.    In its Form 10-Q for the quarter ended September 30, 2015, which was signed by Defendants Waldis and Rosenberger on November 5, 2015, and filed with the SEC on November 5, 2015, Synchronoss reported net revenue of $150.874 million and income from operations of $22.294 million.  Q3 2015 Form 10-Q at page 4.  The Form 10-Q also states:  "our consolidated financial statements . . . have been prepared in accordance with GAAP."

288.    The third quarter 2015 Form 10-Q also incorporated by reference the statements made in paragraph 260 above.

289.    In certifications attached as exhibits to the Q3 2015 Form 10-Q and signed by defendants Waldis and Rosenberger on November 5, 2015, Defendants Waldis and Rosenberger made certifications that were identical to the certifications alleged in paragraph 263, above.

290.    The foregoing statements in ¶¶284 through 289 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked as revenue substantial portions of the value of contracts in the current quarter, which should have been recognized ratably over time; (ii)  Defendants' accounting practices did not comply with GAAP; (iii) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (iv) the Company has restated its financials for this quarter, including adjusting revenue downward by more than $2.3 million relating to "Hosting" adjustment, and $18.195 million related to an "Evidence of Arrangement and Other Revenue" adjustment; and (v) the Company lacked effective internal controls over financial reporting.

### f.    Fourth Quarter 2015 and Full Year 2015

291.    The Company announced its fourth quarter 2015 financial results on February 3, 2016.  The Company's press release reported revenues "[o]n a GAAP basis" of "$157.2 million,

representing an increase of 21% compared to the fourth quarter of 2014." The press release further reported gross profits of $90.2 million, income from operations of $15.4 million, net income of $5.3 million, and diluted earnings per share of $0.12 for the fourth quarter of 2015 compared to $0.30 for the fourth quarter of 2014, all on a GAAP basis. The press release also stated: "Cloud Services revenue accounted for $90.9 million of non-GAAP revenue, representing approximately 58% of total non-GAAP revenue and growing 43% on a year-over-year basis."

292. On the Company's February 3, 2016 earnings call, Defendant Rosenberger stated: "Our non-GAAP Cloud Services revenue in the fourth quarter was $90.9 million, which represented 58% of our total revenue and year-over-year growth of 43%."

293. In its Form 10-K for the year ended December 31, 2015, which was signed by Defendants Waldis and Rosenberger on February 26, 2016, and filed with the SEC on February 26, 2016, Synchronoss reported net revenue of $578.831 million and income from operations of $79.590 million. The Form 10-K also stated: "our consolidated financial statements . . . have been prepared in accordance with U.S. GAAP."

294. The following statement appeared in the Forms 10-K issued by the Company for 2015 (and 2016), which were signed by Defendants Waldis and Rosenberger and filed with the SEC on February 26, 2016, and February 27, 2017, respectively:

> Revenue from software license arrangements is recognized when the license is delivered to our customers and all of the software revenue recognition criteria are met. When software arrangements include multiple elements, the arrangement consideration is allocated at the inception to all deliverables using the residual method providing we have vendor specific objective evidence (VSOE) on all undelivered elements. We determine VSOE for each element based on historical stand-alone sales to third-parties.

These disclosure documents also stated: "we follow specific and detailed rules and guidelines related to revenue recognition."

295.   In certifications attached as exhibits to the 2015 Form 10-K and signed by Defendants Waldis and Rosenberger on February 26, 2016, Defendants Waldis and Rosenberger made certifications that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The certifications further stated:

> The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have:  (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared; (b) Designed such internal control over financial reporting, or caused such control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

296.   The foregoing statements in ¶¶ 291-295 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked as revenue substantial portions of the value of contracts in the current quarter (and for full-year 2015), which should have been recognized ratably over time; (ii)  Defendants' accounting practices did not comply with GAAP; (iii) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (iv) the Company has restated its financials for fiscal year 2015, including adjusting net revenue downward by $55.6 million; (v) the

Company has restated its financials for this quarter, including adjusting revenue downward by more than $2.5 million relating to "Hosting" adjustment, $12.141 million related to an "Evidence of Arrangement and Other Revenue" adjustment, and $20.09 million related to an "Acquisitions & Divestiture" adjustment; (vi) according to CW2, the Company recorded $7 million in revenue from two contracts with AT&T, for which the Company did not have adequate documentation, as required by GAAP, and which never came to fruition, or did so only after the close of the fourth quarter and fiscal year 2015; (vii) the Company improperly – and in blatant violation of GAAP principles – accounted for a $23 million licensing fee entered into in connection with the Zentry joint venture as standalone revenue, rather than as part of the accounting for the formation of the JV and (viii) the Company lacked effective internal controls over financial reporting.

### g.     First Quarter 2016

297.    The Company announced its first quarter 2016 financial results on May 5, 2016. The Company's press release reported GAAP revenue of "$142.7 million compared to $132.9 in the first quarter of 2015."   The press release further reported gross profits of $74.4 million, income from operations of negative $4.7 million, net income of negative $7.3 million, and diluted earnings per share of negative $0.21 for the first quarter of 2016 compared to positive $0.23 for the first quarter of 2015, all on a GAAP basis.  The press release also stated:  "Cloud Services revenue accounted for $84.3 million of non-GAAP revenue, representing approximately 58% of total non-GAAP revenue and growing 18% on a year-over-year basis."

298.    On the Company's May 5, 2016 earnings call, Defendant Rosenberger stated: "Our cloud services revenue in the first quarter was $84.3 million, which represented 58% of our total revenue and grew 18% year-over-year, exceeding both Street and internal expectations."

299.    In its Form 10-Q for the quarter ended March 31, 2016, which was signed by Defendants Waldis and Rosenberger on May 10, 2016, and filed with the SEC on May 10, 2016,

Synchronoss reported net revenue of $142.686 million and loss from operations of $4.665 million.  The Form 10-Q also stated:  "our consolidated financial statements . . . have been prepared in accordance with GAAP."

300.    The first quarter 2016 Form 10-Q also incorporated by reference the statements made in paragraph 294, above.

301.    In certifications attached as exhibits to the Q1 2016 Form 10-Q and signed by defendants Waldis and Rosenberger on May 10, 2016, Defendants Waldis and Rosenberger made certifications that were identical to the certifications alleged in paragraph 295, above.

302.    The foregoing statements in ¶¶297-301 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked as revenue substantial portions of the value of contracts in the current quarter, which should have been recognized ratably over time or not at all; (ii)  Defendants' accounting practices did not comply with GAAP; (iii) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (iv) the Company has restated its financials for this quarter, including adjusting revenue downward by $18.086 million related to an "Evidence of Arrangement and Other Revenue" adjustment, and $10.006 million related to an "Acquisitions & Divestiture" adjustment; (v) according to CW1, the Company failed to disclose that revenue from the $5 million Verizon contract alleged above was included in this quarter's reported financial results of the Company even though the contract had not been executed prior to the end of the quarter on March 31, 2016, if at all; (vi) the Company failed to treat the $10 million licensing "revenue" as part of the accounting of the patent settlement with Openwave as required by GAAP; and (vii) the Company lacked effective internal controls over financial reporting.

### h.      Second Quarter 2016

303.    The Company announced its second quarter 2016 financial results on August 3, 2016.

304.    In its Form 10-Q and associated Form 8-K for the quarter ended June 30, 2016, which was signed by Defendants Waldis and Rosenberger on August 4, 2016, and filed with the SEC on August 4, 2016, Synchronoss reported revenues for the "Six Months Ended June 30, 2016" as $300,237,000, incorporating false revenue figures from the first quarter of 2016.  The Form 10-Q also stated:  "our consolidated financial statements . . . have been prepared in accordance with GAAP."

305.    The foregoing statements in ¶¶ 303-304 were false or misleading for the same reasons the statements set forth in Section VII.A.1.g (concerning first quarter 2016) are false or misleading.

### i.      Third Quarter 2016

306.    The Company announced its third quarter 2016 financial results on November 7, 2016.  The Company's press release reported revenue of "$176.4 million GAAP compared to $150.9 in the third quarter of 2015."  The press release further reported gross profits of $99.2 million, operating income of $13.2 million, net income of $7.7 million, and diluted earnings per share of $0.16 for the third quarter of 2016 compared to $0.21 for the third quarter of 2015, all on a GAAP basis.  The press release also stated:  "Cloud Solution revenue:  $101.9 million of GAAP revenue, representing approximately 58% of total GAAP revenues and growing 34% on a year-over-year basis.  $106.4 million of non-GAAP revenue, representing approximately 59% of total non-GAAP revenue and growing 40% on a year-over-year basis."

307.    On the Company's November 7, 2016 earnings call, Defendant Rosenberger stated:  (a) "Starting with the top line, non-GAAP revenues were $181 million, which was above

the high end of our guidance and up 20% on a year-over-year basis, driven by stronger than expected cloud revenues and in-line activation performance."; and (b) "Our cloud solution revenue in the third quarter was $106.4 million, which represented 59% of our total revenue and grew 40% year-over-year. This was above the high end of our guidance range of between $102 million to $105 million."

308.    On the Company's November 7, 2016 earnings call, Defendant Waldis stated that, "we signed a $25 million license deal with Verizon during the quarter." Defendant Rosenberger stated that the "$25 million license deal" was "signed and recognized in the quarter."

309.    In its Form 10-Q for the quarter ended September 30, 2016, which was signed by Defendants Waldis and Rosenberger on November 8, 2016, and filed with the SEC on November 8, 2016, Synchronoss reported net revenue of $176.421 million and income from operations of $13.209 million.  The Form 10-Q and associated Form 8-K also report revenues for the "Nine Months Ended September 30, 2016" as $476,658,000, incorporating false revenue figures from the first quarter of 2016.  The Form 10-Q also states:  "our consolidated financial statements . . . have been prepared in accordance with GAAP."

310.    The third quarter 2016 Form 10-Q also incorporated by reference the statements made in paragraph 294, above.

311.    In certifications attached as exhibits to the Q3 2016 Form 10-Q and signed by Defendants Waldis and Rosenberger on November 8, 2016, Defendants Waldis and Rosenberger made certifications that were identical to the certifications alleged in paragraph 295, above.

312.    The foregoing statements in ¶¶ 306-311 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked as revenue substantial portions of the value of contracts in the current quarter, which should have

been recognized ratably over time or not at all, including but not limited to the $25 million Verizon license agreement fully recognized as revenue in the quarter; (ii) Defendants booked "revenue" from the $25 million Verizon license agreement in this quarter even though there was not a signed contract as required by GAAP and explained in Ernst & Young's revenue recognition guidelines;  (iii) Defendants' accounting practices did not comply with GAAP; (iv) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (v) the Company has restated its financials for this quarter, including adjusting revenue downward by $6.44 million relating to "Hosting" adjustment and $7.648 million related to an "Evidence of Arrangement and Other Revenue" adjustment; and (vi) the Company lacked effective internal controls over financial reporting.

313.    In addition, on the November 7, 2016, earnings call, an analyst asked Defendant Rosenberger:  "On the $25 million Verizon deal in 3Q, was that baked into your initial guidance, or was that a deal you were working on?"  Rosenberger replied (emphasis added):  "Yes, so clearly that deal has been in the works for little [sic] while and *was clearly contemplated while we were giving guidance on our last earnings call*." Defendant Rosenberger's statement is misleading because at the time of this earnings call, the third quarter of 2016 had closed, and according to CW3, this contract had not been signed prior to the close of the third quarter, and Rosenberger knew this.  Thus, even if the $25 million Verizon contract had been "baked into" guidance for the third quarter of 2016, Rosenberger's statement was misleading because she failed to disclose that the $25 million Verizon contract was improperly included in Synchronoss's third quarter of 2016 revenue.

