**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE SYNCHRONOSS TECHNOLOGIES, INC. SECURITIES LITIGATION | : : : : | Civil Action No. 17-2978 (FLW) (LHG) |
|  | : | **OPINION** |
| THIS DOCUMENT RELATES TO:  ALL ACTIONS | : : : : | |

**<u>WOLFSON, Chief Judge</u>**

Lead Plaintiff, the Retirement System of the State of Hawaii ("Plaintiff"), brings this putative securities class action, on behalf of itself and all other similarly situated individuals, against Synchronoss Technologies, Inc. ("Synchronoss" or the "Company"), a company involved in licensing software to cell phone service providers, as well as Synchronoss's former CEO, Stephen G. Waldis ("Waldis"), and its former CFO, Karen L. Rosenberger ("Rosenberger") (collectively "Defendants"), alleging violations under the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*, and the rules promulgated thereunder. The Court previously dismissed Plaintiff's Amended Complaint without prejudice on June 28, 2019, based on Plaintiff's failure to adequately plead scienter. *See In re Synchronoss Techs., Inc. Sec. Litig.*, No. 17-2978, 2019 WL 2849933 (D.N.J. July 2, 2019). In accordance with that Opinion, Plaintiff filed a Second Amended Complaint (the "SAC") on August 14, 2019. (*See* ECF No. 81.)

Presently before the Court is Defendants' motion to dismiss the SAC on the grounds that the additional allegations in the SAC remain deficient under Plaintiff's burden of pleading scienter. For the reasons set forth below, Defendants' Motion to Dismiss is denied in part and granted in

part.  Plaintiff's Section 10(b) and Rule 10b-5 and Section 20(a) claims against Rosenberger are limited to the alleged improper recognition of revenue absent signed contracts.  Plaintiff's claims based upon the alleged manipulation of expenses and alleged improper accounting for acquisitions and divestures are dismissed.  Plaintiff's claims based on Defendants' forward-looking statements are also dismissed.  Furthermore, because Plaintiff has not adequately alleged facts suggesting a strong inference of scienter as to Waldis, the claims against him are dismissed without prejudice.

## I.   **BACKGROUND**

### A.  Factual Background

The Court set forth the facts underlying this matter at length in its prior Opinion.  For the sake of brevity, the Court recounts only those facts necessary for the resolution of the instant motion.  Synchronoss, a publicly traded mobile technology services company, principally located in Bridgewater, New Jersey, specializes in providing "Activation" and "Cloud" services to commercial mobile carriers, including AT&T and Verizon.  *See* SAC ¶¶ 6, 31, 44.  Waldis founded Synchronoss and has served as its Executive Chairman since 2000.  *Id.*  ¶ 33.  In addition, Waldis was the Company's CEO from its inception in 2000 until January 18, 2017, when he resigned as CEO.  *Id.*  Waldis was reappointed as CEO on April 27, 2017, when his successor resigned as CEO.  *Id.*  He resigned as CEO for a second time on November 13, 2017.  *Id.*  Rosenberger is the former Chief Financial Officer and Executive Vice President of Synchronoss.  *Id.* ¶ 34.  Rosenberger was the Company's CFO from April 2014 until April 1, 2017.  *Id.*  Prior to her appointment as CFO, Rosenberger was the Company's Chief Accounting Officer and Senior Vice President from January 2012 until April 2014.  *Id.*

Synchronoss was founded in 2000 by Waldis, a former AT&T executive, who established an ongoing relationship between the Company and AT&T to provide activation services to

consumers who bought new mobile devices with AT&T as service provider. *Id.* ¶¶ 37–40. Synchronoss provided software licenses to AT&T that enabled the consumer to simply open the box, automatically activate the cell phone and troubleshoot issues using a Synchronoss customer call center. *Id.* ¶ 38. The Company's "Activation business" enjoyed success through 2012 and into 2013 to 2014. *Id.* ¶¶ 38–39. However, in 2013, the Activation business began to deteriorate and the Company looked for other areas of growth, especially because AT&T's account constituted a significant amount of its revenues (80% at one point). *Id.* ¶ 39–40. The Company thus created a "Cloud" business, for which revenue was generated primarily via software licensing agreements between the Company and services providers such as Verizon. *Id.* ¶¶ 44–52. Verizon and AT&T were the Company's two largest customers and represented more than 60% of the Company's revenues. *Id.* ¶¶ 55–56. While the Cloud business generated more revenue than the Activation business, such revenue began to slow by the third quarter of 2015. *Id.* ¶¶ 54, 77. According to Plaintiff, faced with this slow growth, slumping stock price, and pressure to generate revenue, Defendants began fraudulently booking revenue in order to artificially inflate the stock price.

Ultimately, in July 2018, Synchronoss filed restated financials for 2014 to 2016 (the "Restatement"). *Id.* ¶ 3. According to Plaintiff, the Company admitted in the Restatement, *inter alia*, that: (1) it "book[ed] revenues relating to a transaction in a period prior to having sufficient documentation of an agreement with the customer about the transaction," *id.* ¶ 144; (2) "licensing fees were improperly accounted for on a gross basis as revenue, *id.*; (3) its quarterly and annual financial reports for 2014 to 2016 and its communications from 2014 to 2017 were false and/or materially misstated and should no longer be relied upon, *id.* ¶¶ 241–43; (4) it had "pervasive material weaknesses" in internal controls from 2014 to 2017, *id.* ¶ 242; and (5) it fired three

employees "for cause," *id.* ¶ 243.  As a result of the Restatement, revenue for 2014 to 2016 was restated down from $1,212,168,000 to $1,032,271,000, a reduction of nearly $180 million (or more than 14.8%), *id.* ¶ 247, and net income of $93.5 million for 2014 through 2016 was restated to a cumulative loss of $40 million (a difference of $134 million, representing a 143% decrease in income).  *Id.* ¶ 249.

The putative class period is from October 28, 2014 and June 13, 2017.  *Id.* ¶ 25.  During that time, Plaintiff alleges that Defendants fraudulently inflated Synchronoss stock by knowingly falsifying the Company's publicly reported revenues, and that Plaintiff and other investors relied on these material misrepresentations and omissions to their detriment.  Relying on the testimony of eight confidential witnesses, Plaintiff points to certain deals that were improperly recognized as revenue before the contracts were executed: (1) two AT&T purchase transactions that were booked as revenue in late 2015 that allegedly never occurred, SAC ¶¶ 174–75; (2) a $5 million Verizon contract that was recognized as revenue in the first quarter of 2016, when the deal was apparently only in the initial discussion phase, *id.* ¶¶ 163–65, 413; and (3) a $25 million deal with Verizon that was recognized as revenue in the third quarter of 2016 before the contract was signed, *id.* ¶¶ 177–79.

Moreover, Plaintiff claims that Defendants improperly accounted for acquisitions and divestures.  Specifically, in 2016, the Company announced it would divest 70% of its Activation business in a deal with a small, privately held company known as Sequential Technology International, LLC ("Sequential").  SAC ¶¶ 14–16, 97–103.  In connection with this transaction, Synchronoss and Sequential entered into a software license agreement under which Sequential obtained a perpetual license for certain analytics software products owned by Synchronoss, which was valued at $9.2 million by the Company.  *Id.* ¶ 108.  Synchronoss booked the $9.2 million

4

licensing fee as revenue in the fourth quarter of 2016 but did not disclose that booking until months later.  *Id.* ¶ 110.  Further, Plaintiff alleges that Defendants violated certain generally accepted accounting principles ("GAAP") by recognizing as revenue a $10 million patent-dispute settlement payment by Openwave as standalone license revenue when it should have treated this $10 million as a reduction of the purchase price Synchronoss paid to acquire Openwave.  SAC ¶¶ 207–10.

Finally, Plaintiff alleges that Defendants utilized a "flash file" to "determine which expenses to bury or remove 'down below the line' so as to show attractive, but false, margins in the Company's financial reports."  *Id.* ¶ 233.  This alleged misclassification of expenses allegedly included reclassifying employee salaries as "research and development" costs.  *Id.* ¶ 235.

As these allegations are central to the Court's analyses, the Court will discuss them in more detail below.

### B.  Procedural History

On Monday, May 1, 2017, two business days after the Company announced lower than expected financials, Plaintiffs filed this action, alleging that the Company's miss of its Q12017 projections was the result of an alleged fraud perpetrated by the Company and its senior executives.  ECF No. 1.  Following the consolidation of numerous similar complaints, but before any consolidated complaint was filed, Synchronoss announced that it would be restating certain prior financial results for the years 2014 through 2016.  SAC ¶¶ 3, 5.  Plaintiffs then filed a Consolidated Complaint on November 30, 2017.  ECF No. 37.  Defendants moved to dismiss the Consolidated Complaint in February 2018, ECF No. 45, which was pending when Synchronoss filed the Restatement on July 9, 2018.  Lead Plaintiff filed its Amended Complaint on August 24, 2018.  ECF No. 61.  Defendants thereafter moved to dismiss the Amended Complaint.  ECF No. 66.  In an Opinion dated July 2, 2019, this Court dismissed the Amended Complaint without prejudice,

finding that Plaintiff failed to sufficiently allege that Defendants acted with the requisite scienter. *See In re Synchronoss*, 2019 WL 2849933.

Plaintiff filed the SAC on August 14, 2019, adding information obtained from five additional confidential witnesses that Plaintiff claims support an inference of scienter. *See* SAC ¶¶ 362–423. Thereafter, Defendants filed the present motion, arguing that the SAC should be dismissed for failure to, again, adequately allege scienter because the new allegations fail to properly cure the deficiencies highlighted by the Court in the Opinion dismissing the Amended Complaint.