### j.    Fourth Quarter 2016 and Full Year 2016

314.    The Company announced its fourth quarter and full-year 2016 financial results on February 8, 2017.  The Company's press release reported fourth quarter 2016 revenue from

continuing operations of "$121.7 million GAAP compared to $121.2 in the fourth quarter of 2015." The press release further reported for the fourth quarter of 2016 gross profits from continuing operations of $71.5 million, operating income from continuing operations of negative $30.4 million, net income of negative $22.6 million, and diluted earnings per share of negative $0.51 for the fourth quarter of 2016 compared to negative $0.07 for the fourth quarter of 2015, all on a GAAP basis. The press release also stated: "GAAP Cloud Services revenue from continuing operations accounted for $121.7 million in the fourth quarter." The press release reported for the full year 2016 revenues from continuing operations of $476.7 million, gross profits from continuing operations of $282.5 million, operating income from continuing operations of negative $71.9 million, net income of negative $55.7 million, and diluted earnings per share of negative $1.28, all on a GAAP basis.

315.  On the Company's February 8, 2017 earnings call, Defendant Rosenberger stated: (a) "Starting with the top line, non-GAAP revenues from continued operations [for fourth quarter 2016] were $123.9 million."; and (b) "Cloud revenue from continued operations were $123.9 million and was at the high end of our original guidance from $122 million to $125 million."

316.  In addition, on the February 8, 2017 earnings call, Defendants failed to disclose (i) that the Company had entered into a $9.2 million licensing agreement in connection with the divestiture of a portion of its activation business to Sequential; (ii) that it had included that $9.2 million in its revenue for the fourth quarter of 2016 and full-year 2016; (iii) that Sequential had put in place a guarantee to Goldman Sachs of $30 million of the $40 million term loan Goldman Sachs had made to Sequential; and (iv) that Synchronoss had improperly recognized that revenue in that it failed to instead include this transaction as an offset to the purchase accounting in the

same period.  Defendants concealed this information, despite the fact that, as explained earlier herein, several analysts pressed Defendants for additional information about the Sequential transaction on the earnings calls.

317.    Also, on the February 8, 2017 earnings call, Defendant Waldis failed to disclose the improper accounting treatment of the $25 million licensing fee with Verizon, despite responding to a question from an analyst about the Verizon licensing fee.  Specifically, analyst Samad Samana asked:  "The Verizon, the $25 million payment that was announced last quarter. We have been told that, that is a new product or a new initiative.  Is that separate from what you're talking about at Mobile World Congress on the analytics side, or is that the same announcement?  Maybe help us understand that?"  Waldis responded:  "Two different things. The Verizon opportunity is a relationship that you will hear more about in Q1 that is not publicly announced.  The latter that we are referring to is separate.  It's two different."

318.    In its Form 10-K for the year ended December 31, 2016, which was signed by Defendants Waldis and Rosenberger on February 27, 2017, and filed with the SEC on February 27, 2017, Synchronoss reported net revenue of $476.750 million and income from continuing operations of negative $71.809 million.   The Form 10-K also states:   "our consolidated financial statements . . . have been prepared in accordance with U.S. GAAP."

319.    The 2016 Form 10-K also included the statements made in paragraph 294 above.

320.    In certifications attached as exhibits to the 2016 Form 10-K and signed by Defendants Waldis and Rosenberger on February 27, 2016, Defendants Waldis and Rosenberger made certifications that were identical to the certifications alleged in paragraph 295, above.

321.    The foregoing statements in ¶¶ 314 through 320 were false or misleading because (i) Defendants misstated revenue and other financial metrics in that they had improperly booked

as revenue substantial portions of the value of contracts in the current quarter, which should have been recognized ratably over time or not at all; (ii) Defendants' accounting practices did not comply with GAAP; (iii) Defendants' accounting practices failed to comply with the Company's disclosed accounting guidelines; (iv) the Company has restated its financials for this quarter, including adjusting revenue downward by more than $22.3 million relating to "Hosting" adjustment, and $11.412 million related to an "Acquisitions & Divestiture" adjustment; (v) the Company failed to treat the $9.2 million licensing "revenue" as an offset to the purchase accounting associated with the Sequential transaction as required by GAAP; (vi) the Company failed to disclose the $9.2 million licensing agreement that the Company entered into in connection with the Sequential transaction; (vii) the Company failed to disclose the $30 million guarantee Synchronoss provided to Goldman Sachs in connection with the Sequestial divestiture, and (viii) the Company lacked effective internal controls over financial reporting.

**2.    False and Misleading Guidance Statements**

**a.    Third Quarter 2016**

322.    On the Company's August 3, 2016, earnings call, Defendant Rosenberger stated: "Now let me move to guidance for the third quarter and an update on our 2016 outlook.  Non-GAAP revenues are expected to be in the range of $175 million to $180 million, representing year-over-year growth of approximately 17% at the midpoint."  Defendant Waldis was also on the call and knew the foregoing guidance had been given.

323.    The foregoing guidance statement in paragraph 322 above was false or misleading because the guidance for the third quarter of 2016 was undergirded by years of reported historical revenue figures that Defendants knew were false.

324.    In addition, this guidance statement was false or misleading because it included $25 million in revenue related to a contract with Verizon that, according to CW3, was not

executed prior to the close of the third quarter of 2016. Based on Defendants' practice of recognizing revenues in particular quarters before a contract was executed, Defendant Rosenberger knew that the Company would recognize as revenue proceeds from the $25 million Verizon contract regardless of whether it was executed prior to the end of the quarter. Defendants had previously engaged in such conduct with respect to Verizon in violation of basic accounting rules. According to CW1, the Company had previously failed to disclose that revenue from a $5 million Verizon contract was included in the first quarter of 2016's reported financial results of the Company even though the contract had not been executed prior to the end of the quarter on March 31, 2016.

325. Rosenberger later stated that the $25 million contract had been included in revenue guidance for the third quarter of 2016. In response to a question by an analyst in a subsequent earnings call as to whether "the $25 million Verizon deal in 3Q [ ] was [ ] baked into your initial guidance," Rosenberger replied (emphasis added): "Yes, so clearly that deal has been in the works for little [sic] while and *was clearly contemplated while we were giving guidance on our last earnings call*." At the time Rosenberger made this statement, she and Waldis knew that the Verizon contract, which she says was "contemplated" in issuing guidance for the third quarter of 2016, had not been signed and therefore should not have been included in the revenue for the quarter.

326. With "revenue" associated with the $25 million Verizon contract included in Synchronoss's reported revenues, Synchronoss reported non-GAAP revenue of $181.0 million for the third quarter of 2016 (slightly above the high-end of the guidance provided on the August 3 earnings call). Without the $25 million in improperly recognized revenue from the Verizon contract included in the quarter's revenue, Synchronoss would have fallen substantially short of

meeting even the low end of the Company's guidance.  Indeed, as part of the Restatement, the Company adjusted revenue for the third quarter of 2016 downwards by more than $12 million, meaning that if the Company had truthfully reported revenues for the quarter, its net revenues for the this quarter would have been substantially below the previously issued guidance.

### b.     Full Year 2017

327.    On the Company's December 6, 2016 call to discuss the Intralinks acquisition, Defendant Rosenberger stated:  "For the combined company following the proposed Intralinks acquisition, we are giving initial 2017 total revenue guidance of between $810 million to $820 million and pro forma EPS of between $2.45 and $2.60 assuming a late first quarter close on the Intralinks transaction and factoring in the expected impact from our new debt facility." Defendant Waldis was also on this call and knew the foregoing guidance had been given.

328.    On the Company's February 8, 2017 earnings call, Defendant Rosenberger reiterated this guidance:  "For 2017, non-GAAP revenues are expected to be in the range of $810 million to $820 million, unchanged from our initial guidance given on December 6 for the combined company."  Defendant Waldis was also on this call and knew the foregoing guidance had been given.

329.    The foregoing guidance statements in ¶¶327-328 were false or misleading because the guidance for 2017 was undergirded by years of reported historical revenue figures that Defendants knew were false. This false revenue included the $25 million contract with Verizon that was improperly booked as revenue in the third quarter of 2016; and the $9.2 million Sequential licensing fee that was booked as revenue in the fourth quarter of 2016 (but should have been treated as part of the purchase accounting for Sequential).

**B.**     ADDITIONAL ALLEGATIONS OF SCIENTER

    **1.     The Magnitude of the Restatement Creates a Strong Inference of Scienter**

330.     Synchronoss's cumulative revenue for 2014 through 2016, as restated, was adjusted downward from $1,212,168,000 to $1,032,271,000, a cumulative reduction of nearly **$180 million** (or more than 14.8%).  The Company's 2014 revenues were adjusted downward by $74 million (from $457 million to $383 million, or 16%).  Its 2015 revenues were adjusted downward by $56 million (from $579 million to $523 million, or 9.6%).  Its 2016 revenues were adjusted downward by $50 million (from $622 million to $572 million, or 8.1%).

331.     The restatement of Synchronoss's net income (loss) from operations was even more pronounced.  For 2016, Synchronoss's net income from operations of $8 million was restated to a net loss of $3 million (in other words, a 140% decrease in income).  For 2015, Synchronoss's previously reported net income from operations of $47 million decreased to just $2 million, a decrease of nearly 95%.  For 2014, net income from operations of $39 million was restated to a loss of $40 million, an over 200% decrease.

332.     Thus, while Synchronoss reported net income from operations from 2014 through 2016 of $93.5 million, in reality it had a **cumulative loss during that time of $40 million** (a difference of $134 million, a **143% decrease** in net income).  These dramatically restated income metrics demonstrate that Synchronoss has been in dire financial straits for years, a crucial fact obscured by Defendants' massive accounting fraud.

333.     Taking into account these numbers, the relative size, and the timing, nature, and context of the Restatement, a strong inference of scienter is unavoidable.  The Restatement was a cataclysmic event for Synchronoss, whose shares can no longer be traded on NASDAQ as a result of it.  The three-year span of time covered by the Restatement, and the fact that the

Restatement resulted largely from pervasive and repetitive violations of basic revenue recognition principles, in connection with transactions with the Company's largest and most important customers, strongly supports an inference of scienter as to the Company and its senior officers, Waldis and Rosenberger.  Waldis and Rosenberger had unfettered access to the relevant financial data, including revenue, expense, income, acquisition, licensing, and other data, as well as their accounting treatment.

334.   Moreover, the extended duration of time required to prepare and issue the Restatement—over one full year—also supports a strong inference of scienter as to the Company and its senior officers, Waldis and Rosenberger.

335.   The large, multi-million dollar amounts of the AT&T and Verizon revenues alleged herein to have been improperly recognized (a total of $37 million in the four specific transactions identified by CW1, CW2, and CW3) also support a strong inference of scienter, especially since they made the difference in meeting revenue guidance in the quarters in which they were booked.  The limited number of customers at issue and the sheer importance of these customers to Synchronoss (AT&T and Verizon collectively accounted for between 62% to 75% of revenues from 2014 to 2016) similarly demonstrate scienter.

### 2. The Nature of the GAAP and Accounting Policy Violations Creates a Strong Inference of Scienter

336.   A strong inference of scienter also arises here because the GAAP principles and internal accounting policies so pervasively and repetitively violated, as alleged above, were basic rules not requiring accounting expertise.   (In any event, however, Rosenberger is a certified public accountant possessing such expertise.)

337.   ASC 985-605-25-3, -16, and -17 merely codify the principle that unearned revenues should not be recognized.  Both Waldis and Rosenberger (as well as Silverman and

Garcia) had sufficient knowledge and skill to understand this simple accounting principle. Moreover, as CW3 reported, at least one employee vocally objected to flouting this basic rule in connection with the $25 million Verizon transaction in the third quarter of 2016, as alleged above. In fact, as alleged earlier herein, the Company's own accountants issued guidelines that unequivocally stated that revenue cannot be recognized unless and until a signed contract is *in hand* prior to recognizing the revenue.

338. Similarly, both Waldis and Rosenberger had sufficient knowledge and skill to understand ASC 985-605-55-4 and 605-25-3, which codify the principle that where a license is being granted in connection with a related transaction, such as an acquisition, divestiture, or patent settlement, the license fees are not treated as standalone revenue for accounting purposes, but are accounted for as part of the cost or consideration of the underlying transaction.

339. The GAAP and internal accounting policy violations alleged herein pertain to software licensing and sales transactions and to acquisitions. Software licensing and sales are the Company's core business. Moreover, the Company has been party to a host of acquisition transactions over the past several years, including the acquisitions of F-Secure, Openwave, Voxmobili, SnapOne, Intralinks, and other companies. These are not new areas for Synchronoss or its senior officers, Waldis and Rosenberger. These are core lines of business and growth.