## II.   **LEGAL STANDARDS**

### A.   **Rule 12(b)(6)**

Under Federal Rule of Civil Procedure Rule 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quotations omitted). Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

However, Rule 12(b)(6) only requires a "'short and plain statement of the claim showing

that the pleader is entitled to relief' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  The complaint must include "enough factual matter (taken as true) to suggest the required element.  This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citations and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted).  Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted).  Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

### B.  Rule 9(b) and the Private Securities Litigation Reform Act

"Independent of the standard applicable to Rule 12(b)(6) motions," Fed. R. Civ. P. 9(b) "imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002); *see also* Fed.

R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  To satisfy this heightened pleading standard, a plaintiff must state the circumstances of his alleged cause of action with "sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged.'" *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (alteration in original) (quoting *Lum v. Bank of America*, 361 F.3d 217, 223–24 (3d Cir. 2004)).  Specifically, the plaintiff must plead or allege the "date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* at 200 (citing *Lum*, 361 F.3d at 224).  Indeed, the Third Circuit has advised that, at a minimum, Rule 9(b) requires a plaintiff to allege the "essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller*, 311 F.3d at 217).

In addition to Rule 9(b)'s heightened pleading requirements, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C § 78u, *et seq.*, to require an even higher pleading standard for plaintiffs bringing private securities fraud actions. *In re Suprema*, 438 F.3d at 276.  This heightened pleading standard is targeted at preventing abusive securities litigation. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Private securities fraud actions . . . if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law."); *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (identifying "ways in which the class-action device was being used to injure the entire U.S. economy" and listing examples such as "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests, and manipulation by

8

class action lawyers of the clients whom they purportedly represent") (quotes and citations omitted).

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). First, under 15 U.S.C. § 78u-4(b)(1), the complaint must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007) (construing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Both provisions of the PSLRA require facts to be pled with "particularity." *Avaya*, 564 F.3d at 253. This particularity language "echoes precisely Fed. R. Civ. P. 9(b)." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999); *see* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). Although the PSLRA replaces Rule 9(b) as the pleading standard governing private securities class actions, the rule's particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u-4(b)(1) of] the PSLRA." *Avaya*, 564 F.3d at 253 (citations omitted). This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *In re Advanta*, 180 F.3d at 534 (quotations marks omitted).

## III.   DISCUSSION

### A.   Claims under Section 10(b) of the Exchange Act

Plaintiff asserts claims against Defendants under Section(b) of the Exchange Act. The

private right of action under Section 10(b) and Rule 10b-5 "creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997). In relevant part, Rule 10b-5 makes it unlawful for an individual "[t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-6(b). To state a claim under section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation." *Gold v. Ford Motor Co.*, 577 F. App'x 120, 122 (3d Cir. 2014) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

In their motion to dismiss the SAC, Defendants only contend that Plaintiff has failed to sufficiently allege one element of its 10b-5 claim—scienter. "Scienter" is the "mental state [of] intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Under the PSLRA pleading requirements, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Fan v. StoneMor Partners LP*, 927 F.3d 710, 715 (3d Cir. 2019) (quoting 15 U.S.C. § 78u-4(b)(2)). The scienter standard requires a plaintiff to allege facts giving rise to a strong inference "of either reckless or conscious behavior." *Advanta*, 180 F.3d at 534–35. Courts must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. A "strong inference" of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Fan*, 927 F.3d at 718 (quoting *Tellabs*, 551 U.S. at 319); *see also Tellabs*, 551 U.S. at 324 ("The inference that the defendant

acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the most plausible of competing inferences").  Scienter may "be shown by a 'knowing or reckless statement of mind,' which in this securities context would be demonstrated by pleading 'an extreme departure from the standards of ordinary care.'"  *Fan*, 927 F.3d at 718 (quoting *Avaya*, 564 F.3d at 252, 267 n.42).  However, "it is not enough for plaintiffs to merely allege that defendants 'knew' their statements were fraudulent or that defendants 'must have known' their statements were false."  *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 239 (3d Cir. 2004).  Rather, a plaintiff must, at least, specifically allege facts constituting strong circumstantial evidence that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation."  *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2009) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)).

"[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences . . . .  A plaintiff alleging fraud in a § 10(b) action . . . must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference."  *Tellabs*, 551 U.S. at 323, 28–29 (emphasis in original).  "While [courts] will aggregate the allegations in the complaint to determine whether [they] create[] a strong inference of scienter, plaintiffs must create this inference with respect to each individual defendant in multiple defendant cases."  *Winer Family Trust*, 503 F.3d at 337 (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 603 (7th Cir. 2006), *rev'd on other grounds*, 551 U.S. 308 (2007)).

In conducting the scienter analysis, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 322–23 (emphasis in original).

However, the Third Circuit has "explicitly approved of scienter analyses that assess individual categories of scienter allegations individually when it is clear, as it is here, that a district court ultimately considered the allegations as a whole." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 155 (3d Cir. 2018) (citing *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 493 (3d Cir. 2016) (concluding that just because a court is "thorough in explaining why it found scienter lacking as to each asserted misrepresentation does not suggest that it did not consider the allegations as a whole")); *see also Avaya*, 564 F.3d at 280 ("Although we have discussed each of the alleged facts bearing on defendants' scienter one at a time, we have heeded *Tellabs*'s command to evaluate [the plaintiffs'] allegations collectively rather than individually.").

Defendants divide their briefing into parts: (1) that Plaintiff has failed to sufficiently plead facts giving rise to a strong inference of scienter for Plaintiff's claims based on historical financial results affected by the 2018 Restatement; and (2) that Defendants' forward-looking revenue projections are protected by the PSLRA safe harbor provision.

### 1. Historical Claims

#### a. *Confidential Witnesses*

Plaintiff attempts to establish scienter through the testimony of eight confidential witnesses.  Confidential witness statements can support an inference of scienter only where: (1) "the complaint sets forth other factual allegations, such as documentary evidence, which are sufficient alone to support of a fraud allegation," or (2) "when the confidential sources are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the [confidential] source would possess the information alleged." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 290 (D.N.J. 2007) (internal citations omitted).  While Plaintiff relies on a number of documents that purportedly corroborate the statements of the

confidential sources, Plaintiff does not appear to suggest that those documents, standing alone, can support a fraud allegation.  Accordingly, the Court will analyze Plaintiff's allegations concerning the confidential witnesses under the second method.  To satisfy its burden under that method, "the complaint must disclose: (1) the time period that the confidential source worked at the defendant-company, (2) the dates on which the relevant information was acquired, and (3) the facts detailing how the source obtained access to the information." *Id.* (citing *Cal. Pub. Employees' Ret. Sys. V. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004) ("*Chubb*")).  Moreover, "allegations attributed to the information obtained from a confidential source must contain specific details regarding the basis for the source's personal knowledge and describe support events in detail." *Id.* (citing *Chubb*, 394 F.3d at 146.)  Where these requirements are not met, courts must ignore insufficiently described witness statements for the purposes of evaluating the plaintiff's allegations. *Id.*; *Avaya*, 564 F.3d at 263 ("If [confidential] source allegations are found wanting with respect to these criteria, the [courts] must discount them steeply.").

Plaintiff refers to testimony from eight confidential witnesses in the SAC: (1) CW1, a former Synchronoss financial analyst who was responsible for revenue forecasting, SAC ¶¶ 9, 365; (2) CW2, a long-time Synchronoss employee at the Vice President level, *id.* ¶ 174; (3) CW3, an accountant who worked at Synchronoss from 2011 to April 217, *id.* ¶ 93; (4) CW4, a financial analyst who was employed by Synchronoss from 2012 to 2015, *id.* ¶ 371; (5) CW5, who was employed by Synchronoss as director of sales from February 2017 to January 2018, *id.* ¶ 374; (6) CW6, who worked at Synchronoss as a consultant for the 2016–2017 time period and was later employed by the Company as a Vice President from November 2017 to November 2018, *id.* ¶ 376; (7) CW7, who was the Company's Internal Controls Manager for approximately one year and left the Company in March 2017, *id.* ¶ 379; and (8) CW8, who was an account director for the

13

Company from 2008 to 2018, *id.* ¶ 381.

Defendants argue that the information provided to Plaintiff by these confidential witnesses does not give rise to any inference of scienter because (1) Plaintiff fails to cure the deficiencies highlighted by the Court in its prior Opinion with respect to CW1, CW2, and CW3; and (2) that the new confidential witnesses "are not alleged to have any personal knowledge regarding what the Individual Defendants knew about the truth or falsity of any challenged statement."  Defs.' Moving Br., at 15.  Plaintiff, however, maintains that the statements of the confidential witnesses establish scienter with respect to the Company's improper recognition of revenue and the manipulation of expenses.  Because the testimony of the confidential witnesses often overlaps and is used to corroborate the testimony of other confidential witnesses, the Court will discuss the confidential witnesses' statements in two factual categories.