### 3. Defendants' Abuses of Internal Controls Creates a Strong Inference of Scienter

340. CW1, CW2, and CW3 have provided specific facts supporting a strong inference of scienter as to the Company, Waldis, and Rosenberger, across the entire Class Period. Among other things, the CWs have stated the following based on their own personal experience and knowledge:

a. In every quarter in which Rosenberger was CFO (April 2014 to April 2017), the Company's financial results were manipulated at Rosenberger's direction for the purpose of avoiding showing a decrease in profit margins (CW3);

b. Each week, Synchronoss financial analyst Andrew Latyszonek created a "flash file" for the purpose of identifying expenses and other financial metrics to manipulate, which was reviewed and approved by Waldis and Rosenberger on a weekly basis (CW3);

c. Rosenberger expressly approved the misclassification of expenses and other financial metrics on the basis of the "flash file" (CW3);

d. The Company incentivized Latyszonek by compensating him for his participation in improper accounting, including by issuing him a substantial special bonus  (which CW3 believes was $50,000) in fall 2016 (CW3);

e. The Company recognized $7 million in revenue from two purported contracts with AT&T in late 2015, despite that those contracts remained unsigned as of the end of 2015 (CW2);

f. The Company sought to justify the already-recognized $7 million in revenue in 2016, expressly tasking an employee with making the numbers look legitimate to auditors (CW2);

g. The Company recognized $5 million in revenue from a purported contract with Verizon in the first quarter of 2016 that had not been signed by the closing of the quarter (CW1);

h.      Rosenberger was aware that the contract that was the basis of the Company's recognition of $5 million in revenue was unsigned as of April 2016, the month after the quarter had closed (CW1);

i.      The Company recognized $25 million in revenue from a purported contract with Verizon in the third quarter of 2016 that had not been signed by the closing of the quarter (CW3);

j.      At least one revenue recognition accountant protested against the fraudulent recognition of revenues (including the $25 million transaction with Verizon in third quarter of 2016), but was overruled by Rosenberger, (CW3); and

k.      The Company had a robust revenue recognition process in place, including a dedicated Revenue Recognition and Billing Manager, who ordinarily demanded documentation substantiating any revenues that should be recognized, and this process could only be bypassed or disabled by senior Company officers such as Waldis and Rosenberger (CW2, CW3).

341.    These facts leave no doubt as to each Defendant's scienter.  Even recklessness could not explain how revenues from a series of multi-million dollar contracts with the Company's largest and most important customers (AT&T and Verizon) were booked—in at least one case, over the protestations of a revenue recognition accountant—despite the lack of executed agreements.  Nor could it explain how Rosenberger *personally* cooked the Company books to avoid showing declining profit margins.  Only conscious misbehavior explains this fraudulent conduct.

### 4. Defendants' Knowledge of and Participation in the Fraudulent Accounting Scheme Creates a Strong Inference of Scienter

342.    Given, among other things, the importance of Cloud revenues to the Company's financial reporting and given that Defendants knew such revenues were particularly significant to analysts and the investing public and, therefore, to the Company's stock price (and, indeed, said so in the Company's proxy statement), Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.

343.    In addition, Defendants' knowledge included awareness of the existence of accounting improprieties and material weaknesses which enabled the Company to manipulate its reported financial results. The existence of these serious financial matters created a corporate environment ripe for manipulation, particularly with respect to the Company's financial reports to investors.

344.    Moreover, according to CW1, in April 2016, Defendant Rosenberger inquired about the status of a contract with Verizon that had not yet been signed but was nevertheless included in the Company's revenue numbers for that quarter, reflecting her direct knowledge of the fraud.

345.    Further, according to CW2, Synchronoss employed a dedicated manager with responsibility for overseeing recognition of revenue from contracts with clients, who demanded documentation sufficient to justify recognizing revenue from such contracts.  However, when necessary to inflate revenues to meet previously issued guidance or market expectations, senior

Company management overrode the process that was in place to recognize revenue only in an appropriate manner.

346.    CW3 confirmed that, in at least one instance, a revenue recognition accountant objected ("kicking and screaming") to the recognition of $25 million in revenue purportedly from a Verizon transaction in the third quarter of 2016, and was overruled by Rosenberger. CW3 also confirmed that senior officers, including Rosenberger, made fraudulent adjustments to Company expenses and other financial metrics throughout the Class Period to ensure the Company never reported a decline in profit margins.

### 5.    Motive and Opportunity

347.    An inference that Defendants acted with scienter is bolstered by sales of stock that Defendants made throughout the Class Period, while the Company's share price was artificially inflated due to Defendants' materially false or misleading statements and omissions.

348.    According to forms filed with the SEC, Company insiders collectively unloaded at least $21 million (net of the aggregate exercise price of options) in Synchronoss stock in insider trading sales during the Class Period. This amount includes Class Period sales by Defendants Waldis and Rosenberger, as well as Section 16 officers Robert Garcia (President and COO), Ronald Prague (General Counsel), David Schuette (Executive Vice President), and Chris Halbard (Executive Vice President, International), and directors William Cadogan, James McCormick, Charles Hoffman, Donnie Moore, and Thomas Hopkins.

349.    During the Class Period, according to forms filed with the SEC, Defendant Rosenberger sold 51,593 shares of Synchronoss stock for proceeds of $1,458,550.93 (net of the aggregate exercise price of options). Notably, Defendant Rosenberger unloaded 12,453 shares in the first two months of 2017 for proceeds totaling $429,040.66 (net of the aggregate exercise price of options), shortly before Defendants' fraudulent scheme was revealed. In the process,

Defendant Rosenberger reduced the number of shares of Synchronoss common stock that she held by more than 18%, from 40,219 shares at the end of December 2016 to 32,846 shares as of February 21, 2017.  The 12,453 shares of Synchronoss stock that she sold from January 1 through February 21, 2017, is substantially greater than in the comparable time period during prior years:

| Time Period | Shares sold |
|---|---|
| 1/1/2016 – 2/21/2016 | 4,006 |
| 1/1/2015 – 2/21/2015 | 5,518 |
| 1/1/2014 – 2/21/2014 | 4,200 |
| 1/1/2013 – 2/21/2013 | 9,499 |

On an annualized basis, the 12,453 shares this Defendant Rosenberger sold between January 1, 2017 and February 21, 2017, amounts to more than 87,000, more than quadruple the number of shares that she sold in any year since 2013.

350.   Moreover, in December 2016, following the announcement of the Sequential transaction (but before the fraud involving Sequential was disclosed by the Company), Defendant Rosenberger sold 14,000 shares of stock.  This dwarfs the number of shares that she sold in the month of December in each of the prior four years:

| Time Period | Shares sold |
|---|---|
| December 2015 | 0 |
| December 2014 | 2,749 |
| December 2013 | 0 |
| December 2012 | 50 |

351.   Defendant Waldis sold 569,800 during the Class Period for proceeds of $18,086,740.09 (net of the aggregate exercise price of options).  In so doing, Defendant Waldis decreased his holdings in Synchronoss by more than 100,000 shares during the Class Period. The following chart reflects Defendants Waldis's Class Period sales by year:

| Year | # of occasions on which he sold | Shares sold | Net proceeds |
|---|---|---|---|
| 2014 | 3 | 37,318 | $1,126,280.34 |
| 2015 | 11 | 202,713 | $7,333,674.74 |
| 2016 | 16 | 295,799 | $8,450,379.06 |
| 2017 | 3 | 33,970 | $1,176,405.95 |

352.     According to the Forms 4 disclosing these sales, each of these sales was purportedly made pursuant to a Rule 10(b)(5)-1 plan.  However, given the changes in Defendant Waldis's and Rosenberger's patterns of stock sales in Synchronoss, the Rule 10(b)(5)-1 plan applicable to Defendants Waldis's and Rosenberger's transactions in Synchronoss stock must have been amended once or more during the Class Period.  For example, beginning in April 2016 through October 2016, Defendant Waldis sold 13,000 shares of Synchronoss stock each month. In March 2016, he sold 77,430 shares (including 31,430 shares that were acquired as a result of the exercise of stock options).  In addition, according to the Form 4s filed by Synchronoss, after his regular monthly sales of shares through October 2016, Defendant Waldis did not sell any Synchronoss shares until February 2017, when he unloaded 33,970 shares.  And, as explained earlier, Rosenberger's trading suspiciously ramped up prior to her resignation, which further supports that and 10(b)(5)-1 plans were amended.

353.     In addition, Defendant Waldis did not purchase any shares of Synchronoss stock during the Class Period.

354.     Further bolstering an inference of scienter, none of the Company's reporting persons has sold any shares of Synchronoss stock in the more than sixteen months since the 46% one-day drop in April 2017.

355.     In addition, on February 4, 2016, the Company announced a $100 million share repurchase plan to be executed over the ensuing twelve to eighteen months.  As stated in

Synchronoss's 2016 Form 10-K:  "As of December 31, 2016, a total of 1.3 million shares ha[d] been purchased under the program for an aggregate purchase price of $40 million."  Thus, the Company spent more than $40 million in cash repurchasing stock during the Class Period while, at the same time, it was borrowing huge amounts to, for example, engage in the IntraLinks transaction, and accepting an $83 million "friends and family" IOU to complete the Sequential transaction.  These repurchases, many of which were at lofty prices in the $30's and $40's, contributed to the ability of Defendants to unload shares at high prices before the bottom dropped out on April 27, 2017.  Waldis, in 2016, sold more than 295,000 shares of Synchronoss stock for proceeds of more than $8.4 million.  Rosenberger, in 2016, sold more than 20,000 shares of stock for proceeds of more than $400,000.

356.    Defendants' motive to engage in the fraudulent scheme is further bolstered by the Synchronoss's incentive compensation system. Throughout the Class Period, a substantial portion of Defendants' total compensation comprised bonuses that were tied to the Company's performance, providing Defendants a motive to falsely inflate the Company's financial metrics. In its 2014 Proxy, the Company stated that it performed a "clean slate: review of its compensation programs and policies."  Among the changes that the Board made to its executive compensation program, it "added Cloud Revenue as a performance metric for [Synchronoss's] long-term equity incentive compensation plan."  Moreover, as discussed below, revenue and operating income were also performance metrics with respect to various components of Waldis's and Rosenberger's incentive compensation, providing Defendants with a motive for artificially inflating revenue, operating income, and cloud revenue throughout the Class Period.

357.    Since 2014, when the Company altered its incentive compensation plan, a substantial portion of Waldis's and Rosenberger's total compensation comprised incentive

compensation tied to the performance of the Company.  For 2014, 2015, and 2016, Waldis and Rosenberger's base salaries were as follows:

| Defendant | 2014 | 2015 | 2016 |
|---|---|---|---|
| Waldis | $573,947 | $591,165 | $608,900 |
| Rosenberger | $236,900 | $330,000 | $360,000 |

358.   For each of 2014, 2015, and 2016, Defendants Waldis and Rosenberger were awarded a cash bonus calculated based on an objective corporate component and a discretionary individual component.  For each of these years, the corporate component was based on the Company's achievement of predetermined non-GAAP revenue and non-GAAP operating incoming targets.  In part due to Defendants' fraudulent scheme, the Company achieved the targets for non-GAAP revenue and non-GAAP operating income.  Defendants, respectively, were awarded the following cash bonuses with respect to 2014, 2015, and 2016:

| Defendant | 2014 | 2015 | 2016 |
|---|---|---|---|
| Waldis | $961,361 | $821,216 | $748,155 |
| Rosenberger | $258,750 | $242,409 | $241,272 |

359.   In addition, with respect to 2014, 2015, and 2016, Defendants Waldis and Rosenberger were awarded performance based restricted shares.  The number of shares that each was awarded was based on achievement of certain targets for non-GAAP revenue, non-GAAP operating income (for 2014 and 2015; for 2016, this financial metric was replaced by non-GAAP EBITDA growth), and cloud revenue.  Synchronoss's non-GAAP revenue exceeded the target in each of 2014, 2015, and 2016.  Non-GAAP operating income and cloud revenue exceeded the respective targets in 2014 and 2015.  Non-GAAP EBITDA growth in 2016 fell slightly below target (34% compared to a target of 35%), as did cloud revenue ($403.3 million compared to a target of $412.2 million).  Defendants Waldis and Rosenberger received, respectively, the following number of performance based restricted shares with respect to 2014, 2015, and 2016:

| Defendant | 2014 | 2015 | 2016 |
|-----------|------|------|------|
| Waldis | 87,413 | 51,802 | 17,509 |
| Rosenberger | 5,360 | 6,137 | 4,148 |

360.    Defendants Waldis and Rosenberger also were awarded, as a result of the Company's artificially inflated performance, restricted shares that vest over three years and shares subject to options that would vest over the following four years.  In 2014, 2015, and 2016, Defendants Waldis and Rosenberger were awarded the following numbers of shares of restricted stock and shares subject to options:

| Defendant | 2014 Restricted shares, Shares subject to option | 2015 Restricted shares, Shares subject to option | 2016 Restricted shares, Shares subject to option |
|-----------|---------------------------------------------------|---------------------------------------------------|---------------------------------------------------|
| Waldis | 40,493 | 25,901 | 52,951 |
| | 87,413 | 70,546 | 133,043 |
| Rosenberger | 2,464 | 6,137 | 12,915 |
| | 5,360 | 16,716 | 32,449 |

361.    The Defendants had the opportunity to commit fraud because each of them prepared, reviewed and/or approved the SEC filings, press releases, investor presentations, conference call statements and other documents containing the false or misleading statements and omissions as alleged herein, and thus had the ability to influence and control the content of those statements.