### i.   *Confidential Witnesses – Manipulation of Expenses*

Plaintiff relies on certain confidential witnesses' information to demonstrate that Rosenberger was involved in the manipulation of the Company's accounting; specifically, that she knew of, and used, "a weekly 'flash file' to identify expenses to improperly reclassify or otherwise manipulate, including the improper reclassification of sales employee salaries as research and development expenses."  SAC ¶ 415.  In the Amended Complaint, Plaintiff had provided information from CW3 on the "flash file" that the Court found to be too broad and general to support an inference of scienter.  Specifically, the Court highlighted that the "flash file" refers to a wide array of Company financial information and that Plaintiff did not allege that any specific "flash file" contained pertinent facts contradicting any particular public statement and that Plaintiff did not allege that any of the reclassification of salaries were included in the flash files.  *See In re Synchronoss*, 2019 WL 2849933, at *10.   To cure these deficiencies, Plaintiff adds new

information from CW1, CW3, and CW4 that purportedly show that Rosenberger and Waldis took part in the scheme to intentionally misclassify expenses to meet revenue and profit guidance.

According to CW3, during Rosenberger's tenure as CFO of the Company (April 2014 to April 2017), she was involved in the manipulation of financial results that misclassified expenses and other financial metrics in order to avoid having to report a decrease in profit margins.  SAC ¶ 231–36.  CW3 states that Andrew Latyszonek, a financial analyst at the Company, would prepare a "flash file" each week for the purpose of listing which expenses to bury or remove "down below the line" so as to show attractive, but false, margins in Synchronoss's financial reports.  *Id.* ¶ 233.  The flash file would then be sent to Rosenberger via email, who would approve the reclassified expenses.  *Id.* ¶ 416.  CW3 states that Latyszonek would regularly ask CW3 to reclassify certain expenses and CW3 would "regularly decline and point out that the reclassifications contravened GAAP rules."  *Id.* ¶ 416.  When CW3 would refuse, Latyszonek would allegedly contact Rosenberger by email, who would email CW3 and direct CW3 to make the reclassifications.  *Id.* According to CW3, this process occurred so frequently that Latyszonek began bypassing CW3 and "went to Rosenberger first who then emailed CW3 with instructions to reclassify the expenses at issue."  *Id.*

As one example, CW3 states that s/he was personally tasked with "pushing" salaries of Openwave, which Synchronoss acquired in 2016, from sales to research and development.  *Id.* ¶ 235.  According to Plaintiff, this reclassification was significant because R&D expenses are tax-deductible whereas sales costs are not and, in addition, R&D expenses are viewed more favorably by investors because they signal investment in future growth, whereas sales costs erode current margins without future benefit. *Id.* at ¶ 235.  CW3 allegedly confirmed with an Openwave Senior Vice President that the employees whose expenses were being reclassified were not part of

Openwave's R&D team, and then objected to the reclassification of these expenses. *Id.*

Plaintiff alleges that the testimony of CW4 corroborates that of CW3. CW4, a financial analyst who was employed by the Company from July 2012 to August 2015, states that reclassifications were discussed at the weekly flash meetings and the "flash file" was used to identify expenses to be reclassified. *Id.* ¶ 417. According to CW4, "one subject of discussion was the reclassification of salaries from service-related to research and development (which improved the Company's margins)." *Id.* In that connection, CW4 states that Latyszonek instituted a workforce tracking system to keep track of time that the Company's software staff spent on different projects. *Id.* Data from that spreadsheet would be included in the flash file and would be discussed in the context of reclassifying salary expenses. *Id.* CW4 further states that Rosenberger attended the weekly flash meetings, and "thus was aware of the contents of the flash files, the discussions at the weekly flash meetings, and the Company's repeated reclassification of salaries." *Id.*

Finally, Plaintiff alleges that CW1 also attended the weekly flash meetings and states that the meetings' attendees were "constantly" focused on shortfalls between the Company's financial condition and what the Company had represented to the market, and how to close that gap. *Id.* ¶ 418. For example, CW1 recalled that in the second quarter of 2016 there was a $30 million shortfall about which Rosenberger asked, "what can we do?" *Id.* CW1 states that s/he witnessed Latyszonek manipulate the flash file, including reclassifying salaries from cost of sales to research and development. *Id.* ¶ 419. According to CW1, after Latyszonek would reclassify expenses, the meeting attendees would reconvene to confirm that the reclassification of expenses helped close the gap between the Company's financial condition and the guidance it reported to the market. *Id.*

Despite these expanded allegations, Plaintiff's attempt to show scienter through

confidential witnesses' information regarding the alleged improper classification of expenses remains deficient.  Most critical to these allegations is Plaintiff's failure to connect the alleged reclassification of expenses to any allegedly misleading public statement.  *See Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *see also Intelligroup*, 527 F. Supp. 2d at 286.  Here, Plaintiff's claims are based on alleged public statements made that misrepresented the Company's true financial condition.  Plaintiff, however, fails to point to any public statement that was specifically undermined by the alleged manipulation of expenses.  While the confidential witnesses have provided detailed allegations regarding the alleged practice of manipulating expenses through the use of the "flash file," there are no particular allegations that any "flash file" document contained specific facts that contradicted any identified public statement.  Because Plaintiff fails to provide the requisite link between the alleged improper reclassification of expenses and any particular public statements, no inference of scienter can be made from these allegations at this point.

### ii.  *Confidential Witnesses– Improper Recognition of Revenue*

Plaintiff next points to information from confidential witnesses to establish scienter with respect to Defendants' alleged improper recognition of revenue on unsigned deals.  *See* SAC ¶¶ 344–46, 383–414.  Plaintiff asserts that information from CW1, CW2, CW3, CW5, CW6, and CW7, and CW8 demonstrates that, most notably, Rosenberger was aware of, and involved in, the fraudulent recognition of deal revenue before a contract was signed. *See id.*

First, Plaintiff relies on the testimony of CW3 to establish that Rosenberger made an "infamous" decision to recognize $25 million in revenue on a licensing deal with Verizon without having a signed contract, in violation of Company policy and GAAP regulations.  SAC ¶¶ 94, 410.

Plaintiff states that CW3 spoke with the Company's controller, who told CW3 that she had "put up a fight" with Rosenberger in an attempt to avoid booking the $25 million deal," but eventually "threw up her hands" because "Rosenberger was the one on the line signing the financials." *Id.* ¶ 411. CW3 also states that the senior accountant expressed a similar response; that though she was uncomfortable booking the revenue, she told CW3 "What do I care?" because the ultimate responsibility lay with Rosenberger. *Id.*[1] CW3 further stated that after Rosenberger became CFO, she "never really relinquished her control" of the accounting function and, further, that Rosenberger "micromanaged" the accountants. *Id.* ¶ 395.

Plaintiff next alleges that CW1, a financial analyst, CPA, and certified fraud examiner, has personal knowledge that the Company improperly and prematurely recognized $5 million in revenue from a contract with Verizon in the first quarter of 2016, even though the contract in question was not signed until April 2016, after the quarter had closed. SAC ¶ 9. CW1's knowledge is based on a meeting in April 2016 at which CW1 overheard Rosenberger discuss with other

---

[1]      The Court previously found that the information from CW3 was an insufficient basis from which to infer scienter because Plaintiff did not allege that CW3 was involved in the $25 million Verizon transaction or that CW3 had first-hand knowledge of the alleged booking of the deal. *See In re Synchronoss*, 2019 WL 2849933, at *10. The SAC has now added more details about the conversations CW3 had with members of the accounting department regarding this deal. Nevertheless, Defendants argue that Plaintiff's allegations from CW3 is more of the same "second-hand retelling" that I previously deemed insufficient in dismissing the Amended Complaint. *See id.* I do not agree. Plaintiff has proffered additional details with respect to how CW3 received the information regarding the "infamy" of the $25 million Verizon transaction, which shores up CW3's knowledge of the $25 million Verizon deal. The information newly provided by CW3 is not the type of generalized rumor or second-hand retelling that courts routinely dismiss, but rather CW3 provides particularized details of conversations that occurred with members of the accounting team specifically about the transaction at issue. Moreover, CW3, as an accountant, was in a position to have personal knowledge of the Company's revenue booking procedures. Indeed, the information provided by CW3 is more substantial than that rejected by the *Intelligroup* court for being nothing more than rumor. *See Intelligroup*, 527 F. Supp. 2d at 360–61 (discounting allegation that it was "common knowledge" that defendants were "cooking the books" because it was not based on personal knowledge but repeated statements the witness heard). Accordingly, the court declines to discount the information provided by CW3.

Company executives whether the Verizon contract had been signed.  *See id.*  Plaintiff alleges that CW1 is aware that cloud software licensing revenue derived from this agreement with Verizon was included in the revenue results for the first quarter of 2016.  SAC ¶ 412.  This knowledge is based on weekly meetings attended by CW1, during which there were discussions regarding getting the $5 million Verizon deal signed and which Rosenberger attended.  *Id.*  Indeed, CW1 states that in the weekly revenue meetings, which Rosenberger attended, leading up to March 31, 2016, there were discussions regarding "getting the $5 million Verizon deal signed."  *Id.* ¶ 413. CW1 further states that at a closing meeting that occurred after the quarter ended, Rosenberger asked about the status of the Verizon deal and, the Company's Executive Vice President and General Manager responded that he was "working" on getting the contract signed.  *Id.*  Finally, with respect to the execution of the Verizon deal, CW1 states that "during the series of first quarter closing meetings attended by CW1, Rosenberger made a statement along the lines of 'if we book revenue, we have to have signed contracts,' acknowledging the applicability of the accounting standards requiring Synchronoss to acquire signed contracts before recognizing revenue."  *Id.* ¶ 414.