## C.    ADDITIONAL FACTS REGARDING DEFENDANTS' FRAUD

362.    On June 28, 2019, the Court entered an opinion dismissing without prejudice Lead Plaintiff's Consolidated Amended Complaint (ECF No. 75) (amended July 2, 2019, ECF. No. 77) (the "MTD Opinion").  Supplementing and corroborating the facts alleged above, Lead Plaintiff's investigation uncovered a mountain of additional evidence showing that Defendants repeatedly violated GAAP rules and the Company's internal accounting policies and practices, and made false and misleading statements with scienter.   This additional evidence directly addresses the Court's concerns in the MTD Opinion.

### 1.      Lead Plaintiff's Confidential Witnesses

363.    Following the dismissal without prejudice of the Consolidated Amended Complaint, Lead Plaintiff's investigation obtained additional information from two of the CWs referenced in the Consolidated Amended Complaint and from five additional CWs not included in the Consolidated Amended Complaint.

### a.      Lead Plaintiff's Original Confidential Witnesses

364.    In its prior complaint—the Consolidated Amended Complaint—Plaintiff included information provided by three confidential witnesses, each of whom is a former Synchronoss employee.  Following the MTD Opinion, Lead Plaintiff obtained additional information from CW1 and CW3, as set forth herein, and this section summarizes the context of each CW's employment.  Furthermore, Lead Plaintiff is providing additional information from CW2.

### (1)      CW1

365.    As set forth in ¶9, *supra*, CW1 was a Synchronoss financial analyst with responsibility for revenue forecasting.  CW1 was a certified public accountant and certified fraud examiner.  CW1 now has provided additional information concerning the improper booking of the $5 million Verizon deal and information indicating that Rosenberger knew both about the requirement to have a signed contract before recognizing revenue from a deal, and that the Verizon deal had not yet been executed at the time that the revenue from it was recognized.

366.    CW1 is in a position to provide this information because CW1 personally interacted with Rosenberger frequently, given Synchronoss's "flat" organization structure.  These interactions included one-on-one interactions as well as larger meetings.  CW1 met with Rosenberger multiple times per week—during both regularly scheduled and ad hoc meetings.  During weekly revenue meetings, the attendees would discuss the status of deals and whether the deals would be finalized within the recognition period. It was during these meetings that CW1

personally observed Rosenberger acknowledge the need for a signed contract, and CW1 also heard Rosenberger ask Silverman after the close of the first quarter whether the Verizon contract was signed.

### (2)   CW2

367.   CW2, as set forth in ¶10, *supra*, was instructed by Company management in 2016 to retroactively justify $7 million of revenue in connection with two AT&T purchase transactions that were reported for 2015 but did not, in fact, occur in that period.  This account is supported by new information from CW6, who described a series of deals with AT&T totaling approximately $7 million for which there was no evidence that AT&T ever agreed to the deals (*see* ¶406, *infra*).  CW2's instruction to justify $7 million in revenue from AT&T came specifically from Senior Vice President and General Manager Andrew Wilmott.  Independently, CW1 stated that Wilmott oversaw Synchronoss's business with AT&T and that Wilmott and Rosenberger both attended the weekly flash meetings, at which Wilmott or another Company employee discussed the status of deals and whether they were likely to be finalized within the reporting period.  Furthermore, Wilmott and persons reporting to him provided information that was entered in a revenue model that CW1 worked on.  CW1 projected this revenue model on a screen during the weekly flash meetings (which Rosenberger attended), and the revenue model was emailed to Rosenberger every week, sometimes by CW1.

### (3)   CW3

368.   As set forth in ¶¶12, 93, *supra*, CW3 is a former Synchronoss accountant.  CW3 now has provided additional information concerning the booking of the $25 million Verizon licensing deal and Rosenberger's involvement in the manipulation of the Company's accounting.

369.   CW3 is in a position to provide this information because CW3 personally took part in discussions with members of the accounting department—including the controller and a

senior accountant—regarding their concerns about the (lack of) substantiation for booking the Verizon deal.  CW3 also personally heard from the Company's controller that Rosenberger became adamant that the deal be booked as instructed, despite the controller pushing back. Based on CW3's position, CW3 knew that only one individual had the authority to push through the revenue recognition without proper documentation:  the CFO, Rosenberger.  As to the reclassifications, CW3 was personally involved as it was CW3 who was tasked with implementing those improper reclassifications.  Although CW3 objected, Rosenberger e-mailed CW3 directly and instructed that CW3 implement the reclassifications.

### b.      Lead Plaintiff's New Confidential Witnesses

370.    Lead Plaintiff also obtained information from five additional CWs, all of whom are former Synchronoss employees.  This section summarizes the information each new CW has provided and the context of each CW's employment.

### (1)      CW4

371.    CW4 worked for Synchronoss from 2012 to 2015 as a financial analyst.  In that role, CW4 was responsible for analyzing revenue and expenses and focusing on financial analysis of the Company's expenses.

372.    CW4 reported to Krista Miller, who reported to Charles Wasser, the Company's Vice President, Business Operations, who reported to Rosenberger for the majority of the time CW4 was employed by the Company (for a portion of that time, Wasser reported to Executive Vice President George Navarro).

373.    CW4 has informed Lead Plaintiff about the Company's policies and practices with respect to revenue recognition and executed contracts, as well as the classification of expenses.  CW4 is in a position to provide information concerning Synchronoss's requirement to obtain executed contracts before recognizing revenue from a deal because CW4 attended weekly

meetings during which members of the revenue accounting team and the controller discussed whether various contracts had been executed so that revenue could be booked. CW4 was well-placed to observe the Company's practices with respect to expense reclassification because CW4's main responsibility was to analyze the Company's expenses.

### (2)     CW5

374.    CW5 worked at Synchronoss for approximately a year, from February 2017 to January 2018, as a director of sales. CW5 was responsible for selling the Company's Cloud software to customers in a range of businesses.

375.    CW5 was in a position to know about the requirement that there be executed contracts prior to booking revenue because CW5's commissions depended upon recognized revenue. Consequently, CW5 was provided and reviewed the Company's rules governing revenue recognition.

### (3)     CW6

376.    CW6 worked for Synchronoss first as a consultant through McKinsey & Company in the 2016-2017 period and then joined the Company as a direct employee in November 2017. At that time, CW6 became Vice President for the digital business-to-business product management strategy, holding that position until leaving the Company in November 2018.

377.    CW6 reported to Vice President, Head of Sales Charlie Verma, who in turn reported to Executive Vice President Nick Lazzaro, who reported to Waldis. After Lazzaro left the Company in early 2017, Verma reported directly to Waldis. Verma did not stay much longer than Lazzaro, however. Verma left the Company in 2017.

378.    CW6 has provided additional information to Lead Plaintiff concerning the requirement to obtain executed contracts before recognizing revenue. CW6 was familiar with

this requirement as a result of CW6's prior consulting work for McKinsey.  At Synchronoss, CW6 became familiar with the Company's policies and practices in this regard as the result of CW6's efforts to analyze the Company's deals and pricing structure.  More specifically, because CW6 was tasked with determining how much Synchronoss should charge for various products and services, CW6 had to review contracts, as well as revenue obtained from those contracts.

### (4)    CW7

379.    CW7, a former Synchronoss employee, provided further information regarding the Company's customary practice of using written contracts.  CW7 was employed at Synchronoss as the Company's Internal Controls Manager for approximately a year, leaving in March 2017 to pursue other opportunities.  CW7 worked in the Company's Bridgewater headquarters and reported indirectly to Rosenberger via the Company's controller.

380.    CW7 provided information to Plaintiff concerning the Company's policies and practices with respect to revenue recognition.  CW7 was in a position to be familiar with these policies and practices because CW7 was employed as the Company's Internal Controls Manager.  In that position, CW7 was responsible for reviewing, testing, and improving the Company's internal controls regarding, among other things, revenue recognition.  CW7 coordinated with the Company's auditors, Ernst & Young, to accomplish these tasks.

### (5)    CW8

381.    CW8 worked as an account director for a telecom company from 2000 until the company was acquired by Synchronoss in 2008.  CW8 remained as an account director at the Company until 2018.  At Synchronoss, CW8 reported to EVP Mark Mendes.  Once Medes left the Company in April 2016, CW8 reported to Senior Managing Director Marc Bandini who reported to EVP Charlie Thomas.  Thomas in turn reported to Chief Operating Officer Garcia,

other than a few months in early 2017 when Thomas reported to Ron Hovsepian once Hovsepian became CEO.

382. CW8 provided information concerning the requirement to obtain executed contracts before booking revenue. CW8 was very familiar with this requirement, as CW8 worked directly with customers during the 10 years CW8 was at the Company. During this time, CW8 received instruction on the need to obtain documented contracts before revenue could be recognized. Moreover, CW8's sales commissions depended on the amount of revenue recognized from various deals. Finally, CW8 obtained a quarterly spreadsheet that indicated what revenue was recognized from which deals.

### 2. The Company Had a Customary Business Practice of Using Written Contracts

383. The Court found in the MTD Opinion that Lead Plaintiff had not made a sufficient showing that Synchronoss had a "customary business practice of using written contracts." (ECF No. 77, at 26.) The additional allegations below bolster and supplement Lead Plaintiff's allegations that the Company had a well-established, customary practice of using written contracts to sell or license software, and that it was permitted to recognize revenue on those deals *only* if a contract had been signed by both parties.

384. Lead Plaintiff has reviewed Synchronoss's internal documents, which establish that Synchronoss had a customary business practice of using written contracts to sell or license software, as a result of which the Company was required to have a written contract in hand before recognizing revenue in connection with these transactions. Pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX"), which requires publicly traded companies to establish and maintain internal controls and procedures for financial reporting, and to test and maintain those controls to ensure their effectiveness, the Company adopted controls and procedures governing

its processes for accounts receivable and revenue recognition.  In 2015, these policies were set forth in a six-page document that bears the Synchronoss logo on the first page, along with the words "Synchronoss Technologies, Inc.," "Sarbanes-Oxley § 404 Compliance," "Account/Process: AR/Revenue," and "2015."  The first paragraph of this document (referred to herein as the "2015 Revenue Policy"), which Lead Plaintiff has reviewed, states that it "provides detail on the Accounts Receivable and Revenue process in place at Synchronoss Technologies, Inc." The 2015 Revenue Policy states, on page 1, that "[a] Revenue Recognition memo is written for agreements that generate over 500K USD in revenue for the quarter," and explicitly requires that such memo "provide[] a summary of the *contract terms*" and be "reviewed and approved by the upper management of the Finance Department, including the Corporate Controller *and the Chief Financial Officer*," i.e., Rosenberger (emphasis added).