Plaintiff further points to the testimony of CW2, a long-time Synchronoss employee at the Vice President level, who Plaintiff alleges was tasked with justifying $7 million in revenue in connection with two AT&T transactions in late 2015 that did not occur.  SAC ¶¶ 174–75. According to CW2, the Company's Senior Vice President and General Manager Andrew Wilmott tasked CW2 with justifying $7 million in revenue from the AT&T transactions.  *Id.* ¶ 367.  Plaintiff asserts that CW6's experience corroborates that of CW2.  CW6 worked as a consultant at Synchronoss through McKinsey & Company in the 2016–2017 period and, later, became a Vice President for the digital business-to-business product management strategy from November 2017

to November 2018. *Id.* ¶ 376. Both in his role as a consultant and as a direct employee, CW6 was tasked with "straighten[ing] out the Company" and determining what additional products Synchronoss should develop. *Id.* ¶ 399. Plaintiff alleges that at some point during CW6's employment, CW6 began reviewing deal data in the Company's SalesForce system to help determine optimal pricing for its products and specifically investigated the Company's deals completed or forecasted for completion from 2014 to 2022. *Id.* ¶ 403. While CW6 was conducting this investigation, CW6's SalesForce access was revoked without explanation. *Id.* ¶ 404. After his access was revoked, CW6 received information from a customer support team employee who identified the deals for which the Company had in fact received revenue. *Id.* Once this information was collected, CW6 created a *pro forma* analysis that examined the deals that had been characterized as completed and estimated that as much as 50% of the deals that were reported as completed lacked substantiation. *Id.* ¶ 406. This investigation revealed a series of deals with AT&T totaling approximately $7 million for which there was no evidence AT&T agreed to the deals. *Id.* ¶ 406.[2] Based on CW6's relationship with AT&T personnel, CW6 was apparently able

---

[2]     Defendants argue that the information provided by CW6 regarding this analysis should be discounted because it does not demonstrate any accounting irregularities and, further, because the information does not implicate whether either Individual Defendant knew about the booking of any particular transaction. Defs.' Moving Br., at 24–25. First, with respect to the question of accounting irregularities, it is difficult for the Court to accept that CW6's information does not demonstrate any accounting irregularities occurred. CW6 conducted an analysis that revealed that a number of deals were recognized without proper substantiation. That information relates directly to the question of whether revenue was being improperly recognized and, further the information provided by CW6 lines up with that of CW2, who was tasked with justifying revenue that CW6 found was unsubstantiated. Moreover, there is no requirement that confidential witness information be directly linked to an individual defendant as the Court's assessment of confidential witness testimony "rest[s] not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Avaya*, 564 F.2d at 269. I find that the information from CW6's analysis is illustrative of the Company's fast and loose approach to revenue recognition and, therefore, I will not discount the information on this basis.

to cross-reference Synchronoss's records with those of AT&T and was unable to locate evidence that the deals had been agreed to by AT&T. *Id.* Further, personnel at AT&T apparently informed CW6 that it had no intention of completing the deals with Synchronoss. *Id.* Plaintiff avers that CW6's statements with respect to AT&T bolsters CW2's recollection of being tasked with retroactively justifying two deals with AT&T in 2016 that totaled $7 million, and that did not occur but were recognized as revenue in the fourth quarter of 2015. *Id.*[3]

Plaintiff asserts that CW7, who was the Company's Internal Controls Manager for approximately one year, until March 2017, has also provided reliable information with respect to the alleged improper recognition of revenue. SAC ¶¶ 379–80. CW7 provided Plaintiff with information regarding the company's revenue recognition practices, which CW7 was in the position to know about because he was responsible for reviewing, testing, and improving the Company's internal controls regarding, among other things, revenue recognition. *Id.* ¶ 380. According to CW7, the Company's accounting department prepared "accounting memos" to support revenue recognition, which would include financial analysis of the deal and supporting documentation. *Id.* ¶ 391. The accounting memos would be reviewed with the contract in question by either Rosenberger, the controller or the assistant controller. *Id.* According to CW7,

---

[3]     Plaintiff also alleges that CW6 participated in weekly, monthly, and quarterly sales calls, which were attended by about forty people. SAC ¶ 401. During the quarterly sales calls, Rosenberger would participate and tell sales representatives that they "are missing this much revenue" and "we need to figure out how we are going to get there." Id. On those calls, CW6 explained that sales representatives would describe some deals as being in revenue recognition status, even when the deal had not been completed. *Id.* ¶ 402. According to CW6, some members of the sales team described as "rev rec" proposed deals in which a client simply told a representative that the client was going to give the representative the client's business. Id. These allegations are too broad and general to support an inference of scienter. Besides identifying that revenue recognition was discussed on these sales calls, CW6 fails to provide sufficient details regarding any specific deal that was improperly recognized as revenue.

Rosenberger would sign these memos to document her review.  *Id.*  Moreover, while CW7 could not recall the specific threshold, s/he believed that Rosenberger was responsible for reviewing "the multi-million-dollar deals with the Company's two most significant clients that were ultimately affected by the Restatement," *i.e.*, the $25 million Verizon deal and the $7 million AT&T deal.  *Id.* CW7 further "stated that specifically with respect to Verizon and AT&T, . . .  the Company's procedures required a contract signed by the customers before revenue could be booked on any deal.  In fact, according to CW7, after a sales representative made a deal, the procedure called for Synchronoss's Revenue Recognition & Billing Manager . . . to contact the client to confirm the deal and obtain proof of deal approval—that is, specifically for Verizon and AT&T, a signed contract."  SAC ¶ 390.[4]

Finally, though the parties do not dedicate any significant portion of their briefing to the information provided by CW5 and CW8, both additionally provide information regarding the Company's revenue recognition practices.  CW5, a former director of sales at the Company, states that his/her offer letter "which was standard for new sales hires at that time, described [the Company's revenue recognition] rules, including the requirement that contracts had to be signed before revenue could be recorded and the associated commission awarded to the salesperson." SAC ¶ 393.  CW8, a sales representative, alleges that a signed contract was required for revenue to be recognized on the deal.  SAC ¶ 394.  Plaintiff avers that CW8 had this knowledge because he would only receive a bonus based "on those customer agreements for which Synchronoss had

---

[4]    Defendants argue that the information provided by CW7 is "internally inconsistent" and must therefore be disregarded.  Defs.' Moving Br., at 34–37.  Specifically, Defendants argue that If there was already a signed contract, it would make little sense for the Company to contact AT&T or Verizon to obtain further proof of deal approval.  *See* SAC ¶ 390.  The Court will not ignore CW7's information on this basis because it is plausible that the Company could have taken extra steps to ensure that a deal had been reached by contacting the client to confirm the contract had been signed.

received a signed contract." *Id.* CW8 further purports to have reviewed a quarterly spreadsheet created by the Company's Revenue Recognition and Billing Manager that showed that "revenue was recognized only for those deals for which there was proper documentation, and only recognized in the period in which the documentation was dated and executed." *Id.* While this information does not necessarily implicate Rosenberger, it is crucial to the factual picture painted by the Complaint, which suggests that there existed a Company-wide understanding that revenue should not be recognized before a signed contract was obtained.

Considering the above confidential witness information collectively, the Court finds that the SAC sets forth particularized allegations that the Company and, notably, Rosenberger, improperly recognized revenue on contracts before they were signed. These particularized allegations provide, at the very least, strong circumstantial evidence that Rosenberger "knew or, more importantly, should have known that [she] was misrepresenting material facts related to the Company," *see In re Campbell Soup*, 145 F. Supp. 2d at 599, and thus, acted recklessly. What is clear from the information provided by the confidential witnesses is that Rosenberger knew that revenue had been recognized on certain deals, notably the $25 million and $5 million Verizon contracts, before the contracts were signed. Moreover, the SAC demonstrates that Rosenberger was heavily involved in the revenue recognition process. *See, e.g.*, SAC ¶ 395 (setting forth information from CW3 that Rosenberger "'micromanaged' the accountants"). Moreover, the confidential witnesses all gave similar statements with regard to the Company's practice of requiring a signed contract for revenue to be booked, evidencing that such a practice was in place at the Company. That the confidential witnesses did not specifically allege that Rosenberger knew of that policy does not inhibit an inference of scienter—Rosenberger was the CFO of the Company and, previously the Controller, and actively participated in discussions regarding revenue

23

recognition, and was responsible for approving such decisions.  Looking to this evidence as a whole, Plaintiff has sufficiently shown that Rosenberger "knew or, more importantly, should have known that" that revenue was being recognized prematurely.  *See Novak*, 216 F.3d at 308. Accordingly, I find that scienter can be inferred from the confidential witness testimony pertaining to the improper recognition of revenue as to Rosenberger.

### b.  *GAAP Violations*

Allegations of GAAP violations "present nothing but a sub-group of the inaccurate public statement category of securities cases."  *Intelligroup*, 527 F. Supp. 2d at 286.  In that regard, allegations of scienter based on GAAP violations do not create the requisite inference of scienter unless the plaintiff alleges "more."  *See Christian v. BT Grp. PLC*, No. 17-497, 2018 WL 3647213, at *8 (D.N.J. Aug. 1, 2018) ("GAAP violations do not themselves create a strong inference of scienter.  Courts have found that GAAP violations can support an inference of scienter, but do not independently create such an inference."); *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 55657 (D.N.J. 2010); *see also Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 563 (6th Cir. 2005); *Ferris, Baker Watts, Inc. v. Ernst & Young, L.L.P.*, 395 F.3d 851, 855 (8th Cir. 2005); *In re Saxton, Inc. Sec. Litig.*, 156 F. App'x 917, 920 (9th Cir. 2005); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1192 (10th Cir. 2003); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 432 (5th Cir. 2002); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1208–09 (11th Cir. 2001); *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84–85 (2d Cir. 1999); *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994). The decisions in this Circuit are no exception. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 712–13 (3d Cir. 1996). "[T]he 'more' envisioned by the courts consists of the panoply of such facts which could sufficiently indicate that defendants had clear reasons to doubt the validity of the issuer's financials but, nonetheless, kept turning a

blind eye to all such factual 'red flags.'" *Intelligroup*, 527 F. Supp. 2d at 287.