385.    The 2015 Revenue Policy required contracts to be signed by both parties prior to recognizing revenue: it explicitly requires, as stated on page 2, that "[f]or *all invoices*, the AR Senior Accountant and AR Accountant reconcile the pricing information to the customer contract," showing that "all invoices" are pursuant to contracts.  Thus, according to Company policy, the supposed $25 million license deal with Verizon required a signed contract before revenue could be recognized.  There was no signed contract for this deal, yet Waldis and Rosenberger falsely stated that one had been "signed" during the third quarter of 2016 (*see* ¶308, *supra*).

386.    Furthermore, the 2015 Revenue Policy shows that top management of the Company, including Waldis and Rosenberger, were involved in the process of contract execution.  The 2015 Revenue Policy states on page 1 that "[a]n Officer of the Company or a designated individual executes . . . contracts" on behalf of the Company, and representatives of

the Finance and Legal departments had "a quarterly meeting to review new *contracts that have been executed*," during which meeting "upcoming contracts that are soon to be completed" are also reviewed.  Moreover, for every invoice issued by the Company, "[c]opies [of] all [invoice] approvals and invoice support are maintained with its respective invoice in the shared Q: drive." This "invoice support" included the applicable executed contracts, and thus the basis for each invoice and associated revenue was immediately available to Waldis and Rosenberger in the "shared Q: drive."

387.    Company procedures established in 2016, also adopted pursuant to SOX, further confirm that the Company had a customary business practice of using written contracts, and that Waldis and Rosenberger were directly involved in the Company's process of finalizing and executing customer contracts.   Lead Plaintiff has reviewed a 2016 internal Synchronoss document bearing the Synchronoss logo on the first page, along with the words, "Synchronoss Technologies, Inc., "Sarbanes-Oxley § 404 Compliance," "Account/Process: Transactional Revenue Process," and "2016."  The first page of this document, which is referred to herein as the "Transactional Revenue Process," states that "[r]evenues are based on a contractual price per transaction," making clear that contracts are prerequisite to revenue recognition.  On page two, the Transactional Revenue Process states that, "[f]or all transactional revenue recorded greater than $500,000 for any given quarter, AR team prepares a technical memo to consider revenue recognition criteria in accordance with ASC 605-25, Revenue Recognition – Software."  The only exception is "[i]f the revenue is related to a previous *contract*/memo that was prepared during a previous quarter the team does not prepare a new memo" (emphasis added), further clarifying that revenues must pertain to signed contracts.

388.    The Transactional Revenue Process describes the Company's internal controls and procedures during the Class Period.  The document sets forth, beginning on page 1, the process for "[n]ew deals," including: that "[a]pprovals are housed within SalesForce" (customer relationship management software used by Synchronoss); that each deal requires "Business Manager" approval and is then "routed to Business Operations;" and that "[o]nce a deal is unanimously approved, contract negotiations will commence."  Before execution, however, each contract is "required to be reviewed and approved," according to page 1 of the Transactional Revenue Process, which reiterated the policy, also set forth in the 2016 RCM (defined below), that "[a]fter all approvals are received, Sales will *provide the contract to the CEO or COO to sign and execute final contract*" (emphasis added).  Furthermore, "[f]inal contracts are stored within SalesForce," as stated on page 1 of the Transactional Revenue Process, and thus were available to Waldis and Rosenberger.

389.    Lead Plaintiff has also reviewed Synchronoss's Accounts Receivable-Revenue Recognition Risk Control Matrix for 2016 (the "2016 RCM"), an extensive Excel spreadsheet setting forth internal controls relating to the Company's accounting.  The file name for this document is "AR – Rev. Rec. RCM 2016."  The first sheet of the 2016 RCM, which sheet bears the words "Synchronoss Technologies, Inc.," "AR – Rev. Rec. RCM," and "FY'2016" at the top, required that "[c]ontracts cannot be executed prior to obtaining required approval" and that "[a]pprovals are executed and stored within SpringCM," a contract management software application that the Company used.  The first sheet of the 2016 RCM further states that contracts are "required to go through a formal review process *prior to execution*," and that SpringCM "requires Legal and Finance approval before releasing the contract to be *executed by the CEO or COO*"—that is, Waldis or Garcia (who reported directly to Waldis) (emphasis added).

390.    CW7, a former Synchronoss employee, provided further information regarding the Company's customary practice of using written contracts.    CW7 was employed at Synchronoss as the Company's Internal Controls Manager for approximately a year, leaving in March 2017 to pursue other opportunities.  CW7 was responsible for testing and improving the Company's internal controls, working with Ernst & Young to do so, and thus was required to know, and test the robustness of, the Company's policies and procedures with respect to revenue recognition.  CW7 worked in the Company's Bridgewater headquarters and reported indirectly to Rosenberger via Joanna Lanni, the Company's controller.  CW7 stated that, specifically with respect to Verizon and AT&T, the Company's two largest customers, the Company's procedures required a contract signed by the customers before revenue could be booked on any deal.  In fact, according to CW7, after a sales representative made a deal, the procedure called for Synchronoss's Revenue Recognition & Billing Manager, Melissa Chen, to contact the client to confirm the deal and obtain proof of deal approval—that is, specifically for Verizon and AT&T, a signed contract.

391.    CW7 further stated that the Company's accounting department prepared "accounting memos" supporting revenue recognition, which included financial analysis of the deal and supporting documentation, including signed contracts.  Depending on the size of the deal, the contract would be reviewed by the CFO (Rosenberger), the controller (Lanni), or the assistant controller, for approval, and the reviewer would review the accounting memo relating to the contract, according to CW7.  Thus, Rosenberger was responsible for reviewing and approving contracts, and reviewing the associated accounting memos addressing revenue recognition, for the Company's contracts over a specific threshold.  According to CW7, Rosenberger physically signed these accounting memos to document her review.  Rosenberger

also sent queries via email to accounting staff or the relevant salespeople if she had questions or required additional information in connection with this review, according to CW7. Though CW7 did not recall the specific threshold, Rosenberger had review responsibility for the multi-million-dollar deals with the Company's two most significant clients that were ultimately affected by the Restatement. The signed accounting memos, signed contracts, and pertinent emails were kept in monthly "financial statement binders" that, under the Company's internal controls that CW7 tested and strengthened, were required to be retained; they were stored in the accounting department, according to CW7, and had details regarding "everything that was booked that month." CW7 believed that Staff Accountant Francesca Basanese was responsible for compiling these binders during the time CW7 worked at the Company, possibly with help from Revenue Recognition & Billing Manager Melissa Chen.

392.    CW4 also confirmed that the Company had a practice of using written contracts and was required by Company policy to have signed contracts prior to recognizing revenue. CW4 was a financial analyst at Synchronoss from July 2012 to August 2015, working in the Company's Bridgewater headquarters. CW4 was responsible for projects analyzing the Company's revenue and expenses, with a particular focus on expense-related financial analysis. CW4 reported to Krista Miller, who reported to Charles Wasser, the Company's Vice President, Business Operations, who reported to Rosenberger for the majority of the time CW4 was employed by the Company (for a portion of that time, Wasser reported to Executive Vice President George Navarro). CW4 attended the Company's weekly flash file meetings while employed by the Company. According to CW4, accounting staff (including the Company's controller) regularly inquired into whether they could book revenue for outstanding contracts, expressly inquiring for that purpose whether specific contracts had been signed. As alleged

above and corroborated by CW4, Rosenberger attended these weekly flash meetings.  Based on observations and participation in these weekly flash meetings, CW4 stated that "for sure she [Rosenberger] knew" about the requirement of obtaining a written, signed agreement before recognizing revenue.

393.    Additional former employees of the Company corroborated the signed contract requirement for revenue recognition.  CW5 worked at Synchronoss for approximately a year, from February 2017 to January 2018 as a director of sales.  CW5 was responsible for selling the Company's Cloud software to customers in a range of businesses.  As a sales employee, CW5 earned commissions that were tied to recognized revenue, so CW5 was keenly aware of the rules governing revenue recognition.  CW5's offer letter, which was standard for new sales hires at that time, described these rules, including the requirement that contracts had to be signed before revenue could be recorded and the associated commission awarded to the salesperson. Synchronoss was not the first software company CW5 worked for, so CW5 was already familiar with the executed contract requirement, which CW5 described as "standard for revenue recognition" at software companies.  Furthermore, the Company's "new hire manual" for sales employees, which was provided to new salespeople to educate them regarding pertinent policies and procedures, spelled out the various stages of the sales process, including that a contract had to be executed before a deal could be booked as revenue, according to CW5.  All of the deals that CW5 worked on at Synchronoss (from small value deals to those worth several millions of dollars) included layers of review and approval of contracts, including two reviews by the Company's legal department, one before the contract was sent to the customer for execution, and a second review of the signed contract before it was provided to the accounting team to be booked.

394.     Yet another former Synchronoss employee confirmed the Company's practice of requiring executed written contracts before recognizing revenue.  CW8 worked on deals with customers throughout the 10-year period for which CW8 worked at Synchronoss.  CW8 has explained that if CW8 was working on a deal, and revenue was recognized from that deal, there "absolutely" had to be a signed contract.  The Company further required that the contract be signed and dated during the period in which the associated revenue was being recognized.  It was "standard practice" at Synchronoss according to CW8.  In fact, when CW8 was paid a bonus at the end of each year, the bonus was based only on those customer agreements for which Synchronoss had received a signed contract.  CW8 could verify this because CW8 received a quarterly spreadsheet from Revenue Recognition and Billing Manager Melissa Chen, and was able to confirm throughout the year that the revenue was recognized only for those deals for which there was proper documentation, and only recognized in the period in which the documentation was dated and executed.

395.     The Company's premature and improper recognition of large amounts of revenue was known to upper management.  This is particularly true of Rosenberger because of her responsibilities at the Company prior to being appointed CFO. As noted above, Rosenberger was the Company's Chief Accounting Officer from January 2012 until April 2014.  Prior to that, from December 2000 to January 2014 (a period overlapping with her tenure as Chief Accounting Officer), Rosenberger was the Company's controller.   As controller, Rosenberger was responsible for reviewing supporting documentation for revenue and determining whether the documentation was sufficient for the Company to recognize revenue, according to CW3.  Indeed, during the Class Period, the Company's controller was deeply involved in determining whether revenue recognition criteria, including the sufficiency of the underlying documentation, had been

met, including in the case of the $25 million Verizon licensing deal, where the controller "put up a fight" with Rosenberger in to avoid booking revenue from the deal without a signed contract. Rosenberger was controller for *thirteen years*, and thus, CW3 stated, was intimately knowledgeable regarding the Company's practice of using written contracts and the need to obtain executed contracts before booking associated revenue.  Furthermore, according to CW3, Rosenberger "never really relinquished her control" of the accounting function at Synchronoss after she became CFO; rather, she "micromanaged" the accountants.  Therefore, she was fully aware that the Company violated its own policy and GAAP during the Class Period by recognizing revenue without executed contracts.

396.   Rosenberger's awareness of the need for Synchronoss to obtain a signed contract in order to recognize revenue is further evidenced by her certification as a certified public accountant ("CPA").  Rosenberger was first licensed as a CPA in New Jersey on July 1, 2008, and this license was active until December 31, 2017, when it expired.  In order to maintain that license, Rosenberger was required to fulfill continuing education and testing requirements.  Both the testing and the continuing education curricula covered the need to have signed contracts in order to recognize revenue, according to CW3, who was also certified as a CPA.  Indeed, Ernst & Young conducted training sessions at Synchronoss, typically twice a year, in order to fulfill their CPA continuing education requirements, according to CW3, who attended these training sessions with Rosenberger.  During the Class Period, these sessions specifically addressed GAAP rules for revenue recognition, according to CW3, because there was a "major overhaul" of accounting pronouncements governing revenue recognition.  Because the changes to the revenue recognition rules were so significant, the Company was intensely focused on understanding the new rules and their repercussions for the Company—an "entire project" was

devoted to this effort, according to CW3, in which Rosenberger and CW3 both participated. These facts provide additional support for Lead Plaintiff's allegations elsewhere in this Complaint, including the allegation that Defendants' GAAP violations contravened guidelines on revenue recognition published by Ernst & Young (¶¶7, 157), the very same accounting firm that audited the Company and that convened training sessions at the Company that Rosenberger attended.