### i. *ASC 985-605-25-16*

Plaintiff first argues Defendants violated two accounting standards set forth in ASC 985-605-25-16 and -17, by recognizing revenue prior to execution of the contracts in connection with the Verizon and AT&T transactions. These accounting standards provide that revenue from software agreements "shall not be recognized on any element of the arrangement unless persuasive evidence of an arrangement exists," and where a vendor "has a customary business practice of using written contracts, evidence of the arrangement is provided only by a contract signed by both parties." SAC ¶ 155–56. In my Opinion dismissing the Amended Complaint, I found that scienter could not be inferred from the alleged violation of these accounting standards, because Plaintiff failed to allege the existence of a customary business practice of requiring signed contracts before recognizing revenue from a deal and, further, because the Complaint was devoid of any allegations that reflected the Company's revenue recognition practices for AT&T or Verizon contracts. *In re Synchronoss*, 2019 WL 2849933, at *11–13.

To cure these deficiencies, Plaintiff alleges in the SAC that it has reviewed the Company's internal documents which establish that Synchronoss had a company business practice of using written contracts to sell or license software and, as a result, the Company was required to have a written contract in hand before recognizing revenue in connection with these transactions. Plaintiff first points to a document from 2015, referred to as the 2015 Revenue Policy, that "provides details on the Accounts Receivable and Revenue process in place at Synchronoss Technologies, Inc." SAC ¶ 384. The 2015 Revenue Policy, according to Plaintiff, required that "[a] Revenue Recognition memo [be] written for agreements that generate over 500K USD in revenue for the quarter" and requires that such memo "provide[] a summary of the *contract terms*" and be

reviewed and approved by the Controller and the CFO. *Id.* (emphasis in original). Moreover, Plaintiff contends that the 2015 Revenue Policy required contracts be signed by both parties prior to recognizing revenue as it explicitly requires that "[f]or *all invoices*, the AR Senior Accountant and AR Accountant reconcile the pricing information to the customer contract," showing that "all invoices" are pursuant to contracts. *Id.* ¶ 385 (emphasis in original). Finally, Plaintiff submits that the 2015 Revenue Policy shows that "top management," including Waldis and Rosenberger, were involved in the process of contract execution as "[a]n Officer of the Company or a designated individual executes . . . contracts" on behalf of the Company," and that the Finance and Legal departments held quarterly meetings "to review new contracts that have been executed" and "upcoming contacts that are soon to be completed." *Id.* ¶ 386.

Plaintiff next points to procedures adopted in 2016, which are set forth in a document referred to by Plaintiff as the "Transactional Revenue Process." *Id.* ¶ 387. The Transactional Revenue Process provides that "[r]evenues are based on a contractual price per transaction," which Plaintiff alleges makes clear that contracts are a prerequisite to revenue recognition. *Id.* Further, Plaintiff alleges that the document states that "[f]or all transactional revenue recorded greater than $500,000 for any given quarter, AR team prepares a technical memo to consider revenue recognition criteria in accordance with ASC 605-25, Revenue Recognition – Software." *Id.* According to Plaintiff, the Transaction Revenue Process states that after all approvals are received for a deal, the sales team "will provide the contract to the CEO or COO to sign and execute," and the final contract is thereafter stored in SalesForce. *Id.* ¶ 388.

The final document relied upon by Plaintiff is the Company's Accounts Receivable-Revenue Recognition Risk Control Matrix for 2016 (the "2016 RCM"), which is an Excel spreadsheet setting forth internal controls relating to the Company's accounting. *Id.* ¶ 389.

According to Plaintiff, the 2016 RCM required that "[c]ontracts cannot be executed prior to obtaining required approval." *Id.* Plaintiff alleges that the 2016 RCM requires that contracts "go through a formal review process prior to execution" and that the contract management software used by the Company "requires Legal and Finance approval before releasing the contract to be executed by the CEO or COO." *Id.*

While these documents appear to demonstrate the procedures followed in executing a contract, the portions provided by Plaintiff in the SAC provide little information as to *when* revenue of a deal could be recognized. The portions quoted by Plaintiff, which are the only excerpts in the SAC, do not state explicitly that a contract was required to be signed in order for revenue to be recognized. However, when considered in conjunction with the confidential witness testimony recited above, the Court is satisfied that Plaintiff has demonstrated the "more" required for a GAAP violation to support an inference of scienter. Despite Defendants' assertions to the contrary, the allegations of the SAC suggest that the Company did have a policy of using written contracts and, further, that it required signed contracts for revenue to be recognized. *See, e.g.* SAC ¶ 390 ("CW7 stated that, specifically with respect to Verizon and AT&T, the Company's two largest customers, the Company's procedures required a contract signed by the customers before revenue could be booked on any deal."). Thus, the provisions of ASC 985-605-25-16 and -17 applied to the Company. These added allegations support a finding of scienter based on the GAAP violation. *See, e.g.*, *In re Ravisent Techs., Ins. Sec. Litig.*, No. 00-1014, 2004 WL 1563024, at *9 (E.D. Pa. July 13, 2004) (finding GAAP violation supported inference of scienter where defendants recognized revenue in violation of both GAAP standard and clear company policy).

Defendants, nevertheless, argue that Plaintiff has failed to show that revenue recognition is so "simple" that violation of the standard gives rises to an inference of scienter and further points

to the Restatement as evidence that the Company did not always require a signed contract for revenue to be recognized.  First, in support of its argument that revenue recognition standards are not "simple," Defendants refer to Ernst and Young ("EY") Guidelines and FASB guidance that they allege demonstrate the complexity of determining when to recognize revenue.[5]  *See* Defs.' Moving Br., at 28.  The Court's review of that guidance demonstrates that recognizing revenue may sometimes be a complex process, however, both the GAAP standard and the EY Guidelines are clear that where a company has a practice of using signed contracts, a signed contract must be in hand before revenue is recognized.  *See* EY Guidelines, at 75, Frank Decl., Ex. J, ECF No. 84-12.  In other words, once a company adopts such a practice, the question of whether revenue can be recognized appears to become more straightforward—if there is a signed contract, the revenue may be recognized and where there is not, the revenue cannot be recognized.  Plaintiff, as set forth above, has sufficiently alleged that such a practice existed at Synchronoss.

Nor does the Restatement negate any inference of scienter.  Defendant asserts that the Restatement, which stated that "[i]n certain cases, the Company historically formed a view that persuasive evidence of an arrangement existed" contradicts Plaintiff's allegations that the Company employed a practice of requiring written, signed contracts for deal revenue to be recognized.  *See* 2017 10-K/A, at 3, Frank Decl., Ex. 5, ECF No. 84-5.  Plaintiff alleges that, despite what is stated in the Restatement about the Company's historic practices, Defendants knew

---

[5]      Defendants additionally point to this Court's prior Opinion as supporting its argument that recognizing revenue from software agreements is not simple.  *See In re Synchronoss*, 2019 WL 2849933, at *12.  Defendants misconstrue on the Court's reasoning.  Previously, Plaintiff failed to sufficiently allege that the Company required a signed contract before revenue could be recognized.  Absent such particularized allegations, the Court found that Plaintiff could not demonstrate a breach of the GAAP standard supported an inference of scienter.  Now, however, Plaintiff has made such a showing, making it possible to infer scienter based on Defendants' recognition of revenue without signed contracts.

at the time the deals in question were recognized that they should not have been recognized as revenue because the contracts were not signed.  The Restatement does not negate those allegations.

In sum, Plaintiff has adequately demonstrated on this motion (1) the Company had a practice of requiring written signed contracts before revenue was recognized, (2) that the Company recognized certain deals as completed before the contracts were signed, and (3) that Rosenberger was aware that such deals were recognized without a signed contract.  This is sufficient to allege violations of the GAAP standard in question and, further, sufficient grounds from which to infer scienter as to Rosenberger.

### ii.   _ASC 985-605-55-4_

Next, Plaintiff maintains that Defendants violated ASC 985-605-55-4, which addresses the recognition of revenue when a software vendor has multiple software contracts with a single customer that amount to a single arrangement.  _See_ ASC 985-605-55-4.  Specifically, the standard provides that:

> Software vendors may execute more than one contract or agreement with a single customer.  However, a group of contracts or agreements may be so closely related that they are, in effect, parts of a single arrangement and should be viewed as one multiple-element arrangement when determining the appropriate amount of revenue to be recognized in accordance with this Subtopic.