### 3.    The Company's Improper Revenue Accounting Practices

397.    Confidential witnesses provided additional information concerning Synchronoss's practice of prematurely booking deal revenue.

398.    Before joining Synchronoss, CW6 worked as a consultant at McKinsey & Company. CW6 consulted for AT&T from 2012 to early 2016 before working for Synchronoss, first as a consultant through McKinsey beginning in early 2016. CW6 left this position voluntarily in early 2017. Soon thereafter, CW6 was recruited by Chief Customer Officer Chris Putman to return as a direct employee of the Company. CW6 returned in November 2017 and was given the title of Vice President for the digital business-to-business product management strategy, staying in that position until November 2018.

399.    In this role as a business strategies consultant, CW6 obtained experience in revenue audits. During the initial stint as a consultant and the term as a direct employee, CW6 was tasked with "straighten[ing] out the Company." More specifically, CW6 was responsible for determining what additional product(s) Synchronoss should develop and to develop a pricing strategy for the Company's products.

400.    CW6 reported to Vice President, Head of Sales Charlie Verma, who in turn reported to Executive Vice President Nick Lazzaro, who reported to Waldis. After Lazzaro left the Company in early 2017, Verma reported directly to Waldis. Verma did not stay much longer

than Lazzaro, however.  In fact, CW6 recalls that golfing with Verma on a Saturday in 2017 when Waldis called Verma on his mobile phone and began screaming at him.  Waldis was so loud that Verma held the phone away from his ear, and CW6 could hear Waldis indicate that he did not like "all of the meddling" that he perceived Verma and CW6 to be doing into the substance of Synchronoss's deals.  Verma left the Company soon thereafter.

401.   CW6 participated in weekly, monthly, and quarterly sales calls.  About forty people attended the weekly sales calls, including sales representatives and members of the finance team, as well as Frank Zimmerman, the Head of Talent Acquisition.  During those calls, sales representatives discussed the deals on which they were working, including the status of those deals.  During the quarterly sales calls, the CFO would also participate.  The CFO would tell sales representatives, in words or substance, that "we are missing this much revenue" and "we need to figure out how we are going to get there."

402.   CW6 indicated that during the sales calls, representatives would describe some deals as being in "rev rec" (i.e., revenue recognition) status.  They did so even when the deal was not completed.  In fact, some members of the sales team described as "rev rec" proposed deals in which a client simply told a representative that the client was going to give the representative the client's business.

403.   To help Synchronoss determine optimal pricing for its products, CW6 investigated the Company's deals completed or forecasted for completion from 2014 to 2022.  CW6 did so by reviewing deal data that had been entered in the Company's SalesForce system.

404.   Eventually, CW6's SalesForce access was revoked without explanation.  After that, and for a period of time, CW6 received information from a female employee in the

customer support team, who identified for CW6 the deals for which Synchronoss had, in fact, received revenue.

405.    CW6 then created a *pro forma* analysis of the information CW6 had obtained, looking at the deals that had been characterized as completed.  CW6 performed this analysis both to assist management with projections about what the Company could earn over time and because CW6 had begun suspecting that not all of the deals that the Company reported as closed were substantiated.  CW6 included within this analysis the deals that sales representatives had identified as "rev rec" during the weekly sales calls.

406.    CW6's analysis revealed that there were many deals that were recorded in the absence of any evidence that those deals were accepted by the client.  Indeed, CW6 estimated that as much as 50% of the deals that were reported as completed lacked substantiation.  This included a series of deals with AT&T totaling approximately $7 million for which there was ***no*** ***evidence*** that AT&T had agreed to the deals.  As a former AT&T consultant, CW6 had established relationships with AT&T officers and other personnel directly familiar with the AT&T/Synchronoss business relationship.  As a result, CW6 was able to "cross-reference" what Synchronoss was describing as completed deals with what AT&T had in its client product workbooks, which associated dollars with statements of work.  This effort yielded no evidence that the deals totaling $7 million had, in fact, been agreed to by AT&T.  The Synchronoss sales representative for the unsubstantiated $7 million in revenue was Senior Vice President of Sales Jason Horak.  In fact, individuals at AT&T told CW6 and Synchronoss's Vice President of Strategic Solutions Jim Schelle that AT&T had no intention of doing those deals with Synchronoss.  AT&T was adamant about this.  Indeed, a director from AT&T, Jessica Burgundy, sent an e-mail to CW6 containing a thread in which an AT&T employee, whose last name is

Charles, told others at AT&T that she had never agreed to the work with Synchronoss.  This information from CW6 strongly bolsters CW2's recollection of being tasked, in 2016, to retroactively justify two deals with AT&T that together totaled $7 million and did not occur, though the Company, without obtaining signed contracts, prematurely recognized revenue on them in the fourth quarter of 2015.  The recognition of this revenue enabled the Company to report Cloud Services growth in that quarter.

407.   CW6 also recalled purported deals with Sprint in 2016 and 2017 that lacked the required documentation, amounting to between $2 million and $5 million.  CW6 attended meetings with Horak and Sprint executives to pitch Synchronoss's services to Sprint.  CW6 learned during weekly sales meetings that some of the deals discussed between CW6, Horak, and Sprint had moved into the "rev rec" stage, but CW6, despite considerable access to information, found no evidence that these deals had actually come to fruition.  CW6's experience aligns closely with those of other CWs who described flagrant GAAP violations, such as CW2, who stated that the Company would repeatedly recognize revenue prematurely and try to justify it later (*see* ¶11, *supra*), and CW3, who provided information regarding the "infamous" improper booking of $25 million of revenue on a licensing deal with Verizon without securing a signed contract first.

408.   When CW6 told Chris Putnam about these concerns regarding the characterization of the deal statuses, Putnam agreed.  Joel Silverman, however, became angry; Silverman had another senior sales person tell CW6 that CW6's "last day" was approaching.  Once Ron Hovsepian became CEO in early 2017, CW6 began to discuss concerns with Hovsepian—first, over the phone, and then in person at the Barcelona Mobile World Conference in early 2017.   Hovsepian told CW6 that he was suspicious of what was happening at

Synchronoss and had hired independent auditors (either Bain or BCG).  Once CW6 had completed the *pro forma* analysis and shared it with Hovsepian, Hovsepian told CW6 that the results were nearly identical with those of the independent auditor—both showed that there were deals recorded as completed for which there was no substantiation, just as CW2 (who reported that the Company had a practice of booking revenues early and seeking to justify them later, *see* ¶11, *supra*) and other CWs stated.  Hovsepian left the Company shortly thereafter.

409.    The internal Synchronoss documents described above also show that Rosenberger was aware that Synchronoss was recognizing revenue without an objective basis and not in accordance with GAAP, as discussed in ¶201 and § VI.D., *supra*.  The 2015 Revenue Policy states that "[q]uarterly, the AR department prepares a VSOE analysis for maintenance, transactional, and professional service revenue in accordance with ASC 605-25.  The results are documented in a VSOE Revenue Recognition memo, which is reviewed and approved by the AR Manager, Assistant Controller, Controller, *and CFO*," that is, Rosenberger (emphasis added).

### 4.    The Company Improperly Booked $25 Million of Revenue in the Third Quarter of 2016 on a Verizon Licensing Deal

410.    In the MTD Opinion, the Court found that information from CW3, a former Synchronoss accountant, did not sufficiently establish the basis of CW3's knowledge of Rosenberger's "infamous" decision to recognize $25 million in revenue on a licensing deal with Verizon without having a signed contract as required by both Company policy and GAAP, overruling the objections of a Senior Accountant.

411.    CW3 has now provided further information regarding the "infam[y]" of the Company's booking, without proper substantiation, $25 million of revenue in the third quarter of 2016 from a licensing deal with Verizon.  According to CW3, a former Synchronoss accountant from 2011 to April 2017 (¶93, *supra*), CW3 participated in discussions among several members

of the Company's accounting department, including Joanna Lanni (the Company's Controller) and Afua Adjekum (Senior Accountant), who openly discussed their concerns about the lack of proper substantiation required to book this revenue, and expressed discomfort with being instructed to do so.  CW3 spoke with Lanni, the Controller, who told CW3 that she had "put up a fight" with Rosenberger in an attempt to avoid booking the $25 million deal.  CW3 was told that Rosenberger was adamant that the Company needed to book the revenue, so Lanni "threw up her hands"—after all, Lanni observed, "Rosenberger was the one on the line signing the financials." Adjekum, the Senior Accountant, expressed a similar view to CW3: though Adjekum was uncomfortable with booking the revenue, she told CW3, "What do I care?," meaning that the responsibility ultimately lay with Rosenberger, not Adjekum.  Indeed, the controller and other members of the accounting department, according to CW3, did not even have the authority to push through this revenue recognition in the absence of the requisite documentation—only Rosenberger, the CFO, did.

### 5.     The Company's Improper Booking of a $5 Million Verizon Deal

412.     As noted above, CW1 heard Rosenberger ask Synchronoss's Executive VP and General Manager Joel Silverman whether a $5 million contract with Verizon (from which revenue was recognized in the 2016 first quarter) had yet been signed in a meeting that occurred *after* the close of Synchronoss's 2016 first quarter.  CW1 also is aware that cloud software licensing revenue purportedly derived from this agreement was included in the revenue results for the first quarter of 2016.  CW1 further stated that both CW1 and Rosenberger attended five to ten meetings, including weekly revenue meetings and meetings related to the close of the first quarter of 2016 (which meetings occurred after the end of the quarter), at which this $5 million Verizon deal was discussed.  Other attendees of at least a portion of these five to ten meetings were Joanna Lanni, the Company's controller, and Charles Wasser, Vice President, Business

Operations.  These meetings occurred during the period shortly before the close the first quarter of 2016 and extending into at least April of 2016 (after the close of that first quarter).

413.    In the weekly revenue meetings leading up to March 31, 2016, CW1 said, there were discussions regarding getting the $5 million Verizon deal signed, which Rosenberger attended and at which Executive Vice President and General Manager Joel Silverman informed the attendees that the contract was not yet signed.  Moreover, in a closing meeting convened after the quarter ended, Silverman (who did not as matter of course attend quarterly closing meetings during CW1's tenure, but did in this case in order to discuss this specific deal) was asked about the status of the contract for that deal by both Rosenberger and Lanni (the Controller), both of whom attended that meeting along with CW1.  Lanni specifically asked Silverman if the contract was signed, and Silverman responded that he was "working on it," making it clear that the contract had not been signed during the first quarter of 2016.  Hearing this information, CW1 thought, "This is not proper accounting."

414.    Furthermore, during the series of first quarter closing meetings attended by CW1, Rosenberger made a statement along the lines of "if we book revenue, we have to have signed contracts," acknowledging the applicability of the accounting standards requiring Synchronoss to acquire signed contracts before recognizing revenue.  CW1, who is a CPA, emphasized that Rosenberger had to have known this, as it is a study topic for the CPA exam.

### 6.    The "Flash File" and the Company's Improper Reclassification of Expenses

415.   The Court found, in the MTD Opinion, that evidence from CW3 was insufficiently particular regarding Rosenberger's involvement in the manipulation of the Company's accounting, including her knowledge of and use of a weekly "flash file" to identify expenses to improperly reclassify or otherwise manipulate, including the improper

reclassification of sales employee salaries as research and development expenses. Additional information newly obtained from CW3 and CW4 bolsters Lead Plaintiff's allegations and clearly establishes Rosenberger's knowledge of these improper accounting practices.

416. CW3 was responsible for effecting the expense reclassifications. CW3 stated that Rosenberger was deeply involved in these inappropriate reclassification, which violated GAAP rules. The reclassification requests originated with the Company's budget operations team and then were vetted and approved by Rosenberger before being entered in the Company's Oracle accounting system. Andrew Latyszonek, a member of the budget operations team regularly asked CW3 to reclassify certain expenses. CW3 would regularly decline and point out that the reclassifications contravened GAAP rules. However, Latyszonek would then contact Rosenberger by email, and Rosenberger then emailed CW3 directing CW3 to make the reclassifications. This occurred near the end of each quarter, according to CW3, when the Company was attempting to meet its financial targets. This happened so many times that, eventually, Latyszonek bypassed CW3, anticipating objections, and went to Rosenberger first, who then emailed CW3 with instructions to reclassify the expenses at issue.