_Id._ Plaintiff asserts the Defendants violated this standard by improperly recognizing as revenue (1) a $9.2 million licensing fee paid as part of the sale of the Activation business to Sequential, and (2) a $10 million patent-dispute settlement payment by Openwave as standalone license revenue when it should have treated the $10 million as a reduction of the purchase price Synchronoss paid to acquire Openwave.  The Court previously determined that this alleged GAAP violation could not support an inference of scienter because Plaintiff did not show that the decision of whether several contracts are so closely related that they must be treated as a single agreement is a decision

that is "obvious to a business—rather than an accounting—mind." *In re Synchronoss*, 2019 WL 2849933, at *14 (quoting *Intelligroup*, 527 F. Supp. 2d at 352). Because this GAAP violation involved a complex rule, mere error in its application could not support an inference of scienter. *Id.*[6]

In the SAC, Plaintiff adds new allegations that it argues demonstrates that Rosenberger acted with scienter with respect to the Company's improper accounting for the Openwave acquisition and the divestiture of the Company's Activation business to Sequential. *See* SAC ¶¶ 420–422. Plaintiff reasons that in the Restatement, Synchronoss admitted that its internal controls deficiencies included the failure to "ensur[e] transactions are appropriately accounted for from a substance over form perspective." *Id.* ¶ 420. Moreover, Plaintiff claims that "[i]n light of Rosenberger's long experience at the Company, as well as her CPA expertise, she should have been aware that the failure [to treat the Sequential divestiture as a single deal] was inappropriate." *Id.* ¶¶ 422. Plaintiff alleges that when Rosenberger was asked about the Sequential transaction by analysts, neither she nor Waldis mentioned the $9.2 million-dollar fee. *Id.* And, while the $9.2 million was "hidden," Rosenberger sold 14,000 shares of Company stock for more than $550,000, exceeding the amount of shares that she sold in December of each of the prior four years. *Id.*[7]

---

[6]      Plaintiff again argues that the Company's alleged violation ASC 605-25-3 by recognizing funds from the Openwave settlement as revenue supports an inference of scienter. However, Plaintiff fails to address how an alleged violation of an accounting principle that requires the application of reasonable judgments could possibly give rise to a strong inference of scienter. *See In re Synchronoss*, 2019 WL 2849933, at *13 n.9. Indeed, as the Court noted in its prior Opinion, SEC guidance provides that application of this accounting standard is a "challenge" that "requires judgment" and that the SEC is "willing to consider reasonable judgments" in the application of the standard. Id. Plaintiff fails to address this question posed by the Court and, therefore, the Court again declines to find that any apparent violation of ASC 605-25-3 supports any inference of scienter.

[7]      Plaintiff once again argues that scienter is reinforced because Waldis and Rosenberger allegedly failed to disclose that, in connection with the Sequential deal, the Company provided a

Putting aside the timing of Rosenberger's stock sales, which the Court addresses *infra*, Plaintiff has not demonstrated that scienter can be inferred from the Company's misapplication of this complex accounting standard.   Plaintiff merely alleges that, based on Rosenberger's experience and training as a CPA, she must have known that the Company's revenue recognition of these two transactions was improper.   However, such statements that a defendant "must have known" that the Company's actions were improper are not sufficiently particularized to provide an inference of scienter.   *See Advanta*, 180 F.3d at 539 ("Likewise, allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'" (alteration in original) (quoting *Maldonado v. Dominguez*, 137 F.3d 1, 10 (1st Cir. 1998)).   Thus, even if Plaintiff is correct that Defendants violated this GAAP standard, it fails to plead the "more" required to support any inference of scienter from that violation.

### c.   *Magnitude of Restatement/Core Business*

In this Court's prior Opinion, I found that the magnitude of the Company's 2018 Restatement, which set forth that the Company's revenues were overstated by $180 million or 14.8%, and that the previously reported net income of $93.5 million was restated to a cumulative

---

$30 million guarantee to Goldman Sachs and entered into the $9.2 million licensing fee. See SAC ¶ 321.   First, to the extent Plaintiff relies on the alleged concealment of the licensing fee in connection with the Sequential deal, the Court has already rejected its position.   *See In re Synchronoss*, 2019 WL 2849933, at *12 n.7.   Plaintiff's argument that the failure to disclose that the Company provided a guarantee to Goldman Sachs in connection with this deal is similarly unavailing.   Plaintiff again cites to comScore, in which that court found that scienter was reinforced where a defendant "sp[eaks] extensively" about an issue and knows it is "a subject about which investors and analysts often inquire[]," in support of this argument.   *Fresno Cty. Emps. Ret. Ass'n v. comScore*, 268 F. Supp. 3d 526, 552–53 (S.D.N.Y. 2017).   As the Court noted in its prior Opinion, that case is distinguishable because there, it was "undisputed that [defendants] were aware of and made statements about comScore's revenue recognition practices."   *See id.*

loss of $40 million, provided "some inference of scienter," but not a strong inference.  *In re Synchronoss*, 2019 WL 2849933, at \*14.  I additionally found that scienter could not be inferred based on the size of the contracts at issue and their relative importance to Synchronoss's business because Plaintiff failed to demonstrate that Defendants acted with the requisite fraudulent intent with respect to the Verizon and AT&T contracts.  *Id.* at \*15.  In other words, Plaintiff's restatement magnitude and core business allegations failed to support a substantial inference of scienter because Plaintiff failed to allege that Defendants knew that their statements were false.

The Court finds that both these theories now support a stronger inference of scienter, as Plaintiff has sufficiently alleged that Rosenberger knew that the Company had improperly recognized certain revenue without obtaining signed contacts.  This allegation of knowledge is enough to meet the "more" required for a restatement of financial results "to support a strong inference of scienter."  *See In re Bio-Tech Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 588 (D.N.J. 2005) ("Although a restatement of financial results is probative of scienter, more is needed to support a strong inference of scienter.").  It is similarly sufficient for the Court to infer scienter from the size of the contracts involved.  "[U]nder the core operations doctrine, misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives gives rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge."  *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653–54 (E.D. Pa. 2015).  The confidential witness allegations with respect to revenue recognition demonstrate that Rosenberger knew that the Company had improperly recognized revenue on its two biggest accounts—Verizon and AT&T.  That knowledge is sufficient to support an inference of scienter under this theory.  *See City of Roseville Employees' Retirement Sys. v. Horizon Lines, Inc.*, 686 F. Supp 2d 404, 423 (D. Del. 2009) ("While it is true

that false or misleading statements by key executives regarding a company's lead product or core business practices will weigh in favor of finding a strong inference of scienter, [courts] will not make such an inference 'absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements.'").

### d. Resignations

Despite not adding any new allegations regarding the circumstances surrounding the resignations of Rosenberger and Waldis, Plaintiff again argues that the resignation of the Individual Defendants supports an inference of scienter.  Courts in the Third Circuit have found resignations of key officers to be insufficient to show that they acted with the requisite scienter to commit the alleged fraud.  *See In re The Great Atl. & Pac. Tea Co., Inc. Sec. Litig.*, 103 F. App'x 465, 470 (3d Cir. 2004) (finding that personnel changes did not support an inference of scienter where it was unclear whether the resignation was related to the alleged fraud); *In re Hertz Global Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *20–21 (D.N.J. Apr. 27, 2017); *In re Interpool, Inc. Sec. Litig.*, No. 04-321, 2005 WL 200037, at *17 (D.N.J. Aug. 17, 2005).

The Court previously found that this theory of scienter failed because Plaintiff failed to allege any specific connection between the resignation of the Individual Defendants and the alleged fraud.  Plaintiff again fails to connect the resignations of Rosenberger and Waldis to the alleged fraud.  Indeed, Plaintiff again merely states, without support, that the timing of their resignations was unusual.  This is insufficient, in and of itself, to raise any inference of scienter.

### e. Motive and Opportunity

In my prior Opinion, I held that the allegations in the Amended Complaint regarding insider stock trading by the Individual Defendants and the Company's incentive compensation program

did not support an inference of scienter.[8]  *See In re Synchronoss*, 2019 WL 2849933, at \*15–18.

The SAC adds limited new allegations with this respect. Specifically, Plaintiff newly alleges that

Waldis sold 569,800 shares for net proceeds of $18,086,40.09 before Defendants' alleged fraud

was revealed.  SAC ¶ 423.  Plaintiff alleges that this sale was unusual in timing and amount

because, notably, in 2016, Waldis reduced his holdings in the Company by 30% throughout the

year, making over 69% of the sales, or 204,799 shares, in the first quarter of 2016.  *Id.*  Plaintiff

asserts that Waldis's first quarter 2016 stock sales were exponentially larger than stock sales he

previously made in the first quarter for the years 2015, 2014, 2013, and 2012.  *Id.*  Plaintiff alleges

that the unusual nature of these sales is evidenced by the fact that

> Waldis made these sales: (i) just two weeks after the end of the
> fourth quarter of 2015, a period for which the Company wrongly
> booked $7 million in ghost revenue on two AT&T purchases that
> did not occur (revenue that CW2 spent most of 2016 trying to
> retroactively justify on the instructions of Company management);
> (ii) during the quarter in which Synchronoss recognized $10 million
> in revenue from the Openwave settlement agreement that the
> Company later conceded was improper, and (iii) as the Company
> resolved to improperly recognize $5 million in cloud software
> licensing revenue from Verizon despite not having a signed contract
> in hand, clearly contravening accounting standards [and] the
> Company's internal policies.

*Id.*

---

[8]    While the SAC again alleges that the Individual Defendants had a motive to act
fraudulently because of the Company's incentive compensation system, SAC ¶ 356, Plaintiff does
not address these allegations in its briefing, nor did Plaintiff add any new factual allegations in
support of theory that the incentive compensation system motivated the Individual Defendants'
fraudulent behavior.  As this Court stated in its prior Opinion, courts in the Third Circuit have
previously rejected such allegations as a basis for an inference of scienter.  *See In re Bio Tech*, 380
F. Supp. 2d at 581 (observing that allegations of incentive compensation systems provide nothing
more that "generalized motives that would be possessed by most corporate directors or officers
[and] do not establish scienter"); *see also In re Dig. Island Sec. Litig.*, 357 F.3d 322, 331 (3d Cir.
2004) ("[A]n allegation that defendants were motived by a desire to increase executive
compensation was insufficient because such a desire can be imputed to all corporate officers."
(alteration in original) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)).