417. CW4, a financial analyst at Synchronoss's Bridgewater headquarters from July 2012 to August 2015, provided additional evidence regarding Rosenberger's involvement in the reclassification of expenses. Reclassifications were discussed at the weekly flash meetings and the weekly "flash file" was used to identify expenses to be reclassified, according to CW4. At the flash meetings, one subject of discussion was the reclassification of salaries from service-related to research and development (which improved the Company's margins), according to CW4, who stated that a workforce tracking system had been instituted by Latyszonek to keep track of the time that the Company's software staff spent on different projects. Data from this

system, in the form of an Excel spreadsheet, was included in the weekly flash file; the data included details regarding the projects on which the software personnel spent time, according to CW4, and this data was discussed at the weekly flash meetings in connection with the reclassification of salary expenses.  Rosenberger attended the weekly flash meetings, including many at which CW4 was also present, and thus was aware of the contents of the flash files, the discussions at the weekly flash meetings, and the Company's repeated reclassification of salaries, which CW3 confirmed included the improper reclassification of as R&D expenses of salesperson salaries who were not part of Openwave's R&D team (¶235, *supra*).

418.    CW1 also attended weekly flash meetings and witnessed the manipulation of expenses.  CW1's financial analysis role was focused primarily on revenue, while Latyszonek worked on the expenses.  CW1 attended the flash file meetings where expenses were discussed in order to know the expense data for the cash flow forecast and the profit and loss element of the revenue guidance CW1 worked on.  At these meetings, attendees were constantly focused on shortfalls between the Company's financial condition and what the Company had represented to the market, and figuring out how to close that gap.  Rosenberger actively participated in these conversations.  Rosenberger, Garcia, and Latyszonek, reviewing the flash file, would make statements to the effect of, "we are here, we need to get here."  For instance, CW1 recalled that there was a $30 million gap in the second quarter of 2016 about which Rosenberger asked: "what can we do?"

419.    This was the same quarter in which CW3 was instructed to "push[]" the salaries of customer-facing Openwave employees from sales to R&D and booking their salaries as R&D expenses).  Indeed, at the flash meetings, CW1 witnessed Latyszonek manipulate the flash file to change which items could be capitalized versus expensed to improve forecasted margins,

including reclassifying salaries from cost of sales to research and development, which could be capitalized. Garcia most frequently directed Latyszonek to move around expenses in the flash file, while Rosenberger was present and also directed Latyszonek to move expenses around in the file, according to CW1. Latyszonek would then do so, and the meeting attendees reconvened to confirm that the reclassification of expenses helped close the gap between the Company's financial condition and the guidance it had reported to the market, said CW1, who stated that this happened on a regular basis. CW1 also observed that Latyszonek frequently bragged about the bonuses he received from the Company.

### 7. Rosenberger's Knowledge of the Company's Improper Accounting for the Openwave and Sequential Transactions

420. Rosenberger's scienter with respect to the Company's improper accounting for the Openwave acquisition and for the divestiture of the Company's Activation business to Sequential transaction is supported by information from numerous sources. In both instances, the Company, contravening accounting standards, inappropriately chose to consider certain contracts unrelated to the overall transaction, enabling the Company to book revenue it should not have. In the Restatement, Synchronoss admitted that its internal controls deficiencies included the failure to "ensur[e] transactions are appropriately accounted for from a substance over form perspective."

421. Rosenberger worked in accounting and finance roles at the Company for over sixteen years, and, as noted above, the Company made numerous acquisition transactions during Rosenberger's tenure, buying up, in addition to Openwave, F-Secure, Voxmobili, SnapOne, and Intralinks, among others. ASC 605-25 makes emphatically clear that "separate contracts with the same entity or related parties that are entered into at or near the same time," like the agreements for Synchronoss to purchase Openwave and Openwave to pay a a $10 million

settlement to Synchronoss, are "*presumed*" (emphasis added) to have been negotiated as a package and therefore should be treated (as Synchronoss later conceded) as a single arrangement. Moreover, the SEC Staff specifically stated that ASC 605-25 (formerly EITF 00-21) covers litigation settlements and instructed public companies that disclosure of such settlements was important. Rosenberger was certified as a CPA in 2008 and thus had to study for and pass the CPA exam. She was also required to pursue continuing education to maintain her CPA license. For these reasons, she clearly knew or should have known that disaggregating Openwave's $10 million round-trip payment to Synchronoss from the $124.5 million payment Synchronoss made to acquire Openwave in order to book the $10 million as revenue, while failing to disclose even the existence of the $10 million settlement, was a violation of accounting standards. Furthermore, the Company recognized that $10 million payment as revenue for the first quarter of 2016, a time when, according to CW1, Rosenberger was intensely focused during the weekly flash meetings on the gap between the Company's financial condition and the information it had provided to investors.

422. Furthermore, the Company improperly booked $9.2 million in revenue in the fourth quarter of 2016 on a perpetual license agreement with Sequential that it did not disclose to the market. This license agreement was negotiated in conjunction with the agreement for Sequential (formerly known as Omniglobe, which was owned in part by Defendant Waldis) to purchase Synchronoss's Activation business. Thus, these two agreements (and others set forth above, *see* ¶190, *supra*) are "*presumed*" (emphasis added) under ASC 605-25 to have been negotiated as a package and therefore should have been treated as a single arrangement. Synchronoss later conceded that it violated ASC 605-25 in its accounting for the Sequential licensing payment: in the Restatement, Synchronoss reclassified the $9.2 million as additional

gain on the sale to Sequential.  In light of Rosenberger's long experience at the Company, as well as her CPA expertise, she should have been aware that the failure to do so was inappropriate.  However, when answering questions from analysts about the Sequential divestiture, neither Rosenberger nor Waldis made any mention of the $9.2 million fee. Furthermore, in December 2016, after the Sequential transaction was announced, Defendant Rosenberger sold 14,000 shares of stock for a total of over $550,000.  This far exceeds the quantity of shares that she sold in December of each of the prior four years, and one financial reporter observed that Rosenberger's "trading activity had long been limited to modestly-sized . . . sales" before this "aggressive[] selling" in December 2016.  Less than two months later, reporters exposed the $9.2 million Sequential fee and the fraud began to unravel.

### 8. Additional Information Regarding The Individual Defendants' Unloading of Company Stock During the Class Period

423.    As detailed in ¶351 above, during the Class Period, Waldis sold 569,800 Synchronoss shares for proceeds of $18,086,740.09 (net of the aggregate exercise price of options), decreasing his holdings in Synchronoss by more than 100,000 shares before the truth regarding Defendants' fraud was fully disclosed.  Waldis's insider sales of Company stock during 2016, particularly during the first quarter of 2016, were unusual in timing and amount. Waldis sold 295,799 shares of Company stock in 2016 (reaping over $8 million in proceeds), reducing his holdings by approximately 30% during the year.  Waldis made over 69% of those 2016 sales, or *204,799 shares*, during the first quarter alone, for over $6 million. Waldis's first quarter 2016 stock sales were exponentially larger than the stock sales he made during the first quarter of any of the previous five years.  Specifically, they were, respectively, *267%, 154%, 178%, 171%, and 1023%* of Waldis's sales during the first quarter of 2015, 2014, 2013, 2012, and 2011.  Waldis's sales during the first quarter of 2016 included the sale of 70,000 shares on

January 13, 2016—the largest one-day sales total by Waldis since *2010*—and Waldis sold another 24,430 shares just one day later, reducing his holdings by over 10% and receiving proceeds of over $2.9 million in just two days.  Waldis made these sales: (i) just two weeks after the end of the fourth quarter of 2015, a period for which the Company wrongly booked $7 million in ghost revenue on two AT&T purchases that did not occur (revenue that CW2 spent most of 2016 trying to retroactively justify on the instructions of Company management); (ii) during the quarter in which Synchronoss recognized $10 million in revenue from the Openwave settlement agreement that the Company later conceded was improper, and (iii) as the Company resolved to improperly recognize $5 million in cloud software licensing revenue from Verizon despite not having a signed contract in hand, clearly contravening accounting standards the Company's internal policies.

### D.    LOSS CAUSATION

424.    Lead Plaintiff and the Class suffered substantial damages as a direct and proximate result of Defendants' fraudulent conduct as alleged herein.

425.    Throughout the Class Period, the price of Synchronoss's stock was artificially inflated as a direct result of Defendants' materially false or misleading statements and omissions about, *inter alia*, the Company's revenues and guidance, its revenue recognition accounting practices, its compliance with GAAP, and the efficacy of its internal controls over financial reporting.  These materially false or misleading statements and omissions had the purpose and effect of creating in the market an unrealistically positive assessment of Synchronoss and its financial well-being, thus causing the Company's stock to be overvalued and artificially inflated and/or maintaining such artificial inflation at all relevant times.  Defendants' materially false or misleading statements during the Class Period resulted in Lead Plaintiff and the Class purchasing the Company's stock at artificially inflated prices.  Had the truth been disclosed to the market

prior to and/or during the Class Period, Lead Plaintiff and the Class would not have purchased Synchronoss common stock or would not have purchased Synchronoss common stock at the artificially inflated prices they paid.

426.    Starting with the Company's announcement of financial results for the third quarter of 2014 on October 28, 2014, Defendants misled investors to believe that, *inter alia*, the Company was generating more revenue than it really was.

427.    Throughout the Class Period, Defendants continued to misrepresent the Company's quarterly and annual revenues, misstating the Company's balance sheets in its financial disclosures, misrepresenting the Company's results from operations, failing to prepare its financial results in accordance with GAAP, and failing to disclose its improper revenue recognition accounting practices in both reporting its financial results and offering guidance to investors.   These misrepresentations—detailed in Section VI.A—caused artificial inflation in Synchronoss's stock and/or caused Synchronoss's stock to remain artificially inflated throughout the Class Period.

428.    As alleged above, the Company, inter alia, falsely met its quarterly and annual revenue targets (and market expectations) throughout the Class Period by improperly and prematurely recognizing revenue from contracts with its biggest customers, Verizon and AT&T.

429.    Similarly, as alleged above, the Company concealed the fact that it would receive $9.2 million under a licensing agreement with Sequential in December 2016 and further that the Company used that undisclosed $9.2 million licensing fee to falsely meet its fourth quarter 2016 revenue targets, and also issued guidance for 2017 in December 2016, which the Company reiterated in early February 2017, that the Company subsequently withdrew.

430.    As the truth about the Company and its financial condition began to emerge, the artificial inflation caused by the false or misleading statements and omissions alleged herein was gradually eliminated from the price of the Company's securities, causing significant losses to Lead Plaintiff and the Class.

431.    Sometime in the afternoon on Friday, February 24, 2017, SIRF released a report claiming that Synchronoss had concealed aspects of the complex set of transactions through which it divested 70% of its Activation Services business to Sequential and acquired IntraLinks. Synchronoss's stock price dropped from a close of $30.89 on February 23, 2017 to close at $30.49 by the end of trading on February 24, 2017 on substantial volume of 2,963,287 shares. Then, on the immediately following Monday, February 27, 2017, the Company provided further detail regarding the Sequential transaction that had been referenced in the SIRF's investigative report.  In particular, Synchronoss filed its Form 10-K with the SEC, which revealed for the first time that the Company had entered into a licensing agreement with Sequential in December 2016, under which the Company would receive $9.2 million, and which it immediately recorded as revenue.  Specifically, the Form 10-K stated (emphasis added):

> On December 22, 2016, the Company entered into a non-exclusive perpetual license agreement with STIH, in the amount of $9.2 million, ***which is included in net revenues in the statement of income***, for the use of the Company's Analytics software.

Thus, for the first time, the market became aware that the Company had used the one-time $9.2 million licensing fee to meet its fourth quarter 2016 revenue targets.  As a result of these partial corrective disclosures and/or materializations of concealed risk, the Company's stock, which, as stated above, had dropped to close at $30.49 on February 24, 2017 after the SIRF article was released, dropped again on the news to close at $28.69 on February 27, on substantial trading volume of 1.3 million shares.