Particularized allegations regarding motive and opportunity may, in combination with other allegations, support a strong inference of scienter, but "'motive and opportunity' may no longer serve as an independent route to scienter." *Avaya*, 564 F.3d at 277; *see also Tellabs*, 551 U.S. at 323–25. Thus, courts "will not infer fraudulent intent from the mere fact that some officers sold stock." *Burlington Coat Factory*, 114 F.3d at 1424. If the stock sales are, however, unusual in scope and timing, they may support an inference of scienter. *See id.* The question of whether a sale is unusual in scope depends on factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *In re Suprema*, 438 F.3d at 277 (citing *Wilson v. Bernstock*, 195 F. Supp. 2d 619, 635 (D.N.J. 2002)). Other factors relevant to scope and timing are whether the sales were "normal and routine," and whether the profits were substantial relative to the seller's ordinary compensation. *Id.* (citing *Burlington Coat Factory*, 114 F.3d at 1423).

These new allegations do not cure the deficiencies previously identified by the Court with respect to the trading activity of Rosenberger and Waldis. As the Court previously identified, Plaintiff does not dispute that all of Rosenberger and Waldis's trading activity was pursuant to SEC Rule 10b5-1 plans, which "are of minimal value in establishing an inference of scienter."[9] *See Lovallo v. Pacira Pharm., Inc.*, No. 14-06172, 2015 WL 7300492, at *13 (D.N.J. Nov. 18, 2015) (citing *Avaya*, 564 F.3d at 279); *In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 410 & n.56 (D.N.J. 2010) (evidence of trading under 10b5-1 trading plans "largely irrelevant" to

---

[9]    A Rule 10b5–1 plan is a written plan that allows corporate insiders to make prearranged stock transactions. *See* 17 C.F.R. § 240.10b5–1(c). The Court may consider such documents on a motion to dismiss because they are publicly filed SEC documents. *In re Hertz*, 2017 WL 1536223, at *22 n.10; *see also In re Nutrisystem, Inc., Derivative Litig.*, 666 F. Supp. 2d 501, 518 n.11 (E.D. Pa. 2009) ("The Court finds that it can take judicial notice of the public filings showing that the challenged sales by [defendants] were made pursuant to 10b5–1 plans.") (citing *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000)).

demonstration of scienter").[10]   Nevertheless, Plaintiff speculates that the Individual Defendants'

trading activity demonstrates that the SEC plans were adopted or amended during the Class Period.

The Court rejected this argument in its prior Opinion as it is Plaintiff's burden to allege when the

Plan was adopted or amended.  *See In re Synchronoss*, 2019 WL 2849933, at *17 (citing *In re

Nutrisystem*, 666 F. Supp. 2d at 518 n.11).  Plaintiff has offered the Court no reason to revisit this

determination, as the SAC contains no new allegations regarding Rosenberger's stock sales that

would necessitate reconsidering my finding that Plaintiff has failed to sufficiently plead that

Rosenberger's sale of stocks during the Class Period and shortly before her resignation support an

inference of scienter.  *See id.* at *15–18.

Moreover, the new allegations provided by Plaintiff regarding Waldis's trading activity are

not suggestive of scienter.  In sum, Plaintiff alleges that Waldis's stock sales during the first quarter

of 2016 "were exponentially larger than the stock sales he made during the first quarter of any of

the previous five years."  SAC ¶ 423.  Defendants argue that Plaintiff's focus on the first quarter

of 2016 is unavailing because Waldis's annual trading for the four years prior to the Class Period

was generally higher than the Class Period, with his largest proceeds occurring in 2013 when his

stock sales yielded proceeds of more than $15 million.  Indeed, Waldis's annual trading history is

consistent, with his highest annual trading occurring in 2010 (400,000 shares sold for $10,160,000

aggregate  proceeds)  and  2013  (489,760  shares  sold  for  aggregate  $15,105,577  aggregate

---

[10]      Relying on case law from outside this circuit, Plaintiff argues that a 10b5-1 plan is an
affirmative defense and, thus, Defendants' argument that the stock sales were made pursuant to
such a plan cannot be properly considered on a motion to dismiss.  Courts in this Circuit, however,
have regularly considered whether stock sales were made pursuant to Rule 10b5-1 plans on a
motion to dismiss when considering whether insider sales support an inference of scienter.  *See In
re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 512–13 (E.D. Pa. 2018) (finding that fact that
defendants' stock trades were made pursuant to Rule 10b5-1 plans "weighs heavily against an
inference of scienter" on motion to dismiss); *Nutrisystem*, 653 F. Supp. 2d at 517–18.

proceeds), before any allegedly fraudulent activity occurred.  *See* ECF No. 84-10, at 2.  And, as the Court previously determined, the fact that Waldis retained 510,929 shares at the end of the Class Period, at which time the Company's shares had declined from a Class Period high of $53,67 to $12.13, tends to negate any suggestion of scienter.  *See Advanta*, 180 F.3d at 541 ("Far from supporting a 'strong inference' that defendants had a motive to capitalize on artificially inflated stock prices, these facts [i.e., defendants' retained holdings] suggest they had every incentive to keep Advanta profitable."); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("Low aggregate sales and large retained aggregate holdings rebut an inference of motive, even where some defendant have sold significant percentages.").

For these reasons, Plaintiff's allegations with respect to the stock sales of Rosenberger and Waldis fail to support a strong inference of scienter.

### f.  *Opposing Inferences*

Taken together, the Court finds that Plaintiff's allegations with respect to Rosenberger are "as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Plaintiff has sufficiently pled that, at a minimum, Rosenberger was aware that certain contracts, most notably the $25 million and $5 million Verizon contracts, were recognized prior to receipt of a signed contract on each deal.  Plaintiff has further sufficiently alleged that recognition of those deals was in violation of Company policy, which required a signed contract for deal revenue to be recognized and in violation of GAAP standards.  This, taken together with the large magnitude of the Restatement and the size of the contracts at issue, is sufficient to support a substantial inference of scienter as to Rosenberger.

Plaintiff has not, however, made such a showing with respect to Waldis.  Unlike Rosenberger, Plaintiff fails to allege that Waldis was involved in the improper recognition of

revenue, which are the only allegations presented by Plaintiff that support a substantial inference of scienter.  Accordingly, the claims against Waldis will be dismissed.[11]

### 2.  Forward Looking Claims

In addition to arguing that Plaintiff's Restatement-related claims must be dismissed based on Plaintiff's failure to adequately plead scienter, Defendants further argue that Plaintiff's claims related to false or misleading forward-looking statements made by Defendants, *i.e.*, Defendants' "guidance statements projecting revenue" for the third quarter of 2016 and the full year of 2017, are protected by the PSLRA safe harbor for forward-looking statements.[12]  Specifically, Plaintiff alleges that Defendants made knowingly false statements on three 2016 earnings calls.  *See* SAC ¶¶ 322–27.  First, Plaintiff alleges that on an August 3, 2016 earnings call, Rosenberger stated that the Company expected "[n]on-GAAP revenues . . . to be in the range of $175 million to $180 million."  *Id.* ¶ 322.  Plaintiff asserts that this statement was false or misleading "because it included $25 million in revenue related to a contract with Verizon that, according to CW3, was not executed prior to the close of the third quarter of 2016."  *Id.* ¶ 324.  Plaintiff further points to a December 6, 2016 call to discuss the Company's acquisition of IntraLinks Holdings, Inc., in which Rosenberger stated that "we are giving initial 2017 total revenue guidance of between $810 million to $820 million."  *Id.* ¶ 327.  Finally, Plaintiff identifies a February 8, 2017 earnings call

---

[11]     Discovery may reveal information that indicates Waldis knew that revenue was being improperly recognized before signed contracts were received.  If such information is discovered, Plaintiff may move to amend the complaint.

[12]     From the outset, the Court finds that Plaintiff has not demonstrated that Waldis had actual knowledge that any of the guidance statements was false.  While the SAC contains sufficient statements that Rosenberger was involved in the revenue recognition process and allegedly knew that the Verizon deal was improperly booked, there are no such allegations connecting Waldis to that transaction.  Accordingly, all forward-looking statement claims against Waldis will be dismissed.

in which Rosenberger repeated the 2017 guidance, stating that "[f]or 2017, non-GAAP revenues are expected to be in the range of $810 million to $820 million, unchanged from our initial guidance given on December 6 for the combined company." *Id.* ¶ 328. Plaintiff asserts that statements made regarding the 2017 revenue guidance were false or misleading because "the guidance for 2017 was undergirded by years of reported historical revenue figures that Defendants knew were false," including the $25 million contract with Verizon. *Id.* ¶ 329.[13]

The PSLRA Safe Harbor provision, 15 U.S.C. § 78u-5(c), "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254. In other words, under the PSLRA, "forward-looking" statements are not actionable if they are "(1) identified as such, and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278–79 (3d Cir. 2010). The PSLRA's definition of "forward-looking statement" includes, *inter alia*, "projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic or operational

---

[13]     In its briefing on this issue, Plaintiff refers to a false statement allegedly made by Waldis on a November 7, 2016 earnings call in which he stated that the $25 million Verizon contract had been signed during the third quarter of 2016. *See* Pls.' Opp., at 59; SAC ¶ 308. Plaintiff argues that this statement was a statement of present fact and does not fall under the safe harbor. The Court agrees that this statement is not forward-looking and, thus, is not protected by the safe harbor. In any event, the Court also notes that Plaintiff cannot rely on this statement as "plainly false" because Plaintiff has failed to allege that Waldis had knowledge that the $25 million Verizon contract was, in fact, unsigned when it was recognized as revenue. The SAC only alleges that Rosenberger knew that the $25 million Verizon deal was improperly recognized as revenue before it was signed. Accordingly, even if Plaintiff sought to rely on Waldis's statement in support of its historical claims, it cannot, as it has failed to sufficiently plead Waldis's knowledge that the statement was false.

performance." *Id.* at 279 (citing 15 U.S.C. § 78u–5(i)(1)).  The parties do not appear to dispute

that the three statements made by Rosenberger with respect to the projected revenue for the third

quarter of 2016 and the revenue guidance for 2017 are forward-looking statements.  And, indeed,

Plaintiff cannot dispute these statements are forward-looking as they related to "projections of

future performance."  *Aetna*, 617 F.3d at 279.

This Court first addresses whether Defendants' forward-looking statements where

appropriately accompanied by cautionary language.  The Third Circuit has explained that "[a]

vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has

risks will ordinarily be inadequate to prevent misinformation."  *Avaya*, 564 F.3d at 256.  Rather,

"[t]o suffice, the cautionary statements must be substantive and tailored to the specific future

projections, estimates or opinions in the prospectus which the plaintiffs challenge."  *Id.* (internal

citation omitted).  Here, each of the forward-looking statements challenged by Plaintiff was made

on a call with analysts and investors.  *See* SAC ¶¶ 322–29.  Each call was preceded with a statement

from the Executive Vice President of Finance & Corporate Development advising that forward-

looking statements would be made during the call and that the statements "are subject to a variety

of risks and uncertainties that could cause actual results to differ materially from expectations."

*See* Frank Decl., Exs. D, E, F.  In each call, the Company further identified its most recent Form

10-K and Form 10-Q as further setting forth "a discussion of material risks and other important

factors that could affect [its] actual results."  *Id.*

Plaintiff argues that the cautionary language set forth in the SEC forms is insufficient

because it does not "disclos[e] the risks surrounding improper revenue recognition practices and

the more fundamental issue of weak controls."  Pls.' Opp., at 58.  The Court agrees.  Defendants

do not highlight any specific guidance in the SEC forms that applies to the forward-looking

statements at issue.   Instead, Defendants appear to argue that it is sufficient that the Company

identified its guidance statements as forward looking and incorporated the list of risk and

uncertainties that could cause its future results to differ from the predictions set forth in its most

recent SEC filings.   *See* Defs.' Moving Br., at 56.   A review of those risks demonstrates that

perhaps the only cautionary language regarding accounting issues is the following boilerplate

statement:

> We prepare our consolidated financial statements in conformity with
> U.S. Generally Accepted Accounting Principles.   These principles
> are subject to interpretation by the SEC and various bodies formed
> to interpret and create appropriate accounting principles.   A change
> in these principles, or their interpretation, could have a significant
> effect on our reported results and may even retroactively affect
> previously reported results.   Our accounting principles that recently
> may have been or may be affected by changes in accounting
> principles are: (i) accounting for stock-based compensation; (ii)
> accounting for income taxes; (iii) accounting for business
> combinations and goodwill; (iv) revenue recognition guidance; and
> (v) accounting for foreign currency translation.

*See* 2015 Form 10-K, at 26, Frank Decl., Ex. A, ECF No. 84-3.   In *In re Hertz*, the court found

similar language did not constitute a meaningful cautionary statement where the complaint

contains "[a]llegations of accounting manipulations."   2017 WL 1536223, at *14.   The same holds

true here.   This language, stating that revenue may be retroactively affected based on changes in

accounting principles fails to provide meaningful warning of alleged improper accounting that was

ongoing at the Company or that there was risk that the Company's accounting procedures could

affect its revenue results and/or projections.[14]   Accordingly, the Court finds that Defendants failed

to provide meaningful cautionary statements.

---

[14]     The cases relied on by Defendants do not alter the Court's analysis.   For example, Defendants argue that in *Hooey v, Insmed Inc.*, No. 16-4323, 2018 WL 902266, at *20 (D.N.J. Feb. 15, 20180, the court found that the defendant's extensive list of risk factors in its Form 10-K report was sufficiently meaningful to warrant protection under the safe harbor.   However, what

The next step in determining whether the safe harbor applies is assessing whether the forward-looking statements were made with actual knowledge that the statement was false or misleading. *Aetna*, 617 F.3d at 285. To meet this exacting pleading standard, "the PSLRA directs plaintiffs to specify the reason or reasons why the statement is misleading." *Williams v. Globus Med., Inc.*, 869 F.3d 235, 244 (3d Cir. 2017) (quoting *Chubb*, 394 F.3d at 145). Thus, the Third Circuit has instructed that "it is not enough merely to identify a forward-looking statement and assert as a general matter that the statement was made without a reasonable basis." *Id.* (quoting *Burlington Coat Factory*, 114 F.3d at 1429). Rather, a plaintiff must plead factual allegations "that show the projects were 'made with either (1) inadequate consideration of the available data or (2) the use of unsound forecasting methodology." *Id.*

Plaintiff has not made the requisite showing of actual knowledge. First, with respect to the August 2016 earnings call in which Rosenberger provided revenue guidance for the third quarter of 2016, Plaintiff does not suggest that Rosenberger knew that the $25 million Verizon deal would not be signed in projecting that it would be counted as revenue in the third quarter of 2016. The revenue guidance provided on the August 2016 earnings call was just that however—a projection of the revenues expected by the Company for that quarter. While the SAC alleges that the $25 million Verizon deal was eventually improperly booked as revenue, it fails to allege that the Company improperly included that deal in its *forward-looking* guidance. The historic claim based

---

Defendants do not highlight is that in *Hooey*, a number of warnings were specifically tailored to the concerns that impacted the regulatory approval process for a drug trial. *See id.* Indeed, the cautionary statements provided by the *Hooey* defendant specifically addressed potential issues that could have prevented the drug in question from receiving regulatory approval. *See id.* Similarly, in *Aetna*, the Third Circuit determined that while there was no specific warning with respect to Aetna's underpricing of premiums, which was the misleading practice at issue, the company's warning of the risks related to medical cost projections was sufficiently tailored. *See* 617 F.3d at 282. The language in *Aetna* was not boilerplate and "provided meaningful, extensive, and specific cation directly related to the statements concerning 'disciplined' pricing." *Id.*

on the improper booking of that revenue is distinct from the question of whether Rosenberger reasonably expected that the contract would be signed during the third quarter of 2016. Because the SAC does not consider this distinction or otherwise allege that Rosenberger did not, in fact, expect the contract to be signed that quarter, the Court finds that this statement is protected by the safe harbor.

Plaintiff has similarly failed to allege actual knowledge with respect to the 2017 revenue guidance that was put forth on the December and February calls. Plaintiff asserts that the 2017 guidance was false because it "was undergirded by years of reported historical revenue figures that Defendants knew were false." SAC ¶ 329. Specifically, Plaintiff alleges that "[t]his false revenue included the $25 million contract with Verizon that was improperly booked as revenue in the third quarter of 2016; and the $9.2 million Sequential licensing fee that was booked revenue in the fourth quarter of 2016." *Id.* Here, again, the question of whether revenue was *historically* recognized without proper documentation fails to demonstrate that the forward-looking statements are false. Indeed, Plaintiff does not explain what revenue the 2017 revenue guidance was based upon, let alone that it was based on revenue that the Company did not, in fact, expect would come to fruition. Absent these particularized allegations, the safe harbor covers the 2017 revenue projections made on the December and February calls.

Accordingly, Plaintiff's forward-looking claims will be dismissed.

### B. Claims under Section 20(a) of the Exchange Act

Plaintiff additionally alleges that the Individual Defendants are liable under Section 20(a) of the Exchange Act, which provides, in pertinent part:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such

controlled person is liable.

15 U.S.C. § 78t(a); *see also Suprema*, 438 F.3d at 285.  Liability under Section 20(a), however, "is derivative of an underlying violation of Section 10(b) by the controlled person."  *Avaya*, 564 F.3d at 252 (citing *In re Alpharma Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004)).  As the Court has found that Plaintiff has sufficiently pled a Section 10(b) claim against Rosenberger, the Section 20(a) claim against Rosenberger will proceed.  The Section 20(a) claim against Waldis will be dismissed.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is denied in part and granted in part.  Plaintiff's Section 10(b) and Rule 10b-5 and Section 20(a) claims are limited to claims against Rosenberger based upon the alleged improper recognition of revenue absent signed contracts.  Plaintiff's claims based upon the alleged manipulation of expenses and alleged improper accounting for acquisitions and divestures are dismissed.  Plaintiff's claims based on Defendants' forward-looking statements are also dismissed.  Furthermore, because Plaintiff has not adequately alleged facts suggested a strong inference of scienter as to Waldis, the claims against him are dismissed without prejudice.  To the extent Plaintiff seeks to cure any of the deficiencies in its pleadings highlighted in this Court's Opinion, it must file a motion to amend.

Dated: May 29, 2020                             /s/ Freda L. Wolfson
                                                Freda L. Wolfson
                                                U.S. Chief District Judge