432.    On April 27, 2017, the Company announced that the former Intralinks CEO, Ron Hovsepian, who had become Synchronoss's CEO less than two months earlier, and Synchronoss's new CFO, John Frederick, who replaced Defendant Rosenberger less than two months earlier, were abruptly resigning, and further that Synchronoss's total revenue for the first quarter of 2017 would be $13 million to $14 million less than the Company's previously announced guidance of $176 million (an 8% miss), and that operating margins would be only 8-10%, much lower than the Company's prior guidance of 18-19%.   As a result of this further partial corrective disclosure and/or materialization of concealed risk, the stock price was slashed by 46%, dropping $11.33 from a close of $24.62 on April 26, 2017 to a close of $13.29 on April 27, 2017, on enormous trading volume of over 27 million shares.

433.    The Company issued related disclosures on consecutive trading days May 12 and May 15, 2017—a Friday and a Monday, respectively—concerning its inability to timely file its upcoming quarterly statement.   As a result of this further partial corrective disclosures and/or materializations of concealed risk, these disclosures caused the stock to drop from $15.98 on May 11, 2017 to $14.49 on May 15, 2017, on significant trading volume.

434.    More specifically, on May 12, 2017, the Company filed with the SEC a Notice of Late Filing indicating that it could not timely file its first quarter 2017 Form 10-Q because management required additional time to comply with the Company's internal controls and procedures and to review certain aspects of the Company's financial statements.   On that date, the stock closed at $15.62 per share, dropping from the closing price of $15.98 on May 11, 2017 on volume of 1,288,085 shares.

435.    The Company then filed a Form 8-K and issued a press release on May 15, 2017, disclosing that the Company would delay its first quarter 2017 earnings release and conference

call as well as its Form 10-Q for that quarter.  The press release stated that Defendant Waldis and the Company's new CFO, Lawrence Irving, "together with the audit committee of the Company's board of directors and with the assistance of accounting and legal advisors, conducted a thorough review of accounting of certain transactions conducted in prior financial periods," that the results of the review were provided to Synchronoss's external auditor, Ernst & Young, who suggested additional reviews.  As a result of these further partial corrective disclosures and/or materializations of concealed risk, the Company's stock dropped from $15.62 per share to $14.49 per share on high trading volume of nearly 4 million shares.

436.    On May 22, 2017, the Company announced its receipt from NASDAQ of a notice of noncompliance with NASDAQ Listing Rule 5250(c)(1) because of its failure to timely file its first quarter 2017 Form 10-Q.  As a result of this further partial corrective disclosure and/or materialization of concealed risk, the Company's stock dropped from a close of $13.54 on May 19, 2017 to a close of $12.82 on May 22, 2017, on high trading volume of over 4 million shares.

437.    After the end of trading on June 13, 2017, the Company announced that its quarterly and annual financial reports and statements for 2015 and 2016 should not be relied upon because the Company "has identified a material weakness in internal controls over financial reporting related to its revenue recognition process at December 31, 2016."  As a result of this further partial corrective disclosure and/or materialization of concealed risk, the Company's stock fell from the closing price of $12.28 on June 12, 2017 to close at $11.26 on June 14, 2017, on high trading volume of nearly 3.5 million shares.

438.    The precipitous declines in Synchronoss's stock price following the series of revelations from February 27, 2017 to June 13, 2017, and the resulting losses suffered by

members of the Class, are directly attributable to the market's reaction to the disclosure of information and/or risks that had previously been misrepresented and/or concealed by the Defendants, and to the market's adjustment of the Company's stock price to reflect the newly-emerging truth about its actual financial condition, revenues, revenue recognition practices, and compliance with GAAP.

439.    Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiff and other members of the Class.

E.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

440.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this complaint.

441.    First, the statements complained of were not forward-looking statements nor were they identified as forward-looking statements when made.   Rather, the false or misleading statements complained of concerned historical and/or current facts and conditions existing at the time the statements were made.

442.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Defendants are liable for those false or misleading forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Synchronoss who knew that the statement was materially false or misleading when made.

F.    PRESUMPTION OF RELIANCE

443.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    the Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the securities of Synchronoss traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the securities of Synchronoss; and

(e)    Lead Plaintiff and other members of the Class purchased the securities of Synchronoss between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

444.    At all relevant times, the market for the securities of Synchronoss was efficient for the following reasons, among others:

(a)    as a regulated issuer, Synchronoss filed periodic public reports with the SEC;

(b)    Synchronoss regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services, and through the investor relations page on the Company's Internet web site;

(c)    Synchronoss was followed by numerous securities analysts employed by major brokerage firm(s), including Sterling Auty of JP Morgan, Michael Nemeroff of Credit Suisse, Nandan Amjadi of Deutsche Bank, Tavis McCourt of Raymond James & Associates, Gary Powell of Wells Fargo Securities, Tom Roderick of Stiffel Nicolaus, Greg Burns of Sidoti & Company and Samad Samana of Stephens, Inc., who participated in conference calls with Synchronoss management and/or wrote reports that were distributed to the sales force(s) and certain customers of their

respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     the stock of Synchronoss was actively traded on NASDAQ, an efficient market, where the Company's common stock trades under the ticker symbol SNCR.

445.   As a result of the foregoing, the market for the securities of Synchronoss promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities of Synchronoss.   Under these circumstances, all purchasers of the securities of Synchronoss during the Class Period suffered similar injuries through their purchase of the securities at artificially inflated prices and the presumption of reliance applies.

446.   Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, the Class is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

### G.     CLASS ACTION ALLEGATIONS

447.   Lead Plaintiff brings the Exchange Act claims on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class, which, as alleged previously, consists of all persons or entities who purchased or otherwise acquired the securities of Synchronoss during the Class Period (between October 28, 2014 and June 13, 2017, inclusive), and were damaged thereby.   Excluded from the Class are Defendants (as set forth above), and present or former executive officers of the corporate defendant and their immediate family members (as defined in 17 C.F.R. § 229.404 (Instructions (1)(a)(iii) and (1)(b)(ii)).

448.   The members of the Class are so numerous that joinder of all members is impracticable.   For example, Synchronoss's stock traded actively on NASDAQ and, as of

February 16, 2017, there were 45,998,579 Synchronoss shares outstanding.  While the exact number of the Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the Class members number in the thousands.

449.    Lead Plaintiff's claims are typical of the claims of the members of the Class. Lead Plaintiff and the other members of the Class purchased or otherwise acquired Synchronoss common stock during the Class Period and sustained damages as a result of the Defendants' conduct complained of herein.

450.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests that are adverse or antagonistic to the Class.

451.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      (a)    whether the Exchange Act was violated by the Defendants' acts as alleged herein;

      (b)    whether statements made by the Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and prospects of Synchronoss; and

      (c)    the extent of damages sustained by the Class, and the proper measure of damages.

452.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it

impracticable for members of the Class to individually redress the wrongs done to them as alleged herein.  There will be no difficulty in the management of this action as a class action.

453.    The names and addresses of those persons and entities that purchased or otherwise acquired and/or sold Synchronoss's common stock during the Class Period are available from the Company's transfer agent(s) or other sources.  Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

## VIII.   CLAIMS FOR RELIEF

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act
### (Against All Defendants)

454.    Lead Plaintiff and the Class repeat and reallege each of the allegations set forth above as if fully set forth herein.

455.    This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Lead Plaintiff and the Class, against Defendants Synchronoss, Waldis and Rosenberger.

456.    As alleged herein, throughout the Class Period, the Defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.  The Defendants' false and/or misleading statements and omissions were intended to and did, as alleged herein:  (a) deceive the investing public and Lead Plaintiff and other members of the Class; (b) artificially create, inflate and/or maintain the market for and

market price of the Company's securities; and (c) cause Lead Plaintiff and other members of the Class to purchase the Company's securities at inflated prices.

457.    The Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

458.    As described above, the Defendants made the false or misleading statements and/or omissions knowingly and intentionally, or with such recklessness as to constitute willful deceit and fraud upon Lead Plaintiff and the other Class members who purchased Synchronoss stock during the Class Period.

459.    The Defendants' false and/or misleading statements and/or omissions were made in connection with the purchase or sale of the Company's securities.

460.    In ignorance of the false or misleading nature of the Defendants' statements and/or omissions, and relying directly or indirectly on those statements and/or upon the integrity of the market price for Synchronoss securities, Lead Plaintiff and members of the Class purchased Synchronoss stock at artificially inflated prices during the Class Period.  But for the fraud, they would not have purchased the stock at artificially inflated prices.

461.    The market price of Synchronoss stock declined materially upon the public disclosure of the facts that had been previously misrepresented or omitted by the Defendants, as described above.

462.    Lead Plaintiff and members of the Class were substantially damaged as a direct and proximate result of their purchases of Synchronoss stock at artificially inflated prices and the subsequent decline in the price of Synchronoss stock when the truth was disclosed.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**(Against Defendants Waldis and Rosenberger)**

463.    Lead Plaintiff and the Class repeat and reallege each of the allegations set forth above as if fully set forth herein.

464.    This claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Waldis and Rosenberger (collectively, the "Section 20(a) Defendants") on behalf of Lead Plaintiff and the Class.

465.    As alleged herein, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making false or misleading statements and/or omissions in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct.  This fraudulent conduct was undertaken with scienter because Synchronoss is charged with the knowledge and scienter of Defendants' Waldis and/or Rosenberger and/or others who knew of or engaged in recklessness in disregarding the falsity or misleading nature of the Company's statements and of the fraudulent nature of the scheme.

466.    Lead Plaintiff and other members of the Class who purchased Synchronoss stock suffered damages in connection with their purchases of those securities, as a direct and proximate result of the violations of Section 10(b) and Rule 10b-5(b) by the Defendants.

467.    Defendants Waldis and Rosenberger were controlling persons of Synchronoss because of their senior executive positions with Synchronoss, their direct involvement in the day-to-day business and operations of Synchronoss, including participation in drafting and signing and approving Synchronoss's SEC filings, and participation in and speaking roles at investor and earnings conference calls and/or presentations.

468.    By virtue of the foregoing, the Section 20(a) Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Synchronoss, including the content and dissemination of press releases and other materials alleged to be false or misleading herein.

469.    The Section 20(a) Defendants are culpable for participation in the matters alleged herein because they did not act in good faith in connection with the conduct at issue, acted with knowledge that Synchronoss's public statements were materially false or misleading, or omitted material information, and/or or they acted with reckless disregard for the truth.

470.    By virtue of their positions as controlling persons of Synchronoss, and their culpable participation in the Defendants' violation of Section 10(b) and Rule 10b-5(b) as alleged herein, the Section 20(a) Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act.

## IX.   PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class;

(b)    Awarding all damages and other remedies set forth in the Exchange Act against Defendants in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and costs of suit; and

(d)    Such other and further relief as the Court may deem just and proper.

## X.      JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiff hereby demands a trial

by jury on all issues so triable.


Dated:  August 14, 2019



_____*/s/ James A. Cecchi*_____
James E. Cecchi
CARELLA, BYRNE, CECCHI,
   OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

*Liaison Counsel for the Proposed Class*

Daniel L. Berger (*pro hac vice*)
Jonathan D. Park (*pro hac vice to be filed*)
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, New York 10017
Tel:  (646) 722-8500
Fax:  (646) 722-8501

Kyle J. McGee
Rebecca A. Musarra (*pro hac vice to be filed*)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
Tel:  (302) 622-7000
Fax:  (302) 622-7100

*Counsel for Lead Plaintiff and the Proposed Class*

**Appendix A**

**Employees' Retirement System of the State of Hawaii**
**Synchronoss Technologies, Inc. Common Stock Transactions**
**October 28, 2014 through June 13, 2017**

**PURCHASES**

| Trade Date | Quantity | Price |
|------------|----------|-------|
| 2/14/2017 | 66,333 | $33.89 |
| 2/15/2017 | 53,267 | $33.96 |

**POST DISCLOSURE SALES**

| Trade Date | Quantity | Price |
|------------|----------|-------|
| 4/27/2017 | 117,400 | $12.49 |
| 4/27/2017 | 602 | $12.56 |
| 4/27/2017 | 500 | $11.95 |
| 4/27/2017 | 98 | $12.59 |
| 4/27/2017 | 500 | $12.18 |
| 4/27/2017 | 500 | $12.10 